# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BARBARA SCHWAB, *et al.*, Individually; and on behalf of a class of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. CV-0401945 (JBW) (SMG) |
| vs. | ) ) | |
| PHILIP MORRIS USA, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii, iv, v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   Standards Governing a Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . 4

II.  The Standard for Determining When the Civil RICO Statute of Limitations
     Begins to Run – Accrual of a RICO Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   Plaintiffs' Attorneys' Knowledge Cannot Be Imputed to Plaintiffs . . . . . . . . . . . 7

     B.   The Statute of Limitations Has Not Begun to Run in this Case
          Because Inquiry Notice Has Yet to Accrue . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.   Defendants Cannot Demonstrate that Inquiry Notice Arose Prior to
          the Statutory Period Since Plaintiffs Could Not Have Known of
          Their Injury Until Only Recently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III. Defendants Confuse Accrual with the Tolling of the Statute of Limitations in
     RICO Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.  Plaintiffs Have Adequately Alleged Tolling of Their RICO Claim Under the
     Doctrine of Fraudulent Concealment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.   Defendants Have Extensively Concealed Their Fraud . . . . . . . . . . . . . . . . . . . 17

     B.   Due to Defendants' Concealment, Plaintiffs Could Not Have
          Discovered that They Had Been Defrauded Prior to the Statutory
          Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     C.   Plaintiffs' Due Diligence is Demonstrated by the Extensive
          Research Performed to Produce the Complaint in this Case . . . . . . . . . . . . . . . 33

V.   Should the Court Rule that the Separate Accrual Rule Applies in this Case,
     Plaintiffs Still Would Be Entitled to Recover for Injuries Sustained Within the
     Statutory Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Armstrong v. McAlpin,*
    699 F.2d 79 (2d Cir. 1983) ................................................................ 6

*Bailey v. Glover,*
    88 U.S. 342 (1874) ................................................................ 18, 19

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988) .............................................. 5, 35, 36

*Bingham v. Zolt,*
    66 F.3d 553 (2d Cir. 1995) ................................................................ 36

*Catizone v. Wolff,*
    71 F. Supp. 2d 365 (S.D.N.Y. 1999) ................................................ 9

*Chira v. Lockheed Aircraft Corp.,*
    634 F.2d 664 (2d Cir. 1980) ............................................................ 10

*Coveal v. Consumer Home Mortgage, Inc.,*
    No. 04-CV-4755 (ILG), 2005 WL 704835 (E.D.N.Y. Mar. 29, 2005)........................................34

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) ................................................ 10, 11

*Dietrich v. Bauer,*
    76 F. Supp. 2d 312 (S.D.N.Y. 1999) ........................................ 10, 19

*Dodds v. Cigna Secs., Inc.,*
    12 F.3d 346 (2d Cir. 1993) ........................................................ 5, 6

*Eastway Constr. Corp. v. City of New York,*
    762 F.2d 243 (2d Cir. 1985)................................................................5

*First Hawaiian Bank v. Russell & Wolkening, Inc.,*
    861 F. Supp. 233 (S.D.N.Y. 1994) ................................................ 9

*Floyd v. Brown & Williamson Corp.,*
    159 F. Supp. 2d 823 (E.D. Pa. 2001) ................................................ 11

*Gallo v. Prudential Residential Servs., L.P.,*
    22 F.3d 1219 (2d Cir. 1994) ................................................................ 5

*In re Global Crossing, Ltd. Secs. Litig.,*
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................ 34

*Heins v. Potter,*
    271 F. Supp. 2d 545 (S.D.N.Y. 2003) ................................................ 17

*In re Integrated Res., Inc. Real Estate Ltd. P'ships Secs. Litig.,*
    851 F. Supp. 556 (S.D.N.Y. 1994) ................................................ 5, 8

*In re Issuer Pl. Initial Public Offering Antitrust Litig.,*
    No. 00 Civ. 7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) .......................... 7

*Jensen v. Snellings,*
    636 F. Supp. 1305 (E.D. La. 1986) ................................................ 10

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997) ............................................................ 36

*Kinley Corp. v. Integrated Res. Equity Corp.,*
    851 F. Supp. 566 (S.D.N.Y. 1994) .............................................. 34

*Lentell v. Merrill Lynch & Co. Inc.,*
    396 F.3d 161 (2d Cir. 2005), *petition for cert. filed,* 74 U.S.L.W. 3026
    (June 29, 2005) ................................................................ 5, 8

*Link v. Wabash R.R. Co.,*
    370 U.S. 626 (1962) ............................................................ 10

*Little v. Brown & Williamson Tobacco Corp.,*
    243 F. Supp. 2d 480 (D.S.C. 2001) .............................................. 11

*In re Mercedes-Benz Anti-Trust Litigation,*
    157 F. Supp. 2d 355 (D.N.J. 2001) .............................................. 7

*In re Merrill Lynch Ltd. P'ships Litig.,*
    154 F.3d 56 (2d Cir. 1998) ...................................................... 5

*Newman v. Warnaco Group, Inc.,*
    335 F.3d 187 (2d Cir. 2003) .................................................... 6, 7

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
    840 F. Supp. 243 (S.D.N.Y. 1993) ................................................................. 6

*Osborn v. Bank of United States*,
    22 U.S. 738 (1824) ................................................................................. 9

*Pearl v. City of Long Beach*,
    296 F.3d 76 (2d Cir. 2002) ........................................................................ 17

*Robertson v. Seidman & Seidman*,
    609 F.2d 583 (2d Cir. 1979) ................................................................. 5, 8,
                                                                                            18

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ...................................................................... 6, 8

*In re Simon II Litig.*,
    211 F.R.D. 86 (E.D.N.Y. 2002), *vacated and remanded on other grounds*,
    407 F.3d 125 (2d Cir. 2005) ..................................................................... 34

*State of New York v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988) ............................................................. 18, 19,
                                                                                            28

*Sterlin v. Biomune Sys.*,
    154 F.3d 1191 (10th Cir. 1998) .................................................................. 8

*Universal City Studios, Inc. v. Reimerdes*,
    104 F. Supp. 2d 334 (S.D.N.Y. 2000) ........................................................ 10

*Vasile v. Dean Witter Reynolds Inc.*,
    20 F. Supp. 2d 465 (E.D.N.Y. 1998) ........................................................... 5

*Veal v. Geraci*,
    23 F.3d 722 (2d Cir. 1994) ..................................................................... 10

*Williams v. Balcor Pension Investors*,
    150 F.R.D. 109 (N.D. Ill. 1993) ......................................................... 10, 12,
                                                                                            14

## STATE CASES

*Engle v. R.J. Reynolds Tobacco*,
    No. 94-08273CA-22, 2000 WL 33534572 (Fla. Cir. Ct. Nov. 6, 2000), *rev'd
    on other grounds sub nom.*, *Liggett Group Inc. v. Engle*, 853 So. 2d 434 (Fla.
    Dist. Ct. App. 2003) ............................................................................. 11

*Henley v. Philip Morris Inc.*,
   5 Cal. Rptr. 3d 42 (Ct. App. 2003)..................................................................11

*Price v. Philip Morris, Inc.*,
   No. 00-L-112, 2003 WL 22597608 (Ill. Cir. Mar. 21, 2003) .................................... 3, 15,
                                                                                          16, 32

## FEDERAL STATUTES

Fed. R. Civ.  P. 56(c) ..................................................................................................... 4

## MISCELLANEOUS

Restatement (Second) of Agency § 15 (1958) ............................................................ 9

**INTRODUCTION**

Defendants' motion for summary judgment on statute of limitations grounds is based on the

surprising contention that Plaintiffs knew or should have known long ago, that "light" cigarettes

are no less harmful to one's health than regular cigarettes and that smokers tend to defeat the tar-

lowering mechanisms of "light" cigarettes through "compensation." Defendants take this

position despite the facts that: (1) Defendants themselves continue to insist that "light" cigarettes

are less harmful or, at least, that there is substantial disagreement within the scientific community

on that issue; (2) their own scientists profess that, to this day, they believe that "light" cigarettes

are less harmful, and (3) more than one of their former CEOs have testified that they were

unaware of compensation until very recently.  It is patently ridiculous for Defendants to suggest

that Plaintiffs had, or should have had, knowledge of facts that defendants themselves will not

acknowledge even now.  Thus, Defendants cannot establish that Plaintiffs' claims have accrued.

In addition, at least one court has already recognized that even the public health community did

not reach a consensus that "light cigarettes" were no less harmful until the publication of

Monograph 13.  As the Court held in *Price v. Philip Morris, Inc.*, No. 00-L-112, 2003 WL

22597608 (Ill. Cir. Mar. 21, 2003):

> Monograph 13 represents the first public health community consensus that cigarettes with lower
> machine-measured yields of tar and nicotine . . . do not lower the risk of disease as compared to
> higher yield cigarettes . . . . [Therefore, the] Class in this Case could not have known of the fraud
> associated with . . . Lights . . . prior to the publication of Monograph 13 in October 2001.

*Id.* at *13-14.

Moreover, Defendants cannot successfully argue that any knowledge Plaintiffs' counsel may

have learned while representing other parties should be imputed to Plaintiffs.  The cases

Defendants cite demonstrate that to impute any such knowledge, an attorney-client relationship,

2

whether explicit or implied, must have existed at the time the knowledge was acquired. Indeed, to suggest otherwise would turn the principles of agency on their head. Defendants cannot establish that an attorney-client relationship existed between Plaintiffs and their counsel before the limitations period began to run, and they have made no effort to do so.

Furthermore, as illustrated below, there is abundant evidence that Defendants have fraudulently concealed the facts underlying Plaintiffs' claims. That concealment tolls the statute of limitations in this case.

Finally, the issues presented in Defendants' motion are inappropriate for summary judgment. At the very least, genuine issues of material fact exist with regard to Defendants' assertions. Accordingly, Defendants' motion for partial summary judgment on statute of limitations grounds should be denied.[1]

## ARGUMENT

### I.   Standards Governing a Motion for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that there are no genuine issues of material fact. *See, e.g., Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 476 (E.D.N.Y.

---

[1]    If this Court should determine that Plaintiffs' claims have accrued and there is no tolling, then, as explained below, the separate accrual rule applies in this case. Contrary to Defendants' claim, Plaintiffs would be entitled to recover for injuries sustained within the statutory period.

1998) (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)).  In

addition, on a motion for summary judgment courts must resolve any ambiguities and draw all

inferences in favor of the non-moving party.  *Id.* (citing *Eastway Constr. Corp. v. City of New

York*, 762 F.2d 243, 249 (2d Cir. 1985)); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591-

93 (2d Cir. 1979).

## II.    The Standard for Determining When the Civil RICO Statute of Limitations Begins to Run – Accrual of a RICO Cause of Action

The Second Circuit has adopted the "injury discovery" rule in RICO cases to determine

when the four year limitations period begins to run.  *In re Merrill Lynch Ltd. P'ships Litig.*, 154

F.3d 56, 60 (2d Cir. 1998) (per curiam) (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096,

1103 (2d Cir. 1988)).  The discovery rule prevents the running of the statute of limitations until a

plaintiff discovers the nature of his specific injury, or a plaintiff should have discovered the

nature of his injury through reasonable care and diligence after inquiry notice has arisen.  *Id.*

(citing *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)).  Thus, if inquiry notice arose

prior to the date a plaintiff claims to have had actual knowledge of the claim and prior to the

statutory period, constructive knowledge may be imputed to a plaintiff at an earlier date than he

claims.

In general, inquiry notice in RICO cases may arise when a plaintiff has "constructive

notice of facts sufficient to create a duty to investigate further into the matter." *In re Integrated

Res., Inc. Real Estate Ltd. P'ships Secs. Litig.*, 851 F. Supp. 556, 568 (S.D.N.Y. 1994) (quoting

*Dodds*, 12 F.3d at 352); *see also Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 168 (2d Cir.

2005), *petition for cert. filed*, 74 U.S.L.W. 3026 (June 29, 2005) (No. 05-24) (explaining that

inquiry notice arises "when the circumstances would suggest to [a plaintiff] of ordinary

4

intelligence the probability that *she has been defrauded*") (citations omitted) (emphasis added)).

Significantly, Defendants, as a matter of law, bear a *heavy burden* in establishing that Plaintiffs

were on inquiry notice. *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 194-95 (2d Cir. 2003).

In the Second Circuit, inquiry notice "exists only when *uncontroverted evidence irrefutably*

*demonstrates when plaintiff discovered or should have discovered the fraudulent conduct*."

*Newman*, 335 F.3d at 195 (emphasis added) (quoting *Nivram Corp. v. Harcourt Brace*

*Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).  If Defendants cannot "irrefutably

demonstrate" with "uncontroverted evidence" that Plaintiffs had inquiry notice of the fraudulent

conduct prior to the limitations period, then the date of actual discovery by Plaintiffs will

establish the date the statute of limitations began to run in this case. *Id.* at 195 (holding that

because plaintiffs as a matter of law did not have inquiry notice of the alleged fraud prior to the

limitations period, the court need not address defendants' argument that plaintiffs did not act

with reasonable diligence).

The test to determine whether a plaintiff has a duty to inquire is an objective one. *Dodds*,

12 F.3d at 350.  Inquiry notice will arise "when the circumstances would suggest to a [plaintiff]

of ordinary intelligence the probability that she has been *defrauded . . .*" *Id.* (emphasis added),

*quoted in Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000); *see also Armstrong v. McAlpin*,

699 F.2d 79, 88 (2d Cir. 1983) (same).  Because the Second Circuit applies this objective

standard to establish inquiry notice, circumstances must put plaintiffs on notice of *probable*

wrongdoing.  "[T]he information . . . [adequate to] trigger notice" of fraud must be a *probability*,

*not just a possibility* and "must be such that it relates directly to the misrepresentations and

omissions the Plaintiffs allege in their action against the defendants." *Newman*, 335 F.3d at 193

5

(internal quotations and citations omitted) (emphasis added). In the context of a class action suit, the District Court for the Southern District of New York endorsed the District Court of New Jersey's framing of the inquiry notice question in this manner: "the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants." *In re Issuer Plaintiff Initial Public Offering Antitrust Litig.*, No. 00 Civ. 7804 (LMM), 2004 WL 487222, at *5 (S.D.N.Y. Mar. 12, 2004) (citing *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 373 (D.N.J. 2001)). Thus, for inquiry notice to arise, Defendants must show that there is uncontroverted evidence that Plaintiffs knew or could have discovered that it was probable that Defendants had conspired to defraud them.[2]

In their brief, Defendants claim that inquiry notice arose "well before May 11, 2000," although they fail to specify on which date they assert the claims accrued. Defs.' Br. in Supp. of Their Mot. for Summ. J. on Statute of Limitations Grounds ("Defs.' SOL Brief") at 1. They claim that inquiry notice could have arisen: (1) in 1998 because "plaintiffs' own counsel filed class action complaints in state courts" [*id.* at 1]; (2) in 1995 when "state attorneys general made allegations in their well-publicized smoking-and-health cases" [*id.* at 2]; (3) in September 1999 when "the U.S. Government filed *civil RICO* claims against all of the defendants" [*id.* (emphasis in original)]; (4) in December 1998 when documents relied on by Plaintiffs were made "available to the public" [*id.* at 3]; or (5) "for *more than thirty years*" because "the national media has . . . long reported that smokers may be" compensating "for the reduced 'tar' and nicotine delivered by a light cigarette" [*id.* at 9 (emphasis in original)].

---

[2]   In this case, the original Complaint was filed on May 11, 2004. That means inquiry notice in this case must have arisen prior to May 11, 2000, in order for claims to be barred due to the statute of limitations.

Even if Defendants could establish that any of these dates constitute inquiry notice to Plaintiffs, inquiry notice by itself is not notice sufficient to trigger the running of the statute of limitations. In *Rothman v. Gregor*, the Second Circuit was very careful to distinguish between the inquiry notice date and the date on which the statute of limitations commences. 220 F.3d at 97. The court explained that inquiry notice merely "triggers a [plaintiff's] duty to exercise reasonable diligence" to discover the fraud, while the statute of limitations period "does not begin to run until 'the [plaintiff], in the exercise of reasonable diligence, should have discovered the facts underlying the fraud.'" *Id.* (quoting *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998)).

Importantly, determinations regarding due diligence and constructive knowledge "depend on inferences drawn from the facts of each particular case." *Robertson v. Seidman & Seidman*, 609 F.2d at 591 (2d Cir. 1979) (citations omitted). In fact, Second Circuit courts have found that such determinations should be decided on motion for summary judgment "only in extreme circumstances." *In re Integrated Res. Real Estate Ltd. P'ships Secs. Litig.*, 815 F. Supp. at 638. Therefore, *a fortiori*, caution is warranted when deciding such issues upon motion for summary judgment when conflicting inferences can be drawn from the facts. *Lentell*, 396 F.3d at 169 (explaining that the Second Circuit has been "decidedly reluctant to foreclose . . . claims as untimely absent a manifest indication that plaintiffs 'could have learned' the facts underpinning their allegations" prior to the statutory period).

## A.    Plaintiffs' Attorneys' Knowledge Cannot Be Imputed to Plaintiffs

In their Motion, apparently based on agency principles, Defendants have attempted to impute Plaintiffs' attorneys' knowledge of Defendants' fraudulent behaviors to Plaintiffs in order

to set the clock running on the statute of limitations more than four years prior to filing of the Complaint in this case. Defendants, however, completely misstate the law on imputation of attorneys' knowledge to their clients and the principles of agency law.

First of all, an agency relationship must be established before an agent's knowledge may be imputed to a principal.[3] As explained in the Restatement (Second) of Agency, "[a]n agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Restatement (Second) of Agency § 15 (1958). The Supreme Court established the rule with regard specifically to the attorney-client relationship long ago. As explained by Chief Justice John Marshall in *Osborn v. Bank of United States*, 22 U.S. 738, 829 (1824), "no man has a right to appear as the attorney of another, without the authority of that other."

Thus, until such a relationship exists, no imputation of knowledge from an agent to a principal may be imposed. None of the cases cited by Defendants states otherwise. In fact, in every case, only knowledge acquired by the attorneys *during the existence of an ongoing attorney-*

---

[3]     To establish an attorney-client relationship under New York law, a court must consider the following factors:

> 1) [W]hether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in an aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believed that the attorney was representing him and whether this belief was reasonable.

*Catizone v. Wolff*, 71 F. Supp. 2d 365, 368 (S.D.N.Y. 1999) (citing *First Hawaiian Bank v. Russell & Wolkening, Inc.*, 861 F. Supp. 233, 238 (S.D.N.Y. 1994)). None of these factors suggest that an attorney-client relationship existed prior to the statutory period in this case.

8

*client relationship* was imputed to their clients.[4]  For example, Defendants completely misstate

the holding in *In re Ciptrofloxacin Hydrochloride Antitrust Litig.*, 261 F.Supp. 2d 188 (E.D.N.Y.

2003), a case upon which they primarily base their assertion that Plaintiffs should be held

accountable for their attorneys' knowledge.  As an initial matter, the court in that case never

discussed imputation of knowledge from an attorney to the client.  Defendants claim, however,

that the court *dismissed* the case on behalf of certain plaintiffs because their "claims [were] time-

barred where 'identical complaints were filed against some of the defendants in several state

courts within four years of the [alleged injury], in some cases by the exact same lawyers who

represent . . . Plaintiffs in this case.'"  Defs.' SOL Motion at 5.[5]  This is not what the court said or

---

[4]        *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (imputing to client knowledge
acquired during the attorney-client relationship); *Jensen v. Snellings*, 636 F. Supp. 1305, 1310-12
(E.D. La. 1986) (attorney communicated to client information sufficient to trigger the statute of
limitations during the relationship); *Chira v. Lockheed Aircraft Corp.*, 634 F.2d 664, 666-67 (2d
Cir. 1980) (plaintiff was held accountable for his attorney's nonfeasance during their attorney-
client relationship); *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 118 (N.D. Ill. 1993)
(containing no discussion of imputation of attorneys' knowledge to the named class
representatives); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634-35 (1962), (upholding dismissal of
the case based on attorney's failure to prosecute while representing plaintiff); *Universal City
Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000) (holding, in the context of
determining the timeliness of a motion to recuse the presiding judge, that defendants were
accountable for their attorney's knowledge of the judge's prior law firm affiliation, and
dismissing recusal motion based on the delaying tactics of defendants' counsel and on the
untimeliness of the motion to recuse.)

[5]        Note that in the case *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345 (S.D.N.Y. 1999),
the court observed that "there is no absolute rule in the Second Circuit that the filing of a lawsuit
alleging fraud against a defendant is sufficient to place a plaintiff on inquiry notice of other
fraudulent acts by the same defendant."  Several other courts have refused to bar suits containing
allegations of low tar tobacco fraud on statute of limitations grounds. *See, e.g., Engle v. R.J.
Reynolds Tobacco*, No. 94-08273CA-22, 2000 WL 33534572, *5-*6 (Fla. Cir. Ct. Nov. 6, 2000)
(denying motion for new trial in massive Florida class action suit and specifically refusing to
overturn fraud and conspiracy claims, some involving low tar cigarettes, on statute of limitations
grounds), *rev'd on other grounds sub nom.*, *Liggett Group Inc. v. Engle*, 853 So. 2d 434 (Fla.

9

held.  After naming the two operative facts upon which the court based its imputation of

knowledge for purposes of granting the defendants' motion for dismissal for failure to state a

claim for fraudulent concealment,[6] the court stated:

> In addition, **defendants claim** that dozens of nearly identical complaints were
> filed against some of the defendants in several state courts within four years of the
> challenged settlement, in some cases by the exact same lawyers who represent
> Organizational Plaintiffs in this case . . . . Given the publicity of the . . .
> [agreements in the case], Organizational Plaintiffs cannot credibly claim
> ignorance of the operative facts of their claims once the . . . agreements were
> disclosed in that same month.

*In re Ciprofloxacin Hydrochloride*, 261 F. Supp. 2d at 225 (emphasis added).  Defendants'

selective quotation of the case excluded significant language to imply that the court grounded its

decision to dismiss the plaintiffs' claims upon imputation of their attorneys' alleged knowledge

of the operative facts.  This was simply not the case - the court did not dismiss on these grounds.

The court merely quoted a "claim" made by Defendants.[7]

---

Dist. Ct. App. 2003); *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 488
(D.S.C. 2001) (holding that there was no statute of limitations bar and denying defendants'
motion for summary judgment on plaintiff's low tar fraud claim finding that "a reasonable jury
could conclude that B&W knowingly made misleading material statements with regard to its
low-tar and nicotine cigarettes, with the hope of exploiting the public's confusion and
misperception"); *Henley v. Philip Morris Inc.*, 5 Cal. Rptr. 3d 42, 76-78 (Ct. App. 2003)
(sustaining jury's verdict that found fraudulent concealment could toll a smoker's claims of fraud
with respect to marketing of light cigarettes; *Floyd v. Brown & Williamson Corp.*, 159 F. Supp.
2d 823, 830-35 (E.D. Pa. 2001) (finding that fraud, concealment, and conspiracy claims against
the tobacco companies were not barred as a matter of law by the statute of limitations and could
be re-filed in accordance with the opinion).

[6]     Unlike the case at bar, the terms of the agreements on which the "Organizational
Plaintiffs" had based their claim of fraudulent concealment had been publicly and *accurately*
reported the day after the defendants entered into the agreements at issue in the case.

[7]     Defendants' attempt to mislead this Court as to the holding in this Circuit
regarding imputation of an attorney's knowledge to a plaintiff is egregious.  Notably, this is not
the first time Defendants have misstated the law to support their erroneous positions.  In seeking
the discovery of absent class representatives, Defendants similarly misquoted cases discussing

Similarly, in *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 118 (N.D. Ill. 1993), the U.S. District Court for the Northern District of Illinois was assessing the adequacy of the named class members and their counsel to determine whether to certify the proposed class in the case. There were no allegations or discussion whatsoever regarding imputation of the attorneys' knowledge to the named class representatives, and Defendants' intimation that there was is at best misleading and disingenuous.

Again, none of the cases cited by Defendants present circumstances remotely analogous to the circumstances of this case. Defendants have not and cannot allege that an agency relationship existed prior to the time that the attorneys in this case and Plaintiffs agreed to the relationship. Any notion that Plaintiffs should be held accountable, prior to the establishment of any attorney-client relationship in this case, for any knowledge Plaintiffs' attorneys may have had is absurd and not supported by any law in this Circuit or any other jurisdiction.

**B.     The Statute of Limitations Has Not Begun to Run in this Case Because Inquiry Notice Has Yet to Arise**

To this day, Defendants continue to dispute the fact that the descriptor "Lights" fraudulently implies that those products provide some health benefits to consumers. R.J. Reynolds, for example, still claims that "[t]here remains a good deal of controversy concerning whether low-tar cigarettes, in fact, reduce risk." R.J. Reynolds website, *available at* http://www.rjrt.com/smoking/tarCover.aspx (*last visited* August 18, 2005). In fact, each of the Defendants refuses in this case to "[a]dmit that epidemiological and other scientific evidence, including patterns of mortality from smoking-caused diseases, does not indicate a benefit to

---

the standard. *See* Plaintiffs' Motion for Sanction.

11

public health from changes in cigarette design and manufacturing over the last fifty years."[8] Philip Morris's own Senior Vice President of Research and Science testified in his deposition in this case that "[a]s a scientist, I believe there is a benefit to the smoker from smoking a lower tar cigarette as compared to a full-flavor cigarette." Transcript of deposition of Richard Harvey Cox, Ph.D., taken July 20, 2005, at pp. 5-8, 36-39 (Ex. 6); *See also* Expert Report of Peter English ("English Report"), filed in this case by Defendants, at p. 45 ("[s]ince *NCI Monograph 13*, scientists have continued to research the health effects of reductions in tar and nicotine yields. The findings and conclusions of these most recent studies have been mixed"). Indeed, Defendants continue to refer to their products as "Lights," the main fraud alleged in this case. Until they stop this practice, the fraud continues, and inquiry notice has not yet arisen.

Likewise, in contrast to their position here, Defendants have previously claimed that compensation does not exist and consumers do not need to be told about it. Recently, in furtherance of their fraudulent scheme, Defendants urged the FTC to retain its misleading machine measurements of tar and nicotine. In 1997, when the FTC attempted to correct the misleading use of the FTC machine measurements as descriptors, it solicited public comment on a proposal to replace the existing method with one that would provide "a range of yields" for the tar and nicotine delivered and would convey to smokers that "a cigarette's yield depends on how it is smoked." FTC Cigarette Testing; Request for Public Comment (Sept. 12, 1997) (Ex. 7). In

---

[8]     See excerpts from Defendant Philip Morris USA Inc.'s Response to Plaintiffs' Second Requests for Admissions (Ex. 1), Objections and Responses of Defendant British American Tobacco (Investments) Limited to Plaintiffs' Second Set of Requests for Admissions (Ex. 2), Lorillard Tobacco Company's Responses and Objections to Plaintiffs' Second Requests for Admissions (Ex. 3), Defendant Liggett Group Inc.'s Amended Responses and Objections to Plaintiffs' Second Requests for Admissions (Ex. 4), R.J. Reynolds Tobacco Company's Response to Plaintiffs' Second Requests for Admissions (Ex. 5).

response, Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard submitted joint comments to the FTC defending the current machine measurements and opposing the proposed change. 519971037-1176 ("Joint Comments") (Ex. 8). The comments characterized compensation as a "hypothesized phenomenon" and stated that "[t]he testing protocol should not be modified to reflect 'compensatory' smoking," in part because "current knowledge about these behaviors is too sparse to be usable for modeling purposes." *Id.* at 1079.

Furthermore, in response to the question: "[w]hat kinds of consumer education messages should be created to inform smokers of the presence of filter vents and of the importance of not blocking them with their fingers or lips," the comments stated "*[t]he manufacturers are not convinced that vent-blocking is a sufficiently common or documented phenomenon that smokers should be alerted to the presence of filter vents and instructed not to block the vents.*" Joint Comments at 1120 (Ex. 8) (emphasis added). And in response to the FTC's question: "[i]f the effect of compensatory smoking behavior is not incorporated in the tar and nicotine ratings, should a disclosure warning smokers about compensatory smoking behavior be required in all ads," the comments stated that "*[t]he manufacturers are not convinced that compensatory smoking behavior is a sufficiently common or documented phenomenon that consumers should be alerted to its existence . . . .*" *Id.* at 1127 (emphasis added).

Clearly, unsupported representations such as these – denying that compensation occurs, or that it is important enough to warrant notifying consumers – negate any argument that consumers were already aware of the fraudulent nature of Defendants' use of the descriptors. It is truly disingenuous for Defendants to charge the general public with knowledge that it will not even attribute to itself, and that it has tried so hard to conceal. Thus, Defendants' Motion should

13

be denied because, at the very least, there are genuine issues of material fact regarding whether

the inquiry notice necessary to trigger the statute of limitations has yet to be raised accrue.

> **C.     Defendants Cannot Demonstrate that Inquiry Notice Arose Prior to the
> Statutory Period Since Plaintiffs Could Not Have Known of Their Injury
> Until Only Recently**

Even if Defendants can demonstrate that inquiry notice arose, summary judgment should

be denied because they cannot demonstrate that it arose prior to the statutory period because

plaintiffs did not know and could not have known of their injury until only recently.  In *Price v.*

*Philip Morris*, No. 00-L-112, 2003 WL 22597608 (Ill. Cir. Ct. Mar. 21, 2003), Philip Morris

made the exact same arguments regarding the statute of limitations that Defendants have made

here.  At the end of this bench trial, the court made specific findings with regard to the date on

which inquiry notice arose for class members in the case.  The court found that:

> Monograph 13 represents the first public health community consensus that
> cigarettes with lower machine-measured yields of tar and nicotine . . . do not
> lower the risk of disease as compared to higher yield cigarettes . . . . [Therefore,
> the] Class in this case could not have known of the fraud associated with . . .
> [Lights] . . . prior to the publication of Monograph 13 in October 2001.

*Id.* at *13-*14.  The court went on to explain its finding more explicitly:  "*the conclusions of*

*Monograph 13 itself establish that Philip Morris recognized the inherent deception of offering*

*cigarettes as 'Light' and 'Lowered Tar and Nicotine.'*"  *Id.* at *14 (emphasis added).  The court

in *Price* denied Philip Morris' statute of limitations defense finding that:

> [N]one of [Philip Morris'] allegations relate to knowledge that would
> trigger a Statute of Limitations for the claims in this case.  Philip Morris
> has the burden of establishing that Class members knew of the fraud and
> failed to act on that knowledge.  However, *even if Class members knew all*
> *of the facts alleged here, they did not have knowledge of the fraud* . . . .
> [Certain] allegations relate to alleged knowledge of the general dangers of
> smoking as opposed to the fraud allegations related to [Lights] [Other
> allegations are] insufficient because whether Class members knew the

> intention of the FTC machine measurements are irrelevant to the claims at issue . . . [E]ven if [other allegations] were known to some Class members, this knowledge is legally insufficient for the Statute of Limitations Affirmative Defense, because it does not establish knowledge of the increased harm relating to [Lights] cigarettes.

*Id.* at *18-*19 (emphasis added).

The allegations in the *Price* case are essentially the same for Plaintiffs in this case. Because Defendants "[a]t all times since the inception of their Lights products" were "aware of their deception and [were] aware that the public health community was among those deceived by the fact that their products did not deliver the promised low tar and nicotine and were not 'light' as represented," the court held that Defendants cannot demonstrate that inquiry notice arose prior to the publication of Monograph 13. Id. at *14. If public health community officials were not aware until the publication of Monograph 13 that a fraud had been committed on consumers, it is irrational to expect ordinary consumers to discern the fraud.

Information available to the public concerning the phenomenon of compensation or the questionable nature of the FTC machine measurements, etc., fall well short of the specificity regarding the fraud required to prompt further inquiry by a reasonable person and thus do not give inquiry notice sufficient to trigger the statute of limitations.

## III.   Defendants Confuse Accrual with the Tolling of the Statute of Limitations in RICO Cases

Courts frequently confuse the discovery rule for accrual of a plaintiff's cause of action with fraud and tolling of the statute of limitations based on the doctrine of fraudulent concealment. *Heins v. Potter*, 271 F. Supp. 2d 545, 552-554 (S.D.N.Y. 2003) (noting that when courts discuss these doctrines, they "do not always mean the same thing by these phrases, and phrases to which some judges ascribe different meanings are used interchangeably by other

15

judges" and noting that "the Second Circuit has not always drawn clear distinctions between accrual and equitable tolling based on fraudulent concealment") (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 81-83 (2d Cir. 2002)).  When a defendant's wrongful conduct prevents a plaintiff from discovery of his injury, the plaintiff's cause of action does not accrue until actual or constructive discovery of a plaintiff's injury. *Heins*, 271 F. Supp. at 554.  When, however, a plaintiff knew or should have known of his injury, his cause of action has accrued, but may be tolled if a "defendant's wrongful, affirmative acts prevent[ed] him from learning about other facts that might support a cause of action . . ." *Id.*  As the *Heins* court explained, "tolling only applies once a claim has accrued, regardless of whether defendant's misconduct prevented the claim from accruing." *Id.*

To determine whether accrual has occurred, the *Heins* court explained that a claim accrues when a plaintiff knows or should have known "enough of the *critical facts of injury and causation* to protect himself by seeking legal advice." *Id.* at 555 (emphasis added).  At that point, the doctrine of fraudulent concealment may toll the statute of limitations.  Plaintiffs have shown that disputed issues of material fact remain with regard to accrual and inquiry notice, however, if the Court finds there is accrual, the statute of limitations is tolled under the doctrine of fraudulent concealment.

## IV.    Plaintiffs Have Adequately Alleged Tolling of Their RICO Claim Under the Doctrine of Fraudulent Concealment

The doctrine of fraudulent concealment suspends the limitations period in light of Defendants having concealed facts necessary for Plaintiffs to know that their claims existed. More than a century ago, the Supreme Court described the purpose of the doctrine:  to prevent a defendant from "concealing a fraud, or . . . committing a fraud in a manner that it concealed itself

16

until such time as the party committing the fraud could plead the statute of limitations to protect it . . ." *Bailey v. Glover*, 88 U.S. 342, 349 (1874), *quoted in State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

To prove fraudulent concealment sufficient to toll the running of the statute of limitations, Plaintiff must demonstrate:

> (1) that the defendant concealed from him the existence of his cause of action; (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action; and (3) that his continuing ignorance was not attributable to lack of diligence on his part.

*Hendrickson Bros.*, 840 F.2d at 1083.

Thus, just as under the discovery rule discussed above, to prevail in this case Plaintiffs must demonstrate that Defendants concealed the fraud from them; that they did not and could not have learned of the fraud because of Defendants' actions taken to conceal it; and that, despite Plaintiffs' diligent endeavors, they could not have discovered the fraud within the statutory period. At this stage of the case, however, Plaintiffs need merely to demonstrate that there remain genuine issues of material fact with regard to any of these elements to withstand Defendants' Motion for Summary Judgment. *Robertson v. Seidman & Seidman*, 609 F.2d at 591-93 (2d Cir. 1979) (issues of due diligence, constructive knowledge and fraudulent concealment are inappropriate for resolution on summary judgment).

## A.    Defendants Have Extensively Concealed Their Fraud

As established in 1874 by the Supreme Court in *Bailey v. Glover*, Plaintiffs may prove concealment by showing "either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083 (citing *Bailey*, 88 U.S. at 349); *see also*

*Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345 (S.D.N.Y. 1999) (explaining that "there are two general varieties" of wrongful concealment).

Defendants' fraudulent scheme is self-concealing if it must remain confidential to be successful. In other words, for the scheme to endure, it must remain hidden from the victim. *See, e.g., Hendrickson Bros.*, 840 F.2d at 1084 (explaining that when the scheme requires concealment for its existence, "proof of the conspiracy itself suffice[s] to prove concealment by [defendants]").

As explained by the Second Circuit in *Hendrickson Bros.*, "[t]he passing off of a sham article as one that is genuine is an inherently self-concealing fraud . . ." 840 F.2d at 1083. This is precisely the situation that confronted Plaintiffs and putative class members in this case. Defendants created and fraudulently marketed low tar cigarettes based on the sham that they offered less health risk to smokers than their contemporary counterparts. Defendants' scheme would not have worked had this information been public knowledge. Indeed, the contrary inference strains credulity.

As more specifically delineated below and in Plaintiffs' Class Certification brief, at the inception of Defendants' conspiracy, they adopted a strategy to refrain from disseminating literature or information indicating the harmful nature of cigarette products, to undermine research or information adverse to their position, and to suppress efforts to overcome public perception by flooding the consumer market with a public relations campaign to support their position that cigarettes were not harmful. As the market for "light" cigarettes developed, Defendants knew, despite what they led Plaintiffs and the Class to believe, that "light" cigarettes were not safer than regular cigarettes, and that "light" cigarettes could, in fact be more harmful to

consumers than their regular counterparts.  Nevertheless, Defendants took active steps to conceal

the true nature and extent of their fraud, including by conspiring to prevent information about the

actual delivery of tar from "light" cigarettes from getting to the public, failing to disclose that

they were designing cigarettes to increase elasticity, suppressing research, destroying

incriminating materials, and funneling documents through their lawyers in order to cloak

materials under the shroud of privilege to protect them from disclosure, among other things.  All

of these acts prevented Plaintiffs from acquiring knowledge of their claims, or, at the very least,

raise material issues for a jury to decide.

Below are some examples of Defendants' acts designed to conceal the fraud from

Plaintiffs, the public health community, and the public at large.[9]  Because these behaviors often

constitute both elements of self-concealment and affirmative acts to conceal the fraud, they are

listed merely in general chronological order.

Just prior to and during the initial development of the "lights" market, Defendants

understood their growing vulnerabilities and planned to destroy documents that might reveal the

nature of their fraud and conspiracy to the public.  In a December 18, 1969 internal

memorandum, Murray Senkus of R.J. Reynolds' Research Department confirmed to Max Crohn

of the Legal Department that it would destroy documents to protect the company's position in

smoking and health litigation.  The Research Department indicated:

> We do not foresee any difficulty in the event a decision is reached to remove
> certain reports from Research files.  Once it becomes clear that such action is
> necessary for the successful defense of our present and future suits, we will

---

[9]     *See also* Pls.' Mem. of Law in Supp. of Their Mot. for Partial Summ. J., or in the
Alternative, a Mot. in Limine Regarding Defs.' "Compliance with the Public Health
Community" Defense; Mem. in Supp. of Pls.' Mot. for Partial Summ. J., or in the Alternative,
Mot. in Limine Regarding Defs.' "Compensation" Defenses.

promptly remove all such reports from our files.

\* \* \* \* \*

As to the reports which you are recommending to be invalidated, we can cite misinterpretation of data as reason for invalidation. A further reason is that many of these are needless repetitions and are being removed to alleviate overcrowding of our files. *As an alternative to invalidation, we can have the authors rewrite those sections of the reports which appear objectionable.*

500284499-4499 (Ex. 9) (emphasis added).

In 1970, Helmut Wakeham, Philip Morris' Vice President for Research & Development, recommended that Philip Morris purchase INBIFO, a research facility in Germany, arguing that Germany "is a locale where we might do some of the things which we are reluctant to do in this country." 2022244451-4453 at 4451 (Ex. 10). Handwritten notes of Thomas Osdene, a senior Philip Morris research official, laid out the method for handling documents from INBIFO related to health and smoking, directing that sensitive information be sent to his home where he would review and destroy it:

(1)    Ship all documents to Cologne . . .

(2)    Keep in Cologne

(3)    OK to phone & telex (these will be destroyed).

(4)    Please make available File Cabinet. Jim will put into shape end of August or beginning Sept.

(5)    We will monitor in person every 2-3 months.

(6)    If important letters have to be sent please send to home – I will act on them [and] destroy.

1000130803 (Ex. 11).

In 1971, A. H. Laurene, Manager of RJR Chemical Division, in a handwritten note

entitled "Puff Profile Paper," suppressed internal research that demonstrated that the FTC

machine measurements were misleading:

> This paper is well-organized, professionally written, and describes highly
> competent work.  There is nothing wrong with this paper as concerns work
> quality, scientific merit, or written preparation.  At this time, contents can be
> interpreted to be *contrary to Corporation interests* . . . [T]he results of this study
> may be interpreted by adversary forces to mean that smokers receive much more
> "tar" than FTC numbers indicate.  *Such interpretation would be damaging to our*
> *already besieged industry* even if it were later shown to be untrue.  As it now
> stands, we do not have any means of disproving or challenging such interpretation
> . . . . [Smoker compensation] could be interpreted by adversary forces to mean that
> the industry is failing in actuality in its present approach toward reducing "tar"
> delivery to smokers.  Our own approach – higher filtration and/or air dilution – is
> made to seem self-defeating by those data . . . . *Because publication of this paper*
> *might raise further controversy on the issue of "tar" delivery to smokers,*
> *publication is deferred.*

500286135-6136 (Ex. 12) (emphasis added).

Defendants created detailed procedures to shroud documents in privilege, discouraged the

creation of written work relating to their research and, in some cases, even had lawyers modify

research.  A February 25, 1974 letter from R.J. Reynolds' counsel Edwin J. Jacob to H.C.

Roemer, Vice President and General Counsel of R.J. Reynolds, noted that Jacob had modified a

scientific research report previously provided to him by Roemer to make it suitable for

publication, and set forth Jacob's thoughts on the publication of other scientific research reports,

concluding that, "[i]t would be possible, of course, to edit these reports of biological research so

that no explicit reference to 'safer' cigarettes is made.  And, further, explicit disclaimers of any

such implications could be made.  Even then, I believe publication would be unwise."

503652147-2150 at 2148 (Ex. 13).

A March 7, 1974 Philip Morris interoffice memorandum, entitled "Moral Issue on FTC

Tar" from Raymond Fagan to Helmut Wakeham acknowledged that "[s]ome concern has been

21

expressed concerning the moral obligation of Philip Morris (and perhaps the tobacco industry) to reveal to the FTC the fact that some cigarette smokers may be getting more tar than the FTC rating of that cigarette . . . . I believe that there need be no such concern, at least from a position of morality." 1000211075-1076 at 1075 (Ex. 14) (internal numbering omitted).

An August 19, 1975 document from BATCo Secretary P. J. Ricketts explained company procedure for transferring materials and information to attorneys in an effort to create privilege:

> In most cases information which has been given and papers and documents which have been physically handed over to the Company Solicitor will be privileged:  a result of which he will not be forced to disclose any documents etc., to . . . authorities unless in exceptional circumstances, he is required to do so by a Court Order.  Privilege extends only to the documents, papers etc., actually in the possession of the Solicitor and not to any copies . . . . Legal Department should, therefore, be informed and all relevant papers handed over to the Company Solicitor immediately if interest is shown by an outside authority in any matter which has been the subject of . . . special procedures.

107468153-8160 at 8160 (Ex. 15) (emphasis in original).

In the 1970s, Liggett embarked on a program to develop a "safe" cigarette, known as the "XA Project."  The company had demonstrated in mouse skin painting tests that blending certain catalysts with tobacco would destroy cancer-causing compounds.  Because, however, the industry had spent years debunking the health community's mouse skin tests, Liggett faced a marketing problem if it pursued the XA Project:  how could the company promote mouse skin tests as proof that its new cigarettes worked while industry lawyers were challenging the validity of such tests in the courtroom?  Ultimately, in 1977, Liggett was pressured by other cigarette makers to abandon the XA Project because the marketing and sale of a "safe" cigarette could result in infinite liability in civil litigation as it would constitute a direct or implied admission that all other cigarettes were unsafe.  Subsequently, Liggett attempted to hide documents related to

Project XA behind the attorney-client privilege. A 1979 confidential memo from Liggett Vice

President R. B. Seidensticker stated:

> With reference to the Law Department's XA Project, would you please issue a
> memorandum to those concerned requesting that any materials which have not
> already been turned over to the Law department related to XA, be it financial,
> scientific, production or marketing, should be transferred to the Law Department
> no later than Thursday, June 28.

524202306 (Ex. 16).

Correspondence from 1979 between Kendrick Wells, corporate counsel for Brown &

Williamson, and Ernest Pepples, Brown & Williamson's Vice-President of Law, outlined a plan

to wrap scientific information in the attorney-client privilege: "in the operational context, BAT

would send documents without attempting to distinguish which were and which were not

litigation documents." Wells discussed "various alternatives for handling BAT scientific reports

which come to B&W in a way that would afford some degree of protection against discovery,"

and ultimately recommended routing all scientific documents from BATCo through a Brown &

Williamson scientist designated as an agent of the General Counsel. Specifically, the scientist

would "separate the reports which were relevant to smoking and health, or otherwise sensitive,

for special handling" and the documents "designated as sensitive" would be "sequestered."

521016231-6232 (Ex. 17).

In a 1981 memorandum, Kendrick Wells quoted Robert Northrip, a Shook, Hardy &

Bacon attorney who at various times represented Philip Morris and Brown & Williamson, as

having said that, "[i]f company testing began to show adverse results pertaining to a particular

additive, the company control would enable the company to terminate the research, remove the

additive, and destroy the data." 521038287-8291 at 8289 (Ex. 18).

23

At a December 8, 1982 meeting of the VdC Scientific Commission in Hamburg, Germany attended by representatives from Philip Morris, R.J. Reynolds, and at least one BAT entity, it was stated that "it is sometimes important to do projects 'under the table,' otherwise an uncontrollable situation like in the U.S. could occur." 501011329-1333 at 1332 (Ex. 19).

Defendants' fraudulent concealment efforts were intentional. For example, a March 4, 1982 interoffice memorandum from J. H. Reynolds, A. B. Norman, and J. H. Robinson to R. E. Morse (all R.J. Reynolds employees) discussed the deceptive nature of Brown & Williamson's Barclay cigarette design, and similar designs, in astoundingly frank terms:

> The next generation of "Barclay competitors" will be spawned (indeed has already been spawned) in the minds of R & D and marketing people throughout the industry and its suppliers. This generation of products, or the next, could easily be products which will deliver NO "tar" or nicotine when smoked by the FTC method, and yet when smoked by humans essentially be unfiltered cigarettes. Such products could (and would) be advertized as "tar-free," "zero milligrams FTC tar", or "the ultimate low-tar cigarette", while actually delivering 20-, 30-, 40-mg or more "tar" when used by a human smoker! They will be extremely easy to design and produce. If there is any doubt that such products could be made, we will be happy to provide design sketches or prototypes of new or existing designs which will substantially accomplish the feat. *Such cigarettes, while deceptive in the extreme*, would be very difficult for the consumer to resist, since they would provide everything that we presently believe makes for desirable products; taste, "punch", ease of draw and "low FTC tar."

503670658-0659 at 0658 (Ex. 20) (emphasis added).

In 1982, Kendrick Wells, Corporate Counsel at Brown & Williamson, developed extensive strategies to counter the "serious attack . . . forming against lower delivery [low tar] cigarettes." Rather than disclose to the public or public health officials the industry's extensive knowledge of human compensation, in a memorandum, dated July 2, 1982, and entitled "CAC VII: What are the Obstacles/Enemies of a Swing to Low 'Tar' and What Actions Should we [sic] Take?" Kendrick Wells describes an extensive covert plan to undermine the public health

24

community's efforts on the issue:

> The first step will be the identification of attractive scientists not previously involved in the low delivery controversy who would produce studies re-emphasizing the lower delivery, less risk concept. Through political and scientific friends, B&W will attempt to elicit from the administrative and legislative branches of the federal government, and perhaps voluntary health groups, statements sympathetic to the concept that generally less health risk is associated with ultra low delivery cigarette consumption. The program is designed to produce statements of sufficient news interest to reach the public through the media. In addition, B&W would seek to generate spontaneous mainstream media articles . . . [Rejection of the "Lee and Garfinkel" paper] may signal that a comprehensive opinion leader program will be necessary to achieve public consciousness.

680592164-2169 at 2165-2166, 2167 (Ex. 21); *see also* 2021596422-6432 at 6426 (Ex. 22)

(describing similar activities regarding the 1989 release of the Surgeon General's Report as

"[b]rief[ing] journalists in advance and attempt[ing] to pre-empt negative press comment").

On February 18, 1983, in a memorandum entitled "Notes of a Meeting of the Tobacco

Company Research Directors," Dr. Lionel C. F. Blackman, Director of Group Research and

Development and Executive Director at BATCo, warned of the highly sensitive nature of the

industry's compensation research and admonished Defendants' research directors to suppress this

information:

> <u>Compensatory smoking</u>: This . . . is a particularly tricky subject. On the one hand it is commercially sensitive. On the other, it must be in the interest of the industry to get data and speak out against those who claim that the low delivery programme is misleading in that smokers compensate for the low deliveries. Rothmans will circulate an existing internal literature review for consideration; *but no use will be made of this material until each company has sought Legal advice.* [(]*Kendricks-Wells is so concerned with compensation that he advises no reference is made in the revised Blue Book.*)

109840698-0702 at 0700 (Ex. 23) (emphasis added).

A February 26, 1986 memorandum to BATCo's Eric Bruell from Anne Johnson and

Nicholas Cannar, both counsel for BATCo, noted that Brown & Williamson and other U.S.

companies, in response to "substantial product liability litigation," have developed positions that

"decisions to undertake research should be managerial decisions not scientific decisions . . .

smoking and health research should not be undertaken except in relation to major fundamental

research projects . . . information/document distribution should be kept to a minimum to avoid

documents becoming available to plaintiff in litigation." 109870594-0596 at 0594 (Ex. 24).

In 1987, the BATCo controversy over Barclay rekindled. A facsimile sent June 23, 1987,

from Nick Cannar of BATCo to Harry Dymond, BATCo researcher, stated:

> Essentially, Philip Morris's attack on BARCLAY involves the allegation that
> BARCLAY delivers more in human smoking than it does in machine smoking. In
> our defence [sic], we say that, in this respect, BARCLAY is no different from
> other low delivery ventilated cigarettes and that because of "human
> compensation" all smokers tend to take in more tar and nicotine from low delivery
> products. *It is this argument which concerns the rest of the Industry which is
> anxious to preserve the status quo of machine testing.*

400844024-4026 at 4024 (Ex. 25) (emphasis added). Under the heading "Conciliation," the

document described an attempt "to see whether the rest of the Industry would support some

change to the method of reporting tar and nicotine deliveries which would have the effect of

resolving the dispute over BARCLAY deliveries," and stated:

> The basis of the approach could be that we are very concerned about the
> continuing dispute over BARCLAY which we believe will *inevitably lead to a
> public debate about compensation and the misleading nature of machine figures
> for all ventilated cigarettes to the detriment of the Tobacco Industry as a whole.*

*Id.* at 4025 (emphasis added).

A June 26, 1987 document on BAT (U.K. and Export) Limited letterhead from Michael

Leach (BAT (U.K. and Export) Public Affairs Manager) to Nick Cannar (BATCo attorney), H. F.

Dymond (BATCo researcher), A. L. Heard and M. L. Reynolds (Brown &Williamson Director of

Research/Product Development) described "*a suggested approach for the Armageddon option*"

for responding to Philip Morris's attacks on the Barclay cigarette.  The plan involved revealing to

the public information that was obviously not available to them:  that ventilated cigarettes

generated misleading tar and nicotine yield information when measured by machines.  The

document stated:

> Promoting a new standard involves drawing international scientific scientific [sic]
> and public attention to the facts of smoker compensation . . . . The initiative is
> based on good science.  It moves in the new direction of scientific opinion which
> recognises the gap between smoking machine data and true human uptake.
>
> * * * *
>
> Rationale . . . It appears inevitable that existing test methodology will be
> questioned because it is unrealistic.  More accurate methods will be demanded of
> ISO[10] ["ISO" modified to "the industry" by marginalia on document].
>
> * * * *
>
> The initiative foresees BAT going over the head of the rest of the industry and
> recommending directly to the community [modified to "regulators" by marginalia]
> that cigarette testing be seen in a completely new way and that outdated tests be
> replaced.  The industry status quo would be broken . . . . 1.  BAT seen as a rogue
> elephant by the industry.  Isolation.  2.  BAT seen by the community
> ["community" modified to "regulators" by marginalia] as realistic and working to
> present the consumer with honest information . . . . 4.  *The public perception of
> low, medium, high tar cigarettes is turned on its head* . . . . 5.  Smoking and health
> issues are seen in a changed light as it becomes clear that smokers have greater
> control over tar/nic uptake than previously recognised.
>
> * * * *
>
> BAT's views on compensation reflect a growing body of scientific opinion.  There
> is an opportunity for the company to accelerate this movement . . . . 7.  In pursuing
> this alternative, the company moves with the tide of scientific thinking.

400015831-5839 at 5831-5835, 5837-5839 (Ex. 27) (emphasis added).

---

[10]     The ISO method is similar to the FTC machine method for measurements.  *See*
Monograph 13 at 165 (Ex. 26).

The situation continued to fester, as shown by an August 19, 1987 BATCo document in which a BATCo researcher described the "Industry Reaction" to the Barclay controversy and the danger of opening up the compensation issue to public debate:

> PM do[es] not openly concede that compensation occurs . . . . On balance the other Companies dislike the present situation intensely . . . . They are angry with BAT for raising an issue which they believe will bring the entire industry into disrepute. *They acknowledge the compensation argument, recognise the forces presently trying to debate it, believe that the industry should oppose any attempt by those outside the industry to raise the issue.*

400015791-5797 at 5796 (Ex. 28) (emphasis added).

A BATCo document entitled "Summary of a meeting on Barclay held in New York on 24th August 1987" (attended by many tobacco industry executives), which discussed the deceptiveness of machine smoking yields for all ventilated cigarettes, also demonstrated that BATCo's only motive for informing consumers of "the true scientific position" would be to use the "threat[]" of informing consumers to prevent the other cigarette companies from exposing the misleadingly-low machine-measured tar and nicotine levels:

> Our scientific evidence is that smokers "compensate" with all low delivery products and obtain from these products significantly higher deliveries of tar and nicotine than is suggested by the machine figures . . . . We should say that unless attacks on Barclay cease or the Industry is prepared to support a modification of the ISO standard to show the average figure for all ventilated products, including Barclay, then we will take whatever action is appropriate to make known to consumers the fact that machine figures do not provide an accurate guide to human uptake from all ventilated products . . . . If the Industry permits the attack upon Barclay to continue or is not prepared to accept a revision of the ISO standard for all ventilated products, then we would propose to put these threats into operation and to publicise to consumers, consumer organisations and national regulators the true scientific position concerning the measurement of tar and nicotine deliveries of all ventilated products.

400015688-5689 (Ex. 29). Under the heading "Scientific Evidence" and the subheading "On the Negative Side," the document stated that "[i]t is easy to demonstrate compensation with

28

BARCLAY.  Lay people find these demonstrations convincing."  400015690 (Ex. 30).

Philip Morris responded to the threat of exposure aggressively, eventually convincing

BATCo to agree not to refer publicly to human smoking behavior or compensation.

2500046147-6150 (Ex. 31).  A September 8, 1988 memorandum to Geoffrey Bible, then CEO of

Philip Morris International, urged that, as part of any resolution of the dispute over the Barclay

cigarette, "BAT will cease all references and discussions relative to human smoking habits

(compensation) regarding ventilated products.  In other words, discussing who 'cheats' is a non-

productive exercise for our business."  2500046174-6175 at 6175 (Ex. 32).

A January 12, 1989 internal memorandum from Steve Darrah, the head of Philip Morris

International Operations, to Philip Morris' Geoffrey Bible, regarding an upcoming meeting with

BATCo/Brown & Williamson stated that "Philip Morris' position will be the following . . . BAT

will not raise the issue of compensation and human smoking behavior in the future . . . . As we

have made a major 'concession' regarding retroactive litigation, we will ask that BAT stop

immediately all current efforts on their part to raise the issue of human smoking behavior . . ."

2500046145-6146 at 6146 (Ex. 33).

Ultimately, on January 19 and 20, 1989, Philip Morris and BAT representatives met to

resolve their disagreement.  The memorandum describing the meeting, which was sent to and

reviewed by Geoffrey Bible and other Philip Morris executives, reported that "BAT had planned

to help SASO to make a human smoking behavior study in Saudi Arabia to show the difference

in tar delivery between human and machine smoking for low tar products.  These kinds of tests

are <u>extremely dangerous</u> for the entire industry and BAT accept to cancel it."  2500046147-6150

at 6149 (Ex. 31) (emphasis in original).

29

Defendants deliberately concealed material information from the public and knew that the public was being deceived regarding the nature of "light" cigarettes. For example, Nicholas Brookes, Chairman and CEO of Brown & Williamson – after acknowledging that he "can't actually point to an independent piece of research" to prove that low tar cigarettes provide any health benefit – recently testified at trial in *Falise v. American Tobacco Co.*, (E.D.N.Y. Dec. 27, 2000), that he was aware that consumers' "general perception" of low tar cigarettes is that they are less harmful to health and that the reason consumers smoke "light" cigarettes is because they believe they are safer.

Over the years, Brown & Williamson created numerous document management policies to reduce paperwork regarding research that might be used in litigation, including instructing employees to "send a 'mental copy' of your document to a newspaper, one of your competitors, a government agency, or potential plaintiff. Now: would you still write the memo? If so - would you still write it in the same way?" Brown & Williamson reminded employees that "verbal communication is best if you are dealing with a sensitive subject" and that "in some cases writing is not advisable." 402156792-6815 at 6803-6805 (Ex. 34).

In a lengthy report, Norbert Hirschhorn, M.D., a consultant to the World Health Organization, compiled extensive additional evidence which documents four decades of suppression and concealment. *See* Hirschorn, Norbert, *Shameful Science: Four Decades of the Tobacco Industry's Hidden Research on Smoking and Health* (Sept. 5, 1999) (Ex. 35). This evidence and much more should be heard by a jury in order to determine if and when Plaintiffs were put on notice and whether or not the statute of limitations has been tolled.

**B.      Due to Defendants' Concealment, Plaintiffs Could Not Have Discovered that They Had Been Defrauded Prior to the Statutory Period**

Defendants contend that Plaintiffs were on inquiry notice of their injury because the facts alleged in support of their claims "have been publicly known since well before May 2000." Defs.' SOL Brief at 4. Essentially, this claim is based on so-called public knowledge of compensation and the misleading nature of the FTC machine measurements. But Defendants' own CEOs assert that they were unaware of the phenomenon of compensation until very recently. For example, F. Ross Johnson, CEO and President of RJR Nabisco from 1985 to 1989, testified in a 1997 deposition that he himself had never heard of smoker compensation.[11] It is unclear if he knows about it to this day. Similarly, James Morgan, a Princeton graduate who retired as President and CEO of Philip Morris in 1997, testified at trial in 2003 in the *Price* case that he was unaware of compensation until fairly recently.[12] Indeed, he agreed during that testimony that it would be reasonable to assume that if he, "as President of Philip Morris didn't understand the concept of compensation or [wasn't] aware of it that most consumers on the street weren't aware of it as well." *Id.* at 126.[13] As noted above, even Defendants' senior scientists and experts assert that they believe to this day that "light" cigarettes are less harmful (Ex. 6) or, at least, that the evidences is "mixed," (English Report at 45).

Yet, Defendants claim that Plaintiffs and Class members were on inquiry notice when Defendants have frequently described their customers as "stupid." In 1975, in a market research

---

[11]      Deposition of F. Ross Johnson conducted September 11, 1997 in *State of Minnesota v. Philip Morris, Inc.*, No. C1-94-8565 (Minn. Super. Ct. 1994) at 78-79 (Ex. 36).

[12]      Transcript of trial proceedings held February 18, 2003 in *Price* at 8, 121 (Ex. 37).

[13]      James Morgan testified to the same effect at his deposition in this case: "at the very end of my tenure as CEO, the issue of what I believe is called compensation started to come up." Deposition of James J. Morgan held July 7, 2005, Tr. at 125 (Ex. 38).

document entitled "What Have We Learned from People," smokers were described as "illogical, irrational and stupid." 670171216-1256 at 1221 (Ex. 39). Later, in a statement given by David Goerlitz, R.J. Reynolds answer to the Marlboro Man, to the Subcommittee on Transportation and Hazardous Materials of the House Committee on Energy and Commerce, Goerlitz described an encounter he had with an executive of the company. Goerlitz asked the executive "why he and his colleagues didn't smoke, he responded point-blank that 'We don't smoke the sh--, we just sell it . . . We reserve that 'right' for the young, the poor, the black and the stupid" to smoke. 515702037-2042 at 2041 (Ex. 40).

In addition, Defendants attempt to impute constructive knowledge on Plaintiffs based on the posting of documents on the internet in 1998 pursuant to the Master Settlement Agreement. This is yet another red herring. Defendants can make no argument that reasonable people would have known about the websites or even know how to search the enormous databases to discover the specific documents that would have alerted them to Defendants' fraudulent scheme. The Master Settlement Agreement document depositories have not organized the voluminous documents into such categories as "Defendants' Fraudulent Concealment" or "Secret Research" or, in fact, any other sort of categorization. And, as described above, Defendants' websites still maintain that the "lights" descriptors provide meaningful information to consumers. *See supra* Section II B. At the very least, a reasonable consumer would be confused – not adequately notified to trigger the statute of limitations. Summary judgment should be denied because, due to defendants' concealment, plaintiffs did not and could not have discovered that they had been defrauded prior to the statutory period.

**C.     Plaintiffs' Due Diligence is Demonstrated by the Extensive Research Performed to Produce the Complaint in this Case**

The exercise of reasonable diligence may be determined by examining the nature of the concealment, the opportunity to discover the misleading nature of Defendants' actions, and the subsequent action of the parties. *See, e.g., Coveal v. Consumer Home Mortgage, Inc.*, No. 04-CV-4755 (ILG), 2005 WL 704835, at *5 (E.D.N.Y. Mar. 29, 2005). Significantly, this Court has held that a "plaintiff's sophistication in the subject areas is relevant in determining reasonableness." *In re Simon II Litig.*, 211 F.R.D. 86, 143 (E.D.N.Y. 2002), *vacated and remanded on other grounds*, 407 F.3d 125 (2d Cir. 2005) (citing *Kinley Corp. v. Integrated Res. Equity Corp.*, 851 F. Supp. 566, 568) (S.D.N.Y. 1994).

The nature of Defendants' concealment is described extensively above. Also described is the lack of opportunity that even the public health community had to discover Defendants' fraud. In fact, it was not until Monograph 13 that public health officials charged with discovering the health effects of smoking were able to discern that a fraud had been committed with regard to the marketing of Defendants' "light" cigarettes. Plaintiffs can hardly be held to a higher standard of sophistication than the public health officials who did not discover the fraud until then. Significantly, in *In re Global Crossing, Ltd. Secs. Litig.*, 313 F. Supp. 2d 189, 202-03 (S.D.N.Y. 2003), the court denied the defendant's motion to dismiss for lack of due diligence to discover the fraud based on the "complaint, in all its massive detail" as adequate to demonstrate "persuasive evidence that a lengthy and complicated investigation into the details of [defendant's] activities . . . was indeed undertaken." Such is the case here. Plaintiffs' Complaint clearly evidences the extensive due diligence performed by Plaintiffs to bring this cause of action. Plaintiffs have performed adequate reasonable due diligence to withstand Defendants'

33

Motion.

Because Plaintiffs' have demonstrated that, at the very least, genuine issues of material fact exist with regard to evidence necessary to establish fraudulent concealment, Defendants' Motion should be denied.

**V.      Should the Court Rule that the Separate Accrual Rule Applies in this Case, Plaintiffs Still Would Be Entitled to Recover for Injuries Sustained Within the Statutory Period**

Because, as explained above, the statute of limitations in this case has yet to accrue, accrued during the statutory period, or was at the very least tolled by Defendants' fraudulent concealment, Plaintiffs are entitled to damages dating back to when the RICO violation caused such injuries with the original introduction of "light" cigarettes in 1971. *See, e.g.*, *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (explaining that "a plaintiff may sue for *any* injury he discovers or should have discovered within four years of the commencement of his suit") (emphasis added)).  Even if the Court could find accrual, notice, and no tolling as a matter of law, however, Plaintiffs could still proceed under the "separate accrual" rule adopted by the Second Circuit.  That rule provides that a new claim, and thus a new four year limitations period, accrues each time a "new and independent injury" is incurred from the same RICO violation. *See Bingham v. Zolt*, 66 F.3d 553, 559-61 (2d Cir. 1995) (applying the rule in the RICO context); *Bankers' Trust* at 1103. *See, also,  Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (adopting the Clayton Act's rule requiring that  "each overt act that is part of the [antitrust] violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, *regardless of the plaintiff's knowledge of the alleged illegality at much earlier times*") (emphasis added) (internal quotations and citations omitted)).

34

Defendants assert that "Plaintiffs may contend that any alleged 'injury' stemming from their purchases of light cigarettes within four years before they filed the complaint are not time-barred" based on the separate accrual rule, and argue that Plaintiffs are not entitled even to recover for injuries sustained *within* the four-year statutory period prior to the filing of this suit under that rule. Defs.' SOL Motion at 14. While Plaintiffs do not currently rely on the separate accrual rule, given their entitlement to damages from the date Defendants first marketed "light" cigarettes, *See* Compl. ¶ 30., Defendants' argument is inaccurate in any event.

Defendant's argument that the separate accrual rule would not apply in this case is based on their contention that the injuries suffered by the Plaintiffs are not sufficiently "new and independent" to invoke the rule. Assuming that Plaintiffs are correct, and this Court finds that Plaintiffs' purchases of light cigarettes do not constitute separate and independent injuries, then the separate accrual rule does not apply and has no bearing on Plaintiffs' entitlement to relief. If, on the other hand,  the Court finds that each purchase of "light" cigarettes is a new and independent injury, the separate accrual rule establishes that, at the very least, Plaintiffs will be entitled to all damages arising during the four year statutory period. In any event, the nature of Defendants' injury for statute of limitations purposes raises, at the very least, material issues of disputed fact. Thus, summary judgment on this basis is inappropriate.

## CONCLUSION

Because there remain extensive genuine issues of material fact with regard to whether the

statute of limitations has run in this case, this Court should deny Defendants' Motion for

Summary Judgment on this issue.

Dated: August 19, 2005
Washington, D.C.

Respectfully submitted,

Herbert E. Milstein
Michael D. Hausfeld
Lisa M. Mezzetti
Paul T. Gallagher
Kathleen Davies
Douglas J. McNamara  (DM #6069)
Benjamin D. Brown
James J. Pizzirusso
Brent W. Landau
Andrea L. Hertzfeld
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Phone:  (202) 408-4600
Fax:  (202) 408-4699

Burton H. Finkelstein
William P. Butterfield
Richard M. Volin
Hilary K. Ratway
FINKELSTEIN, THOMPSON & LOUGHRAN
1050 30th Street, N.W.
Washington, DC  20007
Phone:  (202) 337-8000
Fax:  (202) 337-8090

LEAD ATTORNEYS FOR PLAINTIFFS

36

OF COUNSEL

Jonathan Alpert
THE ALPERT LAW FIRM
5920 River Terrace
Tampa, FL 33604
Phone:  (813) 223-4131
Fax:  (813) 228-9612

David F. Sorenson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: (215) 875-5705
Fax: (215) 875-4604

Van Bunch
BONNETT, FAIRBOURN,
  FRIEDMAN & BALINT, P.C.
57 Carriage Hill
Signal Mountain, TN 37377
Phone:  (423) 886-9736
Fax:  (602) 274-1199

Gary M. Farmer, Jr.,
FREEDLAND, FARMER,
  RUSSO & SHELLER
2665 Executive Park Dr., Suite 3
Weston, FL  33331
Phone:  (954) 467-6400
Fax:  (954) 670-2530

G. Martin Meyers
LAW OFFICES OF G. MARTIN MEYERS
35 West Main Street, Suite 106
Denville, NJ 07834
Phone:  (973) 625-0838
Fax:  (973) 625-5350

Lisa J. Rodriguez
TRUJILLO, RODRIGUEZ & RICHARDS, LLC

37

8 Kings Highway West
Haddonfield, NJ 08033
Phone: (856) 795-9002
Fax: (856) 795-9887

Thomas V. Urmy, Jr.
Edward F. Haber
SHAPIRO, HABER & URMY, LLP
53 State Street
Boston, MA 02109
Phone: (617) 439-3939
Fax: (617) 439-0134

Stephen Sheller
SHELLER, LUDWIG & BADEY
1528 Walnut Street, 3rd Floor
Philadelphia, PA  19102
Phone: (215) 790-7300
Fax: (215) 546-0942


Russell Smith
R. Bryan Nace
A. RUSSELL SMITH LAW OFFICE
503 Key Building
159 S. Main Street
Akron, Ohio 44308
Phone: (330) 434-7167
Fax: (330) 434-1795

Gerson Smoger
SMOGER & ASSOCIATES, L.L.P.
3175 Monterey Blvd., Suite 3
Oakland, CA 94602
Phone: (510) 531-4529
Fax: (510) 531-4377

Esther Berezofsky
WILLIAMS, CUKER & BEREZOFSKY
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Phone: (856) 667-0500
Fax: (856) 667-5133

## **CERTIFICATE OF SERVICE**

I, Joshua S. Prince, hereby certify that a true and correct copy of the foregoing Plaintiffs'

Brief in Opposition to Defendants' Motion for Summary Judgment on Statute of Limitations

Grounds was served by electronic mail this 19th day of August, 2005, upon the counsel listed on

the attached Service List.

_____
Joshua S. Prince

39

## SERVICE LIST

Harold K. Gordon
Steven P. Harte
Jones Day
222 East 41st Street
New York, NY 10017-6702
212/326-3939
fax: 212/755-7306

Mark Belasic  mabelasic@jonesday.com
Theodore M. Grossman
Robert Klonoff
Jones Day
901 Lakeside Ave., North Point
Cleveland, OH 44114-1190
216/586-3939    fax: 216/579-0212

### *Counsel for R.J. Reynolds Tobacco Company*

Guy Miller Struve
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
212/450-4000  fax: 212/450-3800
Guy.struve@dpw.com
*Counsel for Altria Group Inc.*

Judith Bernstein-Gaeta
Brian T. Edmunds
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
202/942-5493  fax: 202/942-5999
judith_gaeta-bernstein@aporter.com
*Counsel for Philip Morris USA Inc.*

Philip Pfeffer  Ppfeffer@chadbourne.com
Joseph Falcone  jfalcone@chadbourne.com
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, NY 10112
212/408-5100  fax: 212/541-5369
*Counsel for Defendant British American Tobacco (Investments) Limited*
 **and** *British American Tobacco, p.l.c.*

Alan Mansfield     mansfielda@gtlaw.com
Stephen L. Saxl
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
212/801-2100  fax: 212/801-6400

William L. Allinder
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
816/474-6550  fax: 816/421-5547

40