UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA SCHWAB, et al., <br> individually and on behalf of a class <br> of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PHILIP MORRIS USA, INC. et al., <br><br> Defendants. | Case No. CV- 0401945 (JBW) (SMG) |

## CLASS PLAINTIFFS' RESPONSE TO THE COURT'S
## MEMORANDUM OF JUNE 6, 2005

**1.  (a)   Does a civil suit under RICO, for monetary loss based on the price paid for a product sold in violation of federal mail and wire fraud substantive law, split a cause of action for the physical or other harm caused by use of the product based on fraud under state substantive law?**

No.  RICO does not allow recovery for personal injury.  *See Laborers Local 17 Health & Benefit Fund v. Philip Morris*, 191 F.3d 229, 241 (2d Cir. 1999) (no RICO damages remedy "for even direct personal injuries (such as those suffered by the individual smokers)"); *National Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 74 F. Supp. 2d 213, 219 (E.D.N.Y. 1999) (citing *Jerry Kubecka, Inc. v. Avellino*, 88 F. Supp. 963, 968 (E.D.N.Y. 1995) ("If [murder victims] had been merely disabled by the attempt on their lives but survived, presumably they would have had a RICO claim for lost earnings from their business activities because they had been injured in their 'business or property.'"); *Williams v. Dow Chem. Co.*, 255 F. Supp.2d 219, 225 (S.D.N.Y. 2003) ("RICO provides recovery for injury to business and property; it does not provide recovery for physical and emotional injuries."); *Gause v. Philip Morris*, No. 00-9247 WL 34016343, at *4 (E.D.N.Y. 2000) (agreeing with the Court of Appeals in *Laborers Local 17* that "personal injuries of smokers are not injuries to business or property"); *von Bulow v. von Bulow,* 634 F. Supp. 1284, 1309 (S.D.N.Y. 1986) ("The cost to [a murder target] of her committee and her inability to enjoy her personal and real property may well be compensable monetary injuries under RICO."); *Snead v. Hygrade Food Prods. Assoc.,* No. Civ. A. 98-2657 1998 WL 910223, at *3 (E.D. Pa. Dec. 28,1998) (emotional distress claims dismissed, claims for economic damages resulting from loss of employment allowed under RICO); *Reynolds v.*

*Condon*, 908 F. Supp. 1494, 1517-19 (N.D. Iowa 1995) (emotional distress caused by RICO extortion not allowed but claims for loss of home and loss of income approved); *In re Cordis Corp. Pacemaker Prod. Liab. Litig.*, No. MDL 850, C-3-86-543, 1992 WL 54061, at *3 (S.D. Ohio Dec. 23, 1992) (plaintiffs allowed to allege RICO claims for costs of defective pacemakers and for costs of implanting and explanting them, but not for "personal" injuries)).

Since personal injury claims could not be brought in this action, Plaintiffs are not precluded from making those claims at a later date, as neither issue preclusion nor claim preclusion would apply. *See, e.g. Marrone v. Phillip Morris*, No. 03 CA 0120-M 2004 WL 2050485, at *6-*7 (Ohio Ct. App. Sept. 15, 2004).

### Claim Preclusion

"[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Rivet v. Regions Bank*, 522 U.S. 470, 476 (1998); *see also Legnani v. Alitalia Linee Aeree Italiane, S.P.A.* 400 F.3d 139, 142 (2d Cir. 2005). Under the Supreme Court's definition, claim preclusion would bar absent class members' subsequent claims for personal injury only if such claims "*were* or *could* have been raised" in the present action. *Rivet*, 522 U.S. 470 at 476 (emphasis added).

The present action is one in which Plaintiffs seek to recover damages to their property under RICO; personal injury claims will not be raised. Furthermore, because RICO does not allow recovery for personal injuries, as discussed *supra*, Plaintiffs *could not* seek recoveries for personal injuries even if they wanted to. Since these claims will not and cannot be raised, claim preclusion does not apply, and Plaintiffs are not barred on that ground from raising personal injury claims in a subsequent action.

### Issue Preclusion

"[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *see also Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 728 (2nd Cir. 1981). In the context of a class action, a prior judgment bars class members from bringing another class action against the defendant alleging the same conduct for the same time period and precludes class members in other litigation against the same defendant from relitigating the question of whether the defendant engaged in the same conduct during the same time period. *See Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 880 (1984) (holding that a judgment in a prior pattern or practice of discrimination class action case did not preclude class members from alleging individual race discrimination claims against the same defendant because, "[t]he judgment is not...dispositive of the individual claims [the plaintiffs] have alleged in their separate action."); *see also Cemeron v. Tomes,* 990 F.2d 14. 17 (1st Cir. 1993) ("[T]he Supreme Court confirmed what common sense would suggest: a class action judgment . . . binds the class members to matters *actually litigated* but does not resolve any claim based on individual circumstances that was not addressed in the class action." (emphasis added) (citing *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 880-82 (1984)).

The *Cooper* Court also found that the intended purpose of class actions is:

> to establish a procedure for the adjudication of common questions of law or fact. If [the defendant's] theory [of issue preclusion] were adopted, it would be tantamount to requiring that every member of the class be permitted to intervene to litigate the merits of his individual claim…. Indeed Rule 23 is carefully drafted to provide a mechanism for the expeditious decision of *common* questions. Its purposes might well be defeated by an attempt to decide a host of individual claims before any common question relating to liability has been resolved adversely to the defendant.

*Id.* at 880-81.

As in *Cooper*, a judgment here in a class action alleging a violation of RICO would not dispose of individual personal injury claims. Therefore, even if class members *were* permitted to bring their personal injury claims under RICO, requiring that they do so would defeat the purpose of Rule 23.

In accordance with these principles, courts have explicitly rejected the notion that certifying a class alleging fraud claims against a tobacco company for the sale of "lights" cigarettes would result in impermissible claims splitting. *See, e.g., Howard v. Brown & Williamson Tobacco Corp.*, No. 00-L-136, 2001 WL 1910779, at *1 (Ill. Cir. Ct. Dec. 18, 2001) ("This Court believes there is no impermissible splitting of claims here since this consumer fraud action seeking the return of the purchase price of light cigarettes presents legal claims separate and distinct from any personal injury claims relating to smoking that the class members may have now or in the future against the Defendant. Any and all such claims for personal injury by class members are not and could not be included in this case and are hereby specifically preserved."); *Miles v. Philip Morris Cos., Inc.*, No. 00-l-112,2001 WL 34366710, at *2 (Ill. Cir. Feb. 1, 2001) ("As to defendants' challenge of the adequacy of the unnamed class members by seeking to recover only the purchase price of the light cigarettes, this Court believes that there is no impermissible splitting of claims in this action."); *Marrone v. Phillip Morris*, 2004 WL 2050485, at *6 ("Any individual personal injury claims of absent class members would not be precluded because those claims cannot be litigated in this action.").

As pointed out by the Court in *Marrone*, the exceptions to the *Restatement (Second) of Judgments, Sections 24-25* dealing with *res judicata* provide a reason why certification of a consumer fraud class action would not extinguish individual personal injury claims: Section 26 states, in pertinent part, that the general rule does not extinguish a second claim if: 1) "The court in the first action has expressly reserved the plaintiff's right to maintain the second action;" or 2) "The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the . . . restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action . . ." *Id.* (quoting *Restatement (Second) of Judgments* § 26 (1982)). Here, those exceptions to the *res judicata* rule articulated in the *Restatement* apply in that (1) this Court can reserve the right of

221928v1

class members to maintain their personal injury claims in the appropriate state court and (2) because Plaintiffs are unable to seek a remedy for personal injury claims under the RICO statute.

Finally, the issue of claim splitting would apply only to those economic class members who have manifested a personal injury. Those dual economic and personal injury plaintiffs would comprise an extremely small portion of the economic damage class and would have the option to exclude themselves from the class by opting out under Rule 23(c)(2) should they wish to pursue a different course of litigation or to pursue no litigation at all. As for those individuals who have not yet manifested a personal injury but who may in the future, like in the asbestos cases, the bringing of a claim for a later emerging disease is not barred by claim preclusion. *See, e.g., Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 117 n.33 (D.C. Cir. 1982) (allowing a plaintiff to file a second suit for asbestos-related cancer after filing an asbestosis suit because the cancer is a distinct injury); *Gasperoni v. Metabolife*, No. 00-71255, 2000 WL 33365948, at *4 (E.D. Mich. Sept. 27, 2000) (granting class certification to plaintiffs alleging fraudulent misrepresentation and breach of warranty: "[T]he only legal issue to be certified is simply whether the label is materially misleading. Any personal injuries that develop in class members after the present suit, will not be subject to res judicata because their claim will not have been *actually litigated*, nor will it be one that might have been raised in the previous suit.") (emphasis added).

**1.   (b)   Can members of the present putative class of Plaintiffs recover on a federal RICO "loss of value" theory while they and others sue, or can sue, separately for physical damages or other claims under various state laws? ("In certifying a class that seeks an assessment of punitive damages prior to an actual determination and award of compensatory damages (for physical harm), the district court's Certification Order would fail to ensure that a jury will be able to assess an award that, in the first instance, will bear a sufficient nexus to the actual and potential harm to the Plaintiff class, and that will be reasonable and proportionate to those harms."). The *Price* case, like the instant case, contained no claims for personal injury or addiction. *See Miles v. Philip Morris*, No 00-L-112, 2001 WL 34366710, at *1 (Ill. Cir. Feb. 1, 2001). The court in *Price* rejected Defendants' challenge of splitting. *Id.* at *3.**

Yes. To the extent that particular underlying facts in a RICO claim may be involved in a claim for personal injury involving the same defendants, a final judicial finding may collaterally estop the re-litigation of those facts.

**1.   (c)   The RICO statute relied upon by Plaintiffs appears to preclude personal injury awards so that physical harms could not be compensated for under that federal substantive provision. *See* 18 U.S.C. § 1963(c) ("Any person *injured in his business or property* by reason of a violation of section 1962 [prohibited activities] of this chapter may sue…") (emphasis added). State substantive law would be required for such recoveries, would it not? *See 2., infra*.**

Yes.

**2.  (a)   Assuming there were a settlement in the instant case, what would be the nature and scope of the release?**

*Compensatory Damages*

*A.  Personal Injury.*  The nature and scope of a sustainable release involves the relationship of the claims included in the settlement and the injuries caused by the substance of those claims. There are two general forms of compensatory damages – personal injury and economic loss – which smokers have sought in claims against tobacco companies.  Personal injury compensation predominately derives from the causal nexus between smoking and human disease.  A release of the claims in this litigation, if upheld in a final approval and judgment, would not have any impact on individual personal injury claims arising out of human disease caused by smoking.

B.   *Economic Loss.*  Economic loss claims are principally based on RICO, state consumer statutes or state common law and usually encompass a derivative of fraud elements.  The elements of state statutory and common law deception are generally encompassed by the provisions of RICO.  The resulting economic injury from state statutory or common law fraud claims are identical to the business or property injury caused by a RICO violation.  Release of the economic claims in this litigation would constitutionally include a release of all compensatory economic claims which relate to the same derivative fraud facts whether brought under RICO, state statutory law or state common law.

*Punitive Damages*

The release could also be structured to separately identify a liquidated sum covering punitive damages arising out of the same indivisible fraudulent/deceptive misconduct whether the basic claim relates to personal injury or economic loss.  The underlying pattern of uniform, united abuses jointly employed by the tobacco companies over the last half-century apply equally to either general form of compensatory injury.

A two-tiered settlement amount addresses the concern raised by the Second Circuit in *Simon II*, 407 F.3d 125 (2d Cir. 2005), that a free-floating punitive damage untethered to a sum certain compensatory injury was impermissible.  Here, a punitive damage component of a settlement release would be tied and related to the economic loss settlement amount.

Personal injury claims not yet filed, not settled or not reduced to judgment could not, under the reasoning of *Simon II*, be included in a punitive damage amount released in connection with economic loss claims.  Although no punitive settlement amount could be tied or related to such an unliquidated personal injury claim, the conduct giving rise to the punitive damage settlement itself should be a material factor in any subsequent court adjudication of whether separate or additional punishment is warranted.

Punitive damages claims in personal injury actions litigated after a broad-based punitive damages settlement of all economic losses to all included smokers should be restricted to some extent by the scope of a punitive damages release and the magnitude of its settlement.  Courts presiding over such claims should be bound to judge the claim against the background of the

5

egregious misconduct already released and the size of the economic deterrent already imposed. *See e.g. In re: the Exxon Valdez,* 270 F.3d 1215 (9th Cir. 2001).

**2.   (b)   Would it be possible for the release to encompass theories of fraud and related theories in personal injury cases arising out of what is essentially the same charged "lights" cigarette fraud?**

Yes.

**2.   (c)   Would the class have to be extended, with additional representatives and counsel, to provide in essence two major subclasses as follows:**

**1.     Those who claim economic damages for reduced value received as "defrauded" purchasers of "lights" under RICO; and**

**2.     Those who assert fraud or related theories in personal injury cases claiming physical, emotional and related damages as purchasers and users of "lights" under state laws?**

Not necessarily.  Since the core fraudulent misconduct is common, if not virtually identical, it would not appear necessary to have separate sub-classes or separate counsel.  Theoretically, sub-classes and separate counsel might be beneficial if it could enhance consensus or achieve unanimity.  However, a sub-class of personal injury counsel may, as a practical matter, be problematic.  The multiplicity of such litigation and representation may make consensus of these claims improbable.

**2.   (d)   What would be the effect of a class action so modified on other "lights" actions pending or threatened based on the law of various states?**

A class action, as modified in accordance with the Court's suggestions, would necessarily incorporate all other "lights" actions pending or "threatened" based on the law of various states.  Moreover, since the judgment in *Price* has not yet been made final, the settlement and release of the compensatory economic loss and derivative punitive damages in such a  modified "lights" action might be an element that would be considered by the Illinois Supreme Court in assessing the adequacy or necessity of any punitive damages different from or over and above that which is released in an overarching modified "lights"  settlement.  *See In re: the Exxon,* 270 F.3d at 1244 (9th Cir. 2001).

**3.   (a)   Returning to the issue raised in 1. *supra*, the Court reads Plaintiffs' present claims as based on a simple RICO-federal-mail-wire-fraud concept rather than on state substantive consumer fraud law.  Nevertheless, the Court is not clear on the relationship between the two sets of fraud laws – federal and state.  Can, and if so should, the instant class action exclude fraud claims based on the consumer fraud law of jurisdictions such as that in *Price* and other such suits commenced and not yet commenced?**

6

Yes.  The present amended complaint is confined to a simple RICO-federal-mail-wire-fraud concept.  However, by further amendment, fraud claims based on consumer fraud law (statutory and common) of jurisdictions such as *Price* can be included under the ancillary jurisdiction of this Court.  Such an amendment would be consistent with other similar federal cases which have involved related state law violations.  *See, e.g., In re New Motor Vehicles Canadian Export Antitrust Litigation*, MDL No. 1532 (D. Me.); *see generally* Class Action Fairness Act, 28 U.S.C. § 1711.

**3.  (b)   Can the damages for a single fraud transaction (no matter how extensive) be recovered under non-state RICO substantive federal mail-wire fraud law and under state fraud and other law?**

No, not as to compensatory economic losses for the same members of both classes.

**3.  (c)   Does a loss by a Defendant under state consumer fraud law, as in *Price*, which is arguably essentially the same as RICO-federal-mail-wire-fraud substantive law in its primary elements, have a collateral estoppel effect preventing the losing Defendant from contesting the same elements of the RICO fraud claim?**

Yes, upon final resolution on appeal.

**3.  (d)   What, if any, collateral estoppel effect would there be in a loss by Defendants in the RICO case by the government in *United States v. Philip Morris*, 99-CV-02496 (D.D.C.)?  *See, e.g., Park-lane Hosiery Co. v. Shore*, 439 U.S.322 (1979) (offensive collateral estoppel).**

Total on all of the same facts and issues, except reliance and amount or type of damage upon final adjudication of appeal.

**3.  (e)   Does a win by Plaintiffs under either federal or state law result in precluding another claim based on the same fraud under the other law?  Thus, for example, if *Price* stands up; on appeal, would sales of light cigarettes in Illinois during the Illinois conspiracy period be excluded from the recovery base in the instant case?  (*See, e.g., Beck v. Levering*, 947 F.2d 639 (2d Cir. 1991) (collateral estoppel and double recovery); *LaFleur v. Whitman*, 300F.3d 256, 271 (2d Cir. 2002) (choice of law in collateral estoppel); *Bajwa v. Metropolitan Life Ins. Co.*, 208 I11.2d 414 (2004) (Illinois collateral estoppel rule).**

Yes, if *Price* is affirmed on appeal before a final settlement or judgment in this case.

**3.  (f)   Would the Illinois class have to be carved out of the present RICO class (as it appears to be in paragraph 32 of the first amended complaint)?**

The Illinois class would not "have to" be excluded from the present RICO class unless the *Price* judgment were affirmed on appeal before any judgment or settlement became final in this matter.  If *Price* is affirmed before a final settlement or judgment in this case, the economic damages of the Illinois class would be identical to that claimed by the RICO class.  There could

221928v1

be no double recovery and the Illinois class would, as a matter of practicality and necessity, "have to" be excluded from the instant case.

**4.   (a)   Assuming that a single federal substantive theory applies under RICO, does each state's law have any application at all under that theory?**

Yes, but only to the extent each state law would provide an alternative source of relief to members of a class pursuing a violation of that state's law.

**4.   (b)   If so, how are they related?**

The underlying or operative elements of the fraud-type misconduct involve the same common facts.

**5.   (a)   If individual state substantive law has some bearing under A. or B. of 2.,** *supra,* **which states do members of the class fit into – the states where they resided at the commencement of the suit, where they were smoking, etc.?   In** *Price,* **the state where the cigarettes were bought was apparently deemed crucial in figuring class damages.   See** *Price v. Philip Morris,* **No. 00-L-112, 2003 WL 22597608, at \*17 (Ill. Cir. Mar. 21, 2003). Individual state substantive law has no bearing on those issues**.

The claims of class members exclude those for purchases of "light" cigarettes in states in which a certified state class seeking economic damages from fraudulently-induced purchases of "light" cigarettes in that state exists at the time of trial.  Plaintiffs intend to amend the class definition to the following so that claims for such purchases potentially subject to recovery are excluded from the class definition:

> All United States residents who purchased in the United States, not for resale, cigarettes labeled as "Lights" and/or "Light" (collectively "light cigarettes") that were manufactured and/or sold by Defendants during the period commencing on the first date that Defendants began selling "light" cigarettes until the date trial commences (the "Class Period").   **Excluded from the claims of members of the class are their "light" cigarette purchases in any state(s) in which a certified state class seeking economic damages stemming from fraudulently-induced purchases of light cigarettes in that state exists at the time of trial herein.** Excluded from the Class are individuals who are directors and officers of the Defendants' corporations, their parents, subsidiaries and/or affiliates, the Judge handling this case and members of his or her immediate family and the Judge's staff.

**6.   (a)   If individual state substantive law has some bearing under A. or B. of 2.,** *supra,* **can groups of states be treated as providing essentially the same substantive law, and how much difference does that characterization tolerate?**

Yes.  Just as in *Simon II,* under New York choice of law principles the Court can certify a class based on the choice of a single law without applying every state's laws.  *See In re Simon II*

8

*Litig.*, 211 F.R.D. 86, at 175 (E.D.N.Y. 2002), *rev'd on other grounds*, 407 F.3d 125 (2d Cir. 2005) ("*Shutts* left open the possibility that the choice of a single law (or multiple state laws) is constitutionally permissible if the mechanical application of multiple laws threatens the rational adjudication that lies at the heart of due process, and 'this threat outweighs the countervailing Due Process and Full Faith and Credit Clause considerations that animated *Shutts.*").

While there are variations in states' substantive laws, there are not significant enough conflicts that the Court would have to apply each state's law. *See, e.g., Int'l Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, Docket No. ATL-L-3015-03-MT, (N.J. Super. Ct. June 30, 2005) (certifying a consumer fraud act class under New Jersey law despite differences in state law and noting that, "It is true there are differences but these differences only establish there is a conflict which is only the first step in the required analysis. The second step is the review of the policy and purpose of each State's laws...As long as no out-of-state plaintiff gets less protection than their own statutes offer and the New Jersey defendant is subject to New Jersey law, there is little reason for any objections.") (Attached as Ex. 1); *Steinberg v. Nationwide Mutual Ins. Co.*, 224 F.R.D. 67, 78 (E.D.N.Y. 2004) (granting class certification and finding that variances in state contract law provisions do not preclude class certification).

If, however, the Court did decide to apply the substantive law of each state, there are sufficient similarities among the states' law that the states could be subclassed into groups. *See, e.g. Steinberg*, 224 F.R.D at 78 (finding that grouping states according to their state substantive law provisions is manageable for purposes of granting class certification); *P.J.'s Concrete Pumping Serv., Inc. v. Nextel West Corp.*, 803 N.E.2d 1020, 1030 (Ill. App. Ct. 2004) (finding the potential applicability of the state law of seventeen different states unproblematic because the court could divide the class into subclasses).

**6.   (b)   Are class representatives from states or groups  of states with different substantive rules required?**

Yes, if individual state law did have some bearing, groups of states can be treated as providing essentially the same substantive law. *See In re Telectronic Pacing Systems, Inc.*, 164 F.R.D. 222 (S.D. Ohio 1995); *In re: St. Jude Medical, Inc. Silzone Hear Vlaves Products Liability Litigation*, No. MDL 01-1396, 2003 WL 1589527 (D. Minn. Mar. 27, 2003). Different class representatives would likely be required for each such sub-class.

**7.   (a)   If Plaintiffs in the instant case win on their present single RICO theory, will any future state punitive damages then be available in view of the fact that RICO provides a form of punitive damages in its multiplication provision? See 18 U.S.C. § 1964(c).**

Uncertain. The fact of a civil RICO judgment should impact whether a subsequently litigated similar claim is precluded in whole or in part. For example, if a future state punitive damage action is premised on the recovery of the same economic loss damage, recovery by the class of that damage in the RICO action would negate the basis for any economic damage in the state case. If there were no recoverable economic loss by reason of a RICO recovery, there would be no compensatory base upon which to construct a state punitive award.

221928v1

However, if there was no duplication of economic loss, a state court or jury could impose an award of state-authorized punitive damages. State law regarding such damages may permit multiples greater than that mandated by RICO and which would still be constitutionally acceptable. The fact that RICO provides a form of punitive damages in its multiplication provision would not appear, as a matter of law, to preempt different state law multiples consistent with constitutional guidelines and differences in the perceived egregiousness of the wrong – i.e., economic loss related to consumers being cheated versus personal injury relating to individuals suffering disease or dying.

**7. (b)   How does individual state substantive punitive damages law (as limited by federal constitutional law) impact on this issue, if at all?**

Although individual state substantive punitive damages law might not be capped at a multiple of three, an award of multiple damages under federal RICO law should be taken into account in consideration of any differing state law punitive award. At a minimum, the federal treble damage award should be the base for or set-off to any similarly derived state punitive damage.

**7. (c)   Would a treble RICO recovery prevent punitive state law damages in future state law-based claims? *Cf. Simon II* in 1, *supra.***

A "treble RICO recovery" would not necessarily "prevent" a punitive state law damages in future state law-based claims. See 7. (a) and 7. (b), above. It should, however, cause that "treble RICO recovery" to be weighed as a material and limiting factor in assessing any future state law-based punitive damage.

**7. (d)   Would punitive damages already awarded or yet to be awarded in state based claims preclude RICO trebling?**

Yes, but only as to that portion of punitive damages for which there is an overlapping economic loss claim.

**8. (a)   If Plaintiffs in the instant case win, how can or should a recovery be divided?**

If Plaintiffs won this matter, a recovery should be divided proportionally to all class members consistent with claims forms submitted to an independent administrator and based on the best available information. *See* Redfern Report (Attached as Ex. 2).

**8. (b)   Will a disbursing facility be required, and if so, what will be its method and plan of operations?**

Yes. *See* Redfern Report (Attached as Ex. 2).

**9.       If individual state law differences have some bearing on the present single RICO theory, can the experts estimate the numbers of "lights" smokers and damages by different states or groups of states?**

221928v1

Yes.

**10. (a)   How should the jury be charged in the case as it now stands?  Will the Plaintiffs draft a proposed charge in time for the September 12 hearing so that the viability of the litigation can be better evaluated?**

*See* Plaintiffs' Proposed Phase I and II Jury Instructions (Attached as Exs. 3 and 4). There would be a third phase tried after a verdict was entered in Phase I (and after Phase II), which would address equitable relief and would be tried to the Court.

**10. (b)   Should there be special findings?**

See Plaintiffs' Proposed Phase I and II Verdict Forms (Attached as Exs. 5 and 6).

**10. (c)   If so, how should they be phrased?  [Note that *Price* was non jury with findings by the court.]**

Special findings by the jury would be affected by the shape of the issues submitted.  The parties continue to seek to shape the final scope of those issues through motions practice. However, at the present time, Plaintiffs foresee special findings as set forth in Plaintiffs' Proposed Phase I Verdict Form and Plaintiffs' Proposed Phase II Verdict Form,

**11. (a)   For argument's sake only, accepting Parts I, II and III of the statement of "facts" in Plaintiffs' Motion as true, and assuming that named Plaintiffs are appropriate representatives, and that they and counsel satisfy all Rule 23 requirements, how do Plaintiffs propose to confront the legal and administrative problems of certifying, notifying and trying the case?  As one class?  As a consolidation of sub-classes?**

As one class.  *See also* Kinsella Report (Attached as Ex. 7).

**11. (b)   As excluding persons recovering in other actions?**

Yes, if actual recoveries are made in other actions.

**11. (c)   A detailed proposed litigation plan to help the court decide on the litigation's practicability might be helpful.  What evidence can the court consider in deciding certification questions?  See May 26, 2005 Trans. At 21.**

Plaintiffs' Litigation Plan is attached as Ex. 8.

(The court can consider all evidence admitted in all tobacco trials relating to the RICO and conspiracy allegations in this case, as well as all public health materials, experts' reports, affidavits and documentary evidence which may be admissible if offered at trial.)

**12.      Assuming for argument's sake only that Plaintiffs' factual claims are supported – i.e., that Defendants have conspired to commit a continuing fraud on "lights" smokers**

221928v1

**knowing that many would die or suffer from diseases, in order to make profits on cigarettes they sold as "safer" than prior cigarettes, thus defrauding those who bought the cigarettes of the difference between the value they thought they were getting and that they received – is some procedural modification of proof or burdens of proof available? See May 26, 2005 Trans. at 26.**

Yes. Where, as here, there has been a final judgment rendered against at least one defendant (Philip Morris) and multiple judicial decisions of different courts on facts material to the claims in the instant case and Defendants' internal documents and admissions made in open court, there should be a modification of the burden of proof on the issue of reliance.

Under the weight of this evidence, a rebuttable presumption of reliance is appropriate. A presumption is appropriate where the plaintiffs have met their burden of proving a presumed fact by a preponderance of the evidence. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 n.3 (1993); *see also* Weinstein's Federal Evidence § 301.02[3][a], p. 301-12 (1997) ("[T]he presumed facts in most civil cases must be proved by a preponderance of the evidence."). "To establish a presumption is to say that a finding of the predicate fact . . . produces 'a required conclusion in the absence of explanation.'" *St. Mary's* at 506 (quoting 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977)). The role of the presumption is to force the defendants "to come forward with some response." *Id.*.

A rebuttable presumption of reliance is applicable in a RICO class action. Courts have certified RICO class actions where the uniformity of the evidence allowed the court to conclude that the plaintiffs were entitled to a presumption of reliance. *See Spark v. MBNA Corp.*, 178 F.R.D. 431 (D. Del. 1998) (holding that it was logical to presume reliance where all class members received the same advertisement for a low APR); *Chisolm v. Transouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va. 2000) (holding that presumed reliance was appropriate where the defendants presented the fraudulent scheme in a standardized fashion); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479 (S.D. Fla. 1996) (holding that reliance could be presumed because a common core of information gave the alleged fraudulent scheme a standard set of operative facts); *Singer v. AT&T Corp.*, 185 F.R.D. 681 (S.D. Fla. 1998) (holding that a uniform price representation created a presumption of reliance).

In the instant case, the numerous prior judicial decisions, internal industry documents, and admissions of Defendants allow Plaintiffs to sufficiently allege an "ongoing" scheme to defraud smokers with respect to the safety of "light" cigarettes. This evidence available to prove the conspiracy, a summary overview of which is presented below, entitles the Plaintiffs to a rebuttable presumption of reliance, thereby shifting the burden of proof to the Defendants. The Defendants may rebut the presumption of reliance only through a showing of evidence on the basis of which a reasonable jury could find non-reliance more probable than not. *See County of Orange v. Sullivan Highway Prod., Inc.*, 752 F. Supp. 643, 646 (S.D.N.Y. 1990); *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1579 (Fed. Cir. 1984) ("The effect of a presumption of fact . . . is to place upon the opposing party the burden of establishing the nonexistence of that fact.").

12

221928v1

*The Public Health Community "Did-It" And*
*The Federal Trade Commission "Made –Me-Do-It" Defenses[1]*

To date, various plaintiffs have tried claims of some form of fraud against the tobacco companies concerning their production, promotion and marketing of "lights."  *See, e.g., United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* No. 98-3287 (E.D.N.Y.).  The companies have defended themselves in those trials by contending, among other things, that the belief in the health benefit or protection afforded by "lights" cigarettes as opposed to regular cigarettes resulted from that message as communicated by the public health community.  According to Defendants, therefore, the cause of the reliance by the public in the belief of the safety of "lights" was the responsibility of the public health community – they "did-it."

In their closing argument in *United States v. Philip Morris,* Defendants argued:

> With respect to lower tar, the government and the public health community contributed to demand.  They went out and told the public, if you're not going to quit, switch to lower-tar cigarettes.

Defense Closing Argument, *United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.) Transcript of June 8, 2005, afternoon session, at 23221:12-15.  (Excerpt attached as Ex. 11).

Alternatively or cumulatively, the tobacco companies contend that in developing and selling "lights" they were only doing what the Federal Trade Commission authorized or ordered them to do.  According to Defendants, therefore, the public's reliance on the "safety" of "lights" as expressed or implied in FTC machine-measured tar values was the responsibility of the Commission – they "made the tobacco industry do it."  In their Interim Summation in *United States v. Philip Morris,* Defendants argued:

> [T]he FTC determined what the tobacco companies can communicate to the American public regarding tar and nicotine levels….We did exactly what the FTC wanted us to do.  The FTC's machine method measurements started because they wanted to implement the process.

Defense Interim Summation in *United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.), Transcript of February 24, 2005 at 14336:11-24. (Excerpt attached as Ex. 12).

Although Plaintiffs dispute the merits of both defenses, their assertion by the tobacco companies inherently and wholly depends on the success of the public health community's message and/or the FTC's exercise of governmental regulation to create or cause reliance by the

---

[1] The public health community "did-it" and the "government-made-me-do-it" defenses are a sham.  No member of the public health community or the Federal Trade Commission has ever testified in support of these "theories."  In fact, those persons within the public health community and the Commission staff having relevant contemporaneous knowledge will testify that they were, along with the general public, defrauded by defendants. *See* Declarations of Matthew Myers and Judith Wilkenfeld, (Attached as Exhibits 9 and 10, respectively).

13

public in the expressed or implied "safety" of "lights" as compared to regular cigarettes. **These defenses accept and concede that there was overwhelming consumer reliance on the perceived connection between "health benefits" and smoking "lights."** By themselves, these defenses therefore merit shifting the burden of proof to the tobacco companies to establish the percentage of consumers who did not rely on the health message of "lights" and to establish how a "lights" market would ever have developed if there had been no consumer reliance or widespread consumer non-reliance on perceived "lights" health benefits.

*The Market*

But there is far more evidence and findings which militate in favor of shifting the burden of proof with respect to RICO reliance.[2]

A strong consumer consciousness as to the health dangers of smoking emerged following the publication of increasingly definitive conclusions by the public health community identifying cigarette smoking as a cause of numerous human diseases. A sense of fear began to pervade the public—they were becoming "scared." *See, e.g.* Transcript of Interview of James C. Bowling, Vice President of Philip Morris, Inc., August 16, 1976, 2024273104-3137, at 3114-3115 ("…[P]eople are scared. People have been talked to, lied to, et cetera about cigarettes and health, and essentially that has created a climate wherein people want a low good delivery cigarette.") (Attached as Ex. 4 to Pls.' Mem. Supp. Mot. Partial Summ J. Regarding Defs.' "Compliance With the Public Health Community" Defense) (Attached as Ex. 13).

Early tobacco company responses to the "scare" affirmatively and aggressively promoted health reassurance through the virtues of filter-tip cigarettes, which were promoted as protecting the smoker from some of the harmful effects of tar in cigarettes.[3]  *See* Memo by E. Pepples, "Industry Response to Cigarette/Health Controversy," 680099136-145, 136 (February 4, 1976) (giving the following account of the industry's historical response to health concerns: "The tobacco industry has reacted to the challenge of the smoking and health controversy in the following ways: (1) Produce more filter brands and brands with lower tar delivery….") (Attached as Ex. 18 to Pls.' Mem. Supp. Mot. Partial Summ. J. on Defs.' "FTC Defense".) ("Pls.' Mot. on FTC Defense").

This was the period known as the "tar derby" – when tobacco companies tried to outdo each other in advertising the claimed superiority of the health protection of their filters:

> The new filter brands vying for a piece of the growing filter market made extraordinary claims. There was an urgent effort to highlight and differentiate one brand from the others already on the market. It was important to have the most filter traps. Some claimed to possess the least tars.

Memo by E. Pepples, "Industry Response to Cigarette/Health Controversy, *supra,* at 680099137

---

[2] The following references are provided as illustrative only and not as being inclusive of all relevant evidence on the issue of reliance or fraud.

[3] Plaintiffs' reference to the introduction of filters on cigarettes is not an assertion in any way of any claim relating to such filters.

221928v1

Actual tar removal by filtration was irrelevant. The industry calculated that it would be sufficient to deliver the "illusion" of filtration in response to consumers' real concerns about health. "Special Report No. 248: Market Potential of a Health Cigarette," June 1966, 1000338646-8669, at 649 ("The illusion of filtration is as important as the fact of filtration") (Attached as Ex. 7 to Pls. Mem. Supp. Mot. Partial Summ. J. Regarding Defs.' "Compensation" Defenses).

The deception was found by Congress to be far more successful than the filter. In 1958 they wrote:

> The effectiveness of this deceptive advertising is evidenced by the rise in filter-cigarette sales from 1.4 percent of total cigarette sales in 1952 to 40 percent in 1957.[4]

H.R. Rep. No. 85-1372, "False and Misleading Advertising (Filter-Tip Cigarettes)," at 25 (1958) (Attached as Ex. 5). *See also,* Memo by E. Pepples, "Industry Response to Cigarette/Health Controversy," at 680099137 ("In most cases, however, *the smoker of a filter cigarette was getting as much or more nicotine and tar as he would have gotten from a regular cigarette.* He had abandoned the regular cigarette, however, on the ground of reduced risk to health.") (attached as Ex. 18 to Pls.' Mot. on FTC Defense) (emphasis added).

By 1958 the tobacco companies, through their marketing and promotion of filter-tip cigarettes, had themselves contributed to the "connection" between lower tar and health "protection" which had become "deeply embedded in the public mind." *See* 1958 House Report at 25. *See also id,* at 24 (stating that, though the FTC did some effective work in stopping objectionable advertising, "[u]nfortunately, this activity occurred after the public had been 'brainwashed' that filters would furnish health protection"). *See also* Memo by E. Pepples, "Industry Response to Cigarette/Health Controversy," *supra,* at 680099145 ("The manufacturer's marketing strategy has been to overcome and even to make marketing use of the smoking/health connection. Thus the 'tar derby' in the United States resulted from industry efforts to cater to the public's concern and to attract consumers to the new filtered brands.") (Attached as Ex. 18 to Pls.' Mot. on FTC Defense).

The health consciousness of consumers and smokers increased over time. There was a continuing and growing unsatisfied demand for a "safer" cigarette. An internal Philip Morris document confirms that the industry was aware of this pressure:

> In the past decade, the tobacco industry has introduced a multitude of cigarettes with progressively lower tar and nicotine contents. This emphasis on low-tar products is the result of consumer demand spurred at least in part by the smoking and health controversy.

---

[4] By the time "lights" were introduced in 1971, the market for cigarettes had significantly shifted from one which was exclusively non-filtered, to a dual market where filter-tips accounted for 82% of smokers. *See* "Federal Trade Commission Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, 1986", 2073643375-3399 at 2073643381, May 1988 (Attached as Ex. 14).

221928v1

"Breakthrough of the High Taste, Low Tar Cigarette—A Case History of Innovation," by Judy John and Helmut Wakeham, 2021566196-216, at 197. (Attached as Ex. 14 to Pls.' Mem. Supp. Mot. Partial Summ. J. Regarding the Meaning of the "Light/Lights" Descriptors) ("Pls.' Mot. on Meaning of "Light/Lights" Descriptors).

Likewise, a Lorillard document states:

> Lorillard manufactures and sells several brands of cigarettes to meet the demands of various groups of consumers. It was the pioneer in the high filtration type of cigarette *in order to supply the anticipated and subsequently realized, demand for such a cigarette from a large segment of the smoking public.*

"Position Statement," 80684691-695, at 691 (Attached as Ex. 16) (emphasis added).

In the 1970s, the tobacco industry foresaw they were facing an ever "shrinking market" with limited growth potential and continually declining consumption.[5] Philip Morris took the lead and responded by introducing a cigarette brand designed to deliver a lower machine-measured value of tar in cigarette smoke – "lights."[6] The industry itself has even referred to "lights" as providing an alternative to smokers simply cutting down or quitting as a result of health concerns:

> Smokers remain prepossessed by exactly the same concerns that brought about the proliferation of successful lighter brands. They, presumably remain open to and <u>need</u> new ways of delivering <u>less</u>....*It is useful to consider lights more as a third alternative to quitting and cutting down*—a branded hybrid of smokers' unsuccessful attempts to modify their habit on their own.

"Structured Creativity Conference: Delegate Presentations," (June 25-28, 1984), 400993160-3331, at 3265 (Attached as Ex. 19) (emphases in italics added).

Industry wide, "Lights" signified lower tar and lower tar was, by 1971, synonymous with health protection.[7] As reported by the Roper Organization in 1979 in a study commissioned by

---

[5] *See e.g,* "Technological Forecast of the Future Environment and Its Effects on the Tobacco Industry," 670133822-4128, (September 15, 1978), a report prepared for Brown & Williamson, which forecasted a "shrinking market…as smoking incidence decreased." *Id.,* at 670133833. Using a regression analysis, the same document forecasts that by the year 2000, low tar cigarettes would occupy a 99% share of that declining market. *Id.*, at 670133975(Attached as Ex. 17).

[6] Internal company documents reveal that Defendants continued to respond to this same pressure even after the introduction of lights. A December 3, 1991 Memo from James Johnston, former CEO of R.J. Reynolds to scientists Dr. Doolittle and Dr. deBethizy stated: "Our plan is currently focused solely on capturing market share from the other tobacco companies in an overall declining market. This declining market has been occurring in recent years and appears likely to continue. Why is the market declining?...[I]t is evident that another critical factor in the declining market is increasing health-consciousness, a very important attribute of the 1990's consumer." 508300548-59, at 58 (Attached as Ex. 18).

[7] As found by the United States District Court for the Southern District of New York, the term "Lights" was and is "purely descriptive of [a] low tar and nicotine product." 1975 U.S. Dist. LEXIS 15597, at *7 (E.D.N.Y. 1975). While Philip Morris established the "market for lowered tar and nicotine cigarettes" described as "lights," the other

16

Philip Morris, "the appeal of low tars is simple and single—better for you, less harmful, easier on the lungs, throat, etc." "A Study of Smokers' Habits and Attitudes with Special Emphasis on Low Tar and Menthol Cigarettes," (March 1979), 2040065703-5837, at 5729.  (Attached as Ex. 20).

In its 1997 Request for Public Comment on Cigarette Testing, the FTC confirmed that the descriptor "Light" conveyed just what the tobacco industry had recognized in the early 1970s that it would:

> Cigarette manufacturers use a number of descriptive terms (such as "low tar," "light," "medium," "extra light," "ultra light," "ultra low," and "ultima") in advertising and labeling information about their cigarettes.  The Ad Hoc Committee of the President's Cancer Panel concluded that *"[b]rand names and brand classifications such as 'light' and 'ultra light' represent health claims* and should be regulated and accompanied, in fair balance, with an appropriate disclaimer.

Cigarette Testing; Request for Public Comment (September 12, 1997) 62 Fed. Reg. 48158 (emphasis added); *See* Aff. of Judith Wilkenfeld.  (Attached as Ex. 10).

The "lights" brand was nurtured and grown by the industry from a modest beginning[8] to a dominant cigarette brand[9] on its strength and positioning as a health market alternative to the risks of disease associated with regular cigarettes.  The connection between "lights," lower tar and health was exploited by the companies through the disproportionate emphasis in packaging and advertising for "lights" and the promotion of the "lights" descriptor as a shorthand reference for lower tar and better health.  Consumer reliance on the promoted and perceived benefit was endemic.

For example, in the context of the Barclay litigation, the District Court for the District of Columbia noted that:

> [T]the fact that cigarette companies spend millions of dollars advertising low FTC ratings allows the inference that marketing experience demonstrates reliance by consumers on such information in making purchasing decisions.

*Federal Trade Commission v. Brown & Williamson Tobacco Corp.*, 580 F. Supp. 981, 987 n.30 (D.D.C. 1983)*, rev'd in part on other grounds,* 778 F.2d 35 (D.C. Cir. 1985).  The Court went on to find:

---

tobacco companies "capitalize[d]" on the establishment of that market by Philip Morris and competed by copying and using that same descriptor—"lights"—for their cigarettes. *Id.*, at 15.

[8] When Marlboro Lights were introduced in 1971, after their first full year on the market, the sales represented a .5% share of the market.  "The Evolution of Lights in the USA, Case Study" (December 1998), 672500001-134, at 034. The growth rate of the "lights" segment of the market between 1975 and 1981 was 30%.

[9] *See, e.g.* Deposition of James Morgan, June 7, 2005 ("Marlboro Lights is the largest selling packing in the country today.")  (Attached as Ex. 22).

> Cigarettes with low tar and nicotine ratings are generally considered by smokers to be relatively less risky to health and cigarette companies emphasize low ratings to promote certain brands.

*Id.* at 983.

Likewise, in *Price v. Philip Morris,* the court found that no rational smoker would choose lights for a reason other than health:

> As a threshold matter, the mere existence of potential other reasons for a consumer to prefer the products at issue in this case does not vitiate or eliminate the fraud associated with the health representation as a causative influence on all Class members' purchase decisions....*The Court finds it altogether implausible that any smokers who have no concerns about the hazards of smoking or who actually want to defy death by smoking the most hazardous cigarettes available would choose specifically to smoke a low tar cigarette like Marlboro Lights and Cambridge Lights.*

*Price v. Philip Morris*, No. 00-L-112 2003 WL 22597608, at *8 (Ill. Cir. Ct. Marc. 21, 2003) (emphasis added).

In *Boeken v. Philip Morris, Inc.,* the court found that Philip Morris had exploited the expectation that the tobacco industry had created in consumers that "lights" were a safer product:

> In addition to fraud, the evidence establishes that Philip Morris acted with a conscious disregard of consumer health and safety in the manufacture and marketing of a dangerous product, and *intentionally took advantage of the consumer expectation that 'light' cigarettes were safer*....Further demonstrating a conscious disregard for consumer safety, Philip Morris was *still* marketing "light" cigarettes at the time of trial, knowing that they may increase the risk of more serious cancers.
>
> …
>
> The very conduct that injured Boeken was *directed at all smokers* in the United States, repeated over many years with knowledge of the risk to human life and health, and is probative or intentional deceit.  The national marketing of a defective product, *knowing that ordinary consumers expect it to be less hazardous*, knowing that thousands of people will die due to their addiction, is probative of a willful and conscious disregard of the danger to human life.

*Boeken v. Philip Morris, Inc.*, 2005 WL 737511, at *33-*35 (Cal. Ct. App. April 1, 2005) (emphasis added).

In *Henley v. Philip Morris*, in affirming the jury's finding of reliance, the Court found that:

18

221928v1

Plaintiff's claims, in contrast, rest on a quintessential 'mass tort,' i.e., a course of more-or-less uniform conduct *directed at the entire public* and maliciously injuring, through a system of interconnected devices, an entire category of persons to which plaintiff squarely belongs.

*Henley v. Philip Morris*, 9 Cal. Rptr. 3d 29, 72 (Cal. Ct. App. 2004) (emphasis in original).

Markets are constructed and expanded only if there is a core mass on which they can adhere. That core mass must include a predominant proportion of relevant consumers who positively respond to and rely on the express or implied message of the market. As is clear from the collective evidence considered in the foregoing decisions and available in this case, the tobacco industry used the descriptor "lights" to promote and sell a product which was purportedly different from their regular cigarettes as distinguished by its lower tar and health protection. The association between low tar and safety had become "embedded" in the public's mind because the predominant mass of consumers relied on the "lights" descriptor as signifying a "safer" product.

The internal documents of the companies, their acknowledgments, judicial findings and final judgments here, likewise, should be sufficient to create a rebuttable presumption of consumer reliance by reason of Defendants' having achieved what they promoted and sold – a "lights" – low-tar-cigarette in a market for health conscious or concerned smokers. Under such circumstances, the Court should presume reliance by Plaintiffs and the burden should shift to the tobacco companies to demonstrate, by a preponderance of the evidence, the nature and extent of individual smoker non-reliance on the health reassurance foundations of the "lights" market.

**13.    Plaintiffs' Motion was filed under "seal." Why? The courts discourage unnecessary sealing particularly in a matter of public interest such as a national class action.**

Plaintiffs do not desire the filing of these pleadings under seal except under very limited circumstances. The terms of the presently enforceable Protective Order require that, "Where any Confidential information or information derived from Confidential information is included in any Court filing," the material be filed under seal. *See* Protective Order, February 8, 2005, at ¶ 9. Because it was not clear at the time of the filing of the Plaintiffs' Motion for Class Certification which documents Defendants were claiming were Confidential, Plaintiffs filed their Motion under seal in the interest of caution. Plaintiffs have no opposition to the suspension or termination of the Order except for materials which can be demonstrated by Defendants to contain trade secrets or other similar-type competitive proprietary information. Plaintiffs also have no opposition to the refiling of their Motion for Class Certification publicly.

**14.    Can discovery and evidence in other cases be used in the present case against Defendants to reduce costs? Against Plaintiffs?**

Yes as to Defendants under principles of admission, conspiracy or collateral estoppel.

No as to Plaintiffs.

19

**15. (a)   Is it possible to try the case in whole or in part on stipulated facts and experts'
evidence or on written direct testimony or other appropriate techniques?**

In light of the strategies exercised by Defendants in other "lights" litigations, except to the
extent collaterally or otherwise estopped, it does not appear possible to try this case in whole or in
part on stipulated facts.  This judgment, however, is dependent on the ability of Defendants to
challenge relevant public health findings which in all other contexts some have publicly accepted
as being "truthful and accurate" or upon which they urge and expect the public and the
government to rely.  If Defendants were precluded from asserting such inconsistent and
contradictory positions, then all public health reports could be admitted on stipulated expert
testimony of the members of the public health community.

Other trial techniques may be possible, but would depend in large part on the Court's
disposition of the outstanding motions.  If, for example, the Court were to grant Plaintiffs'
motions for partial summary judgment or limitations of evidence, the estimated trial complexity
and time would be greatly reduced.  As the trial parameters become more focused, Plaintiffs
would be prepared to offer and discuss such other techniques.

As a general matter, however, Plaintiffs have developed a litigation plan that provides for a
trial in the case equally manageable to those in the four prior cases involving "lights" and/or
RICO that have actually been tried.  *See Price v. Philip Morris Cos.,* No. 00-L-112 (Ill. Cir. Ct.);
*Scott v. American Tobacco Co.,* No. 96-8461 (La. Dist. Ct.); *Blue Cross and Blue Shield of New
Jersey, Inc. v. Philip Morris, Inc.,* No. 98-3287 (E.D.N.Y.); *United States v. Philip Morris USA,
Inc.,* No. 99-2496 (D.D.C.).  *See also* Plaintiffs' Litigation Plan (Attached as Ex. 8); Second
Declaration of Laurence H. Tribe, August 19, 2005 (Attached as Ex. 23).

**15. (b)   What classes and number of witnesses and classes of evidence does either side plan
to provide at the trial?**

*See* Plaintiffs' Litigation Plan (Attached as Ex. 8).

**16.      What public reports and other data can be introduced without further witnesses at
trial?**

All public reports on any aspect of the issue of smoking and health by recognized members of
the public health community, both domestically and internationally, should be admitted into
evidence as to authenticity and relevance.  If, however, Defendants challenge any of the findings
and conclusions of those reports, none would be introduced by Plaintiffs without a trial witness.

**17. (a)   Can a conspiracy theory support evidence of statements (admissions) of some
defendant parties and non-parties against other defendants?**

Yes.

**17. (b)   Which ones?**

20

221928v1

All statements and actions of all Defendant tobacco companies and their enterprise organizations should be admitted against all Defendants.  Some examples are as follows:

In a 1997 interview broadcast on National Public Radio, Bennett LeBow, then CEO of Liggett Group, described the tobacco company enterprise as follows:

> I mean, there's—there's really a—a so-called "tobacco club" of people who grew up in the business, lived in the business.  And what really happened here over the past 30, 40 years, the people in the tobacco club that listened to all the same lawyers, they got mesmerized by the lawyers—the lawyers telling him you can't do this, you should do this, you should do that, smoking's not addictive, let's not admit it, let's not admit anything—all these things and this, by the way, all these documents, documents which we're really, you know—you know, advising should come out.

Transcript of Bennett LeBow, *NPR Talk of the Nation*, July 30, 1997, at p. 5.  (Attached as Ex. 24).

In describing his acquisition of new legal counsel for Liggett in the mid-1990's in the same interview, LeBow also admitted the kinds of issues about which the industry conspired:

> I sa[id], I want to see all the documents you guys have been holding on for 40 years, bring them over to this new law firm.  So, the new law firm starts looking at the documents [and] they came to me and said, Mr. LeBow, these documents have some devastating things in them.  There's some really bad things in here.  I said, we got to make a settlement now with everybody.  I want a disclosal [sic] this.  I want to come clean.  I don't believe this whole theory of we win everything, and smoking's not addictive, and smoking doesn't cause cancer, or heart disease, or emphysema or whatever.  I want to come clean….I saw these documents sooner or later, they'd have to come out in the light of day.

*Id.* at 2-3.

An internal Philip Morris document considering how best to react to the publicizing of the 1964 Surgeon General's report likewise reveals that the industry had been furthering the enterprise through the Tobacco Institute (TI) and the Tobacco Industry Research Council (TIRC):

> Health impact will surely be an important, perhaps the most important, basis for competition in the industry in the next few years.  Competitive pressures suggest a break up of the common front approach of the industry through TI and TIRC.  While R.J. Reynolds continues to advocate a joint front, sit tight, status quo approach (it has the most to lose from any change in the status quo), others like American and Liggett and Meyers, sanguine for improved competitive conditions, show signs of bolting and have capitalized with their new products on early reactions to the [Surgeon General's] report."

21

221928v1

Philip Morris Research Center, "Smoking and Health Significance of the Report of the Surgeon General's Committee to Philip Morris Incorporated," February 18, 1964, 1003884292-1003884302, at 4295.  (Attached as Ex. 25).

Brown & Williamson, too, demonstrated its understanding that the industry was to adhere to its common front, violation of which was cause for action by other members of the enterprise:

> We are attaching [sic] this meeting of the Executive Committee to discuss the significance of one member's studied departure from *the rule of the road* which is essential to the existence of the Institute.  The rule is that open good faith discussion among all members precedes any company action on a major industry issue.

Outline for Tobacco Institute Meeting on May 19, 1981, 680543063-3064 at 3063 (Attached as Ex. 33 to Pls.' Mem. Supp. Mot. Partial Summ. J. Regarding Existence of Defs.' Conspiracy.) ("Pls.' Mot. on Existence of Defs.' Conspiracy) (emphasis added).

The tobacco companies and their related enterprises operated as a single unit, presenting a united front for over a half-century on all challenges to the safety of cigarette smoking.  No company deviated from the uniform positions of the "tobacco club."  Independent actions were met by threats of joint retaliation.  For example, in 1980, Brown & Williamson developed the "Barclay" cigarette, a product engineered with a particular filter designed to register very low tar and nicotine numbers on the FTC machine but to deliver higher levels of tar and nicotine when smoked by an actual smoker,  Fearing that if Barclay were successful, a proliferation of similar filters would, "most assuredly bring down the rath [sic] of anti-tobacco zealots on the industry,"[10] the other tobacco companies sought to enforce the "rules of the road" according to which the companies understood that, "open good faith discussion among all members precedes any company action on a major industry issue."[11]  Upon the introduction of Barclay in Europe, Philip Morris went so far as to run an advertisement that pointed out that Barclay cigarettes generated machine yields that were drastically lower than the tar and nicotine delivered to actual Barclay smokers.  In response, the former Chariman of BATCo wrote to Philip Morris that Philip Morris had, "ma[de] a mockery of *Industry cooperation on smoking and health issues*."  Letter from Sheehy to Weisman (September 9, 1983), at 201080394 (Attached as Ex. 28) (emphasis added).[12]

---

[10] Memo, "Call to E. Pepples," 503740271 (Attached as Ex. 26).

[11] "Outline for TI Meeting" (May 19, 1981), 680543063-64 (Attached as Ex. 27).

[12] Liggett faced similar industry retaliation with the introduction of its "XA" cigarette. Dr. James Mold testified as follows about XA in his deposition in *Cipollone*:

> Q:  Doctor, are you aware as to whether or not any other tobacco company applied pressure on Liggett not to market the safer cigarette?
> ...
> A:  At a meeting which...was held in New Jersey at the Grand Met Headquarters...at which the various legal people involved and the management people involved and myself were present.  At one point Mr. Dey who...at that time, and I guess still is the president of Liggett Tobacco, made the statement that he was told by someone in the Philip Morris Company that if we tried to market such a product that they would clobber us.

221928v1

By enforcing adherence to its united front approach, the industry was able to operate as a single "tobacco club" enterprise on issues regarding the public health safety of smoking. The acts of one became the acts of all, and the acts of all were the acts of each.

**17. (c)   Are there two conspiracies – one for "lights," and an earlier one for "regulars" – and do both, either, or neither provide a basis for evidence admissibility against all or some members of the conspiracy?  See Rule 801 (d)(2)(E) of the Federal Rules of Evidence**.

There is one conspiracy, which encompassed different episodes over time, involving the industry's concerted response to the public health issues concerning smoking and health.  For purposes of asserting their claim, Plaintiffs are only focusing on the episode of that conspiracy involving the fraud of "light" cigarettes.  However, earlier acts relating to regular and filter cigarettes virtually paralleled later acts for "lights," and all acts were similar in their purpose and effect – widespread public deception designed to create "illusions" of smoking safety to maintain or increase cigarette consumption and industry profitability.[13]

*1.  Light Cigarettes*

By 1971, the tobacco companies were faced with increasing public knowledge confirming the causal connection between smoking and various human diseases and decreasing prospects of long-term cigarette consumption and industry viability.  *See* Defense Closing Argument, *United States v. Philip Morris,* No. 99-2496 (D.D.C.) Transcript of June 8, 2005, morning session, at 23182:23-25 ("One thing we know, and it's not disputed, is that from 1964 forward, the consumption of cigarettes is plummeting.  It's gone down.") (Excerpt attached as Ex. 30).

The industry responded by developing, promoting and marketing a deliberate "illusion" – the "light" cigarette – knowingly designed to produce low machine-measured tar values while delivering no less tar levels to actual smokers than regular cigarettes and providing no meaningful public health benefit as compared to regular cigarettes.

"Lights" were promoted as an alternative to regular cigarettes.  The companies distinguished them from regular cigarettes as a "low tar"[14] and nicotine delivery product.  As such, they were portrayed, perceived and sold by name, implication, and expression as delivering less tar and nicotine, the dangerous and toxic constituents of smoke, to smokers, and which were therefore "safer" than a regular cigarette.[15]  They were not.

---

Deposition testimony of Dr. James Mold, *Cipollone v. Liggett Group, Inc.,* No. 83-2864SA (D.N.J.), Transcript of January 11, 1988, at pp.82-83 (Excerpt attached as Ex. 29).

[13] The following discussion is not, nor is it intended to be, a complete exploration of Plaintiffs' evidence on the conspiracy.  It is a summary overview of the key issues, acts, omissions and consequences.

[14] The lower tar value of "lights" reflected machine measured levels only and had no relationship to actual tar levels delivered to actual smokers.

[15] *See* Institute of Medicine Report, "Clearing the Smoke:  Assessing the Scientific Base for Tobacco Harm Reduction" (2001), at p. 60:

When filtered and low-yield cigarettes were introduced into U.S. markets, they were heavily promoted and marketed with both explicit and implicit claims of reducing the risk of smoking.

221928v1

As found by the National Cancer Institute in 2001:

> Epidemiological and other scientific evidence, including patterns of mortality from smoking-caused diseases, does not indicate a benefit to public health from changes in design and manufacturing over the last fifty years.

*See NCI Monograph 13: Risks Associated with Smoking Cigarettes with Low Machine-Measured Tar and Nicotine* (herein "Monograph 13") (2001), at 10.

Monograph 13 also concluded that:

> …most, perhaps nearly all, *smokers who switched to these low-yield brands did not substantially alter their exposure to tar and nicotine and, correspondingly did not lower their risk.*

*Id.*, at 3.

Virtually the entire public health community echoes the same finding and conclusions.

In its 2001 report "Clearing the Smoke," the Institute of Medicine confirmed:

> PREPs [potential reduced-exposure products] have not yet been evaluated comprehensively enough (including for a sufficient time) to provide evidence for concluding that they are associated with a reduced risk of disease compared to conventional tobacco use.

Institute of Medicine Report, "Clearing the Smoke: Assessing the Science Base for Tobacco Harm Reduction," (2001) p. 4. (Attached as Ex. 31).

Likewise, in 2004, the Surgeon General concluded:

> Smoking cigarettes with lower machine-measured yields of tar and nicotine provides no clear benefit to health.

2004 Surgeon General's Report, at 8. (attached as Ex. 32).

The World Health Organization's International Agency for Research on Cancer (IARC) found:

---

> Even as data accumulated, albeit slowly, that these products did not result in much—if any—decrease in risk, consumers have continued to believe otherwise.

*See also,* Monograph 13, at p. 198 ("Many consumers use the terms 'Light' and 'Ultra-Light' as a guide to the riskiness of particular brands of cigarettes. Many smokers choose Light and Ultra-Light brands because they believe that such cigarettes are less likely to cause health problems.")

More recent studies indicate that the lifetime probability of a continuing cigarette smoker developing lung cancer has increased over time.

IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, "Tobacco Smoke and Involuntary Smoking," Vol. 83 (2004), at p. 175.

The IARC also concluded that the mortality rate among women attributed to smoking in the United States has increased. *Id.* at p. 36.

The industry knew "lights" were no "safer" than regular cigarettes or acted with reckless disregard. A March 28, 1972 memorandum Marked "RJR SECRET" from Claude Teague, Jr. to E.A. Vassallo and Murray Senkus entitled "A Gap in Present Cigarette Product Lines and an Opportunity to Market a New Type of Product," gives insight on how Defendants exploited the desire of smokers to receive less tar and less risk from cigarettes by developing products that the Defendants understood would not deliver the lower tar exposure that they were offering in their marketing:

> [R]egardless of which cigarette the smoker chooses, in obtaining his daily nicotine requirement he will receive about the same daily amount of 'tar.' *If, as claimed by some anti-tobacco critics, the alleged health hazard of smoking is directly related to the amount of 'tar' to which the smoker is exposed per day, and the smoker bases his consumption on nicotine, then a present 'low tar, low nicotine' cigarette offers zero advantage to the smoker over a 'regular' filter cigarette, but simply costs him more money and exposes him to substantially increased amounts of allegedly harmful gas phase components in obtaining his desired daily amount of nicotine....*[t]he thoughts and philosophies expressed above come from many sources and certainly are not solely those of the writer.

500790776-0784, at 0778, 0782-0783, 0784 (Attached as Ex. 35 to Pls' Mem. Supp. Mot. Class Certification) ("Pls.' Class Cert. Mem.") (emphasis added).

As succinctly and candidly expressed by Philip Morris:

> ...I don't think low tar cigarettes were safer, I never did.

Deposition of James Morgan, July 7, 2005 (190:8-9) (Excerpt Attached as Ex. 22)

At no time prior to the introduction and marketing of "lights" and at no time after, did the industry establish or even investigate whether there was a medical or scientific basis to support a claimed, implied or express, health benefit from smoking "lights" as opposed to regular cigarettes. In fact, in a memorandum dated August 26, 1977, S. J. Green, Scientist, Manager, and Director of BATCo Research & Development from 1961-1979, posed the following questions to be discussed at a Chairman's Advisory Conference with Mr. Sheehy, then Chairman of BATCo:

221928v1

Should we market cigarettes intended to reassure the smoker that they are safer without assuring ourselves they are so, or are not less safe?

110072259 at 2259 (Attached as Ex. 10 to Pls.' Class Cert. Mem.) (emphasis added).

The public health community observed:

The tobacco industry's response to health concerns about smoking raised by the public health community was to develop cigarettes with lower yields of tar and nicotine as measured by the FTC method. The reductions in tar were marketed as a surrogate for reductions in risk. *There is no current evidence that the tobacco companies conducted any biological or animal testing to test this hypothesis or reduction in risk.*

Monograph 13, at p. 17.

From 1971 to 2001, no tobacco company conducted, completed and peer reviewed any study, analysis, or evaluation of the relative differences in health safety as between a "light" and regular cigarette.[16] They did, however, conduct multiple studies testing cigarette designs which showed that these highly engineered cigarettes delivered much higher levels of tar when they were smoked as smokers actually used them as opposed to the FTC machine smoking parameters. Many of these studies, particularly those showing that smokers of "lights" had the same exposure as smokers of regular cigarettes, were not disclosed to the public health community or published in the scientific literature.

During this time, the selling of the "illusion" of such "reduced tar" and "safety" was so effective that it shifted the entire balance of the market.[17] In 1971, regular cigarettes comprised 95 percent of the market, while "lights" held only 5%. *See* "The Evolution of Lights in the USA" (December 1998), 672500001-0134, 0031, 0035 (Attached as Ex. 21). By 2001, the balance had virtually reversed—cigarettes yielding FTC machine measured tar ratings of

---

[16] *See, e.g.,* Deposition of James Morgan, in which Mr. Morgan testifies as follows as to the testing done at Philip Morris:

Q: While you were chief executive officer of Philip Morris, did you instruct any of your scientists to conduct research to determine how much tar was actually inhaled by smokers of commercially available Philip Morris light cigarettes?

A: No.

124:11-17, (Excerpt attached as Ex. 22).

[17] This shift in the market that occurred with the introduction of lights is strikingly similar to the shift that occurred with the introduction of filters. Filters were first heavily marketed in the mid 1950s. By 2001, 97% of the cigarettes sold in the United States were filtered. Monograph 13, at 6. The parallel between the industry's use of both filters and "lights" to provide an "illusion" of safety and thereby preserve the industry's viability in the face of growing health concerns is so evident that in a 1998 case study detailing the development of the "lights" market, British American Tobacco referred to filter brands on the market in 1970 as the "Lights" segment.

26

221928v1

between 3 and 15 mg of tar comprised 84 percent of the domestic cigarette market. *See* Federal Trade Commission Report for 2002 (Attached as Ex. 34).

Indeed, the tobacco companies knowingly designed "lights" to make them more elastic in delivery. This increased elasticity made it more likely that an actual "lights" smoker would extract the same amount of tar from his/her "light" cigarette than he/she would have inhaled/ingested from a regular cigarette. Monograph 13 states:

> [C]igarette manufacturers recognized that approaches to reduction of tar yields that actually reduced the nicotine (and tar) delivery to smokers resulted in smokers discontinuing the use of those brands of cigarettes. This led to *an effort to design into the cigarette an elasticity of delivery* so that smokers could extract from the cigarette as much tar and nicotine as they needed....
> ...
> Cigarettes with low machine-measured yields by the FTC method are designed to allow compensatory smoking behaviors that enable a smoker to derive a wide range of tar and nicotine yields from the same brand, *offsetting much of the theoretical benefit of a reduced-yield cigarette.*

Monograph 13, at 4, 146 (emphasis added). The Monograph concluded:

> [P]ublic health authorities dramatically underestimated the ability of cigarette manufacturers to engineer cigarettes that would yield very low tar and nicotine values when machine smoked, but yielded much higher levels of tar and nicotine when smoked by the smoker. *Cigarettes were designed with an elasticity of delivery* that allowed smokers to get much higher yields of tar and nicotine by altering their pattern of puffing....[18]

*Id.*, at 2 (emphasis added).

Internal industry documents confirm this strategy:

> Cigarettes with compensatable filters will be developed. Such products will have low delivery when smoked under standard conditions, but, being velocity sensitive, a smoker may readily [sic] take higher delivery than the standard delivery, if he so wishes.

"Structured Creativity Conference," at 3192 (Attached as Ex. 19).

The report continues:

> <u>Compensatable Cigarettes:</u> The idea of a cigarette which will respond in delivery terms to increased draw effort is not new but is still an opportunity which would satisfy the need to bridge the threshold between genuine low tar and full flavour

---

[18] None of the design changes that were made to "light" cigarettes were contemporaneously disclosed to the public health community.

221928v1

products. However, we should strive to achieve this effect *without appearing* to have a cigarette that cheats the league table. Ideally it should appear to be no different from a normal cigarette thus reducing the likelihood of a competitive challenge. It should also be *capable of delivering up to 100% more than its machine delivery.* I have chosen this ratio because I believe anything more than this would lack credibility from a consumer's point of view. Thus an 8 mg product capable of delivering 15-16 mg would allow the current full flavor smoker to continue to smoke with reassurance but no loss in terms of pleasure.

*Id.*, at 93226 (emphasis added).

An internal Brown & Williamson document states:

Compensation—It exists; most smokers practice it, but we need to understand it better before *advantage can be taken in the marketplace.* Here, I believe designing to the subconscious is preferred to requiring the smoker to commit a conscious act.

Brown & Williamson Tobacco Corporation Research, Development & Engineering Internal Correspondence, from Dr. R. A. Sanford to Mr. E. E. Kohnhorst, re: "Research Program, Future Projects," 51200002-005, at 002 (June 28, 1985) (Attached as Ex. 35) (emphasis added).

[W]e may smoke a low delivery cigarette—but in times of tension or altered mood we want a stronger one. What happens? Either we smoke one more intensively (remember, there is no single dose for a cigarette)—or we smoke two in rapid succession. A dilemma appears—do we design a compensatable cigarette—and sell one—or the non (or minimally) compensatable cigarette—to sell two? Given the unit cost, it is very probable that the second option is not viable—so we have, perhaps, to do the first.
...
What would seem very much more sensible[] is to produce a cigarette which can be machine smoked at a certain tar band, but which, in human hands, can exceed this tar banding. Such is the case with Barclay. ... *Barclay is an extreme example of this 'elasticity' of delivery...*

"Structured Creativity Group: Thoughts by C.C. Craig—R&D, Southhampton Marketing Scenario," 100515899-5910, at 5907, 909-910 (Attached as Ex. 39 to Pls.' Class Cert. Mem.) (emphasis added).

The deliberate engineering of "lights" to allow elasticity of delivery essentially operated to undo what "lights" were identified to do—deliver "less tar" and provide a "safer" smoke.

221928v1

"Lights" cheated smokers. There is no materially measurable difference in actual tar delivered as between "lights" and regular cigarettes and "lights" smokers paid a premium[19] for health reassurance that didn't exist.[20]

"Lights" also cheated public health. Contrary to express and implied assurance of "safety" comparison to regular cigarettes, scientific evidence does not establish any materially measurable public health benefit from smoking "lights" as opposed to regular cigarettes.[21]

The absence of scientific evidence establishing that "lights" actually deliver "lower tar" to smokers or are "safer" to use than regular cigarettes exposes the brand for what it was—a fiction; an "illusion"; a fraud. The fraud was necessary to cigarette consumption and industry well-being. It was vital for industry unity in responding to the concern or challenges it faced regarding smoking and disease. It was perpetrated and maintained by the industry as a whole, in concert, no exceptions.

*Regular Cigarettes*

This "lights" deception is illustrative of the generally deceptive nature of the industry as a whole. For example, despite the overwhelming scientific evidence by 1964 that cigarette smoking caused certain diseases, the tobacco companies, in concert, agreed to fictitiously maintain there was a legitimate, open controversy on the subject. They maintained this untenable, unified position in the face of the knowledge of their own scientists as to the causal connection and their own inability, individually, jointly or severally, to retain qualified independent scientists to support this lie. For example, when asked in his Written Direct testimony in *United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.) "How long have you recognized that smoking was dangerous and caused cancer, emphysema and other diseases?", Dr. Jerry Whidby, a Philip Morris scientist, answered, "Since years before I went to work for Philip Morris." *Id.* at 5. (Attached as Ex. 37). In his trial testimony, when the Court followed up on his written direct answer by asking, "So the answer would be, I gather, that for years before 1972, you recognized that smoking caused cancer,

---

[19] The premium paid by smokers was not an overt one, in that regular cigarettes and "light" cigarettes are priced the same. However, as discussed in the response to Question 19, *infra*, because "lights" were both no safer and had "less taste" than regular cigarettes, by pricing them at the same level, the tobacco industry was extracting a higher price for those cigarettes than could have been obtained in a competitive market in which consumers were not deceived as to the relative qualities of the two products.

[20] *See* Expert Witness Reports of Jeffery Harris and John Beyer. *See also,* 1958 House Report, February 20, 1985, at p. 25 (Attached as Ex. 15), which found that smokers paid a similar premium for filter cigarettes for an illusory "protection" not received: "The American public have paid premium prices of 2 to 6 cents per pack for filter cigarettes for 'protection' they did not receive." *Id.*, at 25.

[21] In fact, there is evidence that smoking "low tar" cigarettes may be *more* harmful than smoking regular cigarettes. *See* Decl. of Peter G. Shields, M.D., February 27, 2005, a p. 7 ("The tobacco companies know, and have known for more than two decades, that increased ventilation for 'light' cigarettes results in increased mutagenicity and yields of mutagens and carcinogens. The tobacco companies (i) produced data that 'light' cigarettes and increasing ventilation would result in tar yields that had increased mutagenicity, higher levels of mutagens and carcinogens, and possibly was more tumorigenic; (ii) had this or other types of information predicting worse health consequences than regular cigarettes…"). *See also, e.g.,* Lee, C., "Genotoxicity Testing Program" (February 25, 1983) 504140026-0029 ("Establishing the correlation between tar content of smoke and genotoxicity: Is low tar smoke safer? There seems to be no simple answer to this question…Our own experience with Ames test on various tar level smoke indicated a higher mutation rate per mg of tar by low tar smoke reflecting a different chemical composition of low tar smoke from higher tar smoke.") (Attached as Ex. 36).

221928v1

emphysema and other diseases; is that correct?", Dr. Whidby answered, "Yes, that is correct. When I was in high school and grammar school, we talked about it in school." Transcript of Record, *United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.), 2/22/05, afternoon session, at 14112:6-15. (Excerpt attached as Ex. 38).

For over half a century Defendants knowingly distorted the body of public knowledge on the relationship of cigarette smoking and disease in order to protect their profits, not their consumers' health. *See Falise v. American Tobacco Co.*, 94 F. Supp. 2d 316, 336 (E.D.N.Y. 2000) ("Plaintiffs have pled with sufficient particularity allegations that, if proven true, would satisfy the first two requirements for reliance, namely that Tobacco intentionally engaged in a scheme to distort public knowledge about synergy and the dangers of cigarettes in general, and that Tobacco was successful in effectuating the nefarious silence.")

Belatedly, and without contrition, the tobacco companies have now for the first time publicly acknowledged this "mistake." In their closing argument in *United States v. Philip Morris,* Defendants argued:

> We have never contended in this case before Your Honor that there was not a consensus after 1964, and we have further acknowledged that when we pursued this campaign, this PR campaign to point out questions, we've acknowledged that that probably was a mistake, and we've been candid with the Court about that.

*See* Defense Closing Argument, *United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.), Transcript of June 8, 2005, morning session, at 23133:17-23. (Excerpt attached as Ex. 30).

### Filter Cigarettes

The tobacco industry's development and promotion of filter tip cigarettes bears a striking similarity in patterns of industry behavior. The cancer scares of the early 1950s were followed by a decline in cigarette consumption and profitability. The tobacco companies rebounded by introducing and promoting filter-tip cigarettes. The declines reversed:

> In the early 1950's a Readers Digest article suggested that smoking and health may be related and volume declined. RJR introduced a quality filtered cigarette, reversing the industry declines.[22]

HSL Presentation (3/21), 502488609-8634, at 8631-8632. (Attached as Ex. 39). *See also* "Special Report No. 248: Market Potential of a Health Cigarette," June 1966, 1000338646-8699, at 652 ("The health scare in the 1950's was accompanied by a decline in cigarette sales...") (Attached as Ex. 7 to Pls.' Mot. on Compensation Defenses).

In 1958 Congress, in investigating the tobacco industry filter-tip episode, found:

---

[22] The report continues: "In 1964, the Surgeon Generals Report was issued and again industry volume declined. The development of low tar cigarettes reversed this decline and those companies at the forefront of this development increased their share." *Id.*

221928v1

> The cigarette manufacturers have deceived the American public through their advertising of filter-tip cigarettes.
> Ironically, while denying the alleged health hazards of cigarette smoking, the cigarette industry has, in its advertising, made these charges appear true.
> Without specifically claiming that the filter tip removes the agents alleged to contribute to heart disease or lung cancer, the advertising has emphasized such claims as "clean smoking," snowy white," "pure," "miracle tip," "20,000 filter traps," "gives you more of what you changed to a filter for" and other phrases implying health protection, when actually most filter cigarettes produce as much or more nicotine and tar as cigarettes without filters.

1958 House Report, at 24-25.  (Attached as Ex.15).

The Committee found this "feat" was the result of deliberate design modifications of the cigarette by the tobacco companies to circumvent, diminish or nullify, in whole or in part, the promoted "tar" removal:

> First the filters were loosened to permit a larger number of smoke particles to get through. Second, the blend was changed to include more of the stronger, heavier-bodied tobaccos. This "switch" to the "low grade,"darker leaves has turned the tobacco market upside down. The mild, light, bright tobaccos, the most desirable of tobacco in the prefilter period, are accumulating as surplus in government warehouses, while the low grades of former years have moved rapidly into the hands of the cigarette manufacturers.

*Id.*, at 18.  The Committee further found and concluded that:

> It appears obvious that the public has "switched" to filter cigarettes in the belief that they afford some degree of protection against the health hazards of cigarette smoking.  While the advertising of such cigarettes has carefully avoided any direct reference to cancer, it has been subtly directed toward overcoming the cancer scare.

*Id.*.  Congress concluded:  "The American public has paid premium prices of 2 to 6 cents per pack for filter cigarettes for 'protection' they did not receive." *Id.*, at 25.[23]

**18.     To what extent can experts project the behavior of plaintiffs or defendants as a group; or sub-group based on samples?  How should such samples be selected?  How should sample information be obtained – by questionnaire, deposition, a mix, etc.?**

Experts can predict the behavior of plaintiffs as a group based on survey samples.[24]  Among other things, such survey analyses can identify the percentage of "lights" smokers who relied in

---

[23] This estimate of the premium for filter-tip cigarettes is consistent with the premium estimated by Plaintiffs' experts in this case that were extracted by the tobacco companies for "lights" "protection" not received.

[24] The Manual for Complex Litigation (Fourth) explicitly provides for the use of sampling and surveys:

31

221928v1

whole or substantial contributing part to the explicit or implied health reassurance of the "lights" as communicated by the tobacco companies. Defendants' own marketing expert articulated the acceptability and appropriateness of using such methods:

> There are also *well-known, widely accepted tools for quantifying the relative value of product attributes and benefits*....[S]uch tools, frequently referred to as choice modeling and choice experiments [can be used] *to identify and quantify the value of health*...

Aff. of David W. Stewart, June 29, 2005, at ¶78 (emphasis added).

Precisely such a study using scientifically accepted methodology and standards was conducted and completed for Plaintiffs by Dr. John R. Hauser. See Expert Witness Report of Dr. John Hauser. (Attached as Ex. 40).

Dr. Hauser concluded:

> Based on the methodologies described in this report and based on calculations of the importance of health risk as a factor in consumer decisions, consumer willingness to pay for lower health risk, and market-based simulations, I conclude that health risk is a positive contributing factor in the choice of "light" cigarettes for 90.1 percent of "light" cigarette consumers and, of these consumers, on average, it is ranked above all other features, excluding price, (i.e., taste or packaging). It is ranked above at least one other feature [for] 97.8 percent of the consumers, indicating its significance for the overwhelming majority of respondents.

*Id.* at ¶ 10.

Apparently studies were independently completed by JP Morgan. These findings virtually mirror the findings and conclusions of Dr. Hauser. *See* JP Morgan, "The Path to a Safer Cigarette" *Global Equity Research,* July 26, 2004 at 1 ("Over 90% of smokers are willing to try a safer cigarette.") (Attached as Ex. 41).

These two surveys, combined with existing survey results and other analyses, create a sufficient basis from which a jury could reasonably find – as a matter of fact – the percentage of light smokers who relied -- in whole or substantial contributing part – on Defendants' deception and/or fraud in the purchase of "lights."

---

> Statistical methods can often estimate, to specified levels of accuracy, the characteristics of a "population" or "universe" of events, transactions, attitudes, or opinions by observing those characteristics in a relatively small segment, or sample, of the population. Acceptable sampling techniques, in lieu of discovery and presentation of voluminous data from the entire population, can save substantial time and expense, and in some cases provide the only practical means to collect and present relevant data.

§11.493

221928v1

19.     **If members of the class would have smoked anyway (perhaps because they were addicted or for other reasons), what monetary loss did they suffer by buying "lights" instead of regular cigarettes at what was essentially the same price?**

The economic loss suffered by "lights" purchasers is reflected by the measure of the impact of the fraud on the value of and market for "lights."

*Lights and Regulars – The Same Price*

As stated by Defendants, virtually nothing in the cigarette industry was done in the last half-century that was not driven by litigation strategy:

> In the U.S., by far the most important factor conditioning action by the manufacturers is the law suit situation and the danger or costly damages being awarded against the manufacturers in a flood of cases…The leadership in the U.S. smoking and health situation therefore lies with the powerful Policy Committee of senior lawyers advising the industry…This Committee is extremely powerful; it determines the high policy of the industry on <u>all</u> smoking and health matters— research and public relations matters for example, as well as legal matters—and it reports directly to the Presidents.

"Report on Policy Aspects of the Smoking and Health Situation in U.S.A.", October 1964, 1003119099-9135, at 9101. (Attached as Ex. 42). (emphasis original).  Setting the price of "lights" at essentially the same level of regulars was no exception.

If "lights" and regulars were of equal taste satisfaction, their sole distinguishing characteristic was the difference in health safety.  "Lights" were clearly marketed for and to a health-conscious smoker or consumer on the understanding that lower tar "lights" were "safer" than regular cigarettes.  *See, e.g.,* Philip Morris Memorandum to Cecil Yow from Joe Tcheng (July 27, 1987), 2504046594-601, at 594 ("There is definitely a growing health consciousness in the market due to regular Government anti-smoking campaign.  However, consumers currently have a poor knowledge of tar and nicotine.  Research shows that Lights = Mild = Less Harmful.") (Attached as Ex. 60 to Pls.' Class Cert. Mem.).  As a matter of both common sense and economic self-interest, given the "relative safety" of "lights" as compared to regulars, and the consumer demand for "safety" in cigarettes, the tobacco companies could and should have extracted an overt premium for that beneficial quality of "lights" over regulars by pricing "lights" above the price of regulars.  They didn't because they couldn't as a matter of the industry's litigation strategy.

If "lights" had been priced above the price of regular cigarettes, it would clearly emphasize the fact that smokers were paying an overt premium for "lights" because they were less dangerous to health.  That admission would have entirely undermined Defendants' conspiracy to maintain a false open controversy as to the health dangers of regular cigarettes.  The tobacco companies' adherence to their "gentleman's agreement" that no company would take any action which might jeopardize their industry position on smoking and health dictated that "lights" be priced no higher than regulars.  Basic economic principles, as well as common sense, would predict that equally

33

tasting cigarettes which posed a materially lesser health risk, and for which there was consumer demand, would have been priced differently than higher health risk equally tasting cigarettes.

But "lights" were in fact no "safer" and provided no material measurable health benefit as compared to regular cigarettes. They also were not equal in taste to regular cigarettes. By pricing such no-safer, less-tasting "lights" at the same level as regular cigarettes, the tobacco companies were able, without elevating the price of "lights" above that of regulars, to uniformly extract a premium for those cigarettes which could not have been commanded in a competitive market which accurately disclosed and described the relative qualities of those products. By artificially imposing the *same market price for a lesser quality/beneficial product*, the tobacco companies "killed two birds with one stone" – they did, in fact, collect a market premium, though not an overt one, for an inferior product based on an "illusion" and maintained the sanctity of their essential industry defense that there was no proof to a scientific certainty that smoking regular cigarettes caused human disease.

Defendants have referred the court to the federal antitrust laws as being the most analogous federal remedial statute to RICO:  "As courts have frequently recognized, because Congress modeled the damages provisions of RICO on those of the Clayton act, numerous doctrines applicable under the antitrust laws are equally applicable in cases brought under RICO."  Defs.' Mem. Supp. Mot. Summ. J. on Causation, Injury, and Damages, July 22, 2005, at p. 34

Courts, too, have drawn this parallel between the antitrust and RICO statutes within the context of a damages determination. *See, e.g., Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150-152 (1987) ( "[W]e believe that it is a *federal* statute that offers the closest analogy to civil RICO. The Clayton Act, 38 Stat. 731, as amended, 15 U.S.C. §15 offers a far closer analogy to RICO than any state law alternative.")

The antitrust laws and RICO involve some of the same policy considerations directed at wrongs to the general public for which there is a statutorally-mandated penalty included due to the especially egregious nature of the misconduct.   The two statutes also employ the same damage language – "by reason of" in defining the causal relation between wrong and injury. *See Id.*, at 150-51 ("Even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act…. Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees…. Moreover, both statutes aim to compensate the same type of injury; each requires that a plaintiff show injury "in his business or property by reason of" a violation."). Although the antitrust laws have no relevance to the elements of a RICO violation for the purpose of engrafting an indirect purchaser rule as urged by Defendants, they are particularly instructive on the issue of the quantification of damage.

Damages are a two-step process under the antitrust laws.  A plaintiff first must establish the existence of unlawful conduct which caused injury in fact.  The second step involves the calculation of the damage caused in the market to the affected plaintiffs or class of plaintiffs.  In making that determination, there are well-recognized differences between the proofs necessary to demonstrate the fact of injury and those needed to measure the amount of damage. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931) ("It is true that

34

there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner has sustained some damage and the measure of proof necessary to enable the jury to fix the amount.  The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount....[T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party."), see also *United States Football League v. National Football League,* 842 F.2d 1335, 1378 (2d Cir. 1988) ("It is true that once proof of injury causation has been established, courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages.  Proof of amount of damages thus need not conform to a particular theory or model, and exact proof of the amount of damages is not required...an antitrust plaintiff must thus provide only sufficient evidence to support a 'just and reasonable estimate' of damages.") (internal citations omitted); *New York v. Julius Nasso Concrete Corp.,* 202 F.3d 82, 88 (2d Cir. 2000) ("[C]ourts have always distinguished between proof of causation of damages and proof of amount of damages... requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the illegal practices of the defendant...[I]f causation is established, the court must 'observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries.'") (internal citations omitted); *New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988) (noting that a plaintiff's burden in proving antitrust damages is "lightened" where there "is a dearth of market information unaffected by the collusive action of the defendants" and that a jury "is entitled to make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.  In such circumstances 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.'") (internal citations omitted).

The same two-step process would seem to apply in RICO actions.  A RICO plaintiff or class should first establish the existence of the enterprise, the pattern of racketeering activity, the deception and the fact of reliance.  Once those proofs are complete, the economic methods to establish the quantity of damage should involve the same flexibility and principles utilized in antitrust actions.  *See, e.g., Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163 (9th Cir. 2002) (likening the requisite level of proof required under the RICO statute to that required in antitrust law, noting, "finally, it is important to distinguish between uncertainty in the fact of damage and in the amount of damage") (citing *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) ("Different standards govern proof of the fact and proof of the amount of damages.")).

According to these principles, there are at least five acceptable methodologies to measure the damage to "lights" smokers arising from Defendants' fraud and deception.

*1.  Value*

The first two measures of "lights" damage assess the difference in consumer behavior related to the impact of the fraud on the product value of "lights."

*a.  Conjoint Analysis*

35

Conjoint analysis, a tool widely used in marketing research, is a recognized and accepted scientific methodology of understanding, predicting, explaining and measuring aspects of consumer behavior. *See* Expert Report of Dr. John R. Hauser, at ¶ 15 (Attached as Ex. 40). Defendants have acknowledged the relevance of this type of analysis in adjudicating the issue of RICO reliance and the value adjustments consumers would have made in purchasing a fraudulently promoted and marketed product.[25]

As explained by Dr. Hauser:

> Conjoint analysis is a tool that enjoys wide use in the field of marketing research. It…is generally recognized by marketing science academics and industry practitioners to be the most widely studied and applied form of quantitative consumer preference measurement. It has been shown to provide valid and reliable measures of consumer preferences, and these preferences have been shown to provide valid and reliable forecasts of what consumers will do (or would have done) under scenarios related to those measured.

Expert Report of Dr. John R. Hauser, (attached as Ex. 40).

This methodology seeks to identify consumer values of the misrepresented product in relation to the actual product from which it was represented to be different – i.e., "lights" as no safer or offering no health benefit to smokers materially different than regular cigarettes.

Plaintiffs have attached as Ex. 45 a sample of what an advertisement for "light" cigarettes would look like if it accurately reflected the product that consumers receive.

As a matter of common sense, given a choice between two equally unsafe products with one having substantially less taste satisfaction, consumers would not willingly agree to pay the same price for both. "Lights" were as unsafe as regulars, but with less taste. There is no rational consumer principle which, in the context of the misrepresentation, would predict or project that the lesser product – "lights" – would command the same value as the regular cigarette. This reality is confirmed and quantified by the conjoint analysis.

---

[25] In fact, though Defendants have at no time made Plaintiffs aware of the fact, Defendants have themselves used conjoint analysis for the very purpose for which it is being used by Plaintiffs in this case—to evaluate the relative importance to consumers of various cigarette attributes, including tar levels and taste. *See* "Results of the Pretest of the Cigarette Conjoint Analysis Task" (November 20, 1978), 538009495-580 (Attached as Ex. 43). Defendants' own documents reveal that marketing firms recommended to Defendants the use of conjoint analysis as the most reliable and valid method for evaluating consumer preference:

> Conjoint analysis is the best way to find out what's important. Should I concentrate more on color or shape?…Decisions of this type abound. Indeed, most marketing decisions look like these….Conjoint Analysis is, in essence, a method that finds out what is important to consumers' decisions. Respondents often hide their motives from themselves—and even more often from market research interviewers. *Conjoint Analysis avoids these problems, and is the most sensitive, reliable, and valid technique available for deciding what is important.*

"The Beaumont Organization, Ltd." 2047251000-1119, at 1003 (Attached as Ex. 44) (emphasis added).

221928v1

Dr. Hauser found:

> Based on the methodologies described in this report, derived from both consumer
> Willingness-to-Pay and Market-Based simulations, I conclude, on the basis of the
> best available information and methodologies, that the fair market value of the
> change in perceived health risk from that of a regular cigarette to that of a "light"
> cigarette is between 39.8 percent and 47.3 percent of the price per pack.[26]

*Id.* at ¶ 62.

### b. Willingness to Pay

Traditional fraud principles seek to measure the difference in the value to a defrauded
consumer of the illusory "light" as compared to the truly safer cigarette promised by the tobacco
companies. Dr. Harris testified as to this methodology and its results in the *Price* litigation. He
explained:

> A measure that compares the value of what was promised to the consumer, and
> the value of what was received at the time of the transaction would be regarded as
> a legitimate economic measure of damages....You think of a product that was
> promised and the product that was actually received as on the shelf, on the same
> shelf or counter in the store. And now the product as promised is available at the
> full retail price, but the product that was actually received is available with a
> certain percentage off. The question is what discount is necessary, how much off
> the full price is required before the consumer will say, okay, I will accept the
> product as received. And in the case I am asking, what is the discount required to
> get an individual cigarette smoker in the class to purchase the Marlboro Lights
> that was in fact no less hazardous or could be more hazardous.

*Price v. Philip Morris,* February 11, 2003 a.m. session, (7:6-9; 10:17-11:5) (Attached as Ex. 46).

Dr. Harris concluded:

> The facts in the present lawsuit do not significantly differ from those in the
> Illinois cases. Accordingly, I conclude that the loss of value approach can
> likewise be applied to the present lawsuit. Moreover, there is already sufficient
> survey evidence to conclude that the loss of value approach is feasible, reliable,
> and reproducible.

Expert Report of Jeffery E. Harris, February 28, 2005, at ¶19.

Using that methodology in this case, Dr. Harris found that the loss in value to consumers in the
case that "light" cigarettes are just as harmful as regular cigarettes is approximately 74.9 percent of
the purchase price. In the case that "lights" could be more harmful than regular cigarettes, the loss

---

[26] Plaintiffs continue further refining these estimates based on incoming information.

221928v1

in value to consumers is approximately 92.0 percent of the purchase price. *See* Supplemental Expert Report of Jeffery E. Harris, March 28, 2005, at ¶ 25.

The willingness to pay method that Dr. Harris employed, sometimes referred to as "contingent valuation," is one that is well accepted and often used in medical economics. As explained in the literature, "In health economics, contingent valuation is a method that elicits an individual's monetary valuations of health programmes or health states." Bayoumi, A.M., "The Measurement of Contingent Valuation for Health Economics," *Pharmacoeconomics,* 22(11):691-700 (2004).[27] The contingent method, "give[s] a set of alternatives which consists of a given amount or a given level of a specific good and a corresponding realistic price." Slothuus, U., "The Contingent Ranking Method—A Feasible and Valid Method When Eliciting Preferences for Health Care?" *Social Science & Medicine,* 54:1601-1609 (2002). Studies have found that, "the contingent ranking method is a feasible and valid method for eliciting preferences and determining willingness to pay estimates." *Id.* at 1601. Notably, research has also determined that, "the contingent ranking method should be applied more often when, for example, conjoint analysis is used." *Id.* at 1607.

The willingness to pay methodology has been used successfully in prior studies to gather information about smokers. For example, in one study, researchers used surveys to elicit the value to smokers of improved cessation products. *See* Busch, S.G., *et al.,* "Value to Smokers of Improved Cessation Products: Evidence from a Willingness-to-Pay Survey," *Nicotine & Tobacco Research,* Vol. 6, No. 4: 631-634 (August, 2004). With that data, researchers were able to calculate an estimate of the value of a quit to assess the market for more effective cessation treatments. *Id.* The study demonstrated, "the validity of using willingness-to-pay surveys in assessing the value of new smoking cessation products…" *Id.* at 631.

Both value methodologies—conjoint analysis and willingness to pay—provide the jury with the basis for finding the aggregate damage caused to the Plaintiffs and the class by reason of Defendants' RICO violation.

### 2. Market Impact

The introduction and marketing of a fraudulently represented "lights" cigarette had a material impact on the market price of those cigarettes. "Lights" cigarettes were not lawfully sold outside of established, recognized markets. The price of a pack of "lights" for which recovery is sought in this case was sold and bought through lawful markets. The price of all packs of "lights" was sold and bought in relation to the market and the market price.

### 3. Regression Analysis

Regression analysis is a widely-used and judicially recognized economic tool for measuring the market impact on pricing caused by identified variables. Markets cannot be created, sustained

---

[27] For example, this willingness to pay methodology has been used in a study that demonstrated high internal consistency and reliability in assessing the burden of migraines. *See e.g.* Hamelsky, S.W., *et al.,* "An Assessment of the Burden of Migraine Using the Willingness to Pay Model," *Cephalalgia: An International Journal of Headache,* 25(2):87-100 (February 25, 2005).

221928v1

or grown unless there is a predominance of buyer demand for the particular brand of product. The market for "lights" existed because as a matter of reality there was a predominating consumer desire for and acceptance of the promoted and believed health benefit of smoking "lights" as compared to regular cigarettes. If here had been no predominating reliance, there would have been insufficient demand and no market.

Defendants themselves predicted tobacco life without "lights":

> Low tar cigarette smokers…are potential quitters…And more of them than the average have tried to quit smoking. Since low tar smokers are an expanding share of the market, their greater desire to quit smoking poses a special problem for the cigarette industry.

May 1978 Tobacco Institute Memo, "A Study of Public Attitudes Toward Cigarette Smoking and the Tobacco Industry in 1978 Vol. I", 501565967-6019, at 6088. (Attached as Ex. 71 to Pls.' Class Cert. Mem.).

The consequences were dire – without a health reassurance product, tobacco companies projected a limited economic life for cigarettes. As Bennett LeBow, former CEO of Liggett, testified in *United States v. Philip Morris:*

> The tobacco industry -- consumers demand -- from a cigarettes been marketed for 25 years, I'm sure every company in the industry continues to sell light cigarettes and has to in order to stay in business.

Transcript of Record, *United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.), April 4, 2005, at 17601. (Attached as Ex. 47).

The market for and marketing of "lights" dramatically altered that economic Armageddon. "Lights" changed supply-demand factors and commanded a market premium of approximately $32.96 billion using state-level data and $24.11 billion using national-level data resulting from the illusion (unknown to consumers) of "lights" safety. Expert Report of John Beyer, March 28, 2005, at ¶ 8. As Dr. Beyer found:

> [T]he effect of light cigarettes was to increase total cigarette demand, resulting in more consumption of cigarettes than otherwise would have been the case. In fact, light cigarettes were introduced for the very purpose of alleviating the health concerns of consumers who would have otherwise reduced their demand for cigarettes. Tobacco industry executives have themselves stated that the demand for their product would likely have fallen if the public had known the health implications of light cigarettes. The effect of the introduction of light cigarettes, and the accompanying increase in demand, was to raise the price for cigarettes to a level higher than it would otherwise have been. Thus, purchasers of light cigarettes paid higher prices than they would have paid for cigarettes but for the alleged wrongdoing.

*Id.*, at ¶32.

The fact of predominating consumer reliance on the represented health benefits of "lights" impacted their price throughout the entire market. The market price for "lights" for every buyer was higher than it would have been but for the relied-upon fraud. *See Id*, at ¶51 ("[T]he effect of the introduction of light cigarettes was to increase the price of cigarettes by 6.3 percent during the class period.").

These market observations on the market price for particular brands of health-benefit cigarettes is reflective of a similar market distortion caused by the introduction of filtered brands of cigarettes in the 1950s.

In its 1958 report, "False and Misleading Advertising (Filter-Tip Cigarettes)", the House Committee on Government Operations found that the advertising of filter cigarettes "implying health protection" was deceptive and that:

> The effectiveness of this deceptive advertising is evidenced by the rise in filter-cigarette sales from 1.4 percent of total cigarette sales in 1952 to 40 percent in 1957. The American public has paid premium prices of 2 to 6 cents per pack for filter cigarettes for "protection" they did not receive.

1958 House Report, at 25. (Attached as Ex. 15).

### *4. Disgorgement*

Based on the same principles of market impact, the sale of "lights" procured profits for the tobacco companies which were the direct result of their fraud. "Lights" profits measure the economic benefit unjustly garnered by the tobacco companies through the promoted fiction of "safety." As with the market price impact, if there had not been a predominating core of consumers relying on the false health reassurance for "lights," there would have been insufficient demand and no "lights" market. The "lights" market and the profits therefrom were derived by Defendants' jointly sustaining and protecting their illusion – as found by Dr. Beyer:

> [D]emand for light cigarettes was motivated by the fraudulent health claims of the defendants. If accurate information concerning the health implications of so-called light cigarettes had been presented to consumers there would have been no reason for them to have chosen to smoke light cigarettes rather than full-flavored cigarettes. Therefore, cigarette companies would have lost the entire sales of light cigarettes and the profits earned from those sales, but for the alleged conspiracy.
>
> …
>
> Based upon the analysis of the operating profits before tax of defendants and the share of their profits estimated to have arisen from sales of light cigarettes, the profits before tax attributable to the sales of light cigarettes during the period from

40

221928v1

1971 through 2004 is calculated to be $45.86 billion. This sum is the damages owed to the class members under the profit disgorgement methodology.

Expert Report of John Beyer, March 28, 2005, at ¶¶ 18, 30.

Calculating a disgorgement of profits of "lights" generated by fraud underestimates the unjust enrichment by reason of the fraud. The illusion enabled the tobacco companies to increase consumption generally and thereby raise the prices of all cigarettes, "lights" and non-"lights," above levels that would have prevailed if consumption dropped.

Each of these market methodologies provides a sustainable basis for a jury determination of the aggregate damage caused by reason of defendants' fraud.

**20.      What relevant knowledge, reliance, motivation, differences in methods of smoking, or other factors can be attributed to all or some members of the class, and how can partial knowledge or other differences attributable to some class members be translated into impact on possible monetary damages of the class? Would these factors affect distribution of possible proceeds? See 8., *supra*.**

Differences in relevant knowledge, reliance, motivation, methods of smoking and other elements, to the extent available, are factored into each of the major segments of Plaintiffs' expert reports. Findings and conclusions are based on all relevant differences known to be attributable to the class. *See also* Redfern Report. (Attached as Ex. 2).

**21. (a)    In viewing the alleged conspiracy and alleged congeries of tobacco cigarette harms from a transactional perspective, see 12., *supra*, might the totality of possible claims be approached in a variety of ways to take into account various state and federal causes of action and differing effects on individual smokers?**

Yes. Depending upon a settlement or amendment of the complaint in this matter, claims over which this court could exercise jurisdiction could be included, which would encompass all variations of the RICO fraud in all related state statutory and common law varieties. The nature and scope of differing effects, if any, on smokers is taken into consideration in the public health findings and the reports of Plaintiffs' experts.

**21. (b)    In light of the fact that limited cases have been brought on different theories with different individuals and classes of aggrieved persons, is a rational solution to the broad controversy, while perhaps difficult, possible?**

Yes. A rational solution to the broad controversy is eminently possible.

**21. (c)    Have the tactics of defendants' and plaintiffs' counsel in cigarette cases, as well as the rulings of courts suggesting limits on a unified approach to a mass tort, created the risk of duplication and splitting?**

41

221928v1

In the absence of any actual recovery by any plaintiffs or class against the tobacco companies for their "lights" fraud, there is no real risk of duplicate judgment in the future. As long as personal injuries are non-recoverable under RICO, there is no impermissible splitting of claims.

Certain tactics of Defendants and court rulings in cigarette cases have, however, impeded a just resolution of the controversy. For example, defendants have committed to speaking with a "single voice" on all issues of smoking and health and that voice is the public health community. On their public websites and in sworn testimony or representations to the United States Congress, the tobacco companies hold out the public health community's findings on smoking and health as the "true and accurate" state of knowledge to which they subscribe and adhere. Defendants "expect" the general public to rely on those findings in making all decisions related to cigarette smoking. They make no public reservation of any fraud of their unqualified endorsement of smoking-related public health community reports.

Yet, inexplicably and paradoxically, Defendants challenge in litigation virtually every major finding of the public health community regarding "lights" cigarettes. There cannot be one "truth" for the public and an opposite "truth" in a court of law. If Defendants commit to one voice, they must be bound by that one voice – no exceptions.

Defendants have also employed tactics which seek to shift focus from their culpability in attempts to blame the public health community and the federal government for the "lights" debacle. These defenses are premised on the inherent concession that if there was a public deception or fraud, it was not the fault of the tobacco companies. Rather, they contend, it was the public health community which advocated that smokers switch to lower-tar cigarettes such as "lights" because of an established or perceived health benefit and the federal government authorized and virtually mandated the marketing and sale of "lights" cigarettes because their machine-measured lower-tar levels yielded a "safer" cigarette as compared to a regular cigarette.

The tobacco companies raise these defenses with virtually no reliable corroborative support. No member of the public health community who has or had a recognized expertise on the issues in this litigation has ever testified on behalf of Defendants in support of Defendants' "public-health-community-did-it" defense. There is no contemporaneous document, in the millions of pieces of paper made public by Defendants or produced in litigation which has been introduced and admitted into evidence in any litigation involving "lights," which establishes that the tobacco companies compliantly or reluctantly did the bidding of the public health community in developing and marketing "lights." Expressly to the contrary, during this time the tobacco companies and the public health community were at "war" – the tobacco companies engaged in what they believed was a life and death struggle to maintain the fiction of the "safety" of regular cigarettes in response to an increasing barrage of unimpeachable scientific consensus that smoking caused multiple human diseases. Moreover, the concept of promoting lower tar as a marker of a "safer" cigarette was first launched by the tobacco companies – without the cover of a public health community pretext – in their deception of "the American public" through introduction in the 1950s of filter-tip cigarettes. *See generally* 1958 House Report, (Attached as Ex. 15). Also at that time the tobacco companies were almost literally tripping over themselves, each trying to competitively out-do the other in express or clearly implied health benefits of filter-tip cigarettes without in any way being authorized or mandated to do so by any agency of the federal government.

Likewise, the "government-made-me-do-it" strategy is unsupported by any contemporaneously-employed member of the Federal Trade Commission who had an overview or principle responsibility for the government agencies' smoking authority or activity.  Not one document has been introduced and admitted into evidence by Defendants establishing that the development or marketing of "lights" cigarettes was mandated or compelled by any exercise of official government regulation.  Where there is no official record of necessary compliance with governmentally-ordered conduct, the tobacco companies should not be allowed to escape accountability for their fraud by arguing in the abstract that they were merely doing what they had to.

**21. (d)   Would that strategic and tactical history prevent an appropriate disposition of the instant and related litigations?  See, e.g., 1. and 3, *supra*, on splitting a cause of action and double recovery.**

No.

Dated:  August 22, 2005                    Respectfully submitted,

/s/   Michael D. Hausfeld_____
Herbert E. Milstein
Michael D. Hausfeld
Lisa M. Mezzetti
Paul T. Gallagher
Douglas J. McNamara
Benjamin D. Brown
James J. Pizzirusso
Brent W. Landau
Andrea L. Hertzfeld
COHEN, MILSTEIN, HAUSFELD
   & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Phone:  (202) 408-4600
Fax:  (202) 408-4699

221928v1

Burton H. Finkelstein
William P. Butterfield
Richard M. Volin
Hilary K. Ratway
FINKELSTEIN, THOMPSON & LOUGHRAN
1050 30th Street, N.W.
Washington, DC  20007
Phone:  (202) 337-8000
Fax:  (202) 337-8090

LEAD ATTORNEYS FOR PLAINTIFFS


OF COUNSEL

Jonathan Alpert
THE ALPERT LAW FIRM
5920 River Terrace
Tampa, FL 33604
Phone:  (813) 223-4131
Fax:  (813) 228-9612

David F. Sorenson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone:  (215) 875-5705
Fax:  (215) 875-4604

Van Bunch
BONNETT, FAIRBOURN,
  FRIEDMAN & BALINT, P.C.
57 Carriage Hill
Signal Mountain, TN 37377
Phone:  (423) 886-9736
Fax:  (602) 274-1199

Gary M. Farmer, Jr.,
FREEDLAND, FARMER,
  RUSSO & SHELLER
2665 Executive Park Dr., Suite 3
Weston, FL  33331
Phone:  (954) 467-6400
Fax:  (954) 670-2530

221928v1

G. Martin Meyers
LAW OFFICES OF G. MARTIN MEYERS
35 West Main Street, Suite 106
Denville, NJ 07834
Phone:  (973) 625-0838
Fax:  (973) 625-5350

Lisa J. Rodriguez
TRUJILLO, RODRIGUEZ &
   RICHARDS, LLC
8 Kings Highway West
Haddonfield, NJ 08033
Phone:  (856) 795-9002
Fax:  (856) 795-9887

Thomas V. Urmy, Jr.
Edward F. Haber
SHAPIRO, HABER & URMY, LLP
53 State Street
Boston, MA 02109
Phone:  (617) 439-3939
Fax:  (617) 439-0134

Stephen Sheller
SHELLER, LUDWIG & BADEY
1528 Walnut Street, 3rd Floor
Philadelphia, PA  19102
Phone:  (215) 790-7300
Fax:  (215) 546-0942

Russell Smith
R. Bryan Nace
A. RUSSELL SMITH LAW OFFICE
503 Key Building
159 S. Main Street
Akron, Ohio 44308
Phone:  (330) 434-7167
Fax:  (330) 434-1795

Gerson Smoger
SMOGER & ASSOCIATES, L.L.P.
3175 Monterey Blvd., Suite 3
Oakland, CA 94602
Phone:  (510) 531-4529
Fax:  (510) 531-4377

221928v1

Esther Berezofsky
WILLIAMS, CUKER & BEREZOFSKY
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Phone:  (856) 667-0500
Fax:  (856) 667-5133

221928v1

**CERTIFICATE OF SERVICE**

I, Andrea L. Hertzfeld, hereby certify that a true and correct copy of the foregoing Class

Plaintiffs' Response To the Court's Memorandum of June 6, 2005 and Declaration of Andrea L.

Hertzfeld In Support of Class Plaintiffs' Response To the Court's Memorandum of June 6, 2005

was served upon the counsel listed on the attached Service List by electronic mail.

Andrea L. Hertzfeld

203645v1

SERVICE LISTof 48    Filed 08/22/05    Page 48 of 48

# SERVICE LIST

Harold K. Gordon
Steven P. Harte
Jones Day
222 East 41st Street
New York, NY  10017-6702
212/326-3939
fax: 212/755-7306

Mark Belasic  mabelasic@jonesday.com
Theodore M. Grossman
Robert Klonoff
Jones Day
901 Lakeside Ave., North Point
Cleveland, OH  44114-1190
216/586-3939    fax: 216/579-0212

### *Counsel for R.J. Reynolds Tobacco Company*

Guy Miller Struve
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017
212/450-4000   fax: 212/450-3800
Guy.struve@dpw.com
*Counsel for Altria Group Inc.*

Judith Bernstein-Gaeta
Brian T. Edmunds
Arnold & Porter
555 12th Street, N.W.
Washington, D.C.  20004
202/942-5493  fax: 202/942-5999
judith_gaeta-bernstein@aporter.com
*Counsel for Philip Morris USA Inc.*

Philip Pfeffer  Ppfeffer@chadbourne.com
Joseph Falcone  jfalcone@chadbourne.com
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, NY  10112
212/408-5100   fax: 212/541-5369
*Counsel for Defendant British American Tobacco (Investments) Limited*
 **and** *British American Tobacco, p.l.c.*

Alan Mansfield     mansfielda@gtlaw.com
Stephen L. Saxl
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY  10166
212/801-2100  fax: 212/801-6400

William L. Allinder
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd.
Kansas City, MO  64108-2613
816/474-6550  fax: 816/421-5547

### *Lorillard Tobacco Company*

Peter A. Bellacosa
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611
212/446-4800  fax: 212/446-4900
pbellacosa@kirkland.com

Leonard A. Feiwus
Julie R. Fischer  (JF-7755)
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY  10019
212/506-1785  fax: 212/506-1800
*jfischer@kasowitz.com*
*Counsel for The Liggett Group, Inc.*

*Counsel for Brown & Williamson Tobacco Corporation, individually,*
*and as successor-by-merger to The American Tobacco Company*

203645v1