FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ OCT 1 2 2005 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BARBARA SCHWAB et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PHILIP MORRIS USA, INC. et al.,<br><br>Defendants. | No. CV 04-1945 (JBW)<br><br>MEMORANDUM AND ORDER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS |

JACK B. WEINSTEIN, Senior District Judge:

I. **Introduction**

In this civil RICO class action, defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. They contend that, as a matter of law, plaintiffs' claims are barred by RICO's four-year statute of limitations; plaintiffs oppose. *See* Defs.' Br. in Supp. of Mot. for Summ. J. on Stat. of Lims. ("Defs.' Br.") (Docket No. 431); Decl. of Todd Geremia ("Geremia Decl.") (Docket No. 442); Defs.' Reply Br. in Supp. of Mot. for Summ. J. on Stat. of Lims. ("Defs.' Reply") (Docket No. 721); Pls.' Br. in Opp. to Defs.' Mot. for Summ. J. on Stat. of Lims. ("Pls.' Br.") (Docket No. 607). Because the statute of limitations is an affirmative defense, discovery is not yet concluded and it cannot be said with any assurance at this time that defendants would necessarily succeed in proving the defense at trial, the motion is denied with leave to renew upon completion of discovery.



1

## II. Law

### A. Burdens on Summary Judgment

Summary judgment is granted "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The movant bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). Evaluation of the record is conducted in a "light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962) (per curiam); *see also O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003).

Critical is recognition of the jury's fact-finding primacy:

> It is well established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) (quotation marks omitted).

### B. RICO Statute of Limitations

The statute of limitations for a civil RICO claim is four years. *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 153, 107 S. Ct. 2759, 2765-6 (1987). RICO itself does not contain a statute of limitations. *See Malley-Duff*, 483 U.S. at 146. By reference to the private

enforcement provisions of the Clayton Antitrust Act, 15 U.S.C. § 15(a), after which civil RICO was modeled, the Court has supplied one. *Id.* at 153. Limitation runs from the date when a plaintiff discovers or reasonably should have discovered his or her injury. *Rotella v. Wood*, 528 U.S. 549, 555-560. The determination of that date is a question of fact.

The statute of limitations is an affirmative defense; defendants must plead and prove it. Fed. R. Civ. P. 8(c). They must demonstrate, as a matter of law, when the class members either 1) knew or 2) should have known of their injuries. *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 59 (2d Cir. 1998). As to the first, they point to several surveys and statements by experts that less than a majority of smokers believe "light" cigarettes are healthier than regular cigarettes. Defs.' Br. in Opp. to Class Cert. 38-40 (Docket No. 346). These surveys are controverted by plaintiffs, who rely upon surveys referred to in Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine (Nat'l Cancer Institute, Nov. 1, 2001) ("Monograph 13"). As to the second, defendants have marshaled a number of media reports, public service announcements and case filings. *See infra* at 4, 7. These, too, are met with evidence supplied by plaintiffs. *Id.* at 7-8.

Defendants also argue that smokers' knowledge for statute of limitations purposes must be decided for each individual smoker, making the statute of limitations defense presumptively valid and the class action unmanageable. Defs.' Br. in Opp. to Class Cert. 58 ff.

Plaintiffs filed this case on May 11, 2004, claiming economic injuries arising from their fraud-induced purchases of light cigarettes marketed by defendants since 1971. Second Amended Complaint ("Compl.") ¶ 30, No. CV 04-1945 (E.D.N.Y.) (Docket No. 95). The bar of limitations is measured from a date four years earlier—May 11, 2000. Should plaintiffs have

3

known of the fraud prior to that date?

Many attorneys knew of the dangers of "light" cigarettes long before 2000. A substantial number of actions based on grounds of fraud much like those now alleged were brought earlier than May 11 of that year. Putative class counsel in the present case—Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Finkelstein, Thompson & Loughran ("plaintiffs' counsel")—filed four similar "light" cigarettes class actions in various state courts in 1998 and 1999: *Aspinall v. Philip Morris Cos.*, No. 98-6002 (Mass. Sup. Ct.) (filed Nov. 25, 1998); *Cummis v. Philip Morris Cos.*, No. L-2114-98 (N.J. Super. Ct.) (filed July 9, 1998); *Marrone v. Philip Morris Cos.*, No. 99 CIV 0954 (Ohio Ct. Com. Pl.) (filed Nov. 8, 1999); *McClure v. Altria Group, Inc.*, No. 99C148 (Tenn. Cir. Ct.) (filed Jan. 19, 1999). Other "of counsel" attorneys to the class filed two "light" cigarettes class actions in state courts during the same period: *Oliver v. R.J. Reynolds Tobacco Co.*, No. 268 (Pa. Ct. Com. Pl.) (filed Mar. 6, 1998); *Trombino v. R.J. Reynolds Tobacco Co.*, No. L-11263-98 (N.J. Super. Ct.) (filed Jan.19, 1999). In those state class actions, plaintiffs sought economic damages on state fraud and consumer protection law grounds alleging facts similar to those now relied upon. *See* Defs.' Br. 4-7. In 1999, the United States government filed a widely remarked upon complaint in federal district court for damages and injunctive relief under RICO and other statutes alleging that the tobacco companies misled consumers about the dangers of "light" cigarettes. Defs.' Br. 2; Compl. for Damages and Injunctive and Declaratory Relief ("Gov't Compl.") at 37-40, *United States v. Philip Morris*, No. 1:99CV02496 (D.D.C. 1999). Other private and state government plaintiffs filed RICO and consumer fraud suits in the 1990s alleging deceptive marketing of "light" cigarettes. Defs.' Br. 21-22. *See, e.g., Allman v. Philip Morris, Inc.*, No. 94-0504-IEG (S.D. Cal.); *Commonwealth of Mass. v. Philip Morris Inc.*,

No. 95-7378 (Mass. Dist. Ct.); *Maryland v. Philip Morris Inc.*, No. 96122017/CL211487 (Baltimore Cir. Ct.); *Oregon v. Philip Morris, Inc.*, No. 9706-04457 (Or. Cir. Ct.); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, CV 98 3287 (E.D.N.Y.).

It is not denied that plaintiffs' counsel has had knowledge of the RICO injury alleged in this matter since at least July 1998, when they filed a class action alleging a similar fraud in New Jersey state court. *See* Defs.' Br. 4 n.1; Geremia Decl. Ex. 2. Defendants contend that this knowledge should be imputed to the entire class under principles of agency. *See* Defs.' Br. 4 ff.; Defs.' Reply 9 ff. To do so would bar the suit entirely.

"The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal." *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994); *see* Restatement (Third) of the Law Governing Lawyers Ch. 2 Introductory Note (2000) (the attorney-client relationship is, "from one point of view, derived from the law of agency."). In a conventional attorney-client relationship, the attorney's knowledge is imputed to the client. *Geraci*, 23 F.3d at 725; Restatement (Third) of the Law Governing Lawyers ("Information imparted to a lawyer during and relating to the representation of a client is attributed to the client for the purpose of determining the client's rights and liabilities in matters in which the lawyer represents the client. . . ."); *see generally* Restatement (Second) of Agency § 272 (agent's knowledge imputed to principal). An attorney's knowledge of an injury may work to bar his client's claim under a statute of limitations. *See Geracia* at 725 (plaintiff's § 1983 claim time-barred because his attorney knew of injury outside three-year statute of limitations period).

In some cases it is appropriate for an attorney's knowledge to be imputed to the client, particularly where there is a single attorney and a single known client in an ongoing relationship.

5

That is not the situation now presented. In the instant case defendants seek to impute the knowledge of counsel to a class of unidentified plaintiffs numbering in the tens of millions who claim they were defrauded for decades. Principles of agency applicable in the single-attorney-single-client relationship cannot be transposed into the class action context under present circumstances. *Cf.* Restatement (Third) of the Law Governing Lawyers § 14 cmt. f ("Class actions may pose difficult questions of client identification."). How can a smoker who was not even aware when he purchased a pack of cigarettes years ago that any of the class attorneys existed be assumed to have known what the attorneys knew?

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). Without consent by both parties, there can be no principal-agent relationship. *See* Restatement (Second) of Agency § 15. Unnamed class members have not yet "consented" to be represented by putative class counsel; these attorneys cannot be their agent for purposes of imputing knowledge of danger. The role of class counsel is akin to that of a judicially appointed fiduciary, not that of a privately retained attorney. *See* Restatement (Second) of Agency § 14F ("A person appointed by a court to manage the affairs of others is not an agent of the others."); *cf.* Rule 23(g), Fed. R. Civ. P. (setting forth standards governing mandatory court appointment of class counsel).

The mass nature of the class action requires that both the court and counsel carefully protect unnamed plaintiffs' rights. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S. Ct. 2295 (1999); *see generally* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev.

1343 (1995); Monograph, *Individual Justice in Mass Tort Litigation* 53 ff. (1995) (noting the ethical challenges facing class counsel). It does not permit the imposition of the principles of agency in a way that would bar the suit and deprive class members of experienced counsel. The knowledge of class counsel cannot be imputed to the members of the class for the purposes of determining whether this suit is barred by the statute of limitations.

The attorneys' knowledge is not decisive. What is critical is what and when the plaintiffs knew or should have known.

### III. Application of Law to Facts

The defendants make a strong case that plaintiffs knew or should have known of their claimed economic injuries years before 2000. A number of reports appeared in newspapers, popular magazines, textbooks, government pamphlets, television news programs and public service announcements from the late 1950s to the present indicating that "light" cigarettes were not as safe as portrayed by defendants. Defs.' Br. 10 ff. Tens of millions of pages of internal documents could easily be obtained for research as a result of the Master Settlement Agreement of November 23, 1998 between the tobacco industry and various states' attorneys general. The Master Settlement Agreement provided that the tobacco companies would make available through their web sites and at a central depository in Minnesota many of the documents produced during discovery of the states' attorneys general actions. *See* Master Settlement Agreement ("MSA") 29-32. Not all of these documents were available at once; the earliest posting on the Philip Morris USA Document Site, for example, appears to be February 1998. Many of the documents relied upon by plaintiffs' counsel were available long before 2000 through the

defendants' web sites and other channels. Defs.' Br. 23.

In response, plaintiffs chronicle the past and ongoing efforts of the tobacco industry to induce public misperception of the health risks posed by smoking by indicating their doubt about the truth of warnings by the health services community, and by limiting the release of their own scientific studies, Pls.' Br. Ex. 12; lobbying the Federal Trade Commission, Pls.' Br. Ex.7-8; cloaking documents with the attorney-client privilege, Pls.' Br. Ex. 15-17; conducting studies outside the United States so that the results would remain secret, Pls.' Br. Ex. 10, 11, 19; and working with scientists sympathetic to the industry to produce reports favorable to the industry's health claims, Pls.' Br. Ex. 21-22. Plaintiffs also point to the testimony of tobacco industry executives who testified that, into the late 1990s, they were ignorant of the phenomenon of compensation—a technique used by many smokers to increase their intake of nicotine and tar from "low-tar" cigarettes. Pls.' Br. Ex. 36-38.

The enormous amount of conflicting evidence filed by the parties on the subject of consumer knowledge demonstrates that genuine issues of fact exist as to the defense of the statute of limitations. If this case goes to trial, it will be for a jury to determine when plaintiffs had actual knowledge or should have had knowledge of the alleged fraud. *Cf. Bingham v. Zolt*, 66 F.3d 553, 558 (2d Cir. 1995) (jury asked to determine "when the estate actually knew of defendants' alleged wrongful acts").

The instant matter is unlike other "knowledge" cases before the Court of Appeals for the Second Circuit. Other litigations have dealt with *either* individuals in close contact with the persons who defrauded them, *see, e.g.*, *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23 (2d Cir. 2002) (hotel employee suing hotel); *Bingham v. Zolt* (administrator of estate suing

8

decedent's legal advisors); *Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) (trust beneficiaries suing administrators), *or* sophisticated plaintiffs who invested significant amounts of money in a venture controlled by defendants. *See, e.g., In re Merrill Lynch* (investors in real estate limited partnerships); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) (federal stock association lending money to mortgage broker). Such plaintiffs in ongoing business relationships with defendants can be expected to be alert to the possibility of fraud in a way that the average smoker, spending a few dollars for a pack of cigarettes as a matter of habit, may not be. The plaintiffs in the instant matter are members of a nationwide mass market; their interaction with defendants was largely limited to advertisements and other general knowledge. A jury question is presented.

Plaintiffs do not discuss the knowledge timing beyond asserting that no class member could have known of his injuries until the publication of Monograph 13. The studies referred to in Chapter 6 of this monograph do provide some support for plaintiffs' position that many smokers lacked knowledge of the dangers of "light" cigarettes. Plaintiffs, however, do not refer to any expert reports on the time when knowledge of dangers about "light" cigarettes were, or should have been, acquired by smokers. They concede only that sometime after 2000 smokers were warned. *See* Tr. of Sept. 12-13, 2005 Hr'g 180:16-22 (warning by defendants on internet and in advertisements). Their argument is essentially one of estoppel: the tobacco companies made tremendous efforts to keep the truth about "light" cigarettes from smokers and so should be estopped from arguing that the smokers learned the truth anyhow. *See Price v. Philip Morris*, No. 00-L-112, 2003 WL 22597608 (Ill.Cir.) (in statewide "light" cigarettes class action trial under Illinois consumer protection acts, defendant held liable for $7 billion in compensatory and

$3 billion in punitive damages).

*Price* apparently adopted the estoppel theory. The Illinois court ruled that since evidence at that trial established that Philip Morris had concealed the truth about "light" cigarettes until November 2002 (when it added inserts to packages of "light" cigarettes that warned of their dangers), it could not assert that the plaintiffs should have been aware of the information any earlier. *Price* at ¶ 81. As to actual knowledge, the court apparently believed that the company's decision to publish the inserts so widely (and duplicate their contents in newspaper advertisements and on its website) provided strong evidence that its customers were unaware earlier of the risks the inserts described. *Id.*

The *Price* court also found that Monograph 13 represented the first scientific consensus on the true nature of "light" cigarettes; it appears to have concluded that the class could not be deemed to have known of the fraud prior to the publication of the monograph. *Id.* at ¶ 80. Defendants in the present litigation contest this point, arguing that Monograph 13 was only a reinterpretation of existing studies. Tr. of Sept. 12-13, 2005 Hr'g 229.

## IV. Continuing Problems

A troubling critical problem for plaintiffs is that some members of the class almost certainly were aware long before 2000 that "light" cigarettes were not appreciably safer for them than regular cigarettes. The statute would bar their claims. Yet the plaintiffs may be able to show that a substantial number of smokers were not aware before May 2000. The individual class members and their times of awareness may well have differed over the years. Suppose, for example, that one million became aware in 1998, one million in 1999, one million in 2000 and

10

one million in 2001. The first two million (1998-1999) would be barred, the third (2000) could be deemed damaged for a year or less, and the fourth (2001) for somewhat more than a year. According to plaintiffs' theory of the case, the particular persons in each group cannot be known.

Assuming a jury could find defendants liable, recovery would have to depend upon a statistical analysis to estimate how many smokers knew what and when. *See* Mem. & Order of Sep. 29, 2005 (Docket No. 763) (discussing *Daubert* issues). One way that plaintiffs might proceed would be:

1) Based on surveys, other evidence and extrapolation, plaintiffs' experts might develop a model showing how many smokers of "light" cigarettes were ignorant of the alleged fraud in each relevant year.

2) Based on evidence, plaintiffs' experts might estimate the "pack premium" paid by smokers because of the fraud, and the total class damages for each year.

3) To provide a total loss for the period of liability fixed by the jury, the damages for each year might be summed up.

4) Members of the class might prove by affidavits the number of packs of "light" cigarettes they bought during the period to receive a pro rata share of damages.

Calculations would have to exclude geographic areas such as Illinois where, in the *Price* case, sales overcharges were recovered in a separate state substantive law fraud recovery.

The population of smokers is not static. There was during the applicable time of alleged fraud a continuing introduction into the class of naive new smokers, including children who may have had no inkling of the extensive literature in the field concerning health risks of "light" and regular cigarettes, newly addicted sophisticated adults and other new smokers. Over the years

11

there was also a continuing seepage out of the class of those who quit smoking, either voluntarily because of what they had learned about health risks; concern about their children's health; or disapproval of their spouses, peers and employers; or involuntarily because of death. Between the completely naive and the completely sophisticated lies a broad changing spectrum of smokers with partial knowledge that may or may not have been fully assimilated. There are, as defendants rightly suggest, probably as many variations in knowledge as there are individual smokers.

In short, to avoid the statute of limitations and determine total damages, plaintiffs' theory may depend upon an estimate predicated largely on expert testimony that may require disaggregation of smokers by knowledge, year by year, with reintegration to obtain total damages. Such estimates, if properly modeled and supported by evidence, may be appropriately used to resolve factual issues not susceptible of direct proof. *See, e.g.*, Federal Judicial Center, Reference Manual on Scientific Evidence 2 (2d ed. 2000) (Breyer, J., describing the "great weight" the Supreme Court had placed on statistical analysis in recent cases); *id.* at 83-178 (offering guidelines for the judicial supervision of statistical evidence); *id.* at 229-276 (guidelines for survey data); *id.* at 277-334 (damages); American Bar Association, Econometrics 179-224 (2005) (use of statistical techniques in class certification to demonstrate existence of common issues); *id.* at 1 n.2 (noting widespread use of statistical analyses outside antitrust context). Since discovery is not completed this problem of proof need not be decided now.

## V. Unresolved Matters

### A. Separate Accruals on Separate Purchases

The Court of Appeals for the Second Circuit has adopted a "separate accrual" rule in civil RICO cases under which "a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) (separate accrual rule not applicable on the facts). If this rule were to apply here, it might permit recovery for economic damages suffered by plaintiffs on all packs of cigarettes purchased after May 11, 2000, four years before class counsel filed the complaint in this matter. Defendants argue that the rule is inapplicable because plaintiffs have alleged a single injury—the loss of value in packages of "light" cigarettes purchased in reliance on defendants' alleged fraud. Defs.' Reply 15. Plaintiffs have not relied on the separate accrual rule in their motions in opposition to summary judgment, Pls.' Br. 34, possibly for the sensible reason that if knowledge barred all claims for purchases before 2001, *a fortiori* it applied to purchases after that date.

### B. Equitable Tolling

In view of the present decision, the issue of equitable tolling because of defendants' alleged fraudulent concealment of the actual deliveries of tar and nicotine by "light" cigarettes need not be considered. *See* Defs.' Br. 18 ff; *Price v. Philip Morris, supra*. Whether to present that issue to the jury by evidence and charge is postponed.

13

## VI. Conclusion

The motion for summary judgment on the ground that the statute of limitations expired before the suit was filed is denied. Leave to renew is granted upon completion of discovery, with additional expert and other evidence on how dated knowledge is to be imputed to the class.

SO ORDERED.

_____
Jack B. Weinstein

Dated: October 6, 2005
       Brooklyn, New York