**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BARBARA SCHWAB, *et al.*, individually and, on behalf of all others similarly situated, )<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>PHILIP MORRIS USA, INC., *et al.*, )<br>)<br>Defendants. )<br>) | No. 1:04-cv-1945 (JBW)(SMG) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
***DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF DR. JOHN R. HAUSER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.     The Court's Rulings on the Reliance Element of Plaintiffs' Claims ................... 4

II.    Dr. Hauser .......................................................................................................... 6

III.   The Conjoint Study ............................................................................................. 7

    A.    Study Design ............................................................................................... 8

        1.    Dr. Hauser Made An Unwarranted A Priori Decision to Test Four Product Attributes ........................................................ 8

        2.    Dr. Hauser Made An Unwarranted A Priori Decision to Aggregate All 65 Brands At Issue ............................................. 10

        3.    The Pretest Was Inadequate ....................................................... 10

        4.    The Survey Was Administered To A Sample That Is Not Representative Of The Proposed Class ...................................... 11

        5.    The Questionnaire Presented Choice Sets That Could Not Possibly Exist In The Market ....................................................... 13

    B.    The Conjoint Study Has No Application To This Case ............................ 14

        1.    The Study Is Not Probative Of Class Members' Reliance .......... 14

        2.    The Study's Central Finding Is Not Probative Of Any Issue In This Case .............................................................................. 15

            a.    The Conjoint Study Produced Irrational Results ............. 17

IV.   The Time Study .................................................................................................. 17

ARGUMENT ................................................................................................................... 24

I.     Dr. Hauser's Testimony And Conjoint Study Must Be Excluded From Evidence Under Daubert And Rule 702 ............................................................ 24

    A.    Dr. Hauser's Opinions Will Not Aid The Jury In Resolving Any Issue In Dispute ...................................................................................... 24

        1.    The Conjoint Study Does Not Address Why Class Members Purchase Their Light Cigarettes ................................. 25

        2.    The Conjoint Study Relies Upon False Assumptions About Consumer Choice ...................................................................... 29

    B.    The Conjoint Study's Aggregation Of Brands Produced Unreliable Results ...................................................................................................... 31

## TABLE OF CONTENTS
### (continued)

| | | | | | Page |
|---|---|---|---|---|---|

C.   Even If Dr. Hauser's Conjoint Study Fit, It Would Have To Be Excluded Due To Serious Methodological Flaws ................................... 33

    1.   The Study Suffers From Methodological Flaws Due To Dr. Hauser's Ignorance Of The Cigarette Industry ........................... 33

        a.   Important Factors In Smokers' Purchasing Decisions Were Omitted From The Survey .................... 34

        b.   The Survey Did Not Accurately Reflect Market Choices ........................................................................ 36

        c.   The Survey Contained Ambiguous Terms ...................... 37

    2.   Other Methodological Flaws ........................................................ 37

        a.   Dr. Hauser Polled A Biased Sample ............................... 37

            (i)   Dr. Hauser failed to properly define a relevant survey "universe" ................................... 38

            (ii)   The Greenfield Online database did not provide a representative sample of the relevant universe ................................. 39

            (iii)   Dr. Hauser utilized unreliable demographic variables ............................................... 40

            (iv)   Dr. Hauser's sampling procedures lacked adequate controls ................................... 41

        b.   The Conjoint Study's Format Suggested To Respondents That Light Cigarettes Are Less Dangerous Than Regular Cigarettes ............................... 42

        c.   Results Of The Conjoint Survey Are Skewed By "Range Effect" ............................................................... 43

        d.   Price Ranges Tested In The Conjoint Survey Increased The Measured Importance Of Price ................ 44

    3.   The Conjoint Survey's Lack Of Reliability Is Demonstrated By Its Irrational Results .............................................................. 45

D.   Dr. Hauser's Conduct In Connection With The Time Study Demonstrates His Inability To Qualify As An Expert Witness ............... 46

II.   Dr. Hauser's Testimony And Conjoint Study Must Be Excluded Under Rule 403 ................................................................................................. 47

CONCLUSION ................................................................................................. 48

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256, 266 (2d Cir. 2002) ..............29

*Amstar Corp. v. Domino's Pizza, Inc.*,
   615 F.2d 252 (5th Cir 1980) ...................................................................................37, 38

*Arche, Inc. v. Azaleia, U.S.A., Inc.*,
   882 F. Supp. 334 (S.D.N.Y. 1995)...................................................................................37

*Binder v. Long Island Lighting Corp.*,
   No. CV 88-1315, 1990 WL 137403 (E.D.N.Y. July 26, 1990), *rev'd other
   grounds*, 933 F.2d 187 (2d Cir. 1991) ............................................................................31

*Cumberland Packing Corp. v. Monsanto Corp.*,
   140 F. Supp. 2d 241 (E.D.N.Y. 2001) .............................................................................33

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..........................................................................................................24

*E.E.O.C. v. Rockwell Int'l Corp.*,
   60 F. Supp. 2d 791 (N.D. Ill.1999) ..................................................................................46

*Fashion Boutique of Short Hills v. Fendi USA*,
   75 F. Supp. 2d 235 (S.D.N.Y. 1999)................................................................................30

*In re Agent Orange Prod. Liab. Litig.*,
   611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. den*,
   487 U.S. 1234 (1988).........................................................................................................47

*In re Jackson Nat'l Life Ins. Corp. Premium Litig.*,
   No. 96-MD-1122, 2000 WL 33654070 (W.D. Mich. Feb 8, 2000)..................................46

*Kumho Tire Corp. v. Carmichael*,
   526 U.S. 137 (1999).....................................................................................................24, 46

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003)………………………………………………………...25

*Raskin v. Wyatt Corp.*,
   125 F.3d 55 (2d Cir. 1997)………………………………………………………….31

## TABLE OF AUTHORITIES

**Page**

### CASES
### (Continued)

*Schwab v. Philip Morris USA, Inc.*,
  No. 04-CV-1945 (JBW), 2006 WL 721368 (E.D.N.Y. March 20, 2006) ..................19, 46

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999)...............................................................................29

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
  559 F. Supp. 1189 (E.D.N.Y. 1983) ......................................................24, 33

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001)..............................................................47

*Vista Food Exch., Inc. v. Vistar Corp*.,,
  No. 03-CV-5203 (DRH), 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005) ..................37, 47

### STATUTES

FED. R. CIV. P. 26(a)...................................................................................47

FED. R. EVID. 403.......................................................................................47

FED. R. EVID. 702 ......................................................................................24

FED. R. EVID. 703 ......................................................................................24

### SECONDARY SOURCES

K. Michael Cummings et al., *Comparison of Recent Trends in Adolescent and Adult Cigarette Smoking Behavior and Brand Preferences*, 6 (Supp. 2) Tobacco Control S31 (1997)………….32

Subhash Lonial et al., *Identifying Purchase Driving Attributes and Market Segments for PCs Using Conjoint and Cluster Analysis*, 2 (2) J. OF ECON. AND SOC. RES. 19 (2000)......................35

M.M.W.R., *Cigarette Smoking Among Adults - United States* (2004) ..............................12, 39, 41

Julie Ratcliffe, The *Use of Conjoint Analysis to Elicit Willingness-to-Pay Values*, 16 INT'l J. OF TECH. ASSESSMENT IN HEALTH CARE 270 (2000).........................................44

4 WEINSTEIN'S FEDERAL EVIDENCE §702.06[3] (2d 1998) ........................................24

Dick R. Wittink et al., *The Effect of Differences in the Number of Attribute Levels on Conjoint Results*, 1 (2) Marketing Letters 113 (1989)...................................................43

## INTRODUCTION

This case focuses on consumers' reliance on the word "light" in the purchase of sixty-five brands of cigarettes over more than thirty-five years. Some of the cigarettes were heavily marketed; others not. Some share brand names with full-flavor or ultra light cigarettes; others not. Some were introduced in the 1970s and some in each decade since. The market shares, tar deliveries, image, advertising, and packaging of the cigarettes vary widely. All that the cigarettes have in common is the word "light" in their name. Based on this one word, plaintiffs claim that consumers of these light cigarettes understood manufacturers to imply that light cigarettes were safer than full-flavor cigarettes, and plaintiffs claim that consumers purchased their cigarettes in reliance on that implication. Dr. John Hauser was to be plaintiffs' expert to prove the percentage of the class that purportedly so relied.

For a long while, plaintiffs offered no proof of consumers' beliefs or reliance whatsoever. Instead, they insisted that reliance be presumed for all consumers. This Court repeatedly rejected that approach (*see, e.g.,* Transcript of Hearing dated September 13, 2005 ("9/13/05 Tr.") at 268 (adopting the term "preposterous" to describe such a presumption), attached as Ex. 25 to the Declaration of Arthur J. Margulies ("Margulies Decl.")), and instructed plaintiffs to offer proof as to the number of consumers who believed lights to be less dangerous, as to the source of those consumers' beliefs, and as to the time when those consumers reached their beliefs. Indeed, after argument on plaintiffs' motion for class certification last September 13, this Court decided not to rule on the motion and rather to reopen discovery to allow consideration of the testimony of Dr. Hauser regarding a survey that was purported to address consumer reliance. Later, the Court extended the timing of this case even further to allow Dr. Hauser to conduct a second survey addressed to the timing of consumers' knowledge of the risks of lights cigarettes. The second

survey was invited so that the Court could potentially make a determination of the percentage of lights smokers whose claims would be barred by the statute of limitations.

Now that the surveys conducted under Dr. Hauser's auspices have been reported and his opinions have been discovered, it is plain that neither Dr. Hauser's surveys nor his testimony fit the issues that this Court has insisted are the center of this litigation:

- Dr. Hauser offers no testimony at all on why consumers chose their brands of cigarettes. (*See* Deposition Transcript of John R. Hauser, dated March 23, 2006 ("3/23/06 Hauser Dep.") at 221:15-16 ("My survey was not designed to do an interbrand comparison."), attached as Ex. 4 to Margulies Decl.) Specifically, his conjoint study does not examine whether the "lights" descriptor caused class members to purchase light cigarettes, even though that is the precisely what this case is about. (*See id.* at 226:17-21 ("I did not do any analysis of why those people chose light to determine whether or not it had 'light' on the pack or whether they had some other -- some other reason for buying it.")

- Dr. Hauser does not know why smokers chose their brand of lights and whether their choice was made in reliance on the word "Lights." (*See id.* at 221:24-222:9 ("Q. For example, do you know whether a Marlboro Lights smoker in the absence of his Marlboro Lights is more likely to choose another Marlboro product or another lights product? A. I am not providing an expert opinion with respect to that."))

- Dr. Hauser has not tested and does not know whether lights smokers received information about the relative health risks of lights from the defendants, from the Surgeon General, from their doctors, from any other source, or from no source. (*See id.* at 222:10-225:13 ("The survey was not designed to determine where they obtained information about health risks."))

- Dr. Hauser did not study what consumers understood the word light to mean when they purchased their cigarettes. (*See id.* at 225:23-25 ("the survey was not designed to totally determine everything that "light" might imply in every product category."))

- Dr. Hauser has not studied and has no opinion whether smokers of light cigarettes would have continued to smoke if lights had not been marketed. (*See* Deposition Transcript of John R. Hauser, dated March 24, 2006 ("3/24/06 Hauser Dep.") at 449:6-16, attached as Ex. 7 to Margulies Decl.)

- Indeed, Dr. Hauser has "no opinion" on whether consumers would have bought the identical cigarettes if they did not contain the word "light" in the name. (*See* 3/23/06 Hauser Dep. at 226:17-18 ("I did not do any analysis of why those people

chose light."))  He has no opinion whether the word light was a "driver" in any purchaser's decision.  (*See id.* at 229:24-231:9.)

Not only is it plain that Dr. Hauser's testimony is irrelevant, but it is unreliable and unprofessional as well.  The survey on which Dr. Hauser predicates his testimony asked respondents to assume impossible hypotheticals, was conducted through leading questions in a polemic, leading format, and produced results that were not only externally incompatible with sales in the real market, but were internally at war with themselves.  Some respondents valued the level of health risk in the highest-risk cigarette (that is, all things being equal, such as taste, they would opt for greater health risks), and others assigned a negative value to the risk in the lowest-risk cigarette.  (*See* Expert Disclosure of W. Kip Viscusi dated May 23, 2006 ("Viscusi Rept.") ¶¶ 93-96, attached as Ex. 14 to Margulies Decl.)  Testimony about this survey, which addressed hypothetical choices of mythical products, would only confuse the jury.

## BACKGROUND

This is a tale of two surveys conducted under the auspices of Dr. John R. Hauser.  The first survey (the "conjoint survey") taken in June 2005, was intended to support damage calculations by Dr. Jeffrey Harris, another plaintiffs' expert.  A "choice-based conjoint" survey, it asked respondents who were current light smokers and who volunteered to answer questions, whether they would prefer various hypothetical cigarettes that vary from cigarettes that actually have been sold in the marketplace.  The survey did not attempt to probe light cigarette smokers' reasons for choosing to purchase the light cigarettes they actually smoked.  Its purpose was to "assess the value and importance of health risks to 'light' cigarette consumers in their decision to purchase a 'light' cigarette."  (Expert Witness Report by John R. Hauser dated December 19, 2005 ("12/19/05 Hauser Rept.") ¶ 4, attached as Ex. 1 to Margulies Decl.)  The second survey (the "time survey") was later conducted at the urging of the Court in response to a ruling

provisionally denying defendants' motion for summary judgment on statute of limitations grounds.  The time survey found that the great majority of current and former light cigarette smokers believe lights are just as dangerous as regular cigarettes, and have held that belief since long before the statute of limitations period had commenced.  After being urged not to divulge the results of the time survey by plaintiffs' counsel, however, Dr. Hauser disowned that survey's results and Dr. Hauser does not rely on it for his testimony.  Dr. Hauser has since disowned any reliance on the second, so-called "time" survey.[1]

## I.   THE COURT'S RULINGS ON THE RELIANCE ELEMENT OF PLAINTIFFS' CLAIMS

Several of the Court's prior rulings are pertinent background to plaintiffs' disclosure of Dr. Hauser and his conjoint study.  Dr. Hauser was engaged by plaintiffs' counsel in February 2005, but plaintiffs' counsel did not disclose his conjoint survey or his opinions based on it by the court-ordered deadline of March 2005 for submitting expert reports.  (*See* E-mail from Shelley Schussheim to John Hauser dated February 16, 2005, attached as Ex. 34 to Margulies Decl.)  Instead, plaintiffs initially took the position that they could satisfy their burden to prove that the proposed class relied on the fraud alleged in this case by asking the Court to adopt an assumption that *every* member of the class should be deemed to have relied on defendants' allegedly fraudulent use of the descriptor "light" in purchasing light cigarettes.[2]

The Court made clear that it would not adopt this invalid assumption:

---

[1] The circumstances leading to his repudiation of that survey undermine his credibility generally.  They are discussed below.

[2] Defendants asserted in the prior round of class certification and summary judgment briefing, and do so again here, that the reliance element of plaintiffs' claims is an individual issue that cannot be adjudicated with aggregate proof.  The issue is academic on this record, however, because plaintiffs have not adduced any aggregate proof of reliance.

> We know that everybody doesn't act the same way.  We are dealing with statistical averages in these cases.

> \* \* \*

> If t[h]e plaintiffs['] position is that everybody who smoked a light cigarette had the same reasons, of course, that's not going to be a valid conclusion.

(Transcript of Hearing dated May 26, 2005 at 19:21-24, 22:15-17, attached as Ex. 27 to Margulies Decl.)  The Court later underscored, both before and during the class certification arguments in September 2005, that it is an "absurd" and "unreliable" proposition to state, as plaintiffs did, that every member of the proposed class relied on the alleged fraud in purchasing every pack of light cigarettes ever sold in the United States.[3]

In response, plaintiffs disclosed Dr. Hauser's expert report and his conjoint survey in August 2005, on the eve of the class certification hearings in September.  Plaintiffs asserted that Dr. Hauser's analysis "would respond to the Court's concerns of whether or not there was a means available to identify a percentage of light smokers who did rely on the fraud absent universality."  (8/31/05 Tr. at 12.)  Because plaintiffs did not make a timely disclosure of Dr. Hauser and his conjoint study, the Court initially ruled that it would not consider Dr. Hauser's analysis in connection with the class certification and dispositive motions before the Court in September 2005.  (*See id.* at 18-19 (THE COURT:  "Hauser.  His additional report will not be

---

[3] *See* Transcript of Hearing dated August 31, 2005 ("8/31/05 Tr.") at 25 ("Excuse me. Stop.  I am not going to make any presumption [that 'every purchaser . . . of light cigarettes purchased in reliance on the purported fraud'].  That would be absurd. . . .  To have this Court presume millions of people react in the same way like Pavlov's dogs is not something that this Court has ever considered doing . . . ."), attached as Ex. 28 to Margulies Decl.; 9/13/05 Tr. at 268-69 ( "I can't simply accept it [the proposition that 'the implicit health representation of the term lights contributed to the purchase decision for all cigarette purchasers of light cigarettes.'] I'm not going to rely on that statement.  It's not a reliable statement."); *id.* at 268 ("That is an absurd proposition to begin with."); *id.* at 268 ("preposterous" is "not an inadequate representation of how I [the Court] feel" about plaintiffs' notion of "universal reliance").

considered on the September 12th argument; is that clear?"); 9/13/05 Tr. at 343 (THE COURT: "Then we won't hear Dr. H[a]user.  We won't hear anything about Dr. Hauser at this argument.")

A week after oral arguments on those motions—during which defendants argued, among other things, that plaintiffs' inability to prove reliance on a class-wide basis warranted denial of their motion for class certification—the Court ruled that the opinions of Dr. Hauser and certain other experts that plaintiffs disclosed after the court-ordered deadlines "may bear on at least some of the critical pending motions."  (Memorandum and Order dated September 21, 2005 at 2, attached as Ex. 22 to Margulies Decl.)  Accordingly, a nearly year-long delay ensued to allow for discovery in connection with, among other witnesses, Dr. Hauser.  As we elaborate in more detail below, Dr. Hauser has not delivered what plaintiffs promised the Court he would:  a "means . . . to identify a percentage of light smokers who did rely on the fraud."  (8/31/05 Tr. at 12.)

## II.    DR. HAUSER

Dr. Hauser is a Senior Consultant and co-founder of Applied Marketing Science, Inc. ("AMS"), a company that does substantive litigation consulting (*see* 3/23/06 Hauser Dep. at 24:20-25:3), and a marketing professor at the Massachusetts Institute of Technology.  Dr. Hauser admittedly is "not a cigarette expert."  (*See* Deposition Transcript of John R. Hauser, dated May 19, 2006 ("5/19/06 Hauser Dep.") at 616:4-5, attached as Ex. 8 to Margulies Decl.)  And that is putting it mildly.  Before he was hired by plaintiffs' counsel in this case, he had never done any work in the cigarette industry or any study of the cigarette market.  (*See* 3/23/06 Hauser Dep. at 20:14-20, 41:25-42:19, 183:19-184:5; 5/19/06 Hauser Dep. at 694:21-695:1.)  Even after being engaged for this case, he never reviewed the Surgeon Generals' reports on smoking, the FTC's reports on cigarettes, the Public Health Service's various cigarette reports, or the FTC's rules on

the measurement and reporting of tar and nicotine.  (*See* 3/23/06 Hauser Dep. at 60:20-61:10, 65:2-11, 118:12-119:3.)  He has not conducted any research on cigarettes.  (*See id.* at 22:12-23; 5/19/06 Hauser Dep. at 694:21-695:1).  Nor has he ever performed studies on any product labeled as "light." (3/23/06 Hauser Dep. at 22:22-23:23.)

Dr. Hauser delegated virtually all of the work related to the conjoint survey to Steven P. Gaskin, another Senior Consultant at AMS, and to other AMS employees.  (*See* 12/19/05 Hauser Rept. ¶ 7; 3/23/06 Hauser Dep. at 25:9-10; 78:24-79:9; 5/9/06 Gaskin Dep. at 28:2-5, 129:4-15, 150:25-151:8, 164:14-17.)  They, too, had never studied the cigarette market and made no review of professional or lay literature to dilute their ignorance on the subject.  (*See* Deposition Transcript of Steven P. Gaskin dated May 9, 2006 ("5/9/06 Gaskin Dep.") at 23:16-18, 24:23-25, 69:8-18, attached as Ex. 9 to Margulies Decl.); Deposition Transcript of Shelley R. Schussheim dated May 10, 2006 ("5/10/06 Schussheim Dep.") at 21:22-22:18, attached as Ex. 10 to Margulies Decl.)  He also delegated virtually all of the work in the time study to Mr. Gaskin. Dr. Hauser did not conduct any of the pretest interviews for either survey, did not construct the outline of questions for such interviews, did not draft the questionnaires that were finally administered, and did not write the first draft of his expert report on the conjoint survey.[4]

## III.    THE CONJOINT STUDY

Plaintiffs' counsel asked Dr. Hauser to offer his expert opinions as to "the value and importance of health risks to 'light' cigarette consumers in their decision to purchase a 'light' cigarette."  (12/19/05 Hauser Rept. ¶ 4.)  To reach his conclusions, Dr. Hauser conducted an internet survey of current light cigarette smokers using a methodology known as "web-based

---

[4]    *See* 3/23/06 Hauser Dep. at 79:4-14, 84:9-12; 5/19/06 Hauser Dep. at 643:9-16, 645:10-646:21, 651:2-11; 5/9/06 Gaskin Dep. at 28:6-10, 150:25-151:19, 152:12-15, 167:4-169:2, 215:8-10.

conjoint analysis." (12/19/05 Hauser Rept. ¶ 15.)  Conjoint analysis provides a means for determining within a limited bundle of product attributes, those features that consumers prefer and the relative weight (or "part-worth") that each feature contributes to choice.  (*See* David W. Stewart Expert Rebuttal Report ("Stewart Rebuttal Rept.") ¶ 21, attached as Ex. 13 to Margulies Decl.; 12/19/05 Hauser Rept. ¶¶ 15-20.)  Dr. Hauser's survey was in two parts.  First, consumers were asked about their perception of the relative taste and health risk of the light cigarettes they smoke.  (*See* 12/19/05 Hauser Rept. Ex. D at E19 & E20; 5/19/06 Hauser Dep. at 695:18-696:8.)  Second, the survey created an artificial world in which respondents were presented with hypothetical cigarettes and asked to choose between them.  (*See* 12/19/05 Hauser Rept. ¶ 30 & Ex. D at E22; 3/24/06 Hauser Dep. at 426:21-427:10.)

### A.    Study Design

#### 1.    Dr. Hauser Made An Unwarranted A Priori Decision to Test Four Product Attributes

Though he has never studied cigarettes or the cigarette industry, Dr. Hauser purported to "identify[] the features that drive 'light' cigarette consumers' purchases of cigarettes" before drafting the questionnaire for his conjoint survey.  (12/19/05 Hauser Rept. ¶ 22.)  He did this without conducting any systematic research or reviewing any of the literature that has been published by the Surgeon General, Morbidity and Mortality Weekly Report ("MMWR"), or other sources.  (*See* 5/19/06 Hauser Dep. at 803:18-22, 823:17-824:13; 5/9/06 Gaskin Dep. at 69:8-18.)  Nor did Dr. Hauser consult any internal cigarette company memoranda or marketing information.  (*See* 5/19/06 Hauser Dep. at 669:11-673:5, 728:3-13.)  Instead, Dr. Hauser and his associates made an *a priori* assumption that four product attributes drive consumers' choices in the market for lights cigarettes:  pack type (hard or soft), taste, price, and degree of perceived health risk.  (*See* 5/10/06 Schussheim Dep. at 75:25-76:5 ("Q. Did you go into the interviews

with any hypotheses as to the attributes that smokers used in choosing to . . . smoke the cigarettes they did?  A.  I believe we did.")  They were apparently oblivious to the fact that two of the four attributes that they used—price and pack type—are meaningless when considered as drivers of purchase decisions because all light cigarettes actually sold in the market have always been priced the same as their counterpart full-flavor cigarettes, and nearly all brands of cigarettes are available in both hard and soft pack.  (*See* Deposition Transcript of John C. Beyer dated June 2, 2005 at 14:5-15, attached as Ex. 31 to Margulies Decl.; Declaration of Bruce Neidle dated June 30, 2005 ¶¶ 4, 9, attached as Ex. 32 to Margulies Decl.)

    All that Dr. Hauser and his associates did to learn about what product attributes drive consumer preferences in the light cigarette market was to conduct "qualitative" interviews with 14 respondents from the Boston area.  (*See* 3/23/05 Hauser Dep. 172:10-20.)  These fourteen respondents were *not* representative of light smokers nationwide, however.  (*See id.* at 173:7-180:17.)  Nor were they representative of smokers of all sixty-five brands of light cigarettes at issue in this case.  (*See id.*)  Moreover, even though several of these respondents told Dr. Hauser's associates that product attributes such as the length of the cigarette, what brand it is, whether it has a filter, and whether it is mentholated were important to them in choosing what cigarettes to purchase (*see* 3/23/06 Hauser Dep. Ex. 13, attached as Ex. 5 to Margulies Decl.), Dr. Hauser did not change his *a priori* assumptions of what product attributes he deemed to be important to consumers' purchase decisions.  (*See* 12/19/05 Hauser Rept. Ex. D at E13.)  Had Dr. Hauser researched the issue, he could have learned about systematic studies concluding that features such as brand image, mentholization, cigarette length, tar and nicotine content, and whether a cigarette is filtered or unfiltered are indeed important drivers of consumers' purchase decisions.  (*See* Expert Report of Dr. Wayne S. DeSarbo dated May 3, 2006 ("DeSarbo Rept.")

at 12-13, attached as Ex. 11 to Margulies Decl.; Expert Report of James J. Heckman dated April 30, 2006 ("Heckman Rept.") ¶ 36, attached as Ex. 12 to Margulies Decl.; Stewart Rebuttal Rept. ¶ 28.)

### 2.   Dr. Hauser Made An Unwarranted A Priori Decision to Aggregate All 65 Brands At Issue

Dr. Hauser also made an *a priori* decision to aggregate the sixty-five different brands of light cigarettes listed in Appendix A to the Second Amended Complaint.  He did not perform or rely upon any studies to determine whether smokers of all light brands can be studied as a large group.  (*See e.g.*, 3/23/06 Hauser Dep. at 147:16-151:22; 3/24/06 Hauser Dep. at 346:24-347:6.) Dr. Hauser simply *assumed* that the influences on purchase decisions of light cigarette smokers of different brands are not significantly different.  That assumption is unreasonable without appropriate empirical data and sensitivity analyses to support it.  (*See* Viscusi Rept. ¶ 57.) Indeed, Dr. Hauser's own data shows that smokers of certain brands vary widely from smokers of other brands in their "willingness to pay" for a safer cigarette.  (*See* pp. 32-33, *infra*.)

### 3.   The Pretest Was Inadequate

Dr. Hauser's associates pre-tested the questionnaire that he used for the conjoint study with only nine respondents, all local to Boston.  (*See* 3/23/05 Hauser Dep. at 172:10-20.)  Of course, these nine respondents were not representative of lights smokers nationwide.  (*See id.* at 173:7-180:17.)  Nor were they representative of all of the brands at issue in this case.  (*See id*. at 275:12-24.)  Indeed, they were not even randomly chosen.  (*See id*. at 173:8-5.)

While the ostensible purpose of the pre-test was to determine whether the questions to be used in the conjoint survey were ambiguous (*see* 12/19/05 Hauser Rept. ¶ 23), Dr. Hauser and his associates did not know what wording might be considered ambiguous because they have never studied the market for cigarettes.  For example, although the survey asks respondents to

make choices between "regular" and "light" cigarettes—and Dr. Hauser bases his opinions on analysis of the data from such questions—the term "regular" relates to unfiltered cigarettes for many smokers and likely relates to full flavor filter cigarettes to others. (*See* Deposition Transcript of Jeffrey E. Harris dated March 9, 2006 at 453:11-20, attached as Ex. 21 to Margulies Decl.) Dr. Hauser's assumption, having not studied cigarette advertising or marketing, was that "regular" cigarettes are filtered, with reduced levels of tar and nicotine, and he never tested consumers' understanding of the term. (*See* 3/24/06 Hauser Dep. at 378:11-380:12,  383:8-25, 390:15-21, 395:1-396:11.) Mr. Gaskin and Dr. Hauser do not know what the respondents in the conjoint survey understood this critically important term to mean. (*See* 5/9/06 Gaskin Dep. at 173:10-14 ("I don't know if they meant filtered or unfiltered."); 3/23/06 Hauser Dep. at 86:5-25.)

### 4.    The Survey Was Administered To A Sample That Is Not Representative Of The Proposed Class

The conjoint survey was conducted after the pre-test and the qualitative interviews.  The respondents who were polled in the conjoint survey were not representative of the proposed class in this case, however.  While plaintiffs define the class as current and former light cigarette smokers in the United States since 1971, (*see* Pls' Mot. for Class Cert. at 1-2, attached as Ex. 33 to Margulies Decl.), Dr. Hauser's survey attempted to poll only current light cigarette smokers. (*See* 5/19/06 Hauser Dep. at 675:24-684:11.)  Even though former smokers are a large portion of the proposed class, Dr. Hauser simply assumed that they would value health risks in exactly the same manner as current smokers.  Moreover, Dr. Hauser made no effort to poll a representative sample of smokers of all sixty-five brands at issue in this case. (*See* Viscusi Rept. ¶ 44.)  And some of the respondents smoked brands that are not even part of this litigation. (*See id.*)

In addition, respondents were not randomly chosen.  They were all Internet users who *volunteer* to take all sorts of surveys in exchange for cash rewards.  (*See* 12/19/05 Hauser Rept. at 12-13; Hauser 3/23 Dep 44:25-45:12, 46:25-47:2, 234:7-15; 3/24/06 Hauser Dep. at 457:16-459:15.)  Internet users are not representative of the general population.  (*See* Stewart Rebuttal Rept. ¶ 47 & n.21.)  And, because internet users are generally younger and white, have attained a higher education, and have a higher household income than the general population, (*see id.*), they are even less representative of cigarette smokers in general.  *See* MMWR, *Cigarette Smoking Among Adults - United States, 2004*, attached as Ex. 16 to Margulies Decl. (showing that the prevalence of cigarette smoking is higher among adults living below the poverty level, and smoking prevalence generally decreased with increasing years of education).

Moreover, Dr. Hauser's quota sampling procedure attempted to match the national demographics of the entire U.S. population with respect to four census variables: sex, age, household income, and region of the country (*see* 12/19/05 Hauser Rept. ¶ 26; 3/23/06 Hauser Dep. at 47:23-51:14), rather than with respect to the national demographics of light cigarette smokers.  (*See* DeSarbo Rept. at 7-11.)  Dr. Hauser ignored demographic information such as ethnicity, education, occupation, and employment status.  (3/23/06 Hauser Dep. at 51:15-53:8; 5/9/06 Gaskin Dep. 115:22-116:7.)  If he had reviewed public literature such as the Surgeon Generals' reports or the MMWR, he would had known that race and ethnicity are strong determinants of brand choice, as are these other factors he ignored.

### 5. The Questionnaire Presented Choice Sets That Could Not Possibly Exist In The Market

In the conjoint survey, respondents were shown sixteen different "screen shots" and, for each one, asked to choose among four hypothetical cigarette products.  (*See* 12/19/05 Hauser Rept. ¶ 30.)  They were not given an option to state that they had no preference as between two

or more of the options. (*See id.* Ex. D at E22.) As noted, the attributes used were (i) pack type, (ii) level of perceived health risk, (iii) taste, and (iv) price. (*See id.* ¶ 30.)

The description of the product attributes that Dr. Hauser used were highly leading. Critically, for "level of perceived health risks," respondents were told to *assume* that cigarettes "vary on health risks" and that there is a hierarchy of risks among cigarettes, ranging through "greater than a regular," "the same as a regular," "the same as light," "the same as ultra-light," and "less than ultra-light." (12/19/05 Hauser Rept. Ex. D at E15.) In the same screen shot, the respondents were inconsistently told to suspend any disbelief they may have and make a wholly unrealistic assumption that "taste can be controlled . . . without changing the health risks associates with smoking the cigarette." (*Id.*, Ex. D at E16.)

When respondents were asked to choose among hypothetical products, they were confronted with products that are not actually sold on the market. They were then instructed to assume that such products exist and make imaginary choices among them. For example, respondents were presented with cigarettes that have "health risks greater than regular cigarettes" and cigarettes with "health risks less than 'ultra-light' cigarettes" (12/19/05 Hauser Rept. Ex. D at E15, E22), as well as cigarettes that cost 50% more or less than what the consumer now pays. (*See id.*, Ex. D at E17, E22.) Dr. Hauser's study also tested no-brainer, fantasy-land "choices" such as between (a) a cigarette that tastes the same as a regular cigarette and has the same health risks as an ultra light cigarette, for 20% less than what the respondent currently pays; and (b) a cigarette that tastes the same as an ultra light cigarette and has a greater health risk than a regular cigarette, for 20% more then what the respondent currently pays. (*See id.*, Ex. D at E22.)

### B.   The Conjoint Study Has No Application To This Case

#### 1.   The Study Is Not Probative Of Class Members' Reliance

Dr. Hauser admits that his conjoint study does not address whether the respondents relied on cigarette companies' alleged misrepresentations in purchasing light cigarettes.  (*See, e.g.*, 5/19/06 Hauser Dep. at 909:19-910:2.)  Specifically, as Dr. Hauser concedes, the study does not examine whether the "Lights" descriptor caused class members to purchase light cigarettes, even though that is the precisely what this case is about.  (*See* 3/23/06 Hauser Dep. at 226:17-21 ("I did not do any analysis of why those people chose light to determine whether or not it had 'light' on the pack or whether they had some other -- some other reason for buying it."); *id*. 230:21-231:4 ("Now, I don't know and I have not done a survey to determine the impact of the word 'light,' specific -- taken totally as separately what that has on health risk. . . .  so I am not providing an expert opinion as to whether or not light is the driver of health risk or taste.")  And, critically, the survey did not determine what the respondents know about the potential dangers of light cigarettes in relationship to other cigarettes, or from what sources light cigarette smokers developed their beliefs about the dangers of smoking light cigarettes.  (*See id.* at 222:10-225:13.)  Thus, Dr. Hauser cannot give an opinion concerning whether respondents acquired their beliefs about the health risks of light cigarettes from defendants' use of the descriptor "Light" or through awareness of statements by the Surgeon General, the Federal Trade Commission, the public health community, their physicians, or statements from any source other than defendants.  (*See id.* at 222:10-226:21.)

The conjoint study also did not address other causal factors, such as whether the respondents would have started or stopped smoking if they had perceived that light cigarettes posed the same health hazards as full-flavored cigarettes.  (*See* 3/24/06 Hauser Dep. at  346:1-19; 347:20-348:6, 487:7-17.)  Nor did it attempt to estimate the number of light cigarette smokers

who purchased light cigarettes in reliance on perceived health characteristics.  (*See id*. at 449:6-16.)  The study also did not seek to determine why consumers switch from one brand to another during their smoking history.  (*See id*. at 346:20-347:6.)  Nor did it attempt to determine what any respondent's second choice would be if their cigarette of choice were not available.  (3/23/06 Hauser Dep. at 221:8-16.)  For instance, Dr. Hauser cannot opine on whether a Marlboro Lights smoker is more likely to choose another Marlboro product, another "Lights" product, another cigarette, or no other cigarette if Marlboro Lights were not available in the marketplace.  (*See id*. at 221:24-222:9.)

###### 2.      The Study's Central Finding Is Not Probative Of Any Issue In This Case

The conjoint study was designed to determine how current light cigarette smokers subjectively value health risks in the abstract.  (*See* 12/19/05 Hauser Rept. ¶ 4; *see also* 3/23/06 Hauser Dep. at 220:11-15.) ("Q. What was the specific question that you sought to answer here? A. Well, the specific question that I was asked to look into was how people value health risks.") But it does not answer whether, in the real world, the respondents' cigarette choice was actually based upon health concerns.  Rather, Dr. Hauser's central "finding" that 90% of light cigarette consumers value health in choosing their cigarettes is based on a sanity test:  all things being equal, including taste, would you choose a hypothetical cigarette that was more dangerous than a regular cigarette or less dangerous than an ultra light cigarette?  (*See, e.g.*, 12/19/05 Hauser Rept. ¶¶ 44, 46; 3/24/06 Hauser Dep. at 504:1-24; *id*. at 424:19-425:1 ("What this says is that for -- my best estimate is that 90.1% of the respondents, if given the choice between two otherwise totally identical cigarettes, one of which had less health risk and the other of which had more health

risk, then they would value that choice and choose the one with less health risk.")[5]  Indeed, the question was so tautological and the formula was so loaded that Dr. Hauser testified that the deviation from 100% might be considered error.  (*See* 3/24/06 Hauser Dep. at 424:2-425:23.)

Moreover, this 90% figure represents respondents who "place a positive value on health and are willing to trade off health versus other aspects." (3/24/06 Hauser Dep. at 504:19-21.)  As Dr. Hauser's own data shows, however, there is no trade off in the real world.  Over 90% of respondents in the conjoint study said that they *prefer* the taste of lights.  (*See* 5/19/06 Hauser Dep. at 705:3-706:1.)  And only 2% of the respondents said that they prefer the taste of "regular" cigarettes to light cigarettes, while the remaining 8% stated that they rate the taste of light cigarettes to be equal to "regular" cigarettes.  (*See id.* at 704:10-18, 724:20-728:2.)  Accordingly, even assuming that light cigarettes are as harmful as full-flavor cigarettes *and* that consumers relied on defendants' purportedly fraudulent use of "lights" in deciding to buy light cigarettes[6]— as the complaint alleges—Dr. Hauser's data shows that at least 90% of consumers of light cigarettes will nevertheless continue to buy light cigarettes, all other things being equal.  (*See* Hauser Dep. at 727:16-728:2.)  This is a matter of common sense:  if consumers have to choose between two cigarettes with the same health risks, the self-evident choice is the cigarette with the better taste.  Thus, the vast, vast majority of the proposed class cannot possibly have a fraud claim against defendants.  For them, there was no trade-off between health risks and taste,

---

[5] Also, 81.6% of those survey respondents who placed a positive value on health risk did not perceive health risk as the most important contributing factor in their purchase of light cigarettes; for them, taste, price, or pack type were more important.  (*See* 12/19/05 Hauser Rept. at ¶ 46; 3/24/05 Hauser Dep. at 416:6-12 ("I am accurately reporting that 18.4 percent of these consumers find health risk to be the most important; therefore, . . . 81.6 percent of the consumers find one of the other four features to be more important than health risks.").

[6] And also assuming, among other things, that the class or some portion of it is not barred by RICO's four-year statute of limitations.

because they prefer the taste of light cigarettes and would therefore choose to purchase light cigarettes even if they believed them to be as dangerous as full-flavor cigarettes.  (*Id.*)

### a.    The Conjoint Study Produced Irrational Results

The conjoint study is a textbook illustration of the adage, "Ask a silly question, get a silly answer."   Asked to make choices among hypothetical cigarette products and suspend their disbelief about the trade-offs between taste and health risk, respondents gave answers that lead to some absurd conclusions:

- More than half of the respondents in the survey placed a greater value on mythical cigarettes with health risks that they were asked to assume was *higher* than another otherwise identical mythical cigarette.   (*See* Viscusi Rept. ¶ 95.)  In other words, if it is to be believed, Dr. Hauser's survey shows that more than 50% of respondents would rather have a more *dangerous* cigarette, other things being equal.

- More than half the sample, or 330 respondents, rated the risk of ultra light cigarettes as being lower than that of light cigarettes, but the majority of those respondents (182) valued the health attributes of light cigarettes more than the health attributes of ultra light cigarettes.  (*See id.* ¶ 121.)

- One quarter of the respondents preferred to pay *more* for identical cigarettes, and 17% of the respondents would rather pay 20% less than 50% less for an identical cigarette.  (*See id.* ¶ 98.)

- Nearly a third of the respondents indicated a preference for one type of pack (hard or soft), but placed a higher value on the other type of pack.  (*See id.* ¶ 104.)

- Ninety-two percent of the respondents who indicated that a "regular" cigarette tastes better than a light cigarette placed a higher value on the taste of a light cigarette.  (*See id.* ¶ 109.)

## IV.    THE TIME STUDY

On October 6, 2005, the Court denied defendants' motion for summary judgment on statute of limitations grounds, with leave to renew the motion upon the completion of discovery. The Court noted that plaintiffs have a "troubling critical problem" concerning the statute of limitations in this case.  (Memorandum and Order dated October 6, 2005 at 10, attached as Ex.

23 to Margulies Decl.)  Namely, RICO's four-year statute of limitations would bar all members of the class who became aware before May 2000 (four years before plaintiffs filed the complaint in May 2004) that light cigarettes "were not appreciably safer for them than regular cigarettes." (*Id.*)  The Court ruled that, in light of the showing defendants had made that some members of the class were "almost certainly" time-barred, any recovery by plaintiffs "would have to depend upon a statistical analysis to estimate how many smokers knew what and when."  (*Id.* at 11.) Specifically, the Court suggested that plaintiffs submit a statistical analysis "showing how many smokers of 'light' cigarettes were ignorant of the alleged fraud in each relevant year."  (*Id.*)

Plaintiffs' counsel asked Dr. Hauser to conduct another survey, the so-called "time study," in response to the Court's statute of limitations ruling.  (*See* Draft Expert Witness Report by John R. Hauser dated December 16, 2005 ("12/16/05 Hauser Draft Rept.") ¶¶ 59-60, attached as Ex. 2 to Margulies Decl.)  The time study questionnaire, like the conjoint study questionnaire, was developed through pretests.  (*See id.* ¶ 72.)  The size of the sample to be polled was 1,026 (two-thirds larger than the sample in the conjoint survey), and the costs were considerable,[7] so the questionnaire was not administered until it was assured that respondents could understand it and respond to it appropriately.  (*See id.* ¶¶ 72, 74; 5/9/06 Gaskin Dep. at 57:24-58:6.)  Unlike the conjoint study, which addressed hypothetical product configurations, the time study addressed cigarettes as they are *actually* marketed.  (*See* 5/9/06 Gaskin Dep. at 184:10-15.)  And the time study, unlike the conjoint study, included both current and former light cigarette smokers—as does the proposed class.  (*See* 5/19/06 Hauser Dep. at 675:17-23, 690:2-7.)

On or about December 16, 2005, Dr. Hauser prepared a draft expert report, which memorialized the findings of his time study.  The December 16 draft stated that the time study is

---

[7] Polling alone cost almost $40,000.  (*See* 5/9/06 Gaskin Dep. at 188:3-19.)

valid and that its results can be relied upon by the Court.[8]  (*See* 12/16/05 Hauser Draft Rept.

¶¶ 16-18, 113.)  Similarly, Mr. Gaskin testified that at the time he and Dr. Hauser drafted the

December 16 report, he believed the survey was valid (*see* 5/9/06 Gaskin Dep. 211:4-25), and

that it would be submitted to the Court as a final report, as no further research was necessary.

(*See id.* at 243:15-23, 256:5-13.)

  The results of the time study were devastating to plaintiffs' case, however.  It showed that

only 15% of current and former lights smokers believed that light cigarettes are less harmful than

regular cigarettes, and that a majority of respondents said they had *always* believed that light

cigarettes were at least as dangerous as regular cigarettes.  (*See* 12/16/05 Hauser Draft Rept.

¶ 93; *see also* 5/9/06 Gaskin Dep. at 263:16-21 (admitting that almost 82% of all respondents

who had an opinion said that they believed that smoking light cigarettes had the same health

---

   [8] On March 21, 2006, this Court affirmed Judge Gold's order granting defendants' motion to compel disclosure of all materials related to Dr. Hauser's time study.  *See Schwab v. Philip Morris USA, Inc.*, No. 04-CV-1945 (JBW), 2006 WL 721368, at *4 (E.D.N.Y. March 20, 2006).  Plaintiffs had resisted defendants' request for discovery, contending that: (a) the survey was not "complete" and had not "produced any finding" (*see, e.g.*, Letter from Brent W. Landau to Paul Koethe dated January 23, 2006 ("1/23/06 Ltr.") at 2, attached as Ex. 17 to Margulies Decl.; Letter from Brent W. Landau to The Honorable Steven M. Gold dated February 9, 2006 ("2/9/06 Ltr.") at 3, attached as Ex. 18 to Margulies Decl.; Plaintiffs' Objections to the Magistrate Judge's Order Regarding Production of Materials Related to Dr. Hauser's Attempted Survey ("3/2/06 Objections") at 8, attached as Ex. 19 to Margulies Decl.); (b) the survey was intended as an experiment for counsel, not for disclosure to the Court, and therefore was "work product" (*see, e.g,* 2/9/06 Ltr. at 4; 3/2/06 Objections at 6-7); (c) the survey consisted of only "raw, unanalyzed data" (*see, e.g.*, 2/9/06 Ltr. at 4; 3/2/06 Objections at 9); and (d) Dr. Hauser not only did not rely on the survey, but did not even "consider" it in forming his ultimate opinions (*see, e.g.*, 1/23/06 Ltr. at 2; 3/2/06 Objections at 5-6; Transcript of Hearing dated March 17, 2006 ("3/17/06 Tr.") at  3, 8-9, attached as Ex. 26 to Margulies Decl.)).  Materials produced by plaintiffs make clear, however, that Dr. Hauser in fact completed his second survey, performed a host of complex statistical analyses of the data, and prepared several draft litigation reports, all before he filed his final December 19, 2005 report.  (*See, e.g.*, 12/16/05 Hauser Draft Rept.; Draft Expert Witness Report by John R. Hauser dated December 19, 2005 ("12/19/05 Hauser Draft Rept."), attached as Ex. 3 to Margulies Decl.)

risks as smoking regular cigarettes).[9]  Class members who do not believe that light cigarettes are less harmful than regular cigarettes were not defrauded by defendants and have no RICO damages.  Dr. Hauser's time study therefore eviscerated the class.

Dr. Hauser's report on the time study was due to be served on Monday, December 19, 2005.  On or shortly before December 16, Mr. Gaskin reported the results of the study to plaintiffs' counsel, Paul Gallagher.  Then, on December 16, Mr. Gallagher promptly boarded a plane to Boston to discuss the draft report with Dr. Hauser and Mr. Gaskin.  (*See* 5/19/06 Hauser Dep. at 851:19-852:2; 5/9/06 Gaskin Dep. at 213:7-11, 218:5-17.)  Even though plaintiffs' counsel had already vetted all of the time survey questions before they were administered to respondents (*see* 5/19/06 Hauser Dep. at 777:24-781:9, 783:4-784:7; 5/9/06 Gaskin Dep. 53:19-55:25, 240:18-23), Mr. Gallagher told Dr. Hauser and Mr. Gaskin for the first time that the survey had asked the "wrong question"; he told them he was not interested in when people came to believe that lights were not safer, but only when they changed their mind specifically as a result of information in government reports.  (*See* 5/9/06 Gaskin Dep. at 220:17-221:12, 234:22-235:5, 241:20-242:36.)[10]  That was the first time plaintiffs' counsel had ever told Mr. Gaskin that this was the supposed purpose of the study.

---

[9] One of the questions asked on the time survey was "Do you personally believe that smoking light cigarettes has more health risks than smoking regular cigarettes, the same health risks as smoking regular cigarettes, less health risks than smoking regular cigarettes or I don't know and not sure?"  (5/9/06 Gaskin Dep. at 238:4-16).

[10] The time study did not limit the sources of information from which consumers could have formed their beliefs.  (*See* 5/9/06 Gaskin Dep. at 240:24-241:12 (Q. "[I]t was your personal understanding based upon all you have your conversations with counsel and your reading of Judge Weinstein's opinion and any other information that you had at your disposal, that you were testing light smokers' beliefs and awareness on the basis of what they had heard from all sources, not just from the government; is that correct?"  A. "It was my belief that the information could come from any source.").

The Court never gave any indication that it is only interested in consumers' beliefs based on government reports.  To the contrary, the Court explicitly rejected plaintiffs' argument that there was universal public ignorance before the publication of Monograph 13 in 2001 just as the Court rejected plaintiffs' other universality arguments.  (*See, e.g.*, Memorandum and Order dated October 6, 2005 at 7 ("[D]efendants make a strong case that plaintiffs knew or should have known of  their claimed economic injuries years before 2000.  A number of reports appeared in newspapers, popular magazines, textbooks, government Pamphlets television news programs and public service announcements from the late 1950s to the present indicating that light cigarettes were not as safe as portrayed by the defendants."), attached as Ex. 23 to Margulies Decl.; 3/17/06 Tr. at 26:1-5 ("MR. HAUSFELD: How did the public know about a fraud that is denied to this day existed? COURT: I don't care about that. You have to deal with the knowledge of your clients and when and how and ***what was in the public domain, what was available to them.***") (emphasis added))

Mr. Gaskin testified at his deposition that, "but for" the intervention of plaintiffs' counsel on Friday December 16, the December 16 draft report would have been filed with the Court in substantially the same form on Monday, December 19.  (*See* 5/9/06 Gaskin Dep. at 254:24-256:13.)  He further testified that Dr. Hauser communicated to him that the report would be filed in substantially that form.  (*See id.*)  That report stated that "[t]he scientific methodology used to design, execute, and analyze the Time Study in this report is sound, reliable, and valid" and that the study "can be relied upon as evidence" in response to the issues identified in the Court's statute of limitations order.  (12/16/05 Hauser Draft Rept. ¶¶ 113-14.)  Dr. Hauser now says that he had qualms about the reliability of the survey (although his draft report, which he personally authored, said the pretests "ensured" that respondents understood the questions and that the

results were reliable).  (*See id.* ¶ 72.)  In any event, over the ensuing weekend, Dr. Hauser

prepared a new draft report that totally re-characterized the time study, its significance, and

reliability.

In the December 19 draft report, the name of the study suddenly changed from the "Time

Study" (*see*, *e.g*., 12/16/05 Hauser Draft Rept. at 31) to the "Experimental Time Study (Draft)."

(12/19/05 Hauser Draft Rept. at p.31)  According to Mr. Gaskin, however, neither he nor Dr.

Hauser ever referred to the time study as "experimental" during the time they conducted it.  (*See*

5/9/06 Gaskin Dep. at 252:9-14.)  And, where Dr. Hauser's December 16 draft referred to a

study "to provide survey evidence about two issues" (Hauser 12/16 Draft Rept. ¶ 61), the

December 19 draft report referred to a study "to determine whether it was feasible to obtain

accurate survey evidence about two issues." (12/19/05 Hauser Draft Rept. ¶ 60.)  Rather than

find — as the December 16 draft had — that the time study was solid, reliable, and valid (*see*

12/16/05 Hauser Draft Rept. ¶ 113), the December 19 draft asserted that the "Experimental Time

Study" was just a trial balloon, and that due to Dr. Hauser's lack of confidence in the study,

further research would not be performed "for all respondents."  (*See*, *e.g*., 12/19/05 Hauser Draft

Rept. ¶¶ 104, 115.)  Meanwhile, plaintiffs' counsel had repeatedly represented to the Court that

Dr. Hauser's time study would be complete by December 19, without once mentioning the

purported "experimental" nature of the inquiry.  (*See* Transcript of Hearing dated November 18,

2005 at 15:10-14, attached as Ex. 35 to Margulies Decl; Transcript of Civil Cause for Telephone

Conference dated October 26, 2005 at 6:10-23, attached as Ex. 36 to Margulies Decl.)

Dr. Hauser's stated reason for doubting the validity of the time study was that he was

"informed" of the state of the public health community's knowledge circa 2001:

> I am informed that the public health community did not reach a
> consensus that 'light' cigarettes had the same health risk as regular

cigarettes until approximately 2001.  If this is the case and if respondents did not have a means to form those beliefs prior to 2001, then it appears that respondents are either telescoping their responses to earlier dates, remembering other events, or some other reporting error.

(12/19/05 Hauser Draft Rept. ¶ 96.)  Dr. Hauser admits that he relied solely on plaintiffs' counsel for this "information" that purportedly caused him to lose faith in the time study.  (*See* 5/19/06 Hauser Dep. at 823:8-24 (Q. "[W]ho informed you that the public health community did not reach a consensus that light cigarettes have the same health risk as regular cigarettes until approximately 2001?"  A.  ". . . Mr. Gallagher told me that other experts would testify to this information."  Q.  "So this information comes exclusively from Mr. Gallagher; is that correct?  That is the only basis of information for that first sentence,  "I am informed that the public health community. . .:"  A. "Well, I am informed, yes.  Mr. Gallagher said there is information, and that is why I put this caveat in there.".))

Later on December 19 — and again based on the suggestion of plaintiffs' attorneys — Dr. Hauser's report was further revised to omit nearly *all* references to the time study.  (*See* 5/19/06 Hauser Dep. at 861:21-862:20.)  In the version of Dr. Hauser's expert report that was ultimately submitted to defendants, the time study is mentioned only in a single footnote, which reads, in part:  "After attempting to conduct such a survey, I have concluded that I would have little confidence that the responses would be sufficiently accurate.  I do not rely on any such survey as part of my expert opinions in this case."  (Hauser 12/19 Rpt ¶ 4 n. 2; *see also* 5/19/06 Hauser Dep. at 861:15-19.)

**ARGUMENT**

I. **DR. HAUSER'S TESTIMONY AND CONJOINT STUDY MUST BE EXCLUDED FROM EVIDENCE UNDER DAUBERT AND RULE 702**

The Court must evaluate the admissibility of Dr. Hauser's testimony and conjoint study for gatekeeping purposes under Rule 702 of the Federal Rules of Evidence. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[11] "The admissibility of expert testimony concerning the results of a survey is dependent upon the qualification of the witness, the helpfulness of the testimony to the trier of fact, and the reliability and 'fit' of the testimony." 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.06[3] at 702-136, 137 (2d ed 1998) (citations omitted). "The reliability and 'fit' of the survey witness's testimony, in turn, depends on the reliability and trustworthiness of the survey itself." *Id*. at 702-137. *See also Toys "R'' Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983) ("Having excluded the survey, I also excluded the opinions of the experts which were based on that survey.") (citing Fed. R. Evid. 703).

A. **Dr. Hauser's Opinions Will Not Aid The Jury In Resolving Any Issue In Dispute**

Dr. Hauser's proffered testimony fails *Daubert's* "fit" requirement. *See* 509 U.S. at 591-92 (interpreting Rule 702 as requiring "expert testimony proffered in the case [to be] sufficiently

---

[11] Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (as amended Dec. 1, 2000).

tied to the facts of the case that it will aid the jury in resolving a factual dispute").  Dr. Hauser does not provide any aggregate data to show what portion of the proposed class, if any, relied on defendants' alleged fraud in purchasing light cigarettes.

Plaintiffs allege that defendants conspired to "defraud the public into believing that light cigarettes were a healthy alternative to regular cigarettes, or even quitting, in order to maximize sales and profits."  *See*, *e.g.*, Second Am. Compl. ¶ 200 (incorporated by reference; Dkt. # 95). The claims focus on the "Lights" descriptor.[12]  To establish RICO damages, plaintiffs must show that they relied on defendants' purportedly fraudulent statement (the use of the descriptor "light" to imply that light cigarettes are less dangerous than regular cigarettes) in deciding to purchase light cigarettes.  *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) (affirming dismissal of RICO claims where plaintiffs had not demonstrated that their injury was proximately caused by a pattern of racketeering activity or by individual predicate acts). Plaintiffs promised the Court that Dr. Hauser would fill the gap in their proof on reliance, but he does not do that.

### 1.    The Conjoint Study Does Not Address Why Class Members Purchase Their Light Cigarettes

Dr. Hauser's conjoint study does not even attempt to address class members' alleged reliance.  He concedes that he has not used the data from his conjoint study to attempt to establish what percentage, if any, of the proposed class can be deemed to have relied on the purported fraud in purchasing light cigarettes:

---

[12] *See* Transcript of Hearing dated September 12, 2005 ("9/12/05 Tr.") at 110 (HAUSFELD: "We're focusing on the packages, your Honor, because one of the elements that Courts looked at with respect to a RICO fraud violation is:  Was the allegation of fraud written or oral?  Was it uniform or variable? That is all answered by the fact that we are focusing on the descriptor lights on each and every package."), attached as Ex. 24 to Margulies Decl.).

> Q.      Do you utilize your conjoint analysis to establish . . . the percentage of light smokers who relied on cigarette companies' allegedly false representations in deciding to purchase light cigarettes?
>
> A.      I have not personally established all of the items in the predicate to your question.

(5/19/06 Hauser Dep. at 909:19-910:2.)

The conjoint survey was not intended, and cannot be used, to determine what the respondents knew about the potential dangers of light cigarettes and, more importantly, from what source.  (*See* 3/23/06 Hauser Dep. at 222:10-225:13.)  As a result, Dr. Hauser is not using the conjoint study to support any opinion about what sources of information consumers relied upon in choosing to purchase light cigarettes:

> Q.      And you're providing no expert opinion on the sources of information that consumers relied upon in choosing light cigarettes, is that correct?
>
> A.      I've answered that before, but I am not providing an expert opinion with respect to the source of information that consumers used when they made their decision to initially begin smoking light cigarettes.

(3/24/06 Hauser Dep. at 476:23-477:8; *see also* 3/23/06 Hauser Dep. at 222:10-225:13.)

In other words, Dr. Hauser does not know whether respondents purchased light cigarettes due to defendants' allegedly misleading use of the word "Light."  (*See* 3/23/06 Hauser Dep. at 222:10-226:21.)  Dr. Hauser has, quite simply, "not done a survey to determine the impact of the word 'light,'" and that he is "not providing an expert opinion as to whether or not light is the driver of health risk" perceptions.  (*Id*. at 230:21-231:9.)  He undertook to estimate only whether light smokers value lower health risks, without addressing *why* they decided to purchase light cigarettes:

> Q.      [Your study] was not designed to determine whether the respondents would have purchased the same cigarettes that they in

fact smoked if those cigarettes did not have the word "light" on them; is that correct?

A.       . . . I did not do any analysis of why those people chose light to determine whether or not it had "light" on the pack or whether they had some other -- some other reason for buying it. However, once they did choose light, I now know that they're willing to basically trade -- they value health risk, they're pretty uniform in terms of valuing health risk, 90 percent of them at least, and furthermore, that they're willing to make trade-offs of health risk versus monetary value.

(*Id.* at 226:17-21.)

Dr. Hauser's study also does not determine whether smokers would not have started smoking if they perceived that light cigarettes were as unhealthy as regular cigarettes (*see* 3/24/06 Hauser Dep. at 346:1-19), or attempt to estimate the number of light cigarette smokers who continued to smoke light cigarettes in reliance on perceived health characteristics. (*See id.* at 449:6-16 (Q. "You were offering no opinion as to the number of smokers of light cigarettes who continued to smoke in reliance on the health characteristics of low tar or other light cigarettes, correct?" A. "I have not completed a study in this case nor have I begun a study in this case of smoking cessation.")

And the conjoint study does not address whether respondents would have changed their behavior even assuming they had perceived light cigarettes to have the same health risks as regular cigarettes:

Q.       [W]ould it be correct for me to conclude from your statement here on paragraph ten that you've determined that 90% of light cigarette consumers would not have purchased lights if they had perceived lights to have the same health risks as regular cigarettes.

A.       No.  There's other things that can go into that.

(3/24/06 Hauser Dep. at 484:1-16; *see also id.* 487:7-17.)[13]  Notably, half of the class

representatives are still smoking light cigarettes, even though they do not believe that light

cigarettes reduce health risks.  (*See* Defs' Opp. to Pls' Mot. Class Cert. ("Class Cert. Opp.") at

22-23, attached as Ex. 30 to Margulies Decl.)  Likewise, during the in-depth interviews, several

individuals said that even if regular cigarettes and light cigarettes had identical health risks, they

would still prefer lights.  (*See* 3/23/06 Hauser Dep. at 320:23-321:9; *id.* at Ex. 13 (Jennifer states

during a pre-survey interview that if lights are as unhealthy as regulars, she wants the light,

because they taste better), attached as Ex. 5 to Margulies Decl.; *id.* and 5/9/06 Gaskin Dep. at

120:4-22 (according to Heinz, if lights and regulars were equally risky, he would smoke lights

anyway because he prefers the taste); 3/23/06 Hauser Dep. Ex 13 and 5/9/06 Gaskin Dep. 121:3-

16 (according to Chris, the "bottom line" is "regular cigarettes are harsh"))

In sum, Dr. Hauser's conjoint study would not help the jury establish whether plaintiffs

are entitled to RICO damages, because it does not even attempt to address plaintiffs' claim that

defendants' use of the "Lights" descriptor caused class members to purchase light cigarettes in

reliance on perceived health benefits.  The study merely found that 90.1% of the respondents in

his survey believe that a cigarette that reduces health risk is better than one that does not, all

other things being equal.  (*See* 12/19/05 Hauser Rept. ¶¶ 44, 46; 3/24/06 Hauser Dep. at 424:19-

425:1, 504:1-24.)  According to Dr. Hauser, his 90.1% estimate addresses only the value that his

survey respondents attach to health risks, not whether that percentage or any percentage bought

_____

[13] Moreover, the study does not purport to estimate the number of consumers who would have stopped smoking if they perceived that light cigarettes were as unhealthy as regular cigarettes.  (*See* 3/24/06 Hauser Dep. at 347:20-348:6 ("Q.  You have made no effort to determine what percentage of light cigarette smokers would have stopped smoking if they perceived that low tar cigarettes, including lights, were as unhealthy as regular cigarettes, correct?  A. The focus of the internet survey was to determine consumers' trade-offs between health risk, price, taste and other dimensions. The internet conjoint analysis survey was not a study of smoking cessation."))

light cigarettes in reliance on the belief that "Lights mean safer." (*See* 3/24/06 Hauser Dep. at 427:20-429:13; 482:14-485:15.)[14]  "[A] survey may be kept from the jury's attention entirely by the trial judge if it is irrelevant to the issues." *Starter Corp. v. Converse, Inc*., 170 F.3d 286, 297 (2d Cir. 1999).  Dr. Hauser's conjoint study presents such a case.

### 2.    The Conjoint Study Relies Upon False Assumptions About Consumer Choice

Expert testimony fails *Daubert's* "fit" requirement where it relates to "facts or data that have not been adequately established in th[e] case." *Amorgianos v. Nat'l Railroad Passenger Corp*., 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001) (citations omitted), *aff'd*, 303 F.3d 256, 266 (2d Cir. 2002).  Here, Dr. Hauser's survey merely assumed what plaintiffs must prove: that consumers perceive differences in health risks between different types of cigarettes and that for consumers of sixty-five different brands, the word "light" has the same implications and motivational force.  For example, one of the survey's "screen shots" provided the following instruction:

> Please assume that the health risks of cigarettes depend upon many design features including the choice of tobacco additives and other characteristics of the cigarette. ***You will be asked to choose among cigarette designs that vary on health risks.***

---

[14] Many of the respondents in Dr. Hauser's survey expressly stated that they believed that light and full-flavored cigarettes posed exactly the same health risks.  (*See* 3/24/05 Hauser Dep. at 416:13-419:9).  Dr. Hauser nonetheless included these respondents in his 90.1% estimate so long as they placed a positive value on health generally.  (*See id*. at 428:17-429:13 (Q. "Included within that 90 percent are people who, in fact, view light cigarettes to be at least as dangerous as regular cigarettes."  A. ". . . . [A] certain number of these people . . . at the time of the survey perceived that the health risks of light cigarettes are the same as to health risks of regular cigarettes, and so some of those people would be included within the 90 percent who, when faced with a choice of a cigarette that was, say, less unhealthy, would, in fact, be willing to choose . . . the less unhealthy cigarette."); *see also id*. at 504:6-21).  Of course, anyone who believed that light cigarettes pose the same risks as regular cigarettes and bought lights anyway did not rely on the alleged fraud.

(12/19/05 Hauser Rept. Ex. D at E15 (emphasis added); *see also id.* (ranking levels of perceived health risks as "greater than regular cigarettes," "same as regular cigarettes," "same as light cigarettes," "same as ultra-light cigarettes," and "less than ultra light cigarettes")

Considerable research conducted by independent experts outside of litigation, however, indicates that many smokers do not believe there are any differences in health risks between full-flavor and light cigarettes. (*See* Stewart Rebuttal Rept. ¶ 36; Defs' Class Cert. Opp. at 38-40; Declaration of David W. Stewart dated July 22, 2005 ¶¶ 53-54, attached as Ex. 29 to Margulies Decl.) Dr. Hauser's own in-depth interviews should have put him on notice of this fact, as many of the interviewees stated this belief. For example, Bert is recorded as saying that he does not think "light" is healthier, and he doubts there is any tar and nicotine difference in ultra light cigarettes. (*See* 3/23/06 Hauser Dep. Ex. 13.) Chris states that "lights" have the same level of health risk as regular cigarettes: "it's still a cigarette." (*Id.*) Tom states that he does not believe "lights" are any healthier, but could suspend his beliefs about health benefits for the purpose of the survey. (*See id.*) Karl observes that tar and nicotine levels are the same for "lights" as for "regular" cigarettes. (*See id.*) (*See also id.* at 299:16-19 (A. "This respondent believes that light cigarettes are no less unhealthy than regular cigarettes, and there are many people in our survey that have that belief.") Yet, respondents who believed that light cigarettes are no safer than regular cigarettes were nevertheless instructed to assume that there are differences in health risk when responding to Dr. Hauser's survey.

Courts have excluded expert testimony where, as here, experts base their findings on unproven factual assumptions that bear on reliance and causation.[15] Dr. Hauser's conjoint study

---

[15] *See Fashion Boutique of Short Hills v. Fendi USA*, 75 F. Supp. 2d 235, 239 (S.D.N.Y. 1999) ("[The expert's] testimony is premised on his assumption that the sharp decline in plaintiff's sales . . . was caused by a 'campaign of disparagement' by defendants. Without proof

should similarly be excluded because his survey relied on an assumption about health risk that has not been adequately established in this case.

### B.     The Conjoint Study's Aggregation Of Brands Produced Unreliable Results

As a central allegation of their suit, plaintiffs allege that class members believed that the brands of light cigarettes listed in Appendix A to the Second Amended Complaint are less harmful than regular cigarettes.  (*See, e.g.*, Second Am. Compl. at 1.)  Rather than designing the conjoint study to account for the differences between smokers of each brand, however, Dr. Hauser decided *a priori* to aggregate sixty-five brands without performing or relying upon any studies to determine whether light cigarette smokers are all the same in their beliefs and in making purchase decisions.  (*See e.g.*, 3/23/06 Hauser Dep. at 147:16-151:22; 3/24/06 Hauser Dep. at 346:24-347:6 ( "The internet survey was not focused on inter brand choice."))  Dr. Hauser simply assumed that the influences on purchase decisions of light cigarette smokers of different brands cannot be significantly different.  Given the significant differences in market share of different brands, that assumption is unreasonable without the appropriate empirical data and sensitivity.  (*See* Viscusi Rept. ¶¶ 56-57.)  However, Dr. Hauser presents no such test to show that his study's results are robust across brands (*see id.* ¶ 58), and fails to provide any authority for such an assumption.

_____

(continued…)

of the causation that [expert witness] assumes, his estimate of the value of [plaintiff's] business is not the measure of damages for the defamatory statements that plaintiff can prove."); *Raskin v. Wyatt Co.*, 125 F.3d 55, 68 (2d Cir. 1997) (exclusion of expert report proper where expert "assume[d] that any anomalies in the . . . data must be caused by age discrimination, and ma[de] no attempt to account for other possible causes"); *Binder v. Long Island Lighting Co.*, No. CV 88-1315, 1990 WL 137403, at *5 (E.D.N.Y. July 26, 1990) (granting summary judgment for employer despite statistical chart showing higher termination rate for older employees, where chart did not account for other reasons, such as retirement benefits, why older employees might have left), *rev'd other grounds*, 933 F.2d 187, 193 n. 2 (2d Cir. 1991) (expressly declining to rely on statistical chart).

Absent any sensitivity test by brand, Dr. Hauser's analysis is based on improper speculation that there are no significant differences among lights consumers in making their purchase decisions.  That is not feasible.  (*See id*. ¶ 57.)  Each brand has unique packaging and is marketed in different ways.  Moreover, the taste of different cigarette forms (regular, light, ultra light) can vary substantially depending upon brand-specific additives, tobacco blend, and tar content.  (*See* DeSarbo Rept. at 14.)

Moreover, the four product attributes tested by Dr. Hauser cannot be freely manipulated within any particular brand.  Not all brands are sold in ultra-light, light, and full-flavor versions, for example.  (*See* Viscusi Rept. ¶ 75.)  Thus, brand loyalty —an extremely important factor that is completely ignored in Dr. Hauser's conjoint study[16]— reduces the extent to which class members would actually switch away from a light cigarette that  poses the same health risk as a full-flavor cigarette if there is no alternative within the class members' brand.  (*See* Viscusi Rept. ¶ 75.)  That is, a lights smoker would be less likely to switch to a full-flavor cigarette if he was loyal to his brand and there was no full-flavor variety within it.

For instance, the Newport Lights smokers in Dr. Hauser's sample had a much smaller mean part-worth value for the utility of the health risk component of light cigarettes than respondents who smoke other brands.  (*See* Viscusi Rept. ¶ 61.)  The coefficients average 11.9 for Newport Lights smokers, compared to 26.3 for the respondents who smoke other brands.  (*See id*.)  Similarly, willingness to pay also varied significantly by brand:  the mean willingness-to-pay estimate is 5.7 for Newport Lights smokers, compared to 191.0 for the respondents who smoke other brands.  (*See id*. ¶ 91.)  These findings undermine Dr. Hauser's wholesale

---

[16] *See* Stewart Rebuttal Rept. ¶ 28 (*citing* K. Michael Cummings et al., *Comparison of Recent Trends in Adolescent and Adult Cigarette Smoking Behavior and Brand Preferences*, 6 (Supp. 2) Tobacco Control S31-37 (1997) ("[e]vidence from two recent studies indicates smokers to be extremely brand loyal").

assumption that there are no significant differences between brands, and demonstrate that the conjoint study's findings cannot be generalized across all brands of light cigarettes.

### C.    Even If Dr. Hauser's Conjoint Study Fit, It Would Have To Be Excluded Due To Serious Methodological Flaws

Beyond its lack of fit and failure to account for brand preference, Dr. Hauser's conjoint study suffers from serious methodological flaws that render its results unreliable and incapable of generalization to the class.  Flaws in a survey's methodology impact whether the survey can be considered trustworthy.  *See Toys "R'' Us*, 559 F. Supp. at 1205.  "The trustworthiness of surveys depends upon foundation evidence that:  (1) the 'universe' or product market is properly defined; (2) a representative sample of that universe is selected; (3) the questions to be asked of the interviewees are framed in a clear, precise and non-leading manner; (4) sound interview procedures are followed by competent interviewers with no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered is accurately reported; (6) the data is analyzed in accordance with accepted statistical principles; and (7) the objectivity of the entire process is assured."  *Cumberland Packing Corp. v. Monsanto Co*., 140 F. Supp. 2d 241, 245 (E.D.N.Y. 2001) (citing *Toys "R" Us*, 559 F. Supp. 1189).  "Failure to satisfy one or more of these criteria may lead to exclusion of the survey."  *Toys "R" Us*, 559 F. Supp. at 1205.

### 1.    The Study Suffers From Methodological Flaws Due To Dr. Hauser's Ignorance Of The Cigarette Industry

Some of the more significant methodological flaws in Dr. Hauser's survey are a direct result of Dr. Hauser's lack of experience in the cigarette industry, and his failure to study any of the available literature on cigarette sales and marketing.

a.      **Important Factors In Smokers' Purchasing Decisions Were Omitted From The Survey**

"An underlying assumption of conjoint analysis is that any individual's choice represents a response to a specific combination of characteristics (a bundle of attributes)."  (Stewart Rebuttal Rept. ¶ 21.)  As Mr. Gaskin admitted during his deposition, if a conjoint study does not test for the right attributes, the results may be skewed by unmeasured attributes.  (*See* 5/9/06 Gaskin Dep. at 72:23-73:12.)

In Dr. Hauser's study, each hypothetical cigarette alternative had only four attributes:  (1) pack type; (2) level of perceived health risks; (3) taste; and (4) price.  (*See* 12/19/05 Hauser Rept. ¶ 30.)  As previously established, Dr. Hauser decided to use those four attributes without having reviewed any of the available literature (s*ee* 5/19/06 Hauser Dep. at 803:18-22, 823:17-824:13; 5/9/06 Gaskin Dep. at 69:8-18) or cigarette company marketing information.  (*See* 5/19/06 Hauser Dep. at 669:11-673:5, 728:3-13.)  Instead, he purports to have hypothesized them *without research* and then confirmed them based on responses obtained during fourteen interviews, even though he admits that no effort was made to ensure that those fourteen individuals were representative of the class (or even the survey respondents).  (*See* 3/23/06 Hauser Dep. at 173:7-180:17.)

Dr. Hauser's lack of experience and refusal to obtain the requisite knowledge resulted in survey questions that do not incorporate relevant product attributes that actually influence consumer choice (particularly as compared to pack type, which had only a small effect on respondents' choices).  Incredibly, the single most important factor influencing smoker choice — brand equity — was not included in Dr. Hauser's study.  (*See* 5/9/06 Gaskin Dep. at 81:9-1882:9-18; 3/24/06 Hauser Dep. at 346:24-347:6.)  Given the loyalty of light smokers in making their actual purchase decisions and the very strong brand images/identities that exist in this

market place, this is a serious deletion.  (*See* DeSarbo Rept. at 12; *see also* Stewart Rebuttal Rept. ¶ 28.)  As noted above, brand loyalty will reduce the extent of switching away from a light cigarette that poses the same risk as a regular cigarette if there is no continuum of cigarette risk choices within brand.  (*See* Viscusi Rept. ¶ 75.)

Other important factors were also excluded, many of which were mentioned by respondents during pre-survey interviews, such as cigarette length (*see* 3/23/06 Hauser Dep. Ex. 13 (notes from interviews with Bert), tar content (*see id*. (notes from interviews with Bert and John)), nicotine content (*see id*. (notes from interviews with John, Chris, and Tom)), menthol flavor (*see id*. (notes from interview with Chris)), and filter size (*see id*. (notes from interview with Chris)).  (*See also id.* at 293:17-294:16; DeSarbo Rept. at 12-13; Heckman Rept. ¶ 36; Stewart Rebuttal Rept. ¶¶ 27-28.)

Where, as here, respondents care about product attributes that are excluded from the analysis, they can implicitly link those excluded attributes with one of the included attributes when he or she rates a choice, thus making it impossible to determine exactly how much the respondents value the included attribute.  *See* Subhash Lonial, Dennis Menezes, and Selim Zaim, *Identifying Purchase Driving Attributes and Market Segments for PCs using Conjoint and Cluster Analysis*, 2(2) J. OF ECON. AND SOC. RES. 19-37, 24 (2000); *see also* Heckman Rept. ¶ 36 & n.20; Viscusi Rept. at 30-31 ¶ 73))[17]  Dr. Hauser's failure to research and test product attributes that are important to real-world consumers in making real-world purchases makes the

---

[17] Moreover, the survey's focus on only four characteristics, one of which is health risk, raised respondents' concerns about health risks, which wouldn't necessarily occur in a survey that offered choices over ten or twenty characteristics.  (*See* Heckman Rept. at ¶ 30; Stewart Rebuttal Rept. at ¶ 23 ("the manner of presentation of information about individual attributes [should] not create an artificial bias that causes respondents to give greater weight to one attribute relative to another based solely on the method of presentation"))

results of the conjoint study unreliable proof of the trade-offs made by consumers of light cigarettes.

### b.        The Survey Did Not Accurately Reflect Market Choices

"The validity of the results of a conjoint analysis rests on the extent to which the results produced in an artificial survey environment ultimately match results obtained with real products in real markets."  (Stewart Rebuttal Rept. ¶ 26; *see also* Heckman Rept. ¶¶ 15-16, 20.)  Thus, the product descriptions presented to respondents must be "reasonable representations of that they might encounter either at present or at some point in the future." (Stewart Rebuttal Rept. ¶ 23.)

In Dr. Hauser's survey, respondents were presented with hypothetical cigarette options that do not even *approximate* those that are actually available in stores.  For instance, the survey tested cigarettes that have "health risks greater than regular cigarettes" and cigarettes with "health risks less than 'ultra-light' cigarettes" (12/19/05 Hauser Rept. Ex. D at E15, E22), as well as cigarettes that cost 50% more or less than what the consumer now pays.  (*See id.*, Ex. D at E17, E22.)

Moreover, respondents were instructed to assume that taste and health are independent, which they are not.  Indeed, Mr. Gaskin admitted that none of the pre-survey interviewees said that they believe that manufacturers can change the risks of cigarettes without affecting taste. (*See* 5/9/06 Gaskin Dep. 150:15-24; *see also* 3/23/06 Hauser Dep. Ex. 13 (during a pre-survey interview, John is reported as saying he believes that taste is connected to tar and nicotine)) Nevertheless, respondents were presented with a choice between unrealistic products such as: (a) a cigarette that tastes the same as a regular cigarette and has the same health risks as an ultra light cigarette, for 20% less than what the respondent pays now; and (b) a cigarette that tastes the same as an ultra light cigarette and has a greater health risk than a regular cigarette, for 20% more then what the respondent pays now.  (*See id.*, Ex. D at E22.)

When a conjoint study stretches the actual brands found in the marketplace in terms of factor levels in this way, the wide discrepancy with reality may not be believable to respondents and may result in unreliable responses.  (*See* DeSarbo Rept. at 16-17.)

### c.      The Survey Contained Ambiguous Terms

Mr. Gaskin, who drafted the questionnaire and conducted the interviews, admits that the meaning of "regular cigarette" was never made clear; some respondents may have thought that "regular" referred to a filtered cigarette, while others may have thought it referred to an unfiltered cigarette.  (*See* 5/9/06 Gaskin Dep. at 173:10-14 ("Q. But you don't know whether when they said they understood the term 'regular,' you don't know what they meant by the term? A. I don't know if they meant filtered or unfiltered."); *see also* 3/23/06 Hauser Dep. at 86:5-25.) To the extent that respondents brought different interpretations of the meaning of the term "regular" to the choice task, it is not meaningful to aggregate their responses or make comparisons among them.  (*See* Stewart Rebuttal Rept. ¶ 45.)  In addition, such differences in interpretation make any extrapolation of the real world meaningless because the same descriptors used by Dr. Hauser will have multiple and different analogs in the real world.  (*See id.*)

### 2.      Other Methodological Flaws

### a.      Dr. Hauser Polled A Biased Sample

A survey is inadmissible when the sample is not representative of the universe it is intended to reflect.  *See Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F. Supp. 334, 335 (S.D.N.Y. 1995) (excluding survey, in part because the "choice of the sample universe was skewed by the focus on apparently higher income respondents"); *Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203(DRH), 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (excluding survey evidence on summary judgment, and stating "the persons interviewed must adequately represent the opinions which are relevant to the litigation") (quoting *Amstar Corp. v. Domino's Pizza, Inc.*,

615 F.2d 252, 264 (5th Cir 1980)).  Plaintiffs define the class as current and former light cigarette smokers in the United States.  (*See* Pls' Mot. Class Cert. at 1.)  Therefore, to be admissible and to provide valid and reliable estimates, Dr. Hauser's sample population had to be nationally representative of current and former light cigarette smokers.

**(i)     Dr. Hauser failed to properly define a relevant survey "universe"**

The case law is clear that to establish a proper survey universe, there must be a close fit between the relevant inquiry and the potential pool of respondents.  *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir 1980) ("[O]ne of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation.").  Dr. Hauser's conjoint survey did not properly define the relevant universe of respondents, because he limited the respondent pool to current smokers of light cigarettes.  (*See* 5/19/06 Hauser Dep. at 675:24-684:11.)  The proposed class, however, is made up of "[a]ll United States residents who purchased in the United States, not for resale, cigarettes labeled as 'Lights' and/or 'Light . . . .'"  (Pls' Mot. Class Cert. at 1.)  A substantial part of the class no longer smokes or switched from light cigarettes to ultra lights, full-flavored, or other cigarettes. None of these individuals are represented in Dr. Hauser's survey, even though they likely hold very different beliefs than current smokers about the health risks of light cigarettes.

Moreover, there was no effort to limit the sample to smokers of the brands at issue in this case.  (*See* 5/9/06 Gaskin Dep. at 115:19-21.)  Forty-one brands listed in Appendix A to the Second Amended Complaint are not represented by even one respondent in Dr. Hauser's sample, and some brands smoked by respondents are not included in Appendix A.  (*See* Viscusi Rept. ¶ 44.)  Some respondents do not smoke a "lights" brand, but instead smoke regular, low tar (but

- 38 -

not "lights") or ultra lights cigarettes.  (*See id*.)  There was also no effort to test a sample that mirrors the market share of Appendix A brands.  (*See id*.)  This failure is particularly important, as some manufacturers may have cigarettes that are viewed quite differently by consumers.  (*See id*.)  Because there is no empirical basis for generalizing Dr. Hauser's study to Appendix A brands, the study cannot support calculations of damages to smokers of these brands.  (*See id*.)

> ### (ii)     The Greenfield Online database did not provide a representative sample of the relevant universe

Potential respondents for Dr. Hauser's internet survey were selected from the Greenfield Online database.  (*See* 12/19/05 Hauser Rept. ¶ 24.)  This database is restricted to consumers who have internet access and have already volunteered to participate in a variety of online surveys.  (*See* 3/23/06 Hauser Dep. at 44:25-45:12, 46:25-47:2, 234:7-15; 3/24/06 Hauser Dep. at 457:16-459:15.)  Internet users, however, are not representative of either the general population or light cigarette smokers.  They are generally younger and white, have attained a higher education, and have a higher household income than the general population.  (*See* Stewart Rebuttal Rept. ¶ 47 & n.21 (citing The Pew Internet and American Life Project, May-June 2004 Tracking Survey.)  Conversely, the prevalence of cigarette smoking in 2004 was higher among adults living below the poverty level, and smoking prevalence generally decreased with increasing years of education.  *See* MMWR, *Cigarette Smoking Among Adults - United States*, 2004.

Moreover, Greenfield's own literature states that most panel members complete between 25-30 surveys over the course of their enrollment, and refers to panel members that participate in online surveys to excess as "Pro Survey Takers" who should be excluded.  (*See* 3/23/06 Hauser Dep. Ex. 24 at 4, 6 (Greenfield Panel Management Practices), attached as Ex. 6 to Margulies Decl.)  Of the 627 respondents that completed Dr. Hauser's survey (12/19/05 Hauser Rept. ¶ 25),

Dr. Hauser calculated that the median number of completed surveys was 31.  (*See* 3/24/06 Hauser Dep. at  467:20-468:6, 474:1-10.)  More than 20% of the respondents had previously participated in over 100 surveys for Greenfield Online.  (3/23/06 Hauser Dep. Ex. 20, attached as Ex. 20 to Margulies Decl.)  Almost 10% of the survey takers had participated in more than 200 prior surveys, and one respondent had participated in more than 1,200 prior surveys.  (*See id.*)

> (iii)     **Dr. Hauser utilized unreliable demographic variables**

Dr. Hauser's quota sampling procedure attempted to match the national demographics of the entire U.S. population with respect to four variables: census region, age, sex, and household income.  (*See* 12/19/05 Hauser Rept. ¶ 26; 3/23/06 Hauser Dep. at 47:23-51:14.)  But the entire U.S. population is not the relevant universe here; current and former smokers of lights cigarettes are.  And there are significant differences between the distribution of these four demographic variables for the entire U.S. population compared to the population of light cigarette smokers. (*See* DeSarbo Rept. at 7-9.)  These differences make a difference.  A smoker's income, for example, will have a direct impact on his "willingness to pay" for health risks.  Demographic information used by cigarette companies to segment their markets, such as ethnicity, education, occupation, and employment status (*see* 3/23/06 Hauser Dep. at 51:15-53:8; 5/9/06 Gaskin Dep. at 115:22-116:16), may have had a more significant relationship with actual light cigarette smoking behavior than the demographic factors used in Dr. Hauser's study.  (*See* DeSarbo Rept. at 7-10.)  For example, Dr. Hauser's sample includes 10% more Caucasian respondents than are present in the general population. (*See* Viscusi Rept. ¶ 48.)  This sample mix will affect some brands disproportionately, such as menthol cigarettes, which tend to be significantly more popular among African-American smokers.  (*See id.*)

### (iv)    Dr. Hauser's sampling procedures lacked adequate controls

"Most Internet surveys employ convenience samples that cannot technically be used to extrapolate to any larger population." (Stewart Rebuttal Rept. ¶ 46.)  This is because there are no controls or sources of validation; respondents can come from anywhere and provide demographic information that may or may not be correct.  (*See id.*)

Here, of the 3999 respondents that remained in the survey after self-termination or as the result of quotas, 2509 terminated because they were not smokers.  (*See* 12/19/05 Hauser Rept. Ex. F.)  This means that 37% of the individuals in the respondent pool at this point in the survey were smokers — a far higher proportion than found in the adult population of the United States. According to the Centers for Disease Control, approximately 20.9% of U.S. adults were current smokers in 2004.  *See* MMWR, *Cigarette Smoking Among Adults - United States, 2004.* Considering that the demographic characteristics of internet users, such as education and income, are associated with a *lower* incidence of smoking, it does not make sense that Dr. Hauser's respondent pool included such a disproportionate number of smokers.  (*See* Stewart Rebuttal Rept. ¶ 48.)

The most plausible explanation is that some of those respondents were not actually smokers.  (*See id.*)  "This can easily happen in an Internet survey where there is no control over repeated participation in surveys, respondents can disguise their identity and there is an incentive for participation in surveys."  (*Id.*)  If there were a significant number of nonsmokers participating in Dr. Hauser's survey, it would create at least two problems.  First, the responses of nonsmokers are irrelevant and the sample is over-inclusive.  (*See id.* ¶ 49.)  Second, there are important problems raised when nonsmokers are asked to respond to questions that include anchors such as "your current brand."  (*See id.*)

> **b.**     **The Conjoint Study's Format Suggested To Respondents That Light Cigarettes Are Less Dangerous Than Regular Cigarettes**

Not only did Dr. Hauser's survey instruct respondents to assume that different types of cigarettes have different levels of health risk (*see* pp. 29-31, *supra*), but the hypothetical risk hierarchy Dr. Hauser used in the survey resulted in biased risk ratings by suggesting to respondents that light cigarettes are less dangerous than regular cigarettes.

The conjoint survey told respondents to assume that cigarettes "vary on health risks" and then presented them with a hierarchy of risks ranging from "health risks greater than regular cigarettes" and those with "health risks less than 'ultra-light' cigarettes," along with products that are described as having health risks that are the same as regular cigarettes, the same as "light" cigarettes, and the same as "ultra-light" cigarettes.  (*See* 12/19/05 Hauser Rept. Ex. D at E15 (survey screen shot))  Moreover, there was no provision in Dr. Hauser's survey for respondents to act on their belief that there is no difference in health risks among types of cigarettes.  (*See* 3/24/06 Hauser Dep. at 535:7-13.)  Having been explicitly told that they will be presented with five different levels of risk, the set of five alternatives could not be interpreted by respondents in any way other than a set of alternatives *ranked* by health risk.  (*See* Stewart Rebuttal Rept. ¶¶ 33, 41-42.)  Indeed, if a respondent believed that ultra light cigarettes were more dangerous than regular cigarettes, Dr. Hauser's instruction would make no sense. "Such forced responses in an artificial choice situation where the 'better' alternative has been defined by the survey instructions and design reveals nothing about consumer behavior in the market."  (*Id.* ¶ 42.)  Confronted with choices where they have been told there are differences in health risk, it is not surprising that respondents would select the alternative with lower health risk.  (*See id.* ¶ 33 (Dr.

Hauser's survey design created situation in which respondents will strongly prefer the "good" alternative to the "bad" alternative))[18]

> **c.     Results Of The Conjoint Survey Are Skewed By "Range Effect"**

The values of attributes obtained in a conjoint analysis are influenced by the number and variability of the options available for each attribute, an effect referred to as a "range effect." *See* Dick Wittink, L. Krishnamurthi, & David Reibstein, *The Effect of Differences in the Number of Attribute Levels On Conjoint Results*, 1 (2) Marketing Letters 113-123 (1989).  In other words, an attribute may be deemed more important than it actually is in making real-world purchases simply because a conjoint study has more levels of variation assigned to it.

There is evidence of range effect in Dr. Hauser's results.  The least important attribute, package, had only two options (hard pack or soft pack).  (*See* 12/19/05 Hauser Rept. ¶¶ 30, 46.) The attribute that on average was third in importance was taste had three levels ("tastes like a regular cigarette," "tastes like your brand of 'light' cigarette," and "tastes like an 'ultra-light cigarette").  (*See id*. ¶¶ 30, 46.)  Both of the attributes found most important, price and heath risk, had five levels.  (*See id*. ¶¶ 30, 46.)  Thus, those attributes with the greatest range were found to be most important, and those with the least range were found to be least important.  (*See* Stewart Rebuttal Rept. ¶ 29; *see also* DeSarbo Rept. at 15-16 (commenting on the "levels effect"))  The survey had no controls in place to account for range effect.  (*See* DeSarbo Rpt at 15-16.)  Thus, it

---

[18] The extent to which the conjoint study induced a bias in ratings of cigarette health risk is indicated by a comparison of Dr. Hauser's two surveys.  The conjoint study included the bias-inducing survey screen shot (*see* 12/19/05 Hauser Rept. Ex. D at E15), whereas his time study did not.  In the conjoint study, 61.6% of subjects rated light cigarettes as posing less risk than regular cigarettes (*see* 3/24/06 Hauser Dep. at 508:12-15), whereas only 15% of respondents in the time study expressed similar beliefs.  (*See* 12/16/05 Hauser Draft Rept. at ¶ 93; *see also* 5/9/06 Gaskin Dep. at 263:16-21).

is likely that range effect biased Dr. Hauser's findings.  (*See id.*; *see also* Stewart Rebuttal Rept. ¶ 29.)

### d.    Price Ranges Tested In The Conjoint Survey Increased The Measured Importance Of Price

Moreover, the price ranges used by Dr. Hauser increased the importance of price.  This is partly due to "range effect" (*see* p. 43, *supra*), but it also reflects the significant variation in price that Dr. Hauser introduced into his artificial market.  (*See* Stewart Rebuttal Rept. ¶ 31; Heckman ¶ 30.)  Price levels ranged from "50% more than what you pay now" to "50% less than what you pay now."  (12/19/05 Hauser Rept. Ex. D at E17.)  By anchoring the trade-offs between price and other attributes on 50% more or less than the current price paid, Dr. Hauser created a specific price point that drove the value of the other attributes.  (*See* Stewart Rebuttal Rept. ¶¶ 31-32.)  Had Dr. Hauser used other values for price in his product descriptors, he would likely have arrived at a very different conclusion regarding the value of health risk.  For example, had he used 20% more than current price rather than 50% of current price as the extreme price points, the value of health risk could not have been greater than 20% of the current price.  (*See id.*)  On the other hand, had Dr. Hauser used 100% more than current price rather than 50% of current price as the extreme price points, he might well have found a willingness among some of his respondents to pay as much as 100% more for cigarettes to reduce health risk.  (*See id.*)  In other words, Dr. Hauser's selection of the price points actually determined the outcome of his study.[19] If he had used a lower discount in his survey, the damage estimate that Dr. Dennis derives from it would have been considerably lower.

---

[19] *See id.*; Heckman Rept. ¶ 30 (citing Julie Ratcliffe, *The Use of Conjoint Analysis to Elicit Willingness-To-Pay Values*, INT'L J. OF TECH. ASSESSM. IN HEALTH CARE, 270-290 (2000) ("levels chosen for the cost attribute are likely to be highly influential in determining the maximum and minimum [willingness-to-pay] values elicited").

3.     **The Conjoint Survey's Lack Of Reliability Is Demonstrated By Its Irrational Results**

The large number of respondents that gave irrational responses suggests that they either did not attend adequately to the survey task, or that the survey itself was flawed in a fundamental way.  (*See* Viscusi Rept. ¶ 94.)  Less risk was often not associated with greater utility, and less cost was often not associated with greater utility.  (*See id.* ¶ 92.)

For instance, common sense dictates that the highest utility value should be accorded to the lowest health risk, with decreasing utility values as the risk level increases.  It did not work that way in Dr. Hauser's survey, however:

- 82 respondents (13%) did not associate the lowest value with the highest risk; 42 respondents (6.7%) had a positive value for the health risk in the highest-risk cigarette, and 97 respondents (15.5%) had a negative value for the health risk in the lowest-risk cigarette.  (*See id.* ¶¶ 95-96.)  Incredibly, 197 respondents (31%.) valued the heath risks for "ultra-lights" more than the health risks in a cigarette that has a health risk of "less-than-ultra-lights."  (*See id.* ¶ 95.)  Thus, Dr. Hauser's survey produced the nonsensical result that a substantial portion of consumers would rather buy an ultralight cigarette than a cigarette that is otherwise identical except that it is safer than an ultralight.

- With respect to price, 94 respondents (15%.) did not have the lowest utility associated with the highest cost, and 159 respondents (25%.) preferred paying what they pay now instead of paying less.  (*See id.* ¶ 98.)  Further, many respondents revealed preferences regarding pack, taste, or risk in early non-conjoint survey questions that contradict their answers in the conjoint survey. (*See id.* ¶ 92.)  For example, just over half the sample (330 respondents) rated the risk of ultra light cigarettes as being lower than that of light cigarettes; however, 182 of those respondents had a *higher* value for the health risk component of light cigarettes.  (*See* Viscusi Rept. ¶ 121.)

- Regarding taste, 78 respondents (12.4%) indicated a preference for the taste of ultra light cigarettes to light cigarettes; however, 71 of them valued the taste of lights more than the taste for ultra lights.  (*See id.* ¶ 107.)  And, 73 of the respondents who indicated a preference for the taste of light cigarettes showed higher utility values for the taste of regular cigarettes.  (*See id*. ¶ 111.)

- Many respondents exhibited preference reversals: 57 respondents (9%) who claim to prefer a soft pack exhibited greater utility values for hard packs, and 136 respondents (22%) who indicate a preference for hard pack had a greater conjoint utility for soft pack.  (*See id.* ¶ 104.)

These results suggest that the survey did not elicit preferences but instead created meaningless values due to biases in the study's methodology. (*See id.* ¶ 70.)

### D. Dr. Hauser's Conduct In Connection With The Time Study Demonstrates His Inability To Qualify As An Expert Witness

This Court has noted, specifically with respect to Dr. Hauser, that "[a]dverse material reviewed and rejected by an expert bears on his credibility, the soundness of his techniques, and the weight to be given his conclusions. It may be relevant to the court's decision whether to qualify under *Daubert*." *Schwab v. Philip Morris USA, Inc.*, No. 04-CV-1945 (JBW), 2006 WL 721368, at *3 (E.D.N.Y. March 20, 2006).

That Dr. Hauser was willing to repudiate the findings of his time study at the behest of plaintiffs' counsel (*see* pp. 17-23, *supra*), demonstrates his failure to "employ[] . . . the same level of intellectual rigor that characterizes the practice of an expert in [his] field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In *E.E.O.C. v. Rockwell International Corporation* the court excluded an expert's report based on the expert's willingness to allow plaintiffs' counsel to influence the findings and contents of the report. *See* 60 F. Supp.2d 791, 795 (N.D. Ill. 1999) ("Even more serious than [the expert's] admissions that he did not consistently follow his own preferred methods, however, is the amount of input that plaintiff actually had into [the expert's] reports."). The court found that that the expert had included a set of calculations in the report at plaintiff's counsel's insistence, even though such inclusion was inconsistent with the expert's professional approach. *See id.* at 796. Moreover, the expert relied on information given to him by counsel, and failed to verify the information from reliable, independent sources. *See id.* at 797. *See also In re Jackson Nat. Life Ins. Co. Premium Litig.*, No. 96-MD-1122, 2000 WL 33654070, at *1 (W.D. Mich. Feb 8, 2000) (precluding expert testimony where "counsel's participation so exceeded the bounds of legitimate 'assistance' as to

- 46 -

negate the possibility that [the expert] actually prepared his own report within the meaning of [Federal Rule of Civil Procedure] 26(a)").  Here too, Dr. Hauser's willingness to appease plaintiffs' counsel has evidently compromised his ability to employ the same level of intellectual rigor that characterizes the practice of experts in his field.  His testimony, and the conjoint study on which he relies, should be excluded from evidence.

## II.     DR. HAUSER'S TESTIMONY AND CONJOINT STUDY MUST BE EXCLUDED UNDER RULE 403

In addition to the above grounds, Dr. Hauser's testimony and conjoint study should be excluded under Rule 403, because any probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.''  Fed. R. Evid. 403.  Expert evidence can be both powerful and misleading because of the difficulty juries may have in evaluating it.  An expert's "false aura of scientific infallibility" creates a risk of misleading juries.  *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1256 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988).  Because the probative value of Dr. Hauser's testimony, if any at all, is substantially outweighed by the danger of confusing the issues and misleading the jury, he should not be permitted to testify in this action.  *See Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203(DRH), 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (finding probative value of survey to be substantially outweighed by the survey's potential for unfair prejudice and confusion); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307-08 (S.D.N.Y. 2001) (same).  The opportunity for confusion here is obvious:  The jury must consider whether purchasers chose their cigarettes on the health implications of the word light, which Dr. Hauser admits he did not study.  Testimony about hypothetical choices among mythical cigarettes with impossible combinations of taste and risk cannot help but confuse the issue.

## CONCLUSION

Defendants' motion to exclude the testimony of Dr. John R. Hauser should be granted.

Dated: June 9, 2006

Respectfully submitted,

Theodore M. Grossman
Robert Klonoff
Mark A. Belasic
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190

Todd R. Geremia (TG-4454)
Arthur Margulies
JONES DAY
222 East 41st Street
New York, New York  10017-6702

*Attorneys for Defendants*
*R.J. Reynolds Tobacco Company and*
*Brown & Williamson Holdings (f/k/a Brown &*
*Williamson Tobacco Corporation), individually and*
*as successor by merger to The American Tobacco*
*Company*

*and on behalf of all Defendants, counsel for whom*
*is listed on the following page*

David M. Bernick
Michelle Browdy
KIRKLAND & ELLIS LLP
Amoco Building
200 East Randolph Drive
Chicago, Illinois 60606
(312) 861-2000

Murray R. Garnick (MG-2549)
Judith Bernstein-Gaeta
James M. Rosenthal
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000

Peter Bellacosa (PB-2394)
KIRKLAND AND ELLIS LLP
153 East 53rd Street
New York, New York
(212) 446-4800

*Attorneys for Defendant Philip Morris
USA Inc.*

Guy Miller Struve (GMS-4506)
Frances Bivens
Matthew S. Stewart
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Gregory M. Loss (GL-5953)
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York New York 10112
(212) 408-5100

*Attorneys for Defendant British American
Tobacco (Investments) Limited*

*Attorneys for Defendant Altria Group, Inc.*

Alan Mansfield (AM-3266)
Stephen L. Saxl (SS-1028)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York  10166
(212) 801-9200

William L. Allinder
SHOOK HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
(816) 474-6550

*Attorneys for Defendant Lorillard
Tobacco Co.*

## <u>CERTIFICATE OF SERVICE</u>

The foregoing DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR

*DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF DR. JOHN R. HAUSER was

served on all counsel of record on June 9, 2006 by electronic mail through the Court's CM/ECF

system.

Todd R. Geremia
_____
Todd R. Geremia