Page 1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NEW YORK

3        C.A. No. CV-0401945(JBW)(SMG)

4    *   *   *   *   *   *   *   *   *   *   *   *   *

5    BARBARA SCHWAB, et al, Individually    *

6    and on behalf of a class of all        *

7    others similarly situated,             *

8            Plaintiffs                      *

9    v.                                      *

10   PHILIP MORRIS USA, INC., et al,        *

11           Defendants                      *

12   *   *   *   *   *   *   *   *   *   *   *   *   *

13               PAGES 1-328

14       VIDEOTAPED DEPOSITION OF JOHN R.

15    HAUSER, Sc.D., a witness called on behalf of

16    the Defendant R.J. Reynolds Tobacco Company,

17    pursuant to the Federal Rules of Civil

18    Procedure, before Jessica L. Williamson,

19    Registered Merit Reporter, Certified

20    Realtime Reporter and Notary Public in and

21    for the Commonwealth of Massachusetts, at

22    the Offices of Goodwin Procter, LLC, 53

23    State Street, Boston, Massachusetts, on

24    Thursday, March 23, 2006, commencing at

25    10:02 a.m.

1            JOHN R. HAUSER, Sc.D.,
2  a witness called on behalf of the Defendant
3  R.J. Reynolds Tobacco Company, having first
4  been duly sworn, was deposed and testified
5  as follows:
6
7           DIRECT EXAMINATION
8
9  BY MR. GROSSMAN:
10  Q.  Dr. Hauser, it's very nice to meet you.
11  A.  Thank you.
12  Q.  Thank you for coming.  I'm going to be
13      asking you a number of questions today and
14      tomorrow.  If there's any question that you
15      don't hear, will you let me know?
16  A.  Yes, I will.
17  Q.  If there's any question you don't
18      understand, will you let me know?
19  A.  Yes, I will.
20  Q.  Now, your deposition has been taken a number
21      of times, I gather?
22  A.  I have had -- I've taken -- I've given
23      testimony in deposition a number of times.
24  Q.  Have you also testified in court?
25  A.  I have testified in court.

1  Q.  How many times have you testified in court?
2  A.  Oh, four that I can remember, perhaps more.
3      It's on my curriculum vitae.
4  Q.  And how many times, approximately, have you
5      testified at deposition?
6  A.  That's also in my curriculum vitae.  I don't
7      recall the exact number.
8  Q.  Approximately 20?
9  A.  It would be in the ballpark of 20, but,
10      again, without looking at my vitae I've not
11      counted them.
12  Q.  Are you ready to testify in this case?  Have
13      you prepared all of your testimony for trial
14      so far as you can tell?
15          MR. GALLAGHER:  Objection to the
16      form.
17  A.  I am ready to testify in this case.  Should
18      more information become available, I will
19      actually take a look at that.  Should I be
20      asked additional questions, I'll take a look
21      at that.
22  Q.  Have you conducted all studies that you've
23      been asked to conduct by plaintiffs'
24      counsel?
25          MR. GALLAGHER:  Objection to the

1      form.
2  A.  Well, I have conducted a study that's
3      described in my expert report.
4  Q.  You have submitted two expert reports in
5      this case, one in August and one in
6      December.  Are you referring to that --
7      you're referring to both in the singular,
8      for all intents and purposes?
9  A.  Both of those reports describe the same
10      study.
11  Q.  Do you have any ongoing studies apart from
12      the study described in those reports?
13  A.  Should I -- should additional information
14      become available, I'll certainly analyze
15      that information.
16  Q.  Do you have any ongoing studies currently
17      apart from the information described in
18      those reports?
19  A.  I have conducted one study, and that's
20      described in the report.
21  Q.  You've completed one study; is that correct?
22  A.  I have completed one study.
23  Q.  Is that your testimony?
24  A.  I have completed one study.
25  Q.  You also have a -- you have engaged in the

1      study which you've described as having been
2      aborted in the footnote to your December
3      report.  Apart from that aborted study and
4      the study described in the report, have you
5      conducted any other studies in this case,
6      completed or otherwise?
7  A.  The way you've described the study as
8      "aborted," I'm not sure that's the adjective
9      to use to describe.  In fact, it wasn't a
10      study, it was just a pilot study.  And I'm
11      not relying upon the information from that
12      pilot study in my expert report.
13          MR. GROSSMAN:  Move to strike as
14      not responsive.
15  Q.  Have you conducted or are you conducting any
16      study other than those two, however you
17      describe them, pilot study and the study
18      listed in your report?
19  A.  Do you mean in this case?
20  Q.  In this case.
21  A.  Okay.  In this case I have no additional
22      studies ongoing, but should additional
23      information come to light, I will analyze
24      that information.
25  Q.  Okay.  There are none ongoing and there are

Page 18

1  Q.  What is your consulting fee?
2  A.  $650 an hour.
3  Q.  And is that typically billed through AMS?
4  A.  Not all the time.
5  Q.  Sometimes you bill directly yourself?
6  A.  Sometimes I bill it directly.  Sometimes I
7      bill it through other entities.
8  Q.  What other entities?
9  A.  Whatever I'm working with at the time.
10 Q.  Other consulting firms?
11 A.  Sometimes I would bill it through other
12     consulting firms.
13 Q.  Do you have any rate other than $650 per
14     hour that you charge to corporations or to
15     counsel in litigation?
16 A.  Not at the current time.
17 Q.  Okay.  Approximately what percentage of your
18     time do you devote to teaching and writing
19     and research, and academic research?
20 A.  Approximately -- well, probably higher than
21     80 percent.
22 Q.  Approximately what percent of your time do
23     you spend consulting with counsel on
24     litigation?
25 A.  Probably 20 percent or less.

Page 19

1  Q.  And approximately what percent of your time
2      do you devote to consulting with
3      corporations?
4  A.  Well, I haven't added everything up, so my
5      total consulting is probably about 20
6      percent or less, and that's divided between
7      both litigation and non-litigation
8      consulting.
9  Q.  Of your consulting what percentage is
10     litigation consulting and what percentage is
11     consulting with corporations?
12     MR. GALLAGHER:  Objection to the
13     form.
14 A.  Of -- would you please reask the question?
15 Q.  Of the time that you spend consulting what
16     percentage do you devote to litigation
17     consulting?
18 A.  Of the percent, that varies year to year.
19 Q.  Well, in the past year, what percentage of
20     your consulting time did you devote to
21     litigation?
22     MR. GALLAGHER:  Objection to the
23     form.
24 A.  Oh, it's certainly less than 100 percent,
25     and it might be slightly more than 50

Page 20

1      percent.
2  Q.  And in the prior year?
3  A.  I would have to go back and look at the
4      details, but it's in the ballpark of 50
5      percent, maybe slightly higher.
6  Q.  Let me hand you what's been marked for
7      identification purposes as Hauser Exhibit 2,
8      which was included as Exhibit A to your
9      report and is your CV, your academic vitae.
10 A.  This is my academic vitae dated as of April
11     20, 2005 --
12 Q.  Yes.
13 A.  -- for the record.
14 Q.  In reviewing that I did not see any prior
15     work in the cigarette industry.  Is it
16     accurate to say that you have never been a
17     consultant in the cigarette industry?
18 A.  To the best of my recollection, I have not
19     been a consultant for -- with regard to
20     cigarettes.
21 Q.  Have you been a consultant for the beer
22     industry at any point?
23 A.  Yes.
24 Q.  Which product?
25 A.  I am the Kirin professor of marketing at

Page 21

1      MIT, and in that regard I have visited
2      Kirin, which is in Japan, a few times.
3  Q.  Have you consulted with them on the
4      marketing of Kirin beer in the United
5      States?
6  A.  I have been briefed on their activities in
7      the United States.
8      MR. GROSSMAN:  Move to strike as
9      non-responsive.
10 Q.  Have you consulted with Kirin on the
11     marketing of beer in the United States?
12     MR. GALLAGHER:  I'll object to the
13     form.  I don't know how this is irrelevant
14     to -- how this is relevant to the expert
15     opinion that Dr. Hauser's giving in this
16     case.
17     MR. GROSSMAN:  I would agree with
18     your first comment that I don't know how
19     it's irrelevant, but I'll continue.
20 Q.  Could you please answer the question?
21 A.  As I've stated, I have been briefed by
22     employees of the Kirin Brewing Company about
23     their marketing activities in the United
24     States.  I don't know if you would consider
25     that consulting or not.

1    Q.   Has Kirin ever hired you to review the
2         market for beer in the United States?
3    A.   My relationship with the Kirin Brewery
4         Company is that they have donated money to
5         MIT, which is actually unrestricted, but I
6         do -- many times I've advised theses from
7         their students who have come to MIT for
8         education.  Some of these theses have
9         analyzed beer markets.  Some of them
10        analyzed other markets that Kirin have been
11        in.  Some of them are just general theses.
12        I do not know if you would consider that
13        consulting.
14   Q.   Have you ever done any -- conducted any
15        study of the market for light beer in the
16        United States?
17   A.   Not that I recall.
18   Q.   Have you ever conducted any study of
19        marketing of light beer in the United
20        States?
21   A.   Not that I recall.
22   Q.   Have you ever conducted any study of any
23        product labeled as light in the United
24        States?
25   A.   Yes.

1    Q.   What product?
2    A.   In -- you have in front of you a report
3         which is a study of light cigarettes.
4    Q.   Apart from the report that you have
5         submitted in this case, have you ever
6         conducted any study of any product labeled
7         as "light" in the United States?
8    A.   Apart from the work that I've done in
9         support of litigation in this case, I do not
10        recall any particular studies of products
11        labeled as "light."
12   Q.   Okay.  So before you were hired by
13        plaintiffs' counsel in this case, you had
14        never done a study on light cigarettes, you
15        had never done a study on light beer, and
16        you had never done a study on any other
17        product labeled as "light" in the United
18        States; is that correct?
19   A.   To the best of my recollection, I have not
20        done any studies that are specifically
21        designed to study "light," the issue of the
22        "light" adjective as described; however,
23        I've certainly studied many products.
24   Q.   Let me hand you what has been marked for
25        identification purposes as Hauser Exhibit

1         No. 3.  And that consists, excuse me, of
2         pages from the website of Applied Marketing
3         Science.  If you could take a look at that
4         and tell me if you're familiar with it.
5              (Witness reviews document.)
6    A.   This appears to be a printout of parts of
7         the AMS website.  AMS is Applied Marketing
8         Science, Incorporated.  It's dated
9         3/21/2006.
10   Q.   Okay.  Thank you.  It says on the first page
11        of the printout that you have under "VOC,"
12        "Order a free copy of the classic article
13        The Voice of the Customer by Abby Griffin
14        and AMS co-founder and MIT professor John R.
15        Hauser."
16             You are a co-founder of AMS?
17   A.   I am a co-founder of AMS.
18   Q.   And you are also a senior consultant to AMS?
19   A.   I believe that's the title they've given me.
20   Q.   Do you have an ownership interest in AMS?
21   A.   Yes, I do.
22   Q.   What is your ownership interest?
23   A.   I don't know the exact numbers, but it's in
24        the ballpark of 10 percent.
25   Q.   Has it been 10 percent since the founding?

1    A.   It's been approximately that.  As new people
2         have come in, they get stock options, and I
3         haven't tracked it.
4    Q.   In this case when you were engaged to
5         undertake a survey, you conducted that
6         through the auspices of AMS?
7              MR. GALLAGHER:  Objection to the
8         form.
9    A.   Well, employees of AMS were working at my
10        direction.
11   Q.   Do you have use other consulting companies
12        apart from AMS to conduct surveys on your
13        behalf?
14             MR. GALLAGHER:  Objection to the
15        form.
16   A.   Well, the question is, are other entity --
17        other survey companies involved in studies
18        that I conduct?
19   Q.   No.  Do you use companies that provide
20        similar services to AMS when you're engaged
21        by counsel to perform surveys of the kind
22        that you were asked to in this case?
23             MR. GALLAGHER:  Objection to the
24        form.
25   A.   Well, the survey in this case is very

Page 38

1  difference between the mapping from physical
2  characteristics into perceptions and the
3  difference from physical characteristics and
4  psychosocial cues into perceptions.
5  Q.  What is the Brunswick lens model?
6  A.  The Brunswick lens model is a model from
7  psychology of the way the consumers form
8  their perceptions preferences to make
9  choices.
10  Q.  And indeed, consumers often will approach a
11  product with a preconceived view of the --
12  of preferences; is that correct?
13       MR. GALLAGHER:  Objection to the
14  form.
15  A.  I -- what do you mean by pre --
16  Q.  Well, I will rephrase the question.
17       Are you familiar with any marketing
18  studies of Coke and Pepsi?
19  A.  I have read about various studies with
20  respect to Coke and Pepsi.
21  Q.  In fact, there are studies that show that
22  you can -- that brand loyalty is so great
23  with Coke and Pepsi that you may not be able
24  to give away the competing product to those
25  people who drink -- I'll rephrase the

Page 39

1  question.
2       The brand loyalty is so great with
3  Coke and Pepsi that there are studies
4  showing that you can't give Pepsi to people
5  who feel a strong attachment to Coke and you
6  can't give Coke even for free to people who
7  feel a strong attachment to Pepsi; is that
8  correct?
9       MR. GALLAGHER:  Objection to the
10  form.
11  A.  I don't recall seeing those studies.
12  Q.  Have you seen studies on brand loyalty of
13  Coke and Pepsi drinkers?
14  A.  I have seen studies and have actually heard
15  about studies with respect to Coke and taste
16  tests and Pepsi and taste tests.
17  Q.  And have -- what's the scope of those
18  studies, and what did they find?
19  A.  I do recall speaking to someone at Coca-Cola
20  about some of the taste test studies that
21  they had done prior to the launch of what at
22  the time was called New Coke.
23  Q.  Did they conduct any conjoint analysis with
24  regard to New Coke?
25  A.  I do not know.

Page 40

1  Q.  Would it surprise you if they did?
2       MR. GALLAGHER:  Objection to the
3  form.
4  A.  Conjoint analysis is a well-regarded market
5  research technique.  Coca-Cola is a
6  marketing company, and if Coca-Cola were to
7  use well-regarded marketing research
8  techniques, that would be the normal course
9  of business.
10  Q.  There have been many products for which
11  conjoint analysis was used that have failed
12  in the marketplace; is that correct?
13  A.  The purpose of conjoint analysis is to
14  understand consumer preferences, and it may
15  be that the conjoint analysis is accurate
16  and confirmed the product is launched
17  anyhow.
18       MR. GROSSMAN:  Move to strike as
19  non-responsive.
20  Q.  There have been many products for which
21  conjoint analysis has been used that have
22  failed in the marketplace; isn't that
23  correct?
24       MR. GALLAGHER:  Answer as you
25  believe appropriate, Dr. Hauser.

Page 41

1  A.  I do not know that for sure.
2  Q.  But you have no reason to believe otherwise?
3       MR. GALLAGHER:  Objection to the
4  form.
5  Q.  Is that correct?
6  A.  You're making a statement that I have no way
7  of verifying.
8  Q.  Dr. Hauser, we've discussed products with
9  the modifier "light."  Have you ever done a
10  study of any product that had the modifier
11  "low fat"?
12  A.  I have been involved peripherally in many
13  studies; however, I do not recall -- I do
14  not recall any specific study with regard to
15  low fat.
16  Q.  Okay.  As we sit here today, you do not
17  recall any study that you have ever been
18  involved in that considered products that
19  were designated by their manufacturers or
20  distributors as low fat; is that correct?
21       MR. GALLAGHER:  Objection to the
22  form.
23  A.  I do not recall any products that were
24  designated as low fat.
25  Q.  As we sit here today, do you recall having

Page 42

1    ever worked on the study of any product
2    designated by its manufacturer or marketer
3    as low tar?
4    A.   Yes.
5    Q.   Apart from your work on behalf of
6    plaintiffs' counsel in this case, as we sit
7    here today, do you recall having worked on
8    any study involving any product that was
9    designated by its manufacturer or marketer
10   as low tar?
11        MR. GALLAGHER:  Objection to the
12   form.
13   A.   I have conducted studies in this case that
14   would relate to products that might be
15   designated as low tar.  Outside of this case
16   and beyond that, I do not recall of any
17   products that I've studied that have been
18   designated as low tar which I've done any
19   formal market research.
20   Q.   Have you ever done any formal market
21   research on any product that was designated
22   by its manufacturer or marketer as magna or
23   super size or anything else relating to the
24   size or intensity of the product?
25        MR. GALLAGHER:  Objection to the

Page 43

1    form.
2    A.   I have done studies relating to the size of
3    the product.
4         MR. GALLAGHER:  I'm sorry, size of
5    what?
6         THE WITNESS:  The size of the
7    product.
8    Q.   It may be that my question wasn't easily
9    understood.  Some products -- just as some
10   products are called light, some products are
11   called super size or the equivalent, like
12   very large soft drinks at the 7-Eleven.  Are
13   you familiar with such marketing --
14        MR. GALLAGHER:  Objection to the
15   form.
16   Q.   -- names?
17   A.   I am familiar with the term "super sized."
18   Q.   Have you ever done any work with regard to a
19   product that was called super sized?
20   A.   I have done work in market research where
21   products that were super sized, in your
22   words, super sized, I mean, large, were
23   involved.
24   Q.   Were they designated as super sized by their
25   manufacturer?

Page 44

1         MR. GALLAGHER:  Objection to the
2    form.
3    A.   I do not recall the specific designation of
4    the specific words.
5    Q.   Okay.  Now, Doctor, in your CV you list a
6    number of publications, including
7    publications in periodical literature, peer-
8    reviewed periodical literature.  You're not
9    always the first listed author, correct?
10   A.   Sometimes I'm not the first listed author,
11   yes.
12   Q.   Regardless of whether you're the first
13   listed author, the last listed author or
14   somewhere in between, you always read the
15   article before it's submitted for
16   publication; is that correct?
17   A.   Yes, I do.
18   Q.   And you always agree with the article before
19   it's submitted for publication; is that
20   correct?
21   A.   If it's listed in my CV, yes.
22   Q.   If you're listed as the author; is that
23   correct?
24   A.   If I'm listed as the author.
25   Q.   Now, in this case AMS engaged Greenfield

Page 45

1    Online to conduct a survey; is that correct?
2    A.   No.
3    Q.   Did Greenfield Online work with AMS in this
4    case?
5    A.   Greenfield worked with AMS on this case.
6    Q.   In what capacity?
7    A.   Greenfield provided access to their panel.
8    Q.   Access to their panel --
9    A.   Their panel of consumers.
10   Q.   And the panel of consumers is on the
11   Internet; is that correct?
12   A.   They have an Internet-based panel.
13   Q.   And by what means did Greenfield provide
14   access to the Internet-based panel that they
15   had?
16   A.   Well, this is a fairly complex procedure
17   that's described fully in my report.
18   Q.   In providing access to its panel, was
19   Greenfield involved at all in the
20   communication with panel members?
21        MR. GALLAGHER:  Objection to the
22   form.
23   A.   Greenfield sent out an e-mail at my
24   direction.
25   Q.   Did you draft the e-mail?

Page 46

1 A. I approved the e-mail. It's a fairly
2 standard e-mail that Greenfield does send
3 out to their panel members.
4 Q. After drafting that e-mail, did Greenfield
5 do anything else on the survey that
6 you reported on in this case?
7 A. Well, Greenfield implemented the sampling
8 procedure that I set out.
9 Q. And did they do anything else?
10 A. That's fully described in my report.
11 Q. Did they do anything else?
12 A. I have described in my report Greenfield's
13 role in this, and I've just testified as to
14 what they have done.
15 Q. Do you recall them doing anything else apart
16 from what you say you described in your
17 report?
18 A. Well, as described in my report, they
19 provided the sample. They, of course, sent
20 out that sample to -- that e-mail to the
21 respondents for them to come in to our
22 server, and they implemented the sampling
23 plan that I've described. This is done
24 electronically.
25 Now, obviously Greenfield contacts

Page 47

1 their respondents for other studies to
2 recruit them in other things.
3 Q. Could you turn with me to your expert
4 report, which was previously marked as
5 Exhibit No. 1, Page 12. Paragraph 24 you
6 say, "For this survey, potential respondents
7 were selected at random from Greenfield
8 Online's database and sent an invitation to
9 go to a special website to complete the
10 survey."
11 How do you know they were selected at
12 random?
13 A. We instructed Greenfield Online to select
14 them at random based upon the sampling
15 procedure.
16 Q. And what was the sampling procedure?
17 A. Well, this is described fully in my report.
18 If you would like, we can go over it.
19 Q. Where in your report are you referring to?
20 A. There are many places -- there may be other
21 places in the report, but, for example,
22 Paragraph 26.
23 Q. And in that you say, "To assure a nationally
24 representative sample of respondents, quotas
25 were set so the sample would match the

Page 48

1 national data on Census region, sex, age,
2 and household income"?
3 A. Yes.
4 Q. What is a census region?
5 A. A census region is a subset of the United
6 States defined by the U.S. Census Bureau.
7 Q. A census region is a regional as opposed to
8 demograph -- a census region refers to a
9 physical region; is that correct?
10 A. Yes, it does.
11 Q. How many census regions are there?
12 A. Depends upon how they're aggregated.
13 Q. How did you aggregate it?
14 MR. GALLAGHER: Objection to the
15 form.
16 A. That's described in this report.
17 Q. Where?
18 A. In the next sentence.
19 Q. Four census regions, what were the four
20 census regions?
21 A. That's described in one of the exhibits, and
22 they were chosen to be collectively
23 exhaustive and mutually exclusive.
24 Q. Apart from dividing the country into four
25 regions, the usual division of gender into

Page 49

1 two parts, age which was divided into three
2 segments; is that correct?
3 A. Age was divided into three segments.
4 Q. And household income was divided into three
5 segments; is that correct?
6 A. Yes.
7 Q. There were no other divisions of the
8 respondents for the sample; is that correct?
9 MR. GALLAGHER: Objection to the
10 form.
11 A. We were attempting to get a nationally
12 representative sample, as I've indicated,
13 representative and which we divided into 72
14 total subsets of that which are proportional
15 to sex, age, household income and region, as
16 indicated in the report.
17 MR. GROSSMAN: Move to strike as
18 non-responsive.
19 Q. There were four regions you said, there were
20 two sexes, there were three age groups, and
21 there were three categories of household
22 income. Apart from those four criteria, you
23 have no other demographic information about
24 any of the respondents; is that correct?
25 A. I used -- as is a very acceptable method to

1  obtain a representative sample, I divided
2  the sample into 72 regions and then put the
3  quota sampling within that.  I believe that
4  that was fully adequate to provide a
5  representative sample.
6         MR. GROSSMAN:  Move to strike as
7  non-responsive.
8  Q.  Will you please answer the question?
9         MR. GALLAGHER:  Objection, asked
10  and answered.  If you have anything to add,
11  you can do so, Dr. Hauser.
12  Q.  Doctor, did you have -- did you -- I'm not
13  asking you whether you thought it was
14  adequate.  Do you understand?
15         MR. GALLAGHER:  Objection.
16  Q.  I'm asking you whether you had any criteria
17  other than the four census regions, the two
18  sexes, the three age groups and the three
19  household income segments that you had
20  demographic information on about the
21  respondents to the survey.  The answer is
22  yes or no.  What is the answer?
23         MR. GALLAGHER:  Objection to the
24  form.  Doctor, if you can't answer it yes or
25  no, answer it how you think is appropriate.

1  A.  We have other information about these
2  respondents.
3  Q.  What other information about the respondents
4  do you have?
5  A.  For example, we know whether or not they
6  were light smokers -- light cigarette
7  smokers.
8  Q.  Did you have any other demographic
9  information about them?
10  A.  I'm trying to recall if we collected any
11  additional information.  I did not feel it
12  was necessary to use any additional
13  information in the selection of a
14  representative sample.
15  Q.  What percentage of the Newport smokers are
16  black?
17         MR. GALLAGHER:  Objection to the
18  form.  Do you mean African American?
19         MR. GROSSMAN:  Yes.
20  A.  Okay.  I do not know, sitting here today,
21  how many Newport smokers are African
22  American.
23  Q.  Did you ever know?
24  A.  I did not -- I do not recall knowing what
25  percentage of Newport smokers are African

1  American.
2  Q.  What percentage of African American smokers
3  smoke Newport?
4  A.  I do not know, sitting here today, what
5  percentage of African American smokers smoke
6  Newport.
7  Q.  What percentage of Hispanic smokers smoke
8  Newport?
9  A.  I do not know, sitting here today, what
10  percentage of Hispanic smokers smoke
11  Newport.
12  Q.  Did you ever know?
13  A.  I do not recall if I knew what percentage of
14  Hispanic smokers were smokers of Newport.
15  Q.  Do you know or did you ever know what
16  percentage of Newport smokers are Hispanic?
17  A.  I believe you've asked that question
18  already.
19  Q.  No, I didn't.  I asked you --
20  Q.  Will you read the record --
21  Q.  I asked you what percentage of Hispanic
22  smokers smoked Newport.  Now I'm asking you
23  what percentage of Newport smokers are
24  Hispanic?
25  A.  Oh.

1  Q.  Do you understand the difference?
2  A.  I thought you asked both of those questions.
3  Q.  No, I didn't.
4  Q.  Okay.  Would you please reask that?
5  Q.  What percentage of Newport smokers are
6  Hispanic?
7  A.  I do not know, sitting here today, what
8  percentage of Newport smokers are Hispanic.
9  Q.  What percentage of cigarettes marketed in
10  the United States carry the word "light"
11  unmodified by the word "ultra" or any other
12  modifier such as "super"?
13  A.  My survey, as is indicated, is basically
14  targeted towards light smokers, and we
15  selected a randomly -- sorry, a
16  representative sample to obtain light
17  smokers.  There is no reason for me to know,
18  although I might be able to back it out of
19  the data, what percent of that sample are
20  light smokers.
21         MR. GROSSMAN:  Move to strike as
22  not responsive.
23  Q.  Do you know what percentage of the market of
24  cigarettes sold in the United States today
25  involve cigarettes that are designated

Page 58

1　Exhibit 4. This is the chart of the "Top 50
2　Brand/Styles based on MSA data - 2002." Do
3　you see that?
4　A.　I see Exhibit 4, yes.
5　Q.　Do you know what the MSA is?
6　A.　MSA. Could you give me what it stands for?
7　Q.　Do you know -- have you ever heard the term
8　"MSA"?
9　A.　I've heard the term "MSA" quite often, but I
10　don't know what it means in this context.
11　Q.　I show you the agreement reached between the
12　cigarette companies and 46 states in
13　approximately 1997 settling cases that were
14　brought by those states.
15　　　　　MR. GALLAGHER: It was 1998.
16　　　　　MR. GROSSMAN: 1998, thank you.
17　A.　I have general lay knowledge that there was
18　some cigarette settlement.
19　　　　　MR. GALLAGHER: Can I ask you what
20　the source of this document is, please?
21　　　　　MR. GROSSMAN: As we sit here, I
22　don't know.
23　　　　　MR. GALLAGHER: You don't know
24　whether it's an FTC report or...
25　　　　　MR. GROSSMAN: I do not know. I

Page 59

1　will give him an FTC report next.
2　BY MR. GROSSMAN:
3　Q.　Doctor, do you see "Total US" and then there
4　are -- it says "Marlboro Lights LT 85 BX,"
5　market share below that, it says "Marlboro
6　FF"?
7　　　　　MR. GALLAGHER: I'll object to the
8　form since we don't know the source of the
9　document, but you can answer, Doctor.
10　　　　　MR. GROSSMAN: That's fine.
11　A.　You're asking me whether I can read those
12　words, yes, I can.
13　Q.　Do you know what the FF stands for?
14　A.　You're asking -- are you asking me to
15　speculate?
16　Q.　No, I'm not asking you to speculate.
17　A.　I --
18　Q.　Without speculation you do not know?
19　A.　Without speculation I do not know what the
20　abbreviation FF means on this document that
21　I've been given.
22　　　　　MR. GROSSMAN: Let's mark this as
23　5.
24　　　　　(Exhibit No. 5, Document later
25　withdrawn, marked for identification.)

Page 60

1　Q.　Doctor, let me hand you what's been marked
2　for identification purposes as Hauser
3　Exhibit No. 5.
4　　　　　(Discussion off the record.)
5　　　　　MR. GALLAGHER: And is this
6　document intended to be incomplete? Because
7　it is.
8　　　　　MR. GROSSMAN: It is incomplete,
9　and I just pointed that out to my colleague.
10　We're going to get a complete one.
11　　　　　MR. GALLAGHER: Okay. Great.
12　Thank you.
13　　　　　MR. GROSSMAN: Let's mark this as
14　Exhibit 6.
15　　　　　(Exhibit No. 6, FTC document headed
16　"'Tar,' Nicotine, and Carbon Monoxide of the
17　Smoke of 1294 Varieties of Domestic
18　Cigarettes for the Year 1998," Issued 2000,
19　marked for identification.)
20　Q.　Dr. Hauser, I've just handed you what's been
21　marked for identification purposes as Harris
22　Exhibit 6 --
23　　　　　MR. GALLAGHER: No, Hauser.
24　Q.　I'm sorry, Hauser Exhibit No. 6, which is a
25　copy -- a complete Hauser copy of the Federal Trade

Page 61

1　Commission's report --
2　A.　This document.
3　Q.　Yes.
4　　　　　-- "'Tar," Nicotine and Carbon
5　Monoxide of the Smoke of 1294 Varieties of
6　Domestic Cigarettes For the Year 1998,"
7　issued in 2000. Have you ever seen this
8　document before?
9　A.　This is the first time that I have seen this
10　document.
11　Q.　All right. Could you turn with me after the
12　initial pages, pages marked at the bottom
13　through Page 11, and then following that
14　there are pages marked at the top beginning
15　at Page 1. Do you see that, in the upper
16　right-hand corner?
17　A.　Okay. Page 1 marked at the top. "Page"
18　appears to be in italics.
19　Q.　Okay.
20　A.　Okay.
21　Q.　Do you see the FTC lists "Brand Name," then
22　"Description," "Tar," "Nicotine," "CO" in
23　the right-hand corner?
24　　　　　MR. GALLAGHER: I'm sorry, we're on
25　Page 1 of the attachment?

1          MR. GROSSMAN:  Yes.
2   Q.   Do you see that?
3   A.   I see "Tar," I see "Nic," which you're
4       telling me -- I can assume is nicotine, and
5       "CO," which I can assume is carbon dioxide.
6   Q.   Carbon monoxide.
7   A.   I'm sorry, carbon monoxide.
8   Q.   Okay.  Looking down at the "All American
9       Value," third cigarette, do you see --
10  A.   Third cigarette, yes.
11  Q.   You see it says "Description, 100"?  Do you
12      know what that refers to?
13  A.   I can speculate.
14  Q.   Well, what do you think it refers to?
15  A.   I can speculate that it's 100 -- is it
16      millimeters or --
17  Q.   Millimeters, yes.
18  A.   -- centimeters or --
19  Q.   Millimeters --
20  A.   Centimeters would be pretty long.
21      Millimeters.
22  Q.   100 millimeters refers to the length.  Then
23      it says "F."
24  A.   So 10 centimeters.
25  Q.   Then it says "F"?

1   A.   Yeah, it says "F."
2   Q.   Do you know what that stands for?
3   A.   No, I do not know what the F stands for.
4   Q.   And then it says "SP."  Do you know what
5       that stands for?
6   A.   I do not know what the SP stands for.
7   Q.   Okay.  And then it says "FF."  Do you
8       understand what that stands for?
9   A.   I thought we were looking at the third "All
10      American Value."
11  Q.   No, the third cigarette.
12  A.   Oh, the third cigarette, okay.  Yes, I see
13      the FF.
14  Q.   Do you know what that stands for?
15  A.   Do you want me to speculate?
16  Q.   No, I don't.  Is it your understanding that
17      the Federal Trade Commission divides
18      cigarettes into those that are full-
19      flavored, those that are light, those that
20      are ultra light?
21          MR. GALLAGHER:  Objection to the
22      form, lack of foundation.
23  Q.   Is it your understanding that the Federal
24      Trade Commission does that?
25  A.   You have provided me with a document here

1       that you have stated is from the Federal
2       Trade Commission, and for the purposes of
3       testimony I'm willing to accept that this is
4       from the Federal Trade Commission.
5   Q.   Okay.  Thank you very much.
6   A.   I notice there is ultra LT, which I presume
7       is light.
8   Q.   Ultra light you mean?
9   A.   What?
10  Q.   Ultra --
11  A.   LT.
12  Q.   -- LT you presume it's ultra light?
13  A.   I presume it's ultra light.  I'm
14      speculating, of course.  FF which appears to
15      be, as you have implied, and, again, it's
16      speculation, is full-flavored, and LT, which
17      I am presuming also to be light, and then
18      there is some blank.
19          So it appears that this document has
20      provided one possible characterization for
21      attributes, scientific physical attributes,
22      that might be attributed to this, and that
23      is certainly true as a tautology.  If this
24      is the Federal Trade Commission and they've
25      provided this table, then presumably they

1       have provided those labels.
2   Q.   Do you know whether the FTC has a test for
3       tar and nicotine?
4   A.   I have been informed by counsel that there
5       is a test for tar and nicotine.
6   Q.   Prior to being informed by counsel did you
7       know whether there was a test for tar and
8       nicotine by the FTC?
9   A.   I did not know what tests were used for tar
10      and nicotine in cigarettes prior to being
11      informed by counsel.
12  Q.   Have you ever smoked?
13  A.   Not in any regular situation.
14  Q.   Have you ever conducted a study or survey of
15      cigarette advertising as part of your work
16      in this case or otherwise?
17  A.   I have not conducted a specific study of
18      cigarette advertising.
19  Q.   Do you know whether cigarette advertising
20      contains tar and nicotine numbers?
21  A.   Do you mean at the present --
22          MR. GALLAGHER:  Hold on.  Are you
23      done with your question?
24          MR. GROSSMAN:  No.  I'll rephrase
25      the question.

Page 78

1    Q.   I'll restate the question.  Could you give
2         me the name -- and I presume that the name
3         of the person is not a scientific procedure.
4         Could you give me the name of the person or
5         persons who wrote the first draft of the
6         questionnaire that was used to form the
7         basis of your opinion in this case?
8              MR. GALLAGHER:  Objection to the
9         form.
10   A.   You are asking a question that implies that
11        there is, in essence, a first draft that is
12        simply modified.  I -- as I've written, as
13        I've taught and as I've done in this case,
14        we talk to consumers.  We understand what
15        those consumers may say.  Based upon that,
16        then as a team we capture our understanding
17        of the consumers and write questions.
18             I was involved in that procedure, so I
19        was involved in the -- in what you are
20        characterizing as a first draft, and I do
21        not want to characterize it as a procedure
22        by which there is a draft, then another
23        draft, then another draft.
24   Q.   Who else was involved in the procedure?
25   A.   Now you've asked a question that I can

Page 79

1         answer.  If you had asked that question in
2         the first place, I could have answered it
3         quite simply.
4    Q.   Who was involved in the procedure?
5    A.   As I've indicated -- well, I don't know if
6         I've indicated in the report, but Mr. Steven
7         Gaskin and Ms. Shelly Schussheim, and I will
8         spell this for the court reporter either now
9         or later, at your --
10   Q.   Later.
11   A.   Later.
12   Q.   We're not going to use time for that.
13   A.   Okay.  They were involved in carrying out,
14        at my direction, qualitative interviews.
15   Q.   To your knowledge, has either Mr. Gaskin or
16        Ms. Schussheim ever been involved in the
17        cigarette industry?
18   A.   I do not know their complete backgrounds and
19        all of the clients they have worked with.
20   Q.   To your knowledge, have they ever been
21        involved in the cigarette industry?
22             MR. GALLAGHER:  Objection to the
23        form, lack of foundation.
24   A.   I do not know whether or not they have done
25        any work for clients in the cigarette

Page 80

1         industry, other than in this case.
2    Q.   Okay.  Do they work at AMS?
3    A.   Both Mr. Gaskin and Ms. Schussheim do work
4         at Applied Marketing Science.
5    Q.   Were you involved in hiring them at Applied
6         Marketing Science?
7    A.   I am a senior consultant to Applied
8         Marketing Science.  As a result, I am
9         sometimes asked by the president to advise
10        him, but those decisions are made by the
11        professional staff at Applied Marketing
12        Science.
13   Q.   Were you in any way involved in the
14        interview or hiring in any way of Mr. Gaskin
15        or Ms. Schussheim at AMS?
16   A.   The pronunciation is Schussheim.
17   Q.   Answer the question.
18   A.   Mr. Gaskin was my student, and I certainly
19        was asked if -- I believe I was asked by the
20        president whether or not Steve Gaskin would
21        be a good employee, and at that time I
22        certainly would have given him the highest
23        of praise.  He's highly qualified and very
24        experienced in the market research industry.
25        I do not recall whether or not I was

Page 81

1         involved in the hiring of Ms. Schussheim,
2         but she is also a very experienced person,
3         and I've worked with her for a number of
4         years.
5    Q.   Have you ever seen the resume or
6         professional CV of either of them?
7    A.   I believe I have seen various documents that
8         might be considered the equivalent of CVs or
9         resumes for Mr. Gaskin.  It is certainly
10        possible that I would have reviewed various
11        qualifications of Ms. Schussheim.
12   Q.   To your memory, have you ever seen any
13        reference in the CV or other background of
14        either Mr. Gaskin or Ms. Schussheim to work
15        for or about the cigarette industry?
16   A.   I do not recall if I have seen any reference
17        in the documents that I've seen that would
18        be equivalent to CVs or resumes that
19        indicated the full set of clients for whom
20        they have worked.
21   Q.   Okay.  Now, what is a regular cigarette?
22   A.   Excuse me.  Could you please reask that?
23   Q.   Yes.  What is a regular cigarette?
24             MR. GALLAGHER:  Objection to the
25        form.

Page 82

1 A. What I do understand is that the consumers
2 that we talked to have in mind a fairly
3 clean definition of what a regular cigarette
4 is.
5 Q. Could you point me to any note of any
6 discussion with any consumer in which you
7 define the term or they use the term
8 "regular cigarette"?
9 MR. GALLAGHER: Objection to the
10 form.
11 A. You have been provided the documents that
12 include the survey that we undertook. I did
13 not --
14 Q. And the pretests.
15 A. What?
16 Q. And the pretests.
17 A. And the pretests. And I do not recall all
18 the wording that we used in those surveys.
19 Even though I reviewed them recently, you
20 know, I don't memorize all the wording.
21 Certainly it's the wording that the
22 consumers understood, and I believe that we
23 used the word "regular" in those surveys.
24 Q. What is your understanding of what a regular
25 cigarette is?

Page 83

1 MR. GALLAGHER: Objection to the
2 form.
3 A. I'm providing an expert opinion here on the
4 market research. As part of that expert
5 opinion, as I've indicated in my writings
6 and in my lectures, it's very important to
7 make sure that the customers and the
8 consumers that we're surveying understand
9 these issues.
10 MR. GROSSMAN: Move to strike as
11 non-responsive.
12 Q. Please answer the question.
13 MR. GALLAGHER: Objection to the
14 form, asked and answered.
15 A. I am not here to --
16 Q. What is your understanding of what a regular
17 cigarette is?
18 MR. GALLAGHER: Same objection.
19 A. My understanding of a regular cigarette, as
20 used in the survey, is that which the
21 consumers understand is a regular cigarette.
22 Q. And what is that?
23 MR. GALLAGHER: Objection to the
24 form.
25 A. My understanding of a regular cigarette, as

Page 84

1 indicated in the survey, is that which the
2 consumers understand is a regular cigarette.
3 Q. Well, you're giving an opinion based upon a
4 survey in which you used the term "regular
5 cigarette." What is your understanding of
6 that term which forms a basis of the opinion
7 that you're giving in this case?
8 MR. GALLAGHER: Same objection.
9 A. There were pre -- prior pretests and
10 qualitative interviews that were both done
11 in which, at my direction, Mr. Gaskin and
12 Ms. Schussheim talked to consumers, and part
13 of those pretests asked them for their
14 understanding when provided with the survey,
15 and also in the qualitative research these
16 consumers understood the meaning of regular
17 cigarettes and they could make the
18 distinction between a regular cigarette and
19 a light cigarette.
20 Q. Do you know whether the term "regular
21 cigarette" is a term that is used in
22 cigarette advertising?
23 MR. GALLAGHER: Objection to the
24 form.
25 A. As I've indicated before, I have not done a

Page 85

1 systematic study of the advertising in the
2 cigarette industry.
3 Q. So the answer is you don't know whether the
4 term "regular" has been used in cigarette
5 advertising to describe a type of cigarette?
6 A. I have not done a systematic study, and I
7 obviously have been -- I've seen cigarette
8 advertisements, and so you're now asking me
9 a memory test, have I ever seen or recall
10 having seen the "regular" -- the word
11 "regular" in some of these cigarette
12 advertisements?
13 Q. Everything in this deposition I guess is a
14 memory test, Doctor, and I'm asking you
15 whether you recall ever having seen the term
16 "regular" in cigarette advertising, yes or
17 no?
18 MR. GALLAGHER: Objection to the
19 form. Objection to the preamble. Objection
20 to asked and answered. And you can answer
21 it any way you want. You don't have to
22 confine yourself to yes or no if you can
23 give a more complete answer.
24 A. I -- well, I did want to say that I do not
25 agree with the preamble, and once we got

Page 86

1    past the preamble I realized I didn't
2    disagree with it, and so if you would like
3    to reask the question, I would be happy to
4    try and answer it.
5    Q.   You still haven't answered my question.  As
6    we sit here today, can you recall the word
7    "regular cigarette" -- the term "regular
8    cigarette" being used in cigarette
9    advertising?
10   A.   As I've indicated before, I have not done a
11   systematic study of all the advertising that
12   the cigarette industry has used either in
13   the last year or in the last many years.  I
14   have certainly seen cigarette advertising.
15   As I sit here today, I do not recall all the
16   words that were used in cigarette
17   advertising.
18   Q.   I'm not asking you about all the words.  I'm
19   asking you about "regular."
20   A.   You're asking me to remember whether a
21   specific word was used.
22   Q.   Yes.
23   A.   As I've indicated today, I do not recall all
24   of the words, and therefore I do not recall
25   that specific word.

Page 87

1    Q.   Okay.
2    A.   You're asking me whether or not I have a
3    memory of that, and I'm saying that this is
4    not -- I do not believe it's a memory test,
5    nor am I providing any expert opinion with
6    respect to advertising.
7    Q.   Okay.  Do you know if the term "regular
8    cigarette" is used by the FTC?
9            MR. GALLAGHER:  Objection to the
10   form.
11   A.   Earlier in this deposition you provided me
12   with Exhibit No. 6 --
13   Q.   Which you had never seen before, correct?
14          MR. GALLAGHER:  I'm sorry, please
15   don't interject --
16          MR. GROSSMAN:  I'm sorry.
17          MR. GALLAGHER:  -- on his answer.
18   A.   Which you indicated to me and I accept as
19   provided by the regular -- by the Federal
20   Trade Commission.  In this report on Page 1
21   is the word, or partial word, R-E-G which we
22   have agreed that probably means regular.
23   Q.   You're referring to Page 1 in the upper
24   right-hand corner?
25   A.   Yes.

Page 88

1    Q.   Okay.  Do you know what that "regular" as
2    used by the FTC refers to?
3            MR. GALLAGHER:  Objection to the
4    form.
5    A.   "Regular" is the second column in this table
6    on Page 1.
7    Q.   And do you know to what it refers?
8    A.   It appears to be the manner in which the FTC
9    has decided to classify cigarettes.
10   Q.   And do you know to what it refers in the
11   FTC's classification?
12          MR. GALLAGHER:  Objection to the
13   form.
14   A.   It appears to be a taxonomy that the FTC has
15   put together, as indicated in this report.
16   As I have testified before, we, in fact, are
17   more concerned with how the consumers
18   perceive this and whether or not the con --
19   the FTC taxonomy is based upon consumer
20   perception I do not know, sitting here
21   today.
22   Q.   Doctor, do you know what the difference
23   between a light and an ultra light cigarette
24   is?
25          MR. GALLAGHER:  Objection to the

Page 89

1    form.
2    A.   We have now gone through this with respect
3    to regular cigarettes.  Is it your intention
4    to go through this now with respect to all
5    designations on Page 1?
6            MR. GALLAGHER:  Doctor, go ahead
7    and answer.
8            THE WITNESS:  Okay.
9            MR. GALLAGHER:  Answer his
10   question.  I know it has nothing to do with
11   your expert opinion in this case, but if
12   they're going to utilize their time in this
13   way, go ahead and answer it if you can.
14          THE WITNESS:  Okay.
15   A.   Once again, I am confident that the
16   consumers understood the difference from the
17   pretests, and I'm providing expert opinion
18   with respect to how consumers perceive the
19   word.  I am not providing my own particular
20   image of what an ultra light or a light
21   cigarette is.
22   Q.   Do you --
23          MR. GROSSMAN:  (To Mr. Koethe.)
24   Yeah, that's a good point.
25   Q.   Do you know whether the FTC or the cigarette

1    AFTERNOON SESSION
2    THE VIDEOGRAPHER:  The time is
3  1:21.  This is the beginning of Tape 3, and
4  we are back on the record.
5
6    (John R. Hauser, Sc.D., Resumed.)
7    DIRECT EXAMINATION, Continued
8
9  BY MR. GROSSMAN:
10  Q.  Doctor, I hope you had a good lunch.
11  A.  Thank you.
12  Q.  I would just like to go through a series of
13      areas of expertise that I believe you don't
14      have, but I wanted to confirm them.  First
15      of all, have you ever read any of the
16      Surgeon General's reports on smoking and
17      health?
18  A.  Oh, certainly was in the popular press, so I
19      may have read something in the newspapers.
20  Q.  You read about them?
21  A.  I may have read about them.  I don't know.
22      At the time I may have read them, but I
23      don't recall any details.
24  Q.  How often do they come out?
25  A.  How often --

1  Q.  Yeah.
2  A.  -- do the Surgeon General reports come out?
3      I'm not claiming any expertise on that.
4  Q.  Fine.  Are you familiar with the document
5      that's entitled "Monograph 13 of the Public
6      Health Service"?
7  A.  I believe that's -- I know there's a
8      monograph, but I can't remember the numbers
9      that -- where some decisions were made as to
10      whether or not -- how healthy cigarettes
11      were, and this was -- information on that
12      was provided to me by counsel.
13  Q.  Okay.  You recall receiving a monograph from
14      counsel on the health implications of
15      cigarettes?
16  A.  No, I do not recall receiving a monograph
17      from counsel on the health implications of
18      cigarettes.
19  Q.  Do you recall having been told about it?
20  A.  I recall having been told the existence of
21      monographs, yes.
22  Q.  Okay.  Do you know whether you were told
23      about the existence of Monograph 7?
24  A.  I do not recall the numbers.
25  Q.  Okay.  Do you recall what you were told

1      about these monographs?
2  A.  I recall that there were monographs that
3      indicated the time at which it became public
4      knowledge, or alleged public knowledge, that
5      light cigarettes were a comparable health
6      risk to regular cigarettes.  But, again,
7      that was told to me by you.  I'm not
8      claiming expertise on that particular
9      question.
10  Q.  Fine.  Do you claim any expertise on the --
11      on cigarette risk assessment?
12      MR. GALLAGHER:  Objection to the
13  form.
14  A.  Could you please define the term?
15  Q.  Yeah.  Do you claim any expertise on the
16      degree of risk inherent in various designs
17      of cigarettes --
18      MR. GALLAGHER:  Objection to the
19  form.
20  Q.  -- health risk?
21      MR. GALLAGHER:  Sorry.  Objection
22  to the form.
23  A.  Are you asking if I have any scientific
24      opinions as to which particular cigarettes
25      cause which health risks --

1  Q.  Uh-huh.  Uh-huh.
2  A.  -- or whether cigarettes cause health risks?
3      I do not have any scientific opinions as to
4      whether or not cigarettes cause health
5      risks, that I'm providing in this case.
6  Q.  And you don't have any scientific opinions
7      as to the difference in health risks of
8      individual brands of cigarettes; is that
9      correct?
10  A.  I am providing in this case opinions about
11      people's perceptions of the differences in
12      health risk.
13  Q.  Do you have any -- do you purport to have
14      any expertise about the actual differences
15      in risk between various brands of
16      cigarettes?
17  A.  I do not have any -- I'm not a -- I'm not
18      providing any medical opinions in this case
19      as to the differences in health risk between
20      various brands of cigarettes.
21  Q.  Are you familiar with the term
22      "compensation" as it's applied to low tar
23      cigarettes?
24      MR. GALLAGHER:  Objection to the
25  form.

Page 146

1    able to determine whether there is material
2    that Dr. Hauser has done that could be
3    relevant to his opinions in this case or
4    relevant to cross-examination I want to
5    know, at a minimum, whether any studies have
6    been done that are specific to a particular
7    brand, and in this case it's Marlboro.
8           MR. GALLAGHER:  I understand that.
9    I need to continue to instruct him in the
10   same manner.  I'm happy to discuss that with
11   counsel, to confer with counsel, in the
12   Massachusetts case to see if it is
13   appropriate or not appropriate for that to
14   be disclosed, but that's the best I can do.
15   And I'm happy to work with you -- work with
16   you on that.
17          MR. GROSSMAN:  Well, let me
18   rephrase the question.
19   BY MR. GROSSMAN:
20   Q.   Dr. Hauser, have you ever done any brand-
21   specific studies regarding consumer
22   perception of the health aspects of any
23   particular brand of cigarettes?
24          MR. GALLAGHER:  Okay.  Same
25   instruction.  If you've done so in a

Page 147

1    consulting fashion for any other litigation
2    that has not yet been disclosed, you should
3    not disclose that at this time without
4    permission of those attorneys involved in
5    that case.
6           MR. ALLINDER:  Just so I
7    understand, is that an instruction not to
8    answer, Paul?
9           MR. GALLAGHER:  I think it's better
10   if Mr. Grossman and I have a single dialogue
11   while he's asking the questions.
12          MR. GROSSMAN:  Well, I'm waiting
13   for the answer, and then I'll see how I
14   address it.
15   A.   What's the question on the table?
16   Q.   Have you conducted any brand-specific
17   studies regarding consumers' perceptions of
18   the health effects of any specific brand of
19   cigarette?
20          MR. GALLAGHER:  Same instruction.
21   A.   Certainly in the study that I've done for
22   this case, we asked people's brand, and we
23   found no significant differences among
24   brand, so having conducted it for many
25   brands, I guess one could say that that's a

Page 148

1    specific brand within that.
2    Q.   Well, first of all, I don't think you've
3    answered my question.  Second, I think we
4    need to go back over your answer in another
5    way.  Let's take it one at a time.
6           Apart from the study that you
7    conducted in this case, have you conducted
8    any study regarding consumers' perceptions
9    of the health effects of any particular
10   brand of cigarette?
11   A.   How do I say this?  I want to be very exact
12   in that we piloted some work, and it's all
13   been disclosed to you completely, that had a
14   slightly different sample than the work in
15   this case, but it was pilot work, and I'm
16   not forming nor am I -- I have not formed
17   any opinion based upon that.
18   Q.   Now, you said that in this survey you had
19   asked questions or received answers that
20   suggested consumers' understanding -- brand-
21   specific understanding of the health risks
22   of particular brands of cigarettes?
23   A.   Okay.
24          MR. GALLAGHER:  And, I'm sorry, by
25   "this survey" you mean the conjoint

Page 149

1    analysis?
2           MR. GROSSMAN:  By the -- the survey
3    used for the conjoint analysis.
4           MR. GALLAGHER:  Okay.
5    Q.   Doctor, let me go inside that answer.  First
6    of all, in your questionnaire you asked
7    people for their brand of cigarettes; is
8    that correct?
9    A.   Yes, people reported their brand of
10   cigarettes.
11   Q.   But you did not ask people for their
12   perceptions of their brand of cigarettes
13   compared to other brands; is that right?
14          MR. GALLAGHER:  Objection to the
15   form.
16   A.   The survey asked people their perceptions of
17   their brand of cigarettes.  There are
18   instances where if, for example, their brand
19   did not have an ultra light, we gave other
20   examples of brands they consider as
21   reference.
22   Q.   You did not ask smokers of, say, Marlboro
23   Lights to compare the health effects of
24   Marlboro Lights to Camel Lights or Winston
25   Lights; is that correct?

Page 150

1    A.   I stand by the answer I've just given, and I
2         do want to -- there are issues where the
3         cigarette that they're light smoking may not
4         have an ultra light version, for example,
5         thus they refer to other reference.
6    Q.   My question --
7    A.   Let me continue.
8    Q.   Yeah.
9    A.   Beyond that, they were not asked to do a
10        perceptual mapping of their preferences --
11        sorry, their perceptions of all of the
12        brands of cigarettes.
13   Q.   The questions dealt with lights, so-called
14        regulars and ultra light cigarettes
15        generically; there was no question apart
16        from the question asking people what brand
17        they smoked that referred to differences
18        between brands of cigarettes but only of
19        types of cigarettes; is that correct?
20        You're shaking your head.  I'll rephrase the
21        question.
22   A.   I don't fully understand your question --
23   Q.   I'll rephrase --
24   A.   You mixed things --
25   Q.   I'll rephrase --

Page 151

1    A.   -- up there.
2    Q.   I'll rephrase --
3    A.   Okay.
4    Q.   -- the question.
5            Could you point me to any question on
6         your questionnaire that asks respondents to
7         compare the health effects of any two brands
8         or any aggregation of brands of cigarettes
9         apart from comparisons between regular,
10        light and ultra light cigarettes, as you
11        define them?
12           MR. GALLAGHER:  Objection to the
13        form.
14   A.   Within the survey consumers were asked to
15        compare within brand health risk, within
16        brand taste, soft versus hard pack and
17        price, so four attributes.  You've just
18        stated one.  They were then not -- they were
19        not specifically asked nor was it a part of
20        the design of the survey for one consumer to
21        give their own perceptions of many different
22        brands of cigarettes.
23   Q.   Okay.  Now, looking again at the page that
24        you have in front of you, which is Hauser
25        005, on the bottom it says, "Another fact

Page 152

1         that was mentioned yesterday, which I
2         confirmed today, the Daubert hearings will
3         take place around August 10th."
4            Are you familiar with Daubert
5         hearings?
6    A.   I know what a Daubert hearing is.
7    Q.   Have you ever participated in one before?
8    A.   Yes.
9    Q.   How many cases?
10   A.   Well, there was only one time where I
11        actually had to testify in a Daubert
12        hearing.
13   Q.   Uh-huh.  When was that?
14   A.   This was in federal court in Florida.
15   Q.   And when was that?
16   A.   It's on my vitae.  I can look it up.  Do you
17        want me to look it up?
18   Q.   Who was the client?
19   A.   The client was the Attorney General --
20        Attorneys General of a number of different
21        states.  I suspect it was about 30 different
22        states, but the exact number I don't recall.
23   Q.   In what kind of case?
24   A.   This was a price-fixing case.
25   Q.   Okay.  So pursuant to this e-mail you

Page 153

1         understood that you might be called upon to
2         testify at Daubert hearings around August
3         10th, correct?
4    A.   That's what the e-mail says, yes.
5    Q.   And it's your understanding, is it not, that
6         you do not participate in the Daubert
7         hearing until after you have filed an expert
8         report?
9    A.   That's -- I'm not a lawyer, so I don't know
10        the rules of when you do or don't appear in
11        a Daubert hearing.
12   Q.   How long did you estimate for plaintiffs'
13        counsel it would take to conduct the study
14        that you would undertake in this case?
15           MR. GALLAGHER:  Objection to the
16        form.
17   A.   I did not provide a specific estimate of the
18        time it would take.
19   Q.   Did AMS provide a specific estimate, to your
20        knowledge?
21   A.   I do not know that.
22   Q.   Did you provide an approximate estimate on
23        the time it would take to conduct the study?
24   A.   I did not provide an approximate estimate.
25        It was my goal to do the study correctly and

Page 162

1   A.   Well, as you're no doubt familiar, there are
2       a lot of potential biases --
3   Q.   Yeah.  Could you --
4   A.   -- in surveys.
5   Q.   -- enumerate those?
6   A.   And one of the roles of the survey expert is
7       to minimize these biases, and in addition to
8       trying to minimize those biases, to do
9       various things such as randomization to
10      eliminate any biases that might happen, and
11      then finally to look at various statistics
12      that could determine whether or not these
13      biases did happen.
14           Now, if you were asking me to
15      enumerate all the potential biases, there
16      are excellent textbooks on the subject.
17  Q.   Enumerate those, if you can recall.
18  A.   Oh, well, there could be telescoping, both
19      reverse and forward telescoping.  You know,
20      there certainly could be other sample
21      biases, and we did our best to prevent
22      those.  There certainly could be order
23      effect biases, and we randomized to avoid
24      those.  You know, again, just every aspect
25      of the survey we have to look at as

Page 163

1       carefully as possible, and we've done our
2       best to minimize any potential biases.  And
3       furthermore, we have statistics that
4       indicate that they are not there.
5   Q.   Are there any other kinds of biases that you
6       can recall, as we sit here?
7   A.   You know, if the word -- if the questions
8       are -- if the -- if a pretest is not done
9       and the survey expert doesn't know that the
10      questions are understandable to response
11      (sic), there may be random order, random
12      effects.
13           I think it's also worth noting that
14      there's a difference between bias, which is
15      a change in the expected value of the
16      answer, which is a systematic direction, and
17      potential randomness that is added.  So a
18      lot of these -- a lot of effects such as
19      question ordering, sample things can add
20      noise and not necessarily a bias.
21           Another type of bias might be
22      endogeneity bias.
23  Q.   Anything else?
24  A.   You know, you're asking me to list, you
25      know, on the spot.  I have to sit down and

Page 164

1       think a while what I put into my notes, but
2       basically -- let me state it in a positive
3       way:  that the survey experts should do
4       their best to make sure the questions are
5       understood, that there's no order effects,
6       that there's no response biases, and that
7       they are analyzed correctly.
8   Q.   Okay.
9   A.   And that's the best -- you know, if that's
10      done right, then you're going to minimize
11      the biases.
12  Q.   What is order effect bias?
13  A.   Okay.  An order effect bias would be if --
14      oh, you know, suppose I ask you a very
15      leading question, as you're very familiar
16      with this, and by asking you that leading
17      question I get you thinking in one way and
18      then I ask the same question again.  That
19      might -- the first question might bias the
20      second question.
21  Q.   That's an example of an order effect bias?
22  A.   That's what you asked for, yes.
23  Q.   Yes.  I actually asked a definition.  An
24      order effect bias is a bias that's injected
25      into a survey when the order of the

Page 165

1       questions leads the respondent to assume the
2       answer that the questioner apparently wants;
3       is that correct?
4           MR. GALLAGHER:  Objection to the
5       form.
6   A.   Not quite.
7   Q.   Okay.  How is it not correct?
8   A.   What you're defining is demand artifact.
9   Q.   Uh-huh.  What is demand artifact?
10  A.   Demand artifact is when the types of
11      questions, not necessarily the order,
12      although could be the order, causes the
13      respondent to guess or infer which answer is
14      desired by the surveyor.
15  Q.   And that's a type of bias; is that correct?
16  A.   That's a type of bias.  And we were very
17      careful to avoid demand artifactS.
18  Q.   And how is order effect different, order
19      effect bias different?
20  A.   An order effect, it -- the order of the
21      questions may actually influence the
22      respondents' answers, and that's why we
23      randomize certain portions of the
24      questions -- certain portions of the survey,
25      I'm sorry, not the questions.

Page 170

1    sure that there is as little bias as is
2    feasible and that any errors in the survey
3    are in fact zero mean.
4    Q.   And to avoid sample bias you want to make
5    sure that the population being surveyed is
6    as representative as possible of the target
7    population, correct?
8          MR. GALLAGHER:  Objection to the
9    form.
10   A.   Not entirely correct.
11   Q.   How is it not correct?
12   A.   What I want to make sure is that if there's
13   any non-representativeness, that that
14   non-representativeness is not correlated
15   with the model that I'm -- being developed.
16   And you could have a non-random sample, but
17   as long as the non-randomness or the
18   non-representativeness is not correlated
19   with the variables you're trying to analyze,
20   it will provide no bias.
21         And that goes back to sort of the
22   second term in the mathematical equation I
23   just gave you.  It's a slightly different
24   way of forming the question.  It's not
25   endogeneity-based, but it goes back to that.

Page 171

1    Q.   Now, in this case you, you and AMS conducted
2    pretests, three rounds of pretests before
3    the questionnaire was administered on the
4    Web; is that right?
5    A.   Well, there are two types of -- there were
6    qualitative interviews, and there were
7    pretests.  And so, you know, done over
8    multiple -- the multiple parts of all of
9    those.
10   Q.   And there were seven people in the first
11   qualitative -- in the first round of
12   qualitative interviews; is that correct?
13   A.   Well, not quite.
14   Q.   How many were there?
15   A.   I believe there were 14.
16   Q.   We have reports of seven.  Were reports
17   generated for every one of the people who
18   was in the qualitative interviews?
19   A.   No, I believe that -- I think Mr. Gaskin did
20   seven, and Ms. Schussheim did, and Mr.
21   Gaskin took detailed notes.  Ms. Schussheim
22   gave me verbal briefings on the interviews
23   that she had done.
24   Q.   Were any notes of any kind made of Ms.
25   Schussheim's interviews?

Page 172

1    A.   If Ms. Schussheim had made notes, those
2    would have been provided to you.
3    Q.   Were any transcripts made of those
4    interviews?
5    A.   I do not believe that there were any
6    transcripts of those interviews.
7    Q.   Were any of the interviews recorded?
8    A.   I do not know if there were any recordings
9    of those interviews.
10   Q.   Now, how were the 14 interviews --
11   interviewees selected for those interviews?
12   A.   As is appropriate, they were selected as a
13   somewhat representative but not fully
14   representative.  For example, they were all
15   within the Boston area.  We're most
16   interested in the general understanding
17   within the qualitative interviews.  Now, we
18   wanted a distinguished qualitative pretest,
19   but the qualitative interviews were chosen
20   to understand the wording.
21         MR. GALLAGHER:  Ted, when you have
22   a chance, can we take a break?
23         MR. GROSSMAN:  Yeah, in a couple
24   minutes we'll reach a break point.
25   Q.   In the qualitative -- all of the people for

Page 173

1    the qualitative interviews were from the
2    Boston area, and all of them smoked light
3    cigarettes; is that correct?
4    A.   I believe they were all light cigarettes.
5    You know, I would have to go back and check
6    that.
7    Q.   Do you have any record of or any knowledge
8    of the ethnic breakdown of the people who
9    were interviewed in the qualitative
10   interviews?
11   A.   I do not recall whether that data was
12   collected -- those data were collected.
13   Q.   Do you recall whether there were any efforts
14   to -- for the qualitative interviews to
15   include people who were African American,
16   people who were Hispanic, people who met
17   other demographic criteria of that kind?
18   A.   These are -- were basically going for
19   qualitative interviews, which means we want
20   to make sure that people understand the
21   surveys, and I've written fairly extensively
22   on this.  You do not need to do the same
23   level of projectability, of sampling, and
24   this has been the literature, oh, certainly
25   back through the '60s that that's not

Page 174

1    necessary.
2        So we followed scientific standards
3    there.  So as a result, I do not know of all
4    the demographic breakdowns of the 14 people
5    in the qualitative interviews.
6  Q.  Okay.  So you don't know if any were black;
7    is that correct?
8  A.  I did not -- I do not recall collecting all
9    the demographic information for people in
10   the -- for the 14 people in the qualitative
11   interviews nor did I feel that was
12   necessary.
13  Q.  In answer to the question, then, you do not
14   know whether any of the 14 people who were
15   interviewed was black; is that correct?
16  A.  Sitting here today, it might be possible to
17   find out whether or not that's the case, but
18   I do not recall whether any of those were
19   African American.
20  Q.  Do you recall whether any of the people
21   interviewed was Hispanic?
22  A.  As I've indicated, I did not record or did
23   not ask to be recorded the demographic
24   match -- makeup of these people.  I did ask
25   that they be representative, and you can go

Page 175

1    through question after question and my
2    answer's going to be the same, I did not
3    record --
4  Q.  Well, I need a record of this.  So the
5    answer is you do not know whether any of the
6    14 people were Hispanic; is that correct?
7  A.  As I've indicated, Mr. Gaskin and Ms.
8    Schussheim collected a representative sample
9    that is appropriate for qualitative
10   research, and as a result I did not ask them
11   to record the demographic information;
12   therefore, on Hispanic or black -- or
13   African American or other ethnic diversity
14   I'm not able, sitting here today, to answer
15   you as to what the makeup of that sample
16   was.
17  Q.  And to the best of your knowledge, you don't
18   know if anyone in the sample was Hispanic;
19   is that correct?
20  A.  I believe I've answered that question two or
21   three times.
22  Q.  No, you haven't.
23      MR. GALLAGHER:  Yeah, he has.
24  Q.  It's a simple question.  It just asks for a
25   simple answer.  Do you know -- do you have

Page 176

1    any knowledge whatsoever whether any of the
2    respondents for the qualitative research was
3    Hispanic?
4        MR. GALLAGHER:  Objection, asked
5    and answered.
6  A.  Well, I'll give the answer that I've given
7    before, which is following appropriate
8    methodology --
9  Q.  If you're going to give the same answer,
10   then there's no need to waste time.
11  A.  Well, let the record reflect that I was not
12   able to finish my answer.
13  Q.  I'll let the record reflect that we're in
14   the midst of a filibuster that's going to
15   take a long time, and all of this is going
16   to be before the judge.  We're in the midst
17   of writing a motion now.
18       MR. GALLAGHER:  Come on, Ted.  Come
19   on, Ted.  Just ask questions, please.
20  Q.  Yes or no, do you know whether --
21       MR. GALLAGHER:  Please don't berate
22   the witness.
23       MR. GROSSMAN:  I am asking a
24   question.
25  Q.  Yes or no, do you know whether any of the 14

Page 177

1    people interviewed was Hispanic?
2        MR. GALLAGHER:  You just asked the
3    question.  He started to give an answer, and
4    you told him you didn't want to hear it, so
5    do you want an answer or not?
6        MR. GROSSMAN:  I want an answer.
7        MR. GALLAGHER:  Okay.
8  Q.  Yes or no, do you know whether any of the 14
9    people was Hispanic?
10       MR. GALLAGHER:  Objection, asked
11   and answered.  Go ahead, Dr. Hauser.
12  A.  My understanding -- if I am to answer your
13   question, you cannot dictate the form of the
14   answer.  And I want to indicate, once again,
15   that I did not collect any information -- or
16   did not record any information as to the
17   ethnic background; therefore, I do not know
18   whether or not -- I do not know, sitting
19   here today, whether or not anybody was
20   Hispanic or not Hispanic.
21  Q.  Do you know what the income levels of the 14
22   people were?
23  A.  Once again, I did not record the demographic
24   makeup of the 14 people in the qualitative
25   interviews, as is appropriate scientific

Page 178

1    knowledge; therefore, sitting here today, I
2    do not necessarily know what the income of
3    these people were.
4  Q.   Were they asked their income?
5  A.   To the best of my recollection, I do not
6    recall whether or not they were asked their
7    income.
8  Q.   Do you have any information about the level
9    of education of the 14 people who were --
10 A.   As I've indicated before, we did a
11   qualitative pretest -- qualitative
12   interviews with 14 people to understand the
13   wording. Following appropriate scientific
14   methodology, I did not record the
15   demographic makeup of these respondents;
16   therefore, I do not know specifically what
17   their income was.
18 Q.   I'm asking you what their --
19 A.   Or education. I do not know specifically
20   what their education is.
21 Q.   As we sit here today, you cannot say that
22   the 14 people interviewed were
23   representative of smokers of light
24   cigarettes as a group with regard to
25   education; is that right?

Page 179

1        MR. GALLAGHER:  Objection to the
2    form, lack of foundation.
3  A.   Actually, here I would rely -- you've
4    actually asked me to, I believe, when we
5    looked at Exhibit 3, you actually indicated
6    "The Voice of the Customer," which is an
7    award winning paper. I think it was the --
8    it's won a number of awards. It's been
9    cited, I don't know if it's 100 or 200 times
10   scientifically, and in that paper there is a
11   very I think fairly well-known beta binomial
12   model which establishes to a high scientific
13   degree that this number of people are more
14   than sufficient to determine the wording.
15   Therefore, it is, in fact, representative of
16   what -- the wording that we might effect.
17   And I've got scientific basis to back that
18   up.
19 Q.   I didn't ask you that question.
20 A.   Yes, you did.
21 Q.   No, I didn't. I asked you whether the
22   education level of the 14 people involved
23   was representative of the education level of
24   light smokers generally, not whether you are
25   willing to rely upon this and not whether

Page 180

1    it's a good way to determine --
2        MR. GALLAGHER:  Okay. Ask your
3    question, please.
4  Q.   What I want to know is, is there any way
5    that you can tell whether the education
6    level of the 14 people who were interviewed
7    is the same on average as the education
8    level of light smokers generally?
9  A.   As I've indicated before, I have not
10   collected demographic information on the 14
11   qualitative informations, nor did I need a
12   feeling -- did I have a feeling to do it.
13   Therefore, I did not have the income or the
14   education information on the 14 people.
15   Therefore, I would not be able to do, say, a
16   chi squared test versus the entire
17   population.
18       MR. GROSSMAN:  You wanted a break,
19   we can take a break now.
20       MR. GALLAGHER:  Great. Thank you.
21       THE VIDEOGRAPHER:  The time is
22   2:36. There is the end of Tape 3, and we
23   are off the record.
24     (Recess taken.)
25       THE VIDEOGRAPHER:  The time is

Page 181

1    2:48. This is the beginning of Tape 4, and
2    we're back on the record.
3  BY MR. GROSSMAN:
4  Q.   Thank you. Dr. Hauser, let me direct you,
5    if I may, to Exhibit 3 once again, which is
6    excerpts from the website of AMS, and if I
7    may, I'd like to direct you to the page --
8    to the -- what's called Page 3 of 3 here on
9    "FAQ on Legal Surveys."
10 A.   Okay. The word "broad" appears in the upper
11   left corner?
12 Q.   The word -- excuse me?
13 A.   "Broad"?
14       MR. GALLAGHER:  Yes.
15 Q.   Yes.
16 A.   Okay.
17 Q.   Do you see where it says, "What are the main
18   things to consider when choosing a survey
19   research expert"?
20 A.   Yes.
21 Q.   It says, "When hiring a new survey expert,
22   the most important criteria to consider (in
23   no particular order) are testifying skill,
24   credentials, expertise, and availability.
25   Look for a survey expert who can provide an

Page 182

1  admissible opinion under the Daubert-Joiner-
2  Kumho gate-keeping tests and also remain
3  cool when testifying under oath despite
4  intensive questioning."
5      Do you know who drafted that?
6  A.  No, I don't.
7  Q.  Did you participate in drafting that?
8  A.  No, I didn't.
9  Q.  Do you know what the Daubert-Joiner-Kumho
10  gate-keeping tests are?
11      MR. GALLAGHER:  Objection to the
12  form, calls for a legal conclusion, but go
13  ahead.
14      THE WITNESS:  Okay.
15  A.  As I've testified before, I've been
16  through what I was told was the Daubert
17  hearing, but I'm not a lawyer, so I didn't
18  realize that there's actually two other
19  words that go with it.
20  Q.  Okay.  Could you look at the next page of
21  this, entitled "Checklist For Choosing a
22  Survey Research Expert."
23  A.  Yes.
24  Q.  Did you help draft this checklist?
25  A.  No, I did not.

Page 183

1  Q.  Have you seen it before?
2  A.  No, actually, I haven't.
3  Q.  You have not?
4  A.  No, I haven't.
5  Q.  Okay.  I would like to direct your
6  attention, if I may, 60 percent down the
7  page under the area of "Expertise."
8  A.  "Expertise."
9  Q.  It says, "Has" -- third down, "Has survey
10  research experience in the specific
11  industry."
12      Do you see that?
13  A.  The word -- I see the phrase that says, "Has
14  survey research experience in the specific
15  industry, research modality or" --
16  Q.  "Population"?
17  A.  Oh, "population," okay.  It's cut off.
18  Q.  Okay.
19  A.  So I presume that's the logical or.
20  Q.  Doctor, it's correct, is it not, that you do
21  not have -- I'll rephrase the question to
22  see if it -- to make you happier.
23      You have no research survey
24  experience, apart from what you've done in
25  this case, in the cigarette industry,

Page 184

1  correct?
2  A.  I do not recall doing any other survey
3  research in the cigarette industry apart
4  from what's been done in this case or
5  related issues.
6  Q.  Either before your work in this case or
7  during the work in this case, did you study
8  the demographics of smokers of light
9  cigarettes?
10  A.  Well, what we have is we have a set of 72
11  demographic categories, and then within that
12  we have people who are light cigarettes
13  (sic), so we have some indication of what
14  the demographic mix might be, but I have not
15  made any specific study of the demographic
16  makeup of the light cigarette population.
17  Q.  Okay.  Just for clarification, you have --
18  you have categories that you asked the
19  people who answered questionnaires, correct?
20      MR. GALLAGHER:  Objection, asked
21  and answered.
22  A.  Well, not correct.  That's not exactly -
23  Q.  Okay.  Well, let me --
24  A.  That's not actually --
25  Q.  Let me rephrase the question.

Page 185

1      You say you asked certain demographic
2  characteristics in the questionnaires that
3  were provided for this survey, correct?
4  A.  We asked demographic questionnaires in
5  the -- demographic questions in the study.
6  Q.  But since you have made no study of the
7  demographics of light smokers in the general
8  population, you have no way to compare the
9  demographics of those who were surveyed with
10  the demographics of light smokers in the
11  general population as a whole; is that
12  correct?
13      MR. GALLAGHER:  Objection to the
14  form, lack of foundation.
15  A.  No, that's not correct.
16  Q.  Well, what percentage of light smokers in
17  the United States have family incomes under
18  $50,000?
19  A.  I don't recall the answer to that question,
20  sitting here today.
21  Q.  How does the demographic makeup of the
22  respondents to your questionnaire compare to
23  the demographic makeup of light smokers
24  generally with regard to the number of
25  people who have family incomes under

1  A.   Well, we said that if people do that, then
2       lexicographic might be a way of describing
3       it.  We did not say that any study had been
4       done to demonstrate that people are
5       lexicographic with respect to SUVs.
6  Q.   So your survey among -- how many people were
7       surveyed?
8  A.   Oh, I seem to recall it was 627, but we can
9       look up the -- well, 627 responses.
10 Q.   All right.  Among the 627 respondents to
11      your survey, there was not a single person
12      who appeared to decide first that he would
13      choose only the cigarettes with the least
14      risk and then decide among those cigarettes
15      that had the least risk; is that correct?
16          MR. GALLAGHER:  Objection to the
17      form.
18 A.   That's not quite right.
19 Q.   For the four aspects that you considered
20      there was no one who made a determinative
21      choice that he would only consider those
22      cigarettes that had the lowest health risk;
23      is that correct?
24 A.   What the survey says is that there are other
25      aspects such as price, such as taste, such

1       as pack type which can compensate for lower
2       health risk, and, in fact, there might --
3       people might be willing to accept higher
4       health risk for a much, much lower price.
5       And --
6  Q.   It wasn't a --
7          MR. GALLAGHER:  Hold on.  Hold on.
8          MR. GROSSMAN:  I'm sorry.
9          MR. GALLAGHER:  Please finish, Dr.
10      Hauser.
11 A.   You know, and that's what the survey says.
12      Now, a few times you haven't been
13      technically accurate in describing a
14      lexicographic process, and just for the
15      record, a lexicographic process is one in
16      which there are no other aspects that can
17      compensate for the initial choice on that
18      first aspect or on the second or whatever
19      going down the list, so it's a little bit
20      different than you defined technically, and
21      I would like to stay with the technical
22      definition.
23 Q.   There wasn't a single person of the 620
24      (sic) respondents who were surveyed who
25      would not trade health benefits for either

1       lower price or hard pack versus soft pack or
2       taste; is that correct?
3  A.   Right.  These people considered health risks
4       extremely important, but it actually was a
5       compensatory attribute.
6  Q.   Now, surveys are designed with specific
7       goals.  This survey was designed with a
8       specific goal; is that correct?
9  A.   A survey is designed to answer specific
10      questions.
11 Q.   What was the specific question that you
12      sought to answer here?
13 A.   Well, the specific question that I was asked
14      to look into was how people value health
15      risks.
16 Q.   And the questions in the survey method have
17      to be appropriate to that study goal; is
18      that correct?
19          MR. GALLAGHER:  Objection to the
20      form.
21 A.   Well, certainly the questions in the survey,
22      the -- well, questions in the survey are
23      designed to answer that question.  Now, not
24      every question in a survey needs to answer
25      any specific question, and sometimes some

1       questions will be included in a survey to
2       avoid demand artifacts, and there's reasons
3       why all the questions are in the survey.
4       But certainly looking at the overall goal of
5       trying to answer a particular set of
6       questions is part of the role of designing a
7       survey.
8  Q.   Doctor, let me confirm that your survey was
9       not designed for certain things, okay?
10      First, your survey was not designed to
11      determine what any respondent's second brand
12      choice would be if their choice were not --
13      if their cigarette of choice were not
14      available; is that correct?
15 A.   My survey was not designed to do an
16      interbrand comparison.
17 Q.   It was not designed to determine cross-
18      elasticity of demand among brands; is that
19      correct?
20 A.   My survey was not designed to determine
21      interbrand cross-elasticity; however, my
22      survey can be used for cross-elasticity
23      among attributes.
24 Q.   For example, do you know whether a Marlboro
25      Lights smoker in the absence of his Marlboro

1     Lights is more likely to choose another
2     Marlboro product or another lights product?
3  A.  I am not providing an expert opinion with
4     respect to that.  I have not done a survey
5     with respect to that particular question.  I
6     focused on light cigarettes, and I focused
7     on the brand of cigarette that they were
8     smoking and asked questions about the
9     attributes of those light cigarettes.
10  Q.  Your survey was not intended to determine
11     what the respondents had read about the
12     potential dangers of light cigarettes in
13     relationship to other cigarettes; is that
14     correct?
15  A.  We're talking about the conjoint analysis
16     survey?
17  Q.  Yes.
18  A.  The conjoint analysis survey was not
19     designed to determine what consumers had
20     read about cigarettes, light cigarettes or
21     other cigarettes; however, certainly any
22     knowledge that they would have gained from
23     reading that would have gone into the
24     answers that they provided with respect to
25     the survey.

1  Q.  It didn't measure how many people had read
2     articles that equated the risks of light
3     cigarettes with the risks of full-flavored
4     filter cigarettes; is that correct?
5         MR. GALLAGHER:  Objection to the
6     form.
7  A.  My survey did not ask respondents how many
8     articles they had read.
9  Q.  And it didn't measure that?
10  A.  My survey may have measured that indirectly,
11     and certainly the amount of articles they
12     read could have influenced their own
13     perceptions of health risks.  And to the
14     extent that that did, there's some indirect
15     evidence.  However, I'm quite happy to say
16     that the survey did not ask specific
17     questions as to how many articles consumers
18     had read.
19  Q.  In fact, your survey did not ask any
20     questions that regarded any source of
21     information for the respondents; is that
22     correct?
23  A.  My sur -- the information that respondents
24     had obtained, had read or had otherwise
25     gotten would affect their answers to health

1     risks and other aspects of questions they
2     can answer.  However, my survey did not
3     specifically ask what information they --
4     the conjoint survey did not ask what
5     information they obtained, whether it be in
6     the form of articles or other sources of
7     information.
8  Q.  Okay.  You don't know the extent to which
9     the survey respondents believed or didn't
10     believe what they heard from cigarette
11     companies; is that correct?
12  A.  We're speaking about the conjoint survey?
13  Q.  We're speaking about the survey as a whole.
14     You did not ask respondents the degree to
15     which they relied upon statements of the
16     cigarette companies or the Surgeon General
17     or other public health authorities or
18     newspapers or magazines or television or
19     anything else; is that correct?
20  A.  The conjoint survey did not ask
21     respondents -- let me see if I can remember
22     this list that you've given me.  They did
23     not ask respondents whether they relied upon
24     information from the Surgeon General.  The
25     conjoint survey did not ask explicitly how

1     many articles people had read.  And then you
2     had a whole list of other things.
3  Q.  Sir, that --
4  A.  By and large, you know, I think it's fair to
5     say that the conjoint analysis survey was
6     asking people's preferences with respect to
7     these -- the characteristics that we
8     measured, as well as other questions, in
9     particular trade-offs among health risk and
10     other things such as monetary value.  The
11     survey was not designed to determine where
12     they obtained information about health
13     risks.
14  Q.  The survey was not designed to measure the
15     respondents' understanding of the word
16     "light" as opposed to some other descriptor;
17     isn't that correct?
18  A.  The word "light" is used in the survey, and
19     I'm quite happy that -- with the pretest and
20     the qualitative interviews that respondents
21     understood the light with -- the word
22     "light" within the context of the survey.
23     However, the survey was not designed to
24     totally determine everything that "light"
25     might imply in every product category.

Page 226

1    Q.  It was not designed to determine whether the
2        respondents would have purchased the same
3        cigarettes that they in fact smoked if those
4        cigarettes did not have the word "light" on
5        them; is that correct?
6            MR. GALLAGHER:  Objection to the
7        form.
8    A.  You know, that's kind of a little bit of a
9        vague question.  You know, certainly the
10       survey asked people as to whether or not
11       certainly their preferences with respect to
12       the health risks and the taste and also
13       monetary value and pack size -- pack type
14       with respect to light cigarettes.  However,
15       we're focusing on people who have already
16       decided to choose light cigarettes.
17           So I did not do any analysis of why
18       those people chose light to determine
19       whether or not it had "light" on the pack or
20       whether they had some other -- some other
21       reason for buying it.  However, once they
22       did choose light, I now know that they're
23       willing to basically trade -- they value
24       health risk, they're pretty uniform in terms
25       of valuing health risk, 90 percent of them

Page 227

1        at least, and furthermore, that they're
2        willing to make trade-offs of health risk
3        versus monetary value.
4    Q.  That --
5            THE WITNESS:  Have we been going
6        for about an hour?  Because I'm getting a
7        little tired.
8            MR. GALLAGHER:  If you need a
9        break, say so.
10           THE WITNESS:  Yeah.
11   Q.  I'll just ask a couple more, and then we can
12       take a break if you want.
13   A.  I just need a candy bar.
14   Q.  Okay.  Well, we'll inquire more about this
15       later.  The majority of light smokers
16       preferred the taste of lights, either the
17       ultra lights or regulars in your survey; is
18       that correct?
19   A.  Well, what -- I'm trying to remember the
20       exact numbers, but it is fair to say that
21       the average importance of the partworth for
22       light taste was higher than the partworth
23       for regular taste.
24   Q.  Which is to say that the average respondent
25       preferred light -- the taste of light

Page 228

1        cigarettes to the taste of what you referred
2        to as regular cigarettes?
3    A.  And I know I'm splitting straws here, but I
4        really want to be accurate as a
5        statistician.  The average of respondents is
6        such that the partworth of light -- taste of
7        light is higher than the partworth of taste
8        of regular.
9    Q.  As we sit here --
10   A.  It's the average of respondents, not the
11       average respondent.
12   Q.  As we sit here today, you have no opinion on
13       whether the choice to smoke the particular
14       cigarettes that the respondents smoked was
15       driven by taste or by the word "light" or by
16       some other factor; is that correct?
17           MR. GALLAGHER:  Objection to the
18       form.
19   A.  That's not correct.
20   Q.  As we sit here today, do you understand
21       that -- let me represent to you that every
22       ad for every cigarette in the United States
23       for the last few decades has represented the
24       tar and nicotine content by FTC measure of
25       the cigarette in question --

Page 229

1    A.  Okay.  You're giving -- you're asking me to
2        accept the fact that --
3    Q.  Accept that.
4    A.  -- I have no way of verifying sitting
5        here --
6    Q.  Yes.
7    A.  -- today?
8    Q.  Yes, accept it.
9    A.  Okay.
10   Q.  And so that any consumer who wants to know
11       the tar and nicotine content of his
12       cigarette as measured by the FTC method can
13       see that on any ad and every ad for
14       cigarettes?  Do you understand that's the
15       predicate of this?
16           MR. GALLAGHER:  That's a
17       hypothetical, correct?
18           MR. GROSSMAN:  Yes.
19   A.  Okay.  So you're asking me to accept that
20       any consumer who has access to ads can read
21       those ads, and you've also asked me to
22       accept the fact that every ad has a
23       statement of tar and nicotine?
24   Q.  Yes.  Knowing that, totally separate from
25       the word "light" or other descriptors such

Page 230

1   as "mild" or "ultra light" or anything else,
2   as we sit here today, it is accurate, is it
3   not, that you have not measured the extent
4   to which the word "light" on the cigarettes
5   in question was a driver in the choice of
6   individuals' brands in buying the cigarettes
7   that the 627 respondents in your survey
8   smoked?
9       MR. GALLAGHER:  Objection to the
10  form.
11  A.  It's kind of a complicated question.  You've
12  asked me to accept two statements as
13  hypothetical, you've asked me to accept that
14  all ads contain tar and nicotine, and you've
15  also asked me to accept that all consumers
16  would have access to these ads, okay?  And
17  after that what we do know is that their
18  perceptions of health risk and their
19  perceptions of taste do affect their
20  decisions.
21      Now, I don't know and I have not done
22  a survey to determine the impact of the word
23  "light," specific -- taken totally as
24  separately what that has on health risk.
25  That's other facts in the case that I am not

Page 231

1   providing an expert opinion on, so I am not
2   providing an expert opinion as to whether or
3   not light is the driver of health risk or
4   taste; however, I do know that once
5   consumers have perceptions of health risks
6   and taste, health risks and taste are
7   drivers of their decision, and furthermore
8   that health risks are a driver of the
9   decision of the vast majority of consumers.
10      MR. GROSSMAN:  Okay.  We can take
11  the break that you wanted.
12      THE VIDEOGRAPHER:  The time is
13  3:48.  This is the end of Tape 4, and we are
14  off the record.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  The time is 4:02
17  p.m.  This is the beginning of Tape 5, and
18  we're back on the record.
19      THE WITNESS:  Okay.  Did we manage
20  to get the temperature corrected?
21      MR. GROSSMAN:  We have asked for it
22  to be corrected.
23      THE WITNESS:  Corrected, yeah.
24  Because we might get more transcript time if
25  we didn't -- if it wasn't so hot in here.

Page 232

1       MR. GROSSMAN:  Well, we're doing
2   the best we can.
3       THE WITNESS:  Okay.
4       MR. GROSSMAN:  It's not my office,
5   but Paul Nemser, who is here, has made the
6   request, so...
7       THE WITNESS:  Okay.  I appreciate
8   that, because it really was getting pretty
9   hot in here.
10      MR. GROSSMAN:  I understand.
11      THE WITNESS:  And I see the court
12  reporter saying yes.
13      MR. GROSSMAN:  That's why I've got
14  all this ice in my water.
15  BY MR. GROSSMAN:
16  Q.  Dr. Hauser, continuing, I was asking you
17  earlier about representativeness of the
18  population being surveyed.  The population
19  that buys any particular product may not be
20  representative of the population as a whole;
21  is that correct?
22  A.  Well, the target of -- the survey should
23  target a population.  And we want a
24  representative set of the target population.
25  So the survey targeted light smokers, so we

Page 233

1   began with an overall represent -- sample of
2   the total population, and our target
3   population was that subset which smoked
4   light cigarettes.
5   Q.  It would be fair to say, would it not, that
6   your target population had a number of
7   attributes:  One was they were light
8   smokers, correct?
9   A.  Well, the target population were people who
10  were light smokers, yes.
11  Q.  In fact, the population surveyed were light
12  smokers who were Internet users who had
13  volunteered to engage in surveys with
14  Greenfield Online; is that correct?
15  A.  Well, the following is the case:  Greenfield
16  Online recruited people, and it's certainly
17  one of the issues that we've been working
18  with over the years to determine whether or
19  not an Internet panel is indeed
20  representative, and I believe they are.
21  There's a lot of evidence now that Internet
22  panels are representative.
23      So it appears that the propensity to
24  opt into an Internet panel, which of course
25  means they have some sort of Internet

1  access, does not correlate with the
2  variables of interest in most surveys, and I
3  don't believe that it correlates with the
4  variables of interest here.
5        MR. GROSSMAN:  Move to strike as
6  non-responsive.
7  Q.  Every respondent in this survey was a light
8  smoker who had Internet access and who
9  volunteered to be interviewed in Greenfield
10  Online surveys, correct?
11       MR. GALLAGHER:  Objection, asked
12  and answered.
13  A.  I targeted light smokers, and I used a
14  Greenfield Online Internet panel to
15  obtain -- to target them.
16  Q.  Have you compared Greenfield Online's method
17  of obtaining respondents with methods of
18  other Internet survey companies in obtaining
19  respondents?
20  A.  That's -- I'm actually one of the experts
21  now who's been asked to -- is some of this
22  possible, and so we've been trying to do it
23  to the greatest of our ability.  And there
24  are -- the details of these panels vary.
25  There are other panels out there, but it

1  appears that Greenfield Online is one of the
2  panels who does -- takes care in terms of
3  maintaining this panel, and to the best of
4  my understanding, they indeed are an opt-in
5  panel.
6  Q.  They are an opt-in panel?
7  A.  Opt-in panel.  And opt-in panels seem to be
8  a very viable, representative, valid and
9  reliable way of obtaining data on consumers.
10       MR. GROSSMAN:  Move to strike the
11  last part of the answer as non-responsive.
12  Q.  Doctor --
13       MR. GROSSMAN:  (To Mr. Koethe.)
14  Let's get out the Harvard conjoint manager's
15  guide.
16       THE VIDEOGRAPHER:  Mr. Grossman,
17  can I ask you to put your microphone on?
18       MR. GROSSMAN:  Oh, I'm sorry.
19       Can we mark this as 12?  Is that what
20  we're up to?
21       (Exhibit No. 12, Harvard Business
22  School monograph entitled "Conjoint
23  Analysis:  A Manager's Guide," marked for
24  identification.)
25  Q.  Right.  Dr. Hauser, I hand you what's been

1  marked for identification purposes as
2  Exhibit 12, which is a Harvard Business
3  School monograph entitled "Conjoint
4  Analysis:  A Manager's Guide."  Are you
5  familiar with this?
6  A.  Well, I'm familiar with the author.  It's
7  probably been quite a while since I've read
8  this.  It's a 1990 article.  It's been 16
9  years since it's been written -- actually 16
10  years since the copyright.  I don't know
11  when Dr. Dolan had written it.  And a lot
12  has changed since then, but I'll be happy to
13  comment on specific aspects on Dr. Dolan's
14  article.
15  Q.  Okay.  Good.  Could you look with me on Page
16  4?
17       MR. GALLAGHER:  Should he have time
18  to read the document?
19       MR. GROSSMAN:  Well, he says he's
20  familiar, but it's been a long time.  I'm
21  going to go into specifics.
22  A.  I said it's been a long time since I've read
23  this.  It's different from saying I'm
24  familiar with it.  If I need to read the
25  entire document, I'll do so.  But if I can

1  answer something in context and the context
2  is clear, I'll certainly make that attempt
3  as well.
4  Q.  Do you see Figure A on Page 4?
5  A.  I see Figure A, yes.
6  Q.  Do you see it says "Decision Stages in
7  Conjoint Study"?
8  A.  Yes.
9  Q.  And Decision 1 is -- or Stage 1 is to
10  "Determine the relevant attributes"?
11  A.  Yes.
12  Q.  Now, in this case you chose four attributes
13  for your conjoint study, correct?
14  A.  Yes.
15  Q.  Do you agree that the first stage and a
16  critical stage of developing a conjoint
17  study is to determine the relevant
18  attributes?
19  A.  Well, I think that -- I mean, at this point
20  we're going to have to read exactly what Dr.
21  Dolan means when he says, "Determine the
22  relevant attributes."  What we did in this
23  survey that I'm quite happy with as to
24  relevance, that the attributes that were
25  chosen were attributes that a priority

1    Brunswick lens model that we were talking
2    about earlier in this deposition.  So I, in
3    fact, have included people's perceptions of
4    both taste and of health.
5  Q.   You've included people's images of
6    perceptions of taste -- and we'll go over
7    these -- as well as pack type and price.
8    Let me put it this way:  Do you know whether
9    any major brand of cigarette in the United
10   States is marketed without a choice of both
11   box and soft pack?
12  A.   Sitting here today, I do not know if there's
13   any major brand in all its variants that is
14   modeled without a choice of hard pack and
15   soft pack.
16  Q.   Do you know if there's any difference in the
17   price of premium brands of cigarettes in the
18   United States?
19       MR. GALLAGHER:  Objection to the
20   form.
21  A.   I have not done a systematic study of the
22   price equilibrium in the marketplace, and
23   I'm not providing any opinions, any expert
24   opinions with respect to the price
25   equilibrium in the marketplace.

1  Q.   In your study you had five categories of
2    taste -- or I'm sorry, you had three
3    categories of taste, tastes like an ultra
4    light, tastes like a light, tastes like a
5    regular; is that correct?
6  A.   I believe that was correct.  It's -- I could
7    either accept that that -- it's getting late
8    in the day.  I'm getting tired.  I'll look
9    at this to be sure, but I believe that was
10   correct.
11  Q.   Be my guest.
12  A.   And I'll do this because you're probably
13   going to ask me about all the other
14   attributes, so I'll --
15  Q.   There's only one other attribute.
16  A.   There's four attributes total.
17  Q.   Yes.  Well, we went through box and price,
18   and now we're going through taste, and the
19   remaining one is health.
20  A.   Okay.  There are three levels of taste,
21   tastes like a regular cigarette, tastes like
22   your brand of light cigarettes, tastes like
23   an ultra light cigarette.
24  Q.   Okay.  There's no distinction made by brand
25   on taste; is that correct?

1  A.   Well --
2        MR. GALLAGHER:  Objection to the
3    form.
4  A.   -- that's not quite true.  We are asking the
5    consumer to focus on their brand of
6    cigarettes, so each consumer is focused on
7    the particular brand of cigarettes that
8    they're interested in.  And there's a lot of
9    description which we can read into the
10   record, which as we've indicated before has
11   been carefully pretested.
12       MR. GROSSMAN:  Move to strike as
13   non-responsive.
14  Q.   Doctor, there is no question on this survey
15   that asks respondents to compare the taste
16   of, say, a Marlboro Light to, say, the taste
17   of a Camel Light; is that correct?
18       MR. GALLAGHER:  Objection to the
19   form, asked and answered.
20  A.   Well, I believe that I've answered that time
21   and again.  And if you keep want to asking
22   it, I'll give you the same answer again.
23   The survey is focused on the person's brand
24   of light cigarette.  They are not asked to
25   compare ultra -- we're not doing a

1    comparison of their perceptions of different
2    brands of cigarettes.
3  Q.   What number was --
4        (Discussion off the record.)
5  Q.   Doctor, could you look with me at Exhibit
6    No. 4.
7  A.   Okay.  Yeah, Exhibit No. 4.
8  Q.   Let me represent to you that this represents
9    the market share of different brands of
10   cigarettes in the United States in 2002, all
11   right?  For purposes of this series of
12   questions, you'll accept that?
13  A.   What -- this actually matters.  What do you
14   mean by "market share"?
15  Q.   Percent of the number of cigarettes sold in
16   the United States.
17  A.   Okay.  So this is market share by volume --
18  Q.   By volume of --
19  A.   That's by volume of cigarettes, and it's not
20   by volume of packs?
21  Q.   That's right.  Well, all packs contain 20
22   cigarettes --
23  A.   Okay.
24  Q.   -- so the two are synonymous.
25       Doctor, looking at this with me, you

Page 254

1    see of the brands that are listed which are
2    the top 50 brands there are following
3    lights, Marlboro Lights with an 11 point --
4    A.   Can I circle these, too, like you're doing?
5    Q.   Sure, if you want.
6    A.   Can I have a pen or something to do it?
7    Q.   There's the highlighter that I was using.
8    A.   Okay.
9    Q.   I happen to have several with me.  Part of
10   my occupation.
11   A.   Okay.  Now what do you want me to do?
12   Q.   Let's highlight, if you like, the lights
13   listed among these top 50 brands.
14   A.   Okay.
15   Q.   Marlboro Lights, 85 box, 11.51 percent
16   share.  Do you see that?
17   A.   Okay.  I've highlighted it.
18   Q.   And third down, Marlboro Lights 100
19   millimeter box --
20   A.   Okay.  I've highlighted it.
21        THE REPORTER:  I'm sorry, I didn't
22   catch the end of yours.
23   Q.   3.07 share.  A few below that, Marlboro
24   Lights 85 soft pack, do you see that?
25   A.   We skipped over Camel regular --

Page 255

1    Q.   We're skipping over all the regulars.
2    A.   What does this mean, "regular light LT"?
3    Q.   Oh, I'm sorry, it means the -- you're right.
4    In this context it means it's the Camel
5    that's not the special blend or the Turkish
6    blend.  That's what the use of the term
7    "regular" in that context is.
8         The Camel Light 85 box, 2.03, correct?
9    A.   So LT means light?
10   Q.   Yes.
11   A.   Okay.
12   Q.   Marlboro Blue Ultra Light, don't do that.
13   That's an ultra light.
14   A.   What?
15   Q.   I --
16   A.   Well, why don't you do it and give it to me.
17   Q.   I'll be happy to.
18        (Pause.)
19   Q.   Doctor, I've handed you the highlighted
20   copy.
21        MR. GALLAGHER:  You don't want
22   highlighted Marlboro Lights Light 85 SP soft
23   pack?
24        MR. GROSSMAN:  No, I don't want
25   those -- the one that I didn't do is the

Page 256

1    Marlboro Medium Light 85 box.
2         MR. GALLAGHER:  What about Marlboro
3    Lights Light 85 SP?
4         MR. GROSSMAN:  We do want that.
5         MR. GALLAGHER:  You do want that?
6         MR. GROSSMAN:  Yeah.
7         MR. GALLAGHER:  So you want me to
8    highlight that for Dr. Hauser?
9         MR. GROSSMAN:  Yeah, please.
10        MR. GALLAGHER:  Okay.
11   BY MR. GROSSMAN:
12   Q.   Doctor, you've been handed what's been
13   marked for identification purposes which is
14   now highlighted --
15   A.   Wait a minute.  This one says Exhibit 4.
16   Q.   Oh, I'm sorry, Exhibit 4, you're correct.
17        -- which has now been highlighted to
18   list those of the top 50 brands and styles
19   in 2002 that were light cigarettes,
20   designated as light cigarettes.  Do you see
21   that?
22   A.   Yes, I do.  And by the way, does this add up
23   to 100 percent?
24   Q.   No, it doesn't, because it's only the top 50
25   brands.

Page 257

1    A.   Okay.  And what does that add up to?
2    Q.   I don't know.  But there are hundreds of
3    brands and styles in the United States.
4    Reynolds alone, I know, since the merger now
5    has about three or four hundred brands and
6    styles, but most of them have infinitesimal
7    shares.  The market is dominated by just a
8    few cigarettes.
9         As you can see, the most popular
10   single brand, according to this, and style,
11   is Marlboro Lights 85 box.  Do you see that?
12   A.   Yes, I do.
13   Q.   With an 11 1/2 percent share of the market.
14   Do you see that?
15   A.   Yes, I do.
16   Q.   And you see about half of all the cigarettes
17   among the top 50 in the United States, just
18   under half, are highlighted as light
19   cigarettes?
20   A.   It seems to be the order of magnitude of a
21   half.  We haven't counted them.
22   Q.   Yeah.  Now, the 50th most popular style is
23   Winston Light 100.  Do you see that?
24   A.   Okay.  And what does the "SP" mean?
25   Q.   I believe it means soft pack.

Page 258

1   A.   Okay.
2   Q.   Doctor, what accounts for the difference,
3        the huge difference in market penetration of
4        these different brands?
5              MR. GALLAGHER:  Hold on.  I just
6        saw another one.  Second to last one, do you
7        want Marlboro Medium Light?
8              MR. GROSSMAN:  No.
9              MR. GALLAGHER:  No?
10             MR. GROSSMAN:  No, because it's
11       called Marlboro Medium, it's not called
12       light.  It's a low tar.
13  A.   Oh, LT stands for low tar, okay.
14  Q.   Yeah.
15  A.   Oh, some of these --
16             MR. GALLAGHER:  Hold on.  In
17       Marlboro Medium LT 100 box, LT means low
18       tar?
19             MR. GROSSMAN:  It is a low tar, but
20       it is not marketed as a light, it's marketed
21       as a medium.  That particular cigarette is
22       marketed as a medium.
23  A.   So then why is Camel regular low tar
24       highlighted?
25             MR. GALLAGHER:  It's gotten a bit

Page 259

1        confusing.
2              MR. GROSSMAN:  It has gotten
3        confusing.
4   Q.   Leave aside the questions of which ones are
5        marked and which ones are not for a moment.
6   A.   Okay.
7   Q.   Marlboro Lights have a -- in their 85
8        millimeter box have an 11 1/2 percent market
9        share of all the cigarettes sold in the
10       United States, okay?
11  A.   Yes.
12  Q.   Winston -- Winston Lights have a much lower
13       penetration?
14  A.   Yes.
15  Q.   Parliament Lights aren't even in the top 50,
16       Parliament Light 100s are not even in the
17       top 50; is that correct?  They're not listed
18       in here?
19  A.   I don't see a Parliament here.  Well, what's
20       this (indicating)?
21  Q.   Parliament Light 85 is included?
22  A.   Yeah.
23  Q.   Parliament Light 100 is not?
24  A.   Okay.  So Parliament Light 85 is, okay.
25  Q.   Benson & Hedges Lights are not included on

Page 260

1        this list; is that correct?
2   A.   I don't see something that -- anything,
3        excuse me, that says Benson & Hedges on this
4        list.
5   Q.   So what accounts for the vast differences in
6        market share of these different brands that
7        are called light?
8              MR. GALLAGHER:  Objection to the
9        form.  It's beyond the expert opinion he's
10       rendering.
11  A.   I haven't done a study of brand differences,
12       and I've so testified it's not part of my
13       expert opinion.
14  Q.   Okay.  Your conjoint analysis did not
15       capture the reasons why some brands are so
16       much more popular among light cigarettes
17       than others; is that correct?
18  A.   My conjoint analysis, each person is
19       conditioned upon having made that choice
20       already, so someone answering my question, I
21       know what they -- what particular brand they
22       asked.  I'm not asking the attributes varied
23       by brand other than the four attributes that
24       I've indicated.  So I'm not providing an
25       expert opinion with respect to brand

Page 261

1        decision.
2   Q.   Your conjoint analysis measured four factors
3        that we've gone over.  It did not measure or
4        attempt to measure the extent to which brand
5        entered into the choice of cigarette smokers
6        in deciding which cigarette to smoke; is
7        that correct?
8              MR. GALLAGHER:  Objection, asked
9        and answered.
10  A.   Well, I have answered it, but, again, the
11       person who is answering this, they have
12       already made the brand decision.  Now I'm
13       asking them hypothetical questions, conjoint
14       profiles within that brand.  So I did not do
15       a brand study, nor am I providing an expert
16       opinion with respect to interbrand
17       decisions.
18  Q.   Doctor, let me hand you what we'll mark as
19       Exhibit 12, I believe -- Exhibit 13, which
20       is a compilation of materials that have been
21       provided to us by plaintiffs' counsel --
22             MR. GALLAGHER:  I'm sorry, can I
23       have a copy of that?
24             MR. GROSSMAN:  Yes.
25  Q.   -- relating to your pretests and to your

Page 274

1    than one person looking at this.
2  Q.  In fact, only one person looked at the
3    interviews that Ms. Schussheim conducted in
4    this case; is that correct?
5  A.  No.
6  Q.  Who else looked at them?
7  A.  Ms. -- okay.  There are three people who
8    were involved in this, Mr. Gaskin, Ms.
9    Schussheim and myself, and I was fully
10    briefed on this, and furthermore, the
11    particular paper we're talking about now is
12    the qualitative interviews to identify what
13    consumers' needs were.  It's a very specific
14    technical definition of what consumer needs
15    are.  This is -- now, qualitative interviews
16    determine the wording for a questionnaire.
17    So two different purposes.
18        MR. GALLAGHER:  When you say
19    "this," we have to say --
20        THE WITNESS:  Okay.
21        MR. GALLAGHER:  -- what you're
22    referring to.
23  A.  Let's be very specific.  We're now talking
24    about two different things.  The one article
25    is "The Voice of the Customer" article,

Page 275

1    which is a study of the ability to identify
2    customer needs.  The other is the
3    qualitative interviews done in the study
4    upon which I'm providing an expert opinion.
5    Here the qualitative interviews were to
6    provide background, but more importantly the
7    specific use of these qualitative interviews
8    were to identify that consumers could
9    respond to the questions that we were
10    developing and to put the questions into
11    words and phrases that consumers were using.
12  Q.  Doctor, Ms. Schussheim is the only person --
13    let me go back over this.  You've already
14    told us that Ms. Schussheim did not take
15    notes of her interviews and that no
16    recording was made of the interviews.  Can
17    you tell us the brands of the seven people
18    who she interviewed?
19  A.  I've already testified that we did not
20    record any of those demographic variables.
21    I mean, you can ask me, do I know whether or
22    not these people drove particular brands of
23    cars.  We didn't record that information,
24    either.
25  Q.  I'm not asking you irrelevant --

Page 276

1  A.  We did record the information that was
2    required.
3  Q.  I'm asking --
4  A.  What I'm trying to get at here is whether or
5    not people can respond to the questions, and
6    there are people involved in determining
7    whether or not these people could respond to
8    the questions, Mr. Gaskin, Ms. Schussheim
9    and myself.
10  Q.  Doctor, as we sit here today, can you recall
11    any of the attributes -- I'll rephrase the
12    question.
13        As we sit here today, can you recall
14    whether the seven people interviewed by Ms.
15    Schussheim believed light cigarettes to be
16    more dangerous, equally dangerous or less
17    dangerous than full-flavored filter
18    cigarettes?
19        MR. GALLAGHER:  Objection to the
20    form.
21  A.  That was not the purpose of the qualitative
22    interviews.  The purpose of the qualitative
23    interviews were to determine whether or not
24    they could answer the questions that we were
25    asking.  And Ms. Schussheim briefed me on

Page 277

1    these, and at the end of the qualitative
2    interviews, coupled with the information
3    also obtained from Mr. Gaskin, we were able
4    to write a questionnaire that could obtain
5    that information.  And as is appropriate, we
6    did not record the actual answers from the
7    pretest interviews because we did not use
8    those in analysis, again, as is recommended
9    not only by scientific and academic press,
10    but by the federal court rules.
11        MR. GROSSMAN:  What?  Could you
12    read that back, please.
13        (Record read.)
14  Q.  Are you --
15  A.  Well, rules is the right -- the wrong -- I
16    mean, let me clarify this.  When I say
17    "rules," it sounds like I'm making a legal
18    opinion.  I'm not making a legal opinion.
19  Q.  Are you suggesting that the rules of any
20    court that you've ever appeared before
21    required you not to keep a record or to
22    destroy evidence of interviews that you
23    conduct?
24        MR. GALLAGHER:  Objection to the
25    form.

Page 290

1    analysis and to develop a questionnaire that
2    uses words and phrases that consumers use to
3    describe the features of cigarettes."
4          Do you see that?
5    A.   Yes.
6    Q.   So before you -- these interviews were
7    conducted on March 9, 2005, the four factors
8    to be considered in your conjoint analysis
9    had not been firmly identified; is that
10   correct?
11   A.   Well, okay.  Again, the process of --
12   there's features we're going to explore, and
13   it's of course an iterative process, but the
14   final decision is made after the qualitative
15   interviews.  And certainly, as is
16   appropriate to the scientific method, we
17   have some hypotheses going in there that can
18   be updated and modified after listening to
19   customers.
20   Q.   Part of the purpose of the in-depth
21   interviews conducted on March 9 was to
22   determine the factors to be included in the
23   Web-based questionnaire that ultimately was
24   used to support your opinion in this case,
25   correct?

Page 291

1    A.   System of the qualitative inter -- the
2    qualitative interviews, combined with other
3    information, ultimately helped us develop
4    the questionnaire in words and phrases that
5    consumers could use.  Certainly there were
6    some issues going in that we wanted to
7    find -- that we had hypotheses that would be
8    features that were relevant.
9    Q.   Doctor, if you could turn with me on Exhibit
10   13 to --
11   A.   Which one is Exhibit 13?
12   Q.   It's the interview set that you should have
13   out.
14   A.   Okay.
15   Q.   -- to the notes that Mr. Gaskin took of the
16   seven interviews that he conducted on March
17   9, 2005.  The first is of a man named Bert.
18   A.   Okay.  We have Bert.  This is Hauser 041.
19   Q.   Yes, it is.  Do you see second paragraph,
20   "Smoked Parliaments - and the brand changed
21   to be all lights.  He smoked the 100s.  No
22   taste difference, no difference in smoking.
23   He didn't even notice at first.  He was okay
24   with that."
25         Do you see that?

Page 292

1    A.   Yes.
2    Q.   Next paragraph, "If he had to switch, he'd
3    smoke another 100."
4          Do you see that?
5    A.   Yes.
6    Q.   Did you consider length of cigarettes as one
7    of the factors to be tested?
8    A.   Length is one of the cigarettes (sic) we
9    could have involved, but fortunately because
10   of the properties of the Gumbel
11   distribution, as long as it was not --
12   basically as long as it satisfied the
13   appropriate statistical properties, it would
14   not bias any of the other coefficients.  So
15   we're making some trade-offs among focus on
16   particular attributes, in this case health,
17   price and taste, as well as we put in pack
18   size.
19   Q.   You can't do the calculation of the Gumbel
20   distribution until after the survey is
21   conducted; is that correct?
22   A.   No, but we can establish qualitatively
23   whether or not there's going to be
24   interactions by talking to the consumers.
25   Q.   You didn't -- at the time when you decided

Page 293

1    the four factors that were going to be
2    studied you hadn't run the Gumbel
3    distribution; is that correct?
4          MR. GALLAGHER:  Objection to the
5    form.
6    A.   You know, at this point run the Gumbel
7    distribution, in fact, we ran the
8    estimation.  There are properties of the
9    Gumbel distribution.  I certainly knew the
10   properties of this Gumbel distribution,
11   which is well established in the literature
12   that this is a way to model if there's going
13   to be unobserved attributes in there and
14   that those unobserved attributes are not
15   going to bias the coefficients of the
16   attributes that are in that.
17   Q.   Did you consider whether length of
18   cigarettes was one of the principal factors
19   that smokers consider in making a decision
20   on which cigarettes to purchase?
21         MR. GALLAGHER:  Objection to the
22   form.
23   A.   Length of cigarettes is one of the many
24   other attributes we could have put in there.
25   I do not believe putting that attribute in

Page 294

1    would have biased the coefficients one way
2    or the other.  Certainly, you know, one
3    might put all sorts of attributes in here.
4    For this person it mattered, for other
5    people it won't, but it's not going to bias
6    the coefficients that are in that
7    estimation.
8  Q.   Did you consider whether to include it in
9    the factors to be studied?
10       MR. GALLAGHER:  Objection, asked
11    and answered.
12  A.   I did not feel that it was necessary to put
13    the length of the cigarettes in there.
14    There were a lot of attributes that we could
15    have put in that we decided not to put into
16    this --
17  Q.   Have you --
18  A.   -- and it's not going to bias the estimates.
19  Q.   Have you reviewed any studies conducted by
20    cigarette manufacturers or anyone else on
21    the importance of length of cigarettes in
22    consumers' decisions of which cigarettes to
23    buy?
24  A.   I have not reviewed any studies with respect
25    to importance of the length of the

Page 295

1    cigarettes, but just as we've indicated
2    before, people are asked to focus on their
3    particular brand and then make a partial
4    decision with respect to all the attributes
5    that we did specify.  As long as these are
6    separable utility functions, it's perfectly
7    acceptable and it's going to give us
8    unbiased estimates.
9       MR. GROSSMAN:  Move to strike as
10    non-responsive.
11  Q.   On the line "If he had to switch, he'd smoke
12    another 100," this respondent, Bert --
13  A.   Well, let's complete the line.  "Would look
14    around."
15  Q.   "Would look around," yes.  "If he had to
16    switch, he would smoke another 100 - would
17    look around."
18    With respect to this respondent, Bert,
19    it appears that he could be lexicographic
20    with regard to 100 length cigarettes; is
21    that correct?
22       MR. GALLAGHER:  Again, I'll object
23    to the form given the fact that this is
24    being taken out of context in the two-
25    page -- what appears to be at least a page

Page 296

1    and a half of notes and you're reading one
2    question, but go ahead and answer if you
3    can, Doctor.
4  A.   Certainly this statement would be
5    consistent, but it may not be.  It also
6    could be conditionally lexicographic
7    conditioned upon having chosen a 100.  He
8    could then be making compensatory trade-offs
9    among the attributes that we did measure and
10    the coefficients we obtained for the
11    relative trade-offs -- remember, conjoint is
12    always dealing with relatives, and we're
13    estimating those relatives conditioned upon
14    the other attributes.
15    And so just as the same answer to
16    brand, as long as I have unbiased
17    coefficients among those attributes, my
18    survey is going to be accurate with respect
19    to those coefficients, or the estimation
20    will be accurate with respect to those
21    coefficients.
22       MR. GROSSMAN:  Move to strike as
23    non-responsive.
24  Q.   Doctor, looking above the empty line,
25    there's one line that -- about 80 percent

Page 297

1    down the page -- it's empty above that --
2    there's a paragraph that is "Lite healthier,
3    they say that but he doesn't think it works.
4    The burning tobacco is going to be there
5    either way."  Do you see that?  "Each way,"
6    do you see that?
7  A.   Yes.
8  Q.   As reported to you, this first respondent
9    did not believe that light cigarettes were
10    healthier than non-light cigarettes; is that
11    correct?
12       MR. GALLAGHER:  Objection to the
13    form.
14  A.   Well, because we're -- what we have here are
15    Mr. Gaskin's notes, "Lite healthier," you
16    know, he reported on these, but, you know, I
17    don't recall all the details.  This is his
18    question to them, or is that the
19    respondent's answer?  It might have been
20    that Mr. Gaskin asked this question to the
21    respondent and then he said that the
22    respondent responded they say that, but he
23    doesn't think it works.
24    And so that means in the existing
25    marketplace this particular respondent

Page 298

1    probably doesn't think that light cigarettes
2    are any less unhealthy than regular
3    cigarettes.
4    Q.   Less healthy, correct?
5    A.   Light cigarettes are --
6    Q.   He doesn't believe that they're any -- he
7         doesn't believe that they're any
8         healthier --
9    A.   Right.
10   Q.   -- with regard to regular cigarettes?
11             MR. GALLAGHER:  Hold on.
12        Objection.  Now you're changing it around.
13        You're putting words in his mouth.
14             MR. GROSSMAN:  No, I'm asking.
15             MR. GALLAGHER:  No.  He said "less
16        unhealthy," and you turned it around and
17        said "healthier."  I don't think anybody in
18        this room is going to say cigarettes are
19        healthy, whether it's a lawyer or --
20             MR. GROSSMAN:  No, he doesn't
21        believe that light cigarettes are any
22        healthier than regular cigarettes.
23             MR. GALLAGHER:  Same objection.
24        It's turning it around.  That's not what he
25        said.  If you want --

Page 299

1             MR. GROSSMAN:  Okay.  I understand.
2             MR. GALLAGHER:  -- the answer read
3         back -- you know where we're going --
4             MR. GROSSMAN:  I understand.
5             MR. GALLAGHER:  -- with this so
6         let's not try it.
7             MR. GROSSMAN:  I don't mean to
8         suggest that cigarettes are healthy.
9    BY MR. GROSSMAN:
10   Q.   This respondent does not believe that light
11        cigarettes contain any lower health risks
12        than regular, what you refer to as regular
13        cigarettes; is that correct?
14             MR. GALLAGHER:  Objection to the
15        form.
16   A.   Okay.  This respondent believes that light
17        cigarettes are no less unhealthy than
18        regular cigarettes, and there are many
19        people in our survey that have that belief.
20   Q.   Next respondent, John, on the following
21        page, Hauser 042, and continuing into 043,
22        John has varying statements here on the
23        health effects of light cigarettes; is that
24        not correct?  It says, "Not hurting himself
25        so bad.  Denial."  And on the next page, "He

Page 300

1    thinks they're half as bad but deep down he
2    knows there's no difference.  It's all a
3    mind thing.  It's just a label.  It's all
4    marketing."
5         Do you see that?
6    A.   Yeah, it's kind of interesting.  Here's a
7         John who's 57, who was cut open four years
8         ago with aorta blocked from smoking and
9         couldn't walk, and stopped in the hospital
10        with just one puff.  So here's a person who,
11        at least by his own statement, as recorded
12        by Mr. Gaskin, believes that smoking has
13        been quite unhealthy for him, and --
14             MR. GROSSMAN:  Move to strike as
15        non-responsive.
16             MR. GALLAGHER:  Hold on.  He's not
17        done.  Go ahead.
18   A.   -- and still said that.  Now, if we get down
19        here, you know, it's kind of interesting
20        that, you know, he sort of knows in his --
21        it's a very interesting interview.
22   Q.   He knows in his heart what?
23   A.   Okay.
24             MR. GALLAGHER:  Hold on.
25   A.   What's --

Page 301

1             MR. GALLAGHER:  I'm going to the
2         object to the form that we're taking certain
3         snippets out of context of the entire thing,
4         and you're not letting Dr. Hauser --
5             MR. GROSSMAN:  No, I'm asking --
6             MR. GALLAGHER:  -- give you a more
7         comprehensive suggestion of what the total
8         interview says.  Go ahead, Doctor.
9             THE WITNESS: Okay.
10   A.   You know, he thinks they're half as bad, but
11        deep down he knows there's no difference,
12        okay.  So it's kind of an interesting
13        statement that he sort of believes that,
14        well, maybe lights aren't quite as bad, but
15        deep down he kind of knows that they're no
16        different.  And, you know, this is the
17        ambivalence that he's showing here in terms
18        of health risk.
19   Q.   All right.  Now, Doctor, farther down in his
20        interview notes it says, "Price choice, same
21        price.  He likes what he has now, he's used
22        to it.  The part on health is just part of
23        addiction denial.  There's a lot of
24        psychology here."
25        Do you see that?

Page 318

1      THE WITNESS:  I see that.
2      MR. GALLAGHER:  All right.
3   BY MR. GROSSMAN:
4   Q.   And with regard to that, Dr. Hauser, that
5      paragraph is "So low tar and nicotine -
6      probably doesn't do a whole lot.  There's no
7      such thing as a safe cigarette.  Lites are
8      75 to 80 percent as dangerous."
9      Is that correct?
10  A.   047 here?  Oh, yeah, okay.  "Low tar
11     and nicotine probably doesn't do a whole
12     lot.  There's no such thing as a safe
13     cigarette.  Lites are 75 to 85 percent as
14     dangerous."
15  Q.   And he further says, does he not, that he
16     doesn't believe advertisers and doesn't
17     believe the cigarette companies?  Indeed, as
18     we quoted earlier, he says, "It's ludicrous
19     for a cigarette manufacturer to make any
20     sort of health benefits claim."
21  A.   Well, what this person appears to be saying
22     is he thinks cigarettes are dangerous and
23     unhealthy, and as I've indicated, our goal
24     was to design questions that people could
25     answer, and the vast majority of our

Page 319

1      people -- the people who responded do think
2      that cigarettes are unhealthy.
3   Q.   Next person, Heinz.
4   A.   I would like to point out I do have to leave
5      in five minutes.
6   Q.   You've pointed that out earlier.  We're
7      moving as fast as we can.
8      MR. GALLAGHER:  We'll end at 6:00,
9      Doctor.
10  Q.   Heinz indicated at the bottom of the page
11     that he thinks that "Danger level of about
12     75 percent of regular."
13     Do you see that?
14  A.   Yes.
15  Q.   Starting above that, he said, "If lites
16     tasted worse, he wouldn't smoke them.  It's
17     bad, so you might as well enjoy it.
18     "What makes it a lite?  He doesn't
19     know."  Later he says, "Taste - a light
20     taste, he likes it.  So ceteris paribus,
21     he'd smoke lites instead of regulars due to
22     taste.  Nicotine is the same."
23     Do you see that?
24  A.   Yes.
25  Q.   All things being equal, if lights and

Page 320

1      regulars had the same degree of risk, he
2      would prefer lights; is that correct?
3   A.   Well, ceretis paribus means all else equal,
4      so I agree with the statement as Mr. Gaskin
5      recorded here that this person, as many of
6      our respondents did, actually likes the
7      taste of lights.  However, it doesn't mean
8      that they would not make a trade-off if
9      they could get a light cigarette that was
10     basically less healthy (sic).  So if they
11     had a choice -- it does not say they could
12     not make a choice between a light cigarette
13     that had the health risk of regular
14     cigarettes and a light cigarette that had
15     the health risk of what should be perceived
16     as a light cigarette, less health risk.
17     So people can make that distinction,
18     and, you know, in this case he thinks that
19     lights are less healthy (sic) than regulars,
20     and he likes the taste.  So there are two
21     reasons to smoke health -- to choose light
22     cigarettes.
23  Q.   But if lights and regulars were identical in
24     health risk, he would prefer the lights?
25     MR. GALLAGHER:  Objection to the

Page 321

1      form.
2   Q.   That's what he said, correct?
3   A.   What he has said is that, yeah, he said that
4      health risk affects his choice.  He's also
5      said that taste affects his choice, and he
6      says that he prefers the taste of light
7      cigarettes to the taste of regular
8      cigarettes.  That's perfectly consistent
9      with the results in the survey.
10  Q.   Let's go to the next person, Jennifer.  And
11     at the very bottom -- since you have a
12     couple of minutes, at the very bottom of her
13     interview notes it says, "Even if lites are
14     as unhealthy as regulars, she wants the
15     lite - taste, feel are better 'lighter'"; is
16     that correct?  Is that a better rendition of
17     what Mr. Gaskin took down?
18  A.   Well, let's read the whole thing.
19     (Witness reviews document.)
20  A.   Well, it says it was easier to inhale lights
21     when she was starting out.
22  Q.   And that health wasn't a consideration when
23     she started?
24  A.   It says that health was not a consideration
25     when she started.  However, she then goes on