Page 329

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Case No. CV-0401945 (JBW)(SMG)

```
----------------------------)
BARBARA SCHWAB, ET AL,       )
INDIVIDUALLY AND ON          )
BEHALF OF A CLASS OF ALL     )
OTHERS SIMILARLY             )
SITUATED,                    )
        Plaintiffs,          )
                             )
        VS.                  )
                             )
PHILIP MORRIS USA, INC.,     )
ET AL,                       )
        Defendants.          )
----------------------------)
```

DAY II
PAGES 329-580

VIDEOTAPED DEPOSITION of

DOCTOR JOHN R. HAUSER, called as a witness

by and on behalf of the Defendant, pursuant

to the Federal Rules of Civil Procedure,

before Teresa E. Costello, Registered

Professional Reporter, Certified Shorthand

Reporter No. 1452S98, and Notary Public

within and for the Commonwealth of

Massachusetts, at the offices of

Goodwin Procter, 53 State Street, Boston,

Massachusetts, on Friday, March 24, 2006,

commencing at 10:06 a.m.

Page 346

1  A. I still find the question confusing, but let
2     me attempt to answer it.  In the internet
3     survey the -- in the conjoint analysis I did
4     not attempt to measure the reasons as to why
5     people started smoking in the first place.
6  Q. In the conjoint analysis you made no effort
7     to determine whether anyone would not have
8     started smoking if he perceived that light
9     cigarettes were as unhealthy as regular
10    cigarettes?
11        MR. GALLAGHER:  Objection to the
12    form.
13 A. In the internet survey, the conjoint
14    analysis survey, I did not attempt to
15    determine the causes that led consumers to
16    start smoking, and therefore I did not
17    measure in the conjoint analysis internet
18    survey whether or not starting smoking was
19    due to health risk.
20 Q. Okay.  In the internet survey you made no
21    effort to determine why consumers switched
22    from one brand to another during their
23    smoking history, correct?
24 A. The purpose of the internet survey focused
25    on the brand they were now smoking and then

Page 347

1     trade-offs between health risk, monetary
2     value, taste and other dimensions, and thus
3     the respondents were conditioned upon
4     already having chosen a brand.  The internet
5     survey was not focused on inter brand
6     choice.
7  Q. So you made no effort and you have not
8     calculated the percentage of light smokers
9     who would have switched to other cigarettes
10    if they perceived -- let me rephrase that
11    question.
12        You have not looked to determine
13    what percentage of light smokers would have
14    stopped smoking if they perceived that low
15    tar cigarettes, including lights, were as
16    unhealthy as regular cigarettes, correct?
17        MR. GALLAGHER:  Objection to the
18    form.
19 A. Could you rephrase that?
20 Q. Ah-hah.  You have made no effort to
21    determine what percentage of light cigarette
22    smokers would have stopped smoking if they
23    perceived that low tar cigarettes, including
24    lights, were as unhealthy as regular
25    cigarettes, correct?

Page 348

1        MR. GALLAGHER:  Same objection.
2  A. The focus of the internet survey was to
3     determine consumers' trade-offs between
4     health risk, price, taste and other
5     dimensions.  The internet conjoint analysis
6     survey was not a study of smoking cessation.
7  Q. Consequently you've made no effort to
8     determine the percentage, if any, of light
9     smokers who would have stopped smoking if
10    they believed that low tar cigarettes,
11    including lights, were as unhealthy as
12    regular cigarettes, correct?
13 A. That's not quite true.
14 Q. What percentage of consumers, according to
15    your internet survey, would have stopped
16    smoking if they perceived that light
17    cigarettes were as unhealthy as regular
18    cigarettes?
19 A. Well, I haven't looked at all the data to
20    answer that particular question; however,
21    the following I do know.  That when we give
22    them statements such as change in health,
23    they have indicated that they would continue
24    to purchase the cigarettes, but at a
25    different price, for example, so this data,

Page 349

1     while not directly addressing that question,
2     is certainly data that could inform the
3     answer to that question, and so as a result,
4     you know, it's a study that certainly could
5     be done.
6        I'm not providing an expert opinion
7     on smoking cessation; however, it's
8     possible, should I be asked to reanalyze the
9     data with smoking cessation in mind, I might
10    be able to form opinions, but I've not done
11    that at this point, and I'm not providing an
12    expert opinion on smoking cessation.
13 Q. Indeed -- in the current marketplace there
14    was cigarettes that are unfiltered.  There
15    are cigarettes, higher tar cigarettes,
16    full-flavored cigarettes with filters.
17    There are low tar cigarettes including light
18    cigarettes, and there are ultra light
19    cigarettes, correct?
20 A. I'm -- you're making a statement as to the
21    marketplace which sounds reasonable.  I'm
22    willing to accept that as your statement
23    subject to verification.
24 Q. Every one of the participants in your survey
25    have rejected ultra light cigarettes, is

6 (Pages 346 to 349)

Page 378

1  A. Are you referring to interviews in this
2     case?
3  Q. Yes.
4  A. Okay, you're referring to interviews in this
5     case.  I debriefed -- I was debriefed by Mr.
6     Gaskin and Miss Schusshein on the interviews
7     that they conducted; however, I did not
8     conduct any additional interviews beyond the
9     interviews that they conducted at my
10    direction.
11 Q. So to the best of your knowledge -- let me
12    go back.  No consumer has ever told you,
13    personally, that he views a filter tip
14    cigarette as a regular cigarette, is that
15    correct?
16        MR. GALLAGHER:  Objection to the
17    form.
18 A. I can't answer that.  I've spoken to many
19    consumers in many instances totally outside
20    this case.  I do not recall whether they
21    referred to cigarettes as regular cigarettes
22    or not.  It's certainly the word that I'm
23    used to hearing, so I form that belief
24    sometime; however, I'm not giving an expert
25    opinion on that.

Page 379

1        The pre-test interviews in this
2     case were done or qualitative interviews
3     done in this case were done by my team.
4  Q. Now did Mr. Gaskin or Miss Schusshein tell
5     you how many people being interviewed
6     referred to filter tip cigarettes as
7     regular?
8  A. Miss Schusshein and Mr. Gaskin told me that
9     based upon the qualitative interviews and
10    their experience and experiential
11    interviews, they told me that the questions
12    as we ultimately worded them, were well
13    understood by consumers, and they can make
14    the appropriate trade-offs.
15        MR. GROSSMAN:  Move to strike as
16    non-responsive.
17 Q. Doctor Hauser, did Miss Schusshein or
18    Mr. Gaskin specifically tell you the number
19    of respondents, the number of people who
20    they interviewed who understood the word,
21    regular cigarette, to mean filter tip
22    cigarette?
23        MR. GALLAGHER:  Objection to the
24    form.
25 A. Consumers understood the word, regular, and

Page 380

1     they were able and willing to make
2     trade-offs with respect to regular.  We did
3     not do any quantitative analysis of pre-test
4     interviews nor did we do a quantitative
5     analysis of qualitative interviews as is
6     appropriate survey methodology; therefore,
7     since I did not record the number of people
8     who told me that or described cigarettes as
9     regular whether they be filtered or
10    unfiltered or whatever, that was not
11    recorded; therefore, I cannot, sitting here
12    today, give you the exact number of people.
13 Q. Let me represent to you that at his
14    deposition two weeks ago Doctor Jeffrey
15    Harris said that he found the word, regular,
16    as used in this survey to be ambiguous.  Now
17    I'm going to ask you questions with regard
18    to specific ads.  Let me hand you what's
19    been marked for identification purposes
20    as --
21        MR. GALLAGHER:  Hold on.  What was
22    the point of that?  Are you going to ask him
23    a question about what Doctor Harris said
24    about these ads?
25        MR. GROSSMAN:  Yes, about what

Page 381

1     Doctor Harris said and the ads.
2         MR. GALLAGHER:  Gratuitous.
3         MR. GROSSMAN:  No.  Both are
4     identical.
5         MR. GALLAGHER:  Do you have
6     a copy of the transcript to show him what
7     Doctor Harris actually said since that is
8     available?
9         MR. GROSSMAN:  I think we do.  I
10    think we do have a copy of it.
11        MR. GALLAGHER:  He shouldn't have
12    to rely on your representation of what
13    Doctor Harris said.
14        MR. GROSSMAN:  We're not going to
15    take time to do it now but --
16        MR. GALLAGHER:  If you can make
17    that available, that's the fairest thing to
18    the witness because I think you're
19    mischaracterizing Doctor Harris' testimony.
20        MR. GROSSMAN:  Let me hand you
21    this.  We're not going to take time out to
22    do it right now, but I'll show you the
23    portion.
24        MR. GALLAGHER:  Well, I don't think
25    he has to answer a question until he's seen

14 (Pages 378 to 381)

Page 382

1  it.
2      MR. GROSSMAN: Well, I'm going to
3  ask him another question.
4  Q. Doctor Hauser, let me show you what's been
5    marked for identification purposes as
6    Exhibit 15. It's an ad for Camel
7    cigarettes?
8      MR. GALLAGHER: Can you read that
9    copy, Doctor Hauser?
10 A. This is an ad with -- a little bit hard to
11   see -- it looks like P period -- I can't.
12   There's some pencil up here. It looks to be
13   a date of 6/1/67?
14 Q. Yes. This is an advertisement from 1967 for
15   Camel cigarettes.
16 A. And there's another date that appears to be
17   4/18/67. What do those mean?
18     MR. GALLAGHER: My copy is cut off.
19   I don't even have the full advertisement.
20 Q. Do you see under the -- that there are two
21   packages of Camels in this ad?
22     MR. GALLAGHER: Doctor Harris, let
23   me see your version. This is not a complete
24   copy. It is cut off.
25     MR. GROSSMAN: Your objection is

Page 383

1  noted.
2      MR. GALLAGHER: A significant
3  number of words on the right-hand side. It
4  is unclear what the full ad says. Go ahead.
5      MR. GROSSMAN: Your objection is
6  noted.
7      MR. GALLAGHER: Thank you.
8  Q. Doctor Hauser, do you see the two packages
9    of cigarettes?
10 A. There's a package of Camels and there's a
11   package of Camels that's a little bit cut
12   off on this ad.
13 Q. The one that just --
14 A. A different package, yes.
15 Q. The different package which is on the right
16   is an unfiltered cigarette, and the one on
17   the left is a filtered cigarette, is that
18   correct?
19 A. Yes.
20 Q. And underneath it says, "Regular or Filter.
21   Have a real smoke. Have a Camel."
22   Is that correct?
23 A. It says, "Regular or Filter," and then the
24   next line it says, Have a real smoke... have
25   a C-a-r.

Page 384

1  Q. Part of an M?
2  A. Part of an M.
3      MR. GALLAGHER: I have one more
4    question. Are you representing the date
5    written on here is the date when this ad
6    ran?
7      MR. GROSSMAN: It's my
8    understanding that that is the date when the
9    ad ran. This is from 1967.
10     MR. GALLAGHER: 1967 prior to the
11   introduction of light cigarettes.
12     MR. GROSSMAN: That's correct.
13 Q. Have you ever seen this ad before,
14   Doctor Hauser?
15 A. I've seen many, many ads throughout my life.
16   This ad -- if I accept your representation
17   as 1967 which is almost 40 years ago, I do
18   not recall whether or not I've seen this ad
19   40 years ago.
20 Q. Let me hand you what I've had marked for
21   identification purposes as Hauser
22   Exhibit 16. That's a Chesterfield ad. This
23   also is quite old. I don't know the date,
24   but I believe it's from the 1960's.
25 A. Okay, so you believe that this ad is from

Page 385

1  the 1960's, and I should accept that as a
2  predicate?
3  Q. Yes.
4  A. So should I write that on there?
5  Q. No, don't write that down there.
6  A. So I can write that down on my yellow sheet
7    of paper?
8  Q. If you want to, sure.
9  A. So we now have Chesterfield, assume 1960's.
10 Q. Doctor, this ad represents two unfiltered
11   cigarettes, one called king size and the
12   other a shorter pack. Do you see where it
13   says, "Chesterfield best for you?" And
14   above that --
15 A. Wait. Where?
16 Q. Lower right?
17 A. Oh, okay. "Chesterfield, best for you."
18 Q. Above that it says, "Chesterfield first with
19   premium quality in both regular and
20   king-size?"
21 A. Yes, I see that.
22 Q. And in that ad regular refers to the shorter
23   size unfiltered cigarette?
24 A. Okay. In this advertisement which I'm going
25   to have to accept as a predicate, is a true

15 (Pages 382 to 385)

Page 390

1  coupon.  Doctor Hauser, I've handed you
2  what's been marked for identification
3  purposes as Hauser Number 19.  This is a
4  store coupon from 1981.  If you look on the
5  second page it says, "Coupon expiration
6  date, December 31, 1981."  Do you see that?
7  A. I see this.  I'm sorry.  Where is the date
8  on this?
9  Q. Second page?
10 A. Second page.  December 31st, 1981.
11 Q. You see this is a coupon to save $1 on a
12 carton of Camel Lights, Camel Filters or
13 Camel Regulars?
14 A. I see where it says that, yes.
15 Q. It's your understanding, is it not, that
16 Camel regular is the unfiltered product?
17      MR. GALLAGHER:  Objection to the
18 form.
19 A. You're asking me to make an opinion here?  I
20 have not studied these nor have I talked to
21 how consumers would interpret those.
22 Q. Okay, I'd like to direct your attention --
23 A. This particular ad.  I'm not saying how
24 consumers would interpret this particular
25 ad.

Page 391

1  Q. You've not studied how consumers interpret
2  any cigarette ad, is that correct?
3  A. I have not done a systematic survey, study
4  of cigarette advertising.
5  Q. What's the number of this?  I'd like to
6  direct your attention, if I may, to
7  Exhibit Number 6.
8      MR. GALLAGHER:  Are you done with
9  the -- done with advertisements?
10      MR. GROSSMAN:  No, it's all going
11 to be together.
12      MR. GALLAGHER:  I want to keep them
13 out.
14 Q. Could you please look at Exhibit Number 6?
15 A. Which one is that?
16 Q. That is the FTC Tar, Nicotine and Carbon
17 Monoxide report issued in the year 2000.
18 A. Exhibit 5 or Exhibit 6?
19 Q. Let me see and I'll tell you.  Exhibit 5.
20 Yes, this was the one we substituted in.
21 Look at Exhibit 6.
22 A. Look at Exhibit 6?
23 Q. Yes.
24 A. Thank you.
25 Q. Doctor Hauser, I'd like to direct your

Page 392

1  attention, if I may, to in the upper
2  right-hand corner page six.
3  A. Upper right-hand corner of page six.
4  Q. Page six in the upper right-hand corner?
5  A. It's blank.
6      MR. GALLAGHER:  No, it's --
7  A. You mean the text?
8  Q. Do you see where it says page six up here?
9  No, go further.  The first eleven pages are
10 numbered at the bottom, and then there are
11 pages --
12 A. Pages numbered at the top, okay.  Okay, I
13 have it.
14 Q. Could you look with me at the Camel
15 cigarettes listed?
16 A. Yes.
17 Q. You see there are described a number of five
18 cigarettes that are 100's and then it has F?
19 Some are listed as light or menthol or ultra
20 light.  Do you see that?
21 A. I see basically a printout of a table here,
22 yes, and what was your question?
23 Q. Do you see that some of the Camels are
24 listed as 100's?
25 A. I see that in the second column of this

Page 393

1  table, Camels, there are one, two, three,
2  four, five of them listed as 100.
3  Q. Do you see that there are then a number
4  listed as king?
5  A. There are a number listed as king.  I agree
6  with that.
7  Q. Do you see there's then one listed as
8  regular?
9  A. Well, there's one listed in this taxonomy
10 with the terms, Reg.
11 Q. Yes.  That's the Camel non filtered?
12 A. Is that what NF means?
13 Q. Yes, it is.
14 A. I will accept your representation that NF
15 means non filtered.
16 Q. Could you look with me at page --
17 A. However, there are -- well, go ahead.
18 Q. Page 16.
19 A. Also at the top?
20 Q. At the top.  Toward the middle of the page
21 do you see the Lucky Strikes?
22 A. I see Lucky Strike.
23 Q. Do you see the first one is regular, listed
24 as regular non filtered?
25 A. I again see a table on page 16 here.  I see

17 (Pages 390 to 393)

Page 394

Lucky Strike in the first column. I see Reg in the second column.

Q. And beyond that there are Lucky Strikes listed as king, and those have filters?

A. I see the three other listed as Lucky Strike. They appear to have asterisks after them. I do not know what the asterisks mean. In the second column there's the word, king, and in the third column there is the letter, F.

Q. One more. Could you look with me at page 21 in the upper right-hand corner?

A. Oh, I'm on the page. Sorry.

Q. Do you see almost at the bottom there's -- there are a number of cigarettes called Pall Mall?

A. Yes, in the first column there are one, two, three, four, five, six, seven Pall Mall. Two of these have asterisks. I still do not know what the asterisks mean.

Q. The last one says, regular non filtered? Do you see that?

A. The last one in this taxonomy has Reg in the second column and has NF in the third column.

Page 395

Q. Doctor Hauser, have you undertaken any study to determine whether the term, regular, as it is used in cigarette advertising as it's used by the FTC or as it's used by cigarette companies, refers to 70-millimeter cigarettes most, but not all of which, are non filtered?

MR. GALLAGHER: Objection to the form. Lack of foundation.

A. I have not done a systematic study of the taxonomy used by the FTC nor am I providing an expert opinion in this case about cigarette advertising.

Q. As we sit here today you have made no study to determine whether smokers of cigarettes understand the term, regular, when it's applied to cigarettes, to mean short, unfiltered cigarettes, is that correct?

A. That is not correct.

Q. Have you ever asked any consumer what his or her understanding is of the term, Camel regular?

MR. GALLAGHER: Him, personally, or as part of a study, just to clarify?

MR. GROSSMAN: I'll break it down

Page 396

first.

Q. Have you ever asked any consumer what he or she understands by the term, Camel regular?

A. As part of this litigation I have not asked any consumer what he or she means by -- which was it again?

Q. Camel regular?

A. Camel regular, however, as you know there were qualitative interviews and pre-tests that were done by my team upon which I've been briefed.

Q. If consumers understand regular to refer to an unfiltered cigarette, as a hypothetical --

A. Okay, one more. Let me write it down. So now we have assume consumers regular equals what?

Q. Regular equals short, unfiltered cigarette.

A. Short. That's pure hypothetical because that's not the case, but go ahead.

Q. Doctor, if consumers understand -- as a predicate question -- your survey, in more than one place, asks consumers to compare the risks of what are referred to as light cigarettes and what are referred to as

Page 397

regular cigarettes, isn't that correct?

A. Yes. Those words are chosen within the context of the survey in the context of the questions that are being asked, and I'm confident that the pre-test and the qualitative interviews indicate that consumers understood the context of those words.

Q. Move to strike the latter part as unresponsive. Doctor Hauser, if consumers, and I understand that you believe otherwise, but if consumers understand the term, regular, to apply to unfiltered cigarettes, then the comparison that they were -- that they make in health risks of light cigarettes and so-called regular cigarettes would not be applicable to the comparison of their perception of the health risks of light cigarettes with full flavored filtered cigarettes, is that correct?

MR. GALLAGHER: Objection to the form.

A. Very complicated question which includes a hypothetical that I do not accept. Furthermore, we are talking -- you're making

Page 414

1    health risks was second most important for
2    an additional approximately 58 percent, so
3    the 58 plus the 18 is now getting into the,
4    you know, large majority of consumers for
5    which health risk is ranked either first or
6    second.
7  Q. For the typical consumer of light
8    cigarettes, health risks are the most
9    important factor -- let me -- I'll start the
10   question again. For the typical purchaser
11   of light cigarettes, health risks are not
12   the most important factor in choosing their
13   brand and type of cigarette.
14 A. Again, defining importance as the difference
15   between the maximum partworth for that
16   feature and the minimum partworths for that
17   feature. Again, just so we're making sure
18   of the technical definition here, then for
19   18.4 percent of the respondents, health risk
20   is the most important. It's the second most
21   important for approximately 58 percent and a
22   third of four for approximately 22 percent
23   so, you know, I'm answering the question
24   because I want to be as technically accurate
25   as possible to avoid any misinterpretation

Page 415

1    of the numbers.
2  Q. You've given opinions in other class actions
3    about predominance and typicality, correct?
4  A. Predominance and typicality, I understand,
5    are legal terms. I'm not providing a legal
6    opinion here. I am testifying as to the
7    veracity of the -- the reliability and
8    validity of the survey and I'm also
9    testifying to what the results of those mean
10   in terms of percentage of consumers who have
11   certain opinions. I leave it to counsel to
12   turn this into a legal filing.
13 Q. Given four factors and only four to consider
14   as to the choice of cigarettes, those
15   factors being box or pack, health risks,
16   price and perceived taste, the overwhelming
17   majority did not choose perceived health
18   risks as the most important factor in their
19   choice, correct?
20       MR. GALLAGHER: Objection. Asked
21   and answered.
22 A. Again, just so we have a technical statement
23   here and I really want to make clear this so
24   I can answer the question as accurately as
25   possible. Here importance is the difference

Page 416

1    between the maximum partworth for that
2    feature and the minimal partworth for that
3    feature. Having now made that definition so
4    I can be perfectly clear, I am quite happy
5    to say that -- not happy to say -- that's
6    not happy. I am accurately reporting that
7    18.4 percent of these consumers find health
8    risk to be the most important; therefore,
9    100 minus 18.4 which is 81.6 percent of the
10   consumers find one of the other four
11   features to be more important than health
12   risks.
13 Q. Doctor, in your survey before asking
14   consumers to make choices upon which
15   partworths were measured, you asked
16   consumers on a numerical scale to compare
17   the risks of light cigarettes with what you
18   referred to as regular cigarettes, is that
19   correct?
20 A. Okay, let's -- yes, there was a numerical
21   scale, but so that we can facilitate the
22   questioning, let's get to that exact
23   numerical scale in the survey. Okay, we're
24   talking about health risks?
25 Q. Yes.

Page 417

1  A. Yes. So this is page E19 of Exhibit 7.
2  Q. You asked respondents to rate what they
3    perceive to be the health risks of light
4    cigarettes compared to regular cigarettes on
5    a scale of zero to 150 and one to 150 where
6    100 equals the risk of a regular cigarette,
7    is that correct?
8  A. That's -- let me just make that technically
9    correct. It's a scale of zero to the top
10   point is 150 plus, and the respondents then
11   can enter a number between zero and
12   essentially anything they want, the high
13   end. I do not recall whether anybody
14   entered higher than 150, but yes, we did use
15   this scale.
16 Q. And your tabulation of the responses shows
17   that approximately 40 percent of all
18   respondents valued light cigarettes on that
19   scale as being 100 or higher, is that
20   correct?
21       MR. GALLAGHER: Objection to the
22   form.
23 A. Well, it depends what you mean by
24   approximately 40 percent, but the actual
25   numbers can be calculated. On this scale I

23 (Pages 414 to 417)

Page 418

1    believe it was about 38 percent, maybe a
2    little bit less, indicated 100, and then
3    there was a much smaller percentage that
4    indicated a number higher than 100, and this
5    was their perceptions at the time of the
6    survey which was in the spring of 2005.
7  Q. Doctor, just for clarity, over 38 percent of
8    all of the respondents value the health
9    risks --
10 A. Well, let's say over 37. That's what I do
11   remember.
12 Q. Over 37 percent of all the respondents wrote
13   the number 100. Isn't that correct? It's
14   37.16 percent wrote the number 100, isn't
15   that correct?
16 A. I really wish you would use positives in the
17   questions; it would be so much easier.
18   Would be done quicker.
19 Q. I'll rephrase the question. Over 37 percent
20   of the respondents to your survey wrote the
21   number 100 in the comparison of the risks of
22   light cigarettes and so-called regular
23   cigarettes, correct?
24 A. It is correct that at the time of the
25   survey, which was spring, 2005, and again

Page 419

1    I'm trying to remember the exact number. I
2    don't have it in front of me, but it is the
3    ball park of 37 percent of the respondents
4    answered -- wrote down 100 in this box.
5  Q. And another group comprising something over
6    one percent of the respondents, wrote
7    numbers over 100, correct?
8        MR. GALLAGHER: Objection to the
9    form.
10 A. At the time of the survey, which was spring
11   of 2005, there were a small percentage of
12   respondents, I do not recall whether it was
13   slightly over or slightly under one percent,
14   wrote a number higher than 100 in this box.
15 Q. So when asked directly, something over
16   38 percent of all the respondents viewed
17   light cigarettes as being as dangerous or
18   more dangerous than so-called regular
19   cigarettes, correct?
20 A. Well, what we're saying is that
21   approximately 60 percent, a little bit
22   under, a little bit more -- a little bit
23   more than 60 percent -- a little bit more
24   than 60 percent of the people viewed the
25   health risks of light cigarettes to be less

Page 420

1    than the health risks of regular cigarettes
2    at the time of the survey which is again
3    spring of 2005.
4        I do not know prior to the -- from
5    the conjoint analysis I do not know whether
6    they held different beliefs prior to that
7    survey.
8  Q. Fine, but more than 38 percent viewed light
9    cigarettes at the time of the survey as
10   being as dangerous or more dangerous than
11   so-called regular cigarettes, correct?
12 A. As I've indicated, slightly over 60 percent
13   which is 100 minus 38 or whatever, you can
14   do the arithmetic just as well as we can,
15   perceived light cigarettes as being less
16   unhealthy than regular cigarettes and, of
17   course, the complement of that, 100 minus
18   that number would perceive the opposite at
19   the time of the survey.
20       MR. GROSSMAN: Okay, we have to
21   change the tape. Why don't we take a
22   five-minute break? While you're changing
23   the tape, I want to stay on the written
24   record for one moment. Paul, the data that
25   you --

Page 421

1        MR. GALLAGHER: Ted, I really need
2    to use the restroom.
3        MR. GROSSMAN: Okay.
4        (Brief Recess.)
5  Q. Doctor Hauser, when we took the break you
6    had discussed a number of people who had
7    valued in your survey the health risks of
8    light cigarettes as being equal to or
9    greater than the health risks of so-called
10   regular cigarettes.
11       Notwithstanding that, under your
12   partworth analysis, you conclude that over
13   90 percent of light cigarette smokers
14   suffered economic damage because they valued
15   health risks of light cigarettes as higher
16   than the perceived -- let me -- I will start
17   that over.
18       Doctor, inasmuch as you found in
19   answers to direct question that more than
20   38 percent of all respondents valued the
21   health risks of light cigarettes as being
22   equal to or greater than the health risks of
23   regular cigarettes, your calculation of
24   damages excluded that group of over
25   38 percent as having no damages at all.

24 (Pages 418 to 421)

Page 422

1   Isn't that right?
2        MR. GALLAGHER: Objection to the
3   form.
4   A. I'm providing an expert opinion with respect
5   to the survey and the responses of the
6   survey. I have not yet been asked to
7   provide any economic assessment of the
8   damages.
9   Q. Well, for that person who did, Doctor
10  Harris, Doctor Harris was not provided with
11  the responses of the survey participants to
12  the question that asked them to value the
13  health risks of light cigarettes against the
14  health risks of regular cigarettes on a zero
15  to 150 plus scale, isn't that correct?
16  A. I am unaware of all of the documents that
17  Doctor Harris was or was not provided.
18  Q. Who made the decision as to which documents
19  Doctor Harris would be provided with?
20  A. Are you asking me to speculate?
21  Q. I'm asking you if you know.
22       MR. GALLAGHER: Don't speculate.
23  If you know, Doctor.
24  Q. I'm asking you if you know who made that
25  decision?

Page 423

1   A. I do not know what documents Doctor Harris
2   requested, nor do I know what documents he's
3   been provided.
4   Q. Who transmitted the documents to Doctor
5   Harris to the best of your knowledge?
6        MR. GALLAGHER: Objection to the
7   form.
8   A. Which documents are you referring to?
9   Q. Any documents relating to your partworth
10  study to your questionnaire.
11       MR. GALLAGHER: Objection to the
12  form.
13  A. I do not know who transmitted the
14  information to Harris with respect to the
15  conjoint analysis study other than what he
16  asked me directly, so I don't want to
17  speculate as to who would have provided that
18  information.
19  Q. Now in your opinion you say that for 90.1 of
20  the -- page 22.
21  A. Exhibit?
22  Q. Exhibit Number 1, page 22.
23  A. Page 22.
24  Q. You say in the beginning of the end of the
25  third line --

Page 424

1   A. Third line on page 22.
2   Q. "For 90.1 percent of the 627 respondents,
3   this difference was positive, indicating
4   that, given the choices made by respondents
5   who answered the survey, the best estimate
6   of their importance for health risks is
7   positive." Correct?
8   A. That's what this report says and that's my
9   opinion.
10  Q. Your opinion is that approximately
11  90 percent of light smokers view health
12  risks -- let me rephrase that question.
13  It's your opinion that approximately
14  90.1 percent of smokers of light cigarettes,
15  if given a choice between two identical
16  cigarettes, except for health risks, would
17  prefer the cigarette that was safer,
18  correct?
19  A. What this says is that for -- my best
20  estimate is that 90.1 percent of the
21  respondents, if given the choice between two
22  otherwise totally identical cigarettes, one
23  of which had less health risk and the other
24  of which had more health risk, then they
25  would value that choice and choose the one

Page 425

1   with less health risk.
2        Now there's the other ten percent.
3   I can't recall which of those would go the
4   other way or which of those just would be
5   indifferent.
6   Q. Why would anyone presented with two
7   otherwise identical cigarettes not prefer
8   the safer cigarette?
9        MR. GALLAGHER: Objection to the
10  form.
11  A. Well, there were a few people in here --
12  it's a very small number -- which might be
13  considered error and we indicated there's
14  always going to be a few of those within any
15  survey, and that's why we have to deal with
16  the vast majority of these, and it might
17  also be that there are other reasons that I
18  would just have to speculate upon, but with
19  the quantitative number per se is that we
20  came up with a very, very small number who
21  appeared to be placing positive or negative
22  value on health risk, very small number
23  which could be within surveyor.
24  Q. In so doing those people were not comparing
25  the perception of health risks of light

25 (Pages 422 to 425)

Page 426

1  cigarettes as they're marketed and regular
2  cigarettes so-called as they're marketed
3  which was asked in a different question on
4  your questionnaire, but rather were
5  evaluating whether they gave any value to
6  health risks at all, is that correct?
7       MR. GALLAGHER: Objection to the
8  form.
9  A. Well, you put in a predicate there that
10 wasn't quite technically accurate. Now if
11 you can re-ask the question either without
12 that predicate or --
13 Q. Which predicate are you preferring to?
14 A. Well, the predicate that says as marketed,
15 and that just didn't feel right, and I found
16 the question a little bit confusing in the
17 way you asked it, so I want to be very
18 careful when I answer the question that I
19 want to answer a well-phrased question that
20 I understand.
21 Q. In your questionnaire you asked respondents
22 to compare hypothetical cigarettes, not
23 cigarettes that are actually marketed,
24 correct?
25      MR. GALLAGHER: Objection to the

Page 427

1  form.
2  A. The conjoint analysis task describes
3  cigarettes as profiles. Some of these are
4  hypothetical cigarettes. Some of those that
5  responded may recognize as their existing
6  brand, but we are predicated upon the
7  cigarette they're smoking, and then we do
8  vary these four characteristics as I've
9  testified at great length yesterday and
10 today.
11 Q. And in that regard you -- even for people
12 who viewed light cigarettes as being just as
13 risky as so-called regular cigarettes, even
14 such people might prefer a healthier
15 cigarette if they didn't have to give up
16 anything in taste or price or package, is
17 that correct?
18      MR. GALLAGHER: Objection to the
19 form.
20 A. Well, I think what we're finding is that for
21 approximately 90 percent of the people, if
22 they could get better health or less health
23 risk, if they could get less health risks
24 then they would be willing to give up some
25 things to get that, and that's what we're

Page 428

1  saying. Might be taste, might be price,
2  might be pack size, but basically 90 percent
3  of the people have positive value,
4  significant positive -- well, I'm sorry, in
5  this case it's just positive value. They
6  have positive value on health.
7  Q. And that positive value is not the positive
8  value that they perceived to be the
9  difference between the cigarettes that they
10 actually smoke and regular cigarettes as
11 marketed in the marketplace, is that
12 correct?
13      MR. GALLAGHER: Objection to the
14 form.
15 A. That's not correct.
16 Q. Okay. Let me rephrase the question.
17 Included within that 90 percent are people
18 who, in fact, view light cigarettes to be at
19 least as dangerous as regular cigarettes.
20      MR. GALLAGHER: Objection to the
21 form.
22 A. Respondents in the survey answered that they
23 perceived, at the time of the survey, and
24 we've gone over these percentages before,
25 but a certain number of these people and we

Page 429

1  can go back and take a look at those
2  percentages, if need be, at the time of the
3  survey perceived that the health risks of
4  light cigarettes are the same as to health
5  risks of regular cigarettes, and so some of
6  those people would be included within the
7  90 percent who, when faced with a choice of
8  a cigarette that was, say, less unhealthy,
9  would, in fact, be willing to choose -- not
10 only choose the less unhealthy cigarette,
11 but they would be willing to give up other
12 aspects, compensatory attribute to get that
13 better health risk as they perceive it.
14 Q. Doctor, we've gone over the four factors
15 that were measured. One of the factors that
16 was not measured -- one factor that was not
17 measured was brand, correct?
18 A. We've gone over this again and again and
19 again.
20 Q. That's it.
21 A. And as I've indicated, consumers were to
22 consider the brand they were currently using
23 and light cigarette they were currently
24 smoking.
25 Q. There is no where in your study where you

Page 446

1  it was asked, so I cannot make an opinion on
2  whether the question was asked correctly,
3  whether it was two-sided or any other
4  appropriate things, so as a result I cannot
5  provide an opinion with respect to this
6  question.
7      MR. GROSSMAN: Mark this as 21.
8      (Poll Releases marked
9       Exhibit Number 21.)
10 Q. Doctor Hauser --
11     MR. GALLAGHER: Let's make this the
12 last exhibit before lunch, please.
13 Q. Doctor Hauser, I hand you what's marked for
14 purposes of identification Hauser Exhibit 21
15 which is a release of the Gallup Poll,
16 November 18, 1999, and I would like to
17 direct your attention, if I may, to the
18 third page where Gallup gives historic
19 results on the question, "All things
20 considered, would you like to give up
21 smoking or not?"
22     MR. GALLAGHER: Have you had an
23 opportunity to take a look at the document,
24 Doctor Hauser?
25     THE WITNESS: No, I have not and I

Page 447

1  don't know if I'm going to be able to do
2  this before one o'clock.
3      MR. GALLAGHER: Well, go ahead and
4  ask your question.
5  Q. Okay, I'll ask the question. We'll see.
6  Have you made any study of public polling to
7  determine the extent to which smokers
8  indicate an interest in stopping smoking?
9      MR. GALLAGHER: Again, I object to
10 the form.
11 A. I have indicated many times I am not
12 providing an expert opinion in this case
13 with respect to smoking cessation.
14 Q. Beyond that have you made any effort to
15 compare the results of your questionnaire
16 with any public poll that has ever been
17 conducted and published to determine whether
18 your responses to the questionnaire are
19 within the same range as those determined by
20 public polls that were commissioned for
21 purposes other than litigation?
22     MR. GALLAGHER: Objection to the
23 form.
24 A. Well, let me first say that as you have
25 indicated there are no questions on my

Page 448

1  survey with respect to smoking cessation
2  other than as we've so testified. You've
3  now shown me a Gallup poll which I have not
4  had a chance to study the methodology on.
5  You have also shown me some data from
6  Greenfield also which I have not had the
7  chance to study methodology on, so these two
8  may or may not be consistent, and I have no
9  opinion on that until I have a chance to
10 study this and I also, which I think is the
11 final part of your question, I have not
12 provided an expert opinion with regard to
13 smoking cessation in this case, and I have
14 not undertaken any studies with respect to
15 smoking cessation that I can recall.
16 Q. And you're not offering any opinion with
17 regard to the number of smokers of light
18 cigarettes who continued to smoke in
19 reliance on the health characteristics of
20 low tar cigarettes, correct?
21 A. I'm sorry. I really must apologize here. I
22 just wanted to take a quick look at these
23 documents that you put in front of me, so
24 I -- go ahead.
25     MR. GALLAGHER: Listen to his

Page 449

1  question.
2  A. Listen to your question so if you could
3  please re-ask it.
4  Q. You're offering no opinion --
5  A. And --
6  Q. I'll start it again. You were offering no
7  opinion as to the number of smokers of light
8  cigarettes who continued to smoke in
9  reliance on the health characteristics of
10 low tar or other light cigarettes, correct?
11     MR. GALLAGHER: Objection to the
12 form to the extent that it calls for a legal
13 conclusion. Go ahead, Doctor Hauser.
14 A. I have not completed a study in this case
15 nor have I begun a study in this case of
16 smoking cessation.
17 Q. And your conjoint analysis does not purport
18 to measure out-of-pocket expenses or
19 out-of-pocket damages that may have been
20 suffered by light cigarette smokers, is that
21 correct?
22     MR. GALLAGHER: Objection to the
23 form. Again, legal conclusions. Go ahead,
24 Doctor Hauser.
25 A. As I've indicated, I am testifying as an

Page 454

1  Stanford, whether it was students or whether
2  it was faculty members, and as far as I can
3  tell they do not provide explicit reference
4  to the study, and the contact person is the
5  vice president of marketing communications
6  at Knowledge Networks.
7  Q. If you look on the last page they say the
8  source of their information in the box is
9  "Comparing the results of probability and
10  non-probability sample surveys presented at
11  the 2005 AAPOR conference."
12  A. So in other words what they're referencing
13  is a verbal presentation which we have no
14  way of verifying, and they do not indicate
15  either who made that presentation or whether
16  or not a Knowledge Networks person was a
17  coauthor of that presentation, and curiously
18  they do not indicate any of the marketing
19  faculty at Stanford having been involved.
20  Q. Prior to your engagement of Greenfield
21  Online to compile the panel that was used in
22  this case, did you make -- did you undertake
23  any research to compare the validity of the
24  samples aggregated by Greenfield with the
25  validity of samples aggregated by Knowledge

Page 455

1  Networks, GoZing, Harris Online, SSI or
2  Survey Direct?
3  A. Would you please clarify what you mean by
4  aggregated?
5  Q. Greenfield presented you with a panel among
6  whom your survey was taken. Is that
7  correct?
8  A. Greenfield presented us with a potential set
9  of respondents from whom we sampled with
10  stratification to 72 different categories.
11  Now I note that there's absolutely nothing
12  in this document that you've given to me
13  that deals at all with stratification or
14  with the fact that such stratification will,
15  in fact, enhance to the representativeness
16  of the survey, so what you've presented me
17  with is an analysis of alternative
18  methodologies on the raw sample without
19  these various stratifications.
20  Q. Some Online service providers develop their
21  panels through sampling and others through
22  volunteering, correct?
23  A. Well, what I do know is that originally
24  Knowledge Networks had an attempt that they
25  were going to use RDD sampling, random

Page 456

1  digitiling, which we defined yesterday and
2  based upon that they were then going to
3  provide their samplests with web TV as a
4  means of answering internet panels.
5  Now I do know from the people that
6  I once knew at Knowledge Networks they just
7  weren't able to make that work, and they
8  started losing a lot of business because
9  basically the market research industry was
10  not convinced of the adequacy of the
11  Knowledge Networks panel.
12  Now I have not tracked Knowledge
13  Network since then, so I do not know if
14  Knowledge Networks has, in fact, recovered
15  from the trouble that they were in at that
16  time, and that was back in oh, I think it
17  was about 2001, 2002 when they had a major
18  defection of the head of -- basically the
19  chief scientist and the head of R and D
20  defected from Knowledge Networks because
21  they were uncomfortable with this, and I do
22  not know whether or not this is in response
23  to some of the problems that Knowledge
24  Networks was having.
25  Q. I'm not asking for a testimonial on behalf

Page 457

1  of Knowledge Networks. I'm just asking
2  whether some internet-based companies --
3  internet research providers obtained their
4  panels based upon sampling and others
5  obtained their panels based upon volunteers?
6  A. What I do know is that prior to
7  approximately 2001 Knowledge Networks had a
8  plan to obtain their sample -- their
9  internet sample from random digit dialing.
10  I do not know if that continues today. This
11  sort of seems -- this document, which is a
12  press release, seems to imply that they
13  continue that today, so I do not know if
14  Knowledge Networks has been able -- has
15  found a way in which to make that work.
16  Q. Okay. Greenfield Online obtains its panels
17  through volunteers, is that correct?
18  A. Greenfield Online is primarily an opt in
19  panel as has been appropriate in terms of
20  the change in basically the way surveys are
21  done over the last five or six years with
22  the -- basically opt in being one of the
23  best way to get panels.
24  Q. Every person who participated in your survey
25  online had volunteered to participate in

33 (Pages 454 to 457)

Page 458

1  Greenfield Online surveys, is that correct?
2  A. Every survey that's done, the respondent is
3     presented with an option, and that option
4     could be to complete that survey or not
5     complete the survey, so if the person, in
6     fact, has completed the survey that we ask
7     them to complete, then I guess you can say
8     that that's volunteering, but we took again
9     the methodology which you seem to be
10    slightly mischaracterizing is we randomly
11    sample for Greenfield. We then did a
12    stratification. We then invited people. We
13    sought these people out, and we invited them
14    to complete our survey, so it's not fully
15    volunteering.
16 Q. Doctor Hauser, the way these people were
17    chosen by Greenfield Online in the first
18    place was that these people volunteered to
19    participate not only in one survey, but in a
20    series of surveys for Greenfield Online,
21    isn't that correct?
22         MR. GALLAGHER: Objection to the
23    form. Asked and answered.
24 A. You know, you're using the word, volunteer,
25    here. Now volunteer, if you'd like to

Page 459

1  define what you mean, do you mean the
2  procedure by which Greenfield used? Now
3  it's not that these people are saying Gee, I
4  want to take your surveys, and they're not
5  coming out of the blue.
6       Greenfield is doing a various set
7  of things, set of activities to recruit
8  people to join their panels and everyone is
9  given the option of being in that panel, and
10 that same thing is true with Knowledge
11 Networks.
12      They just use a different way of
13 recruiting people to join their networks
14 also Knowledge Network panels, they have the
15 option to join or not join.
16 Q. How does Greenfield review its panel?
17 A. Greenfield, to the best of my recollection,
18    and I did review this, but again we don't
19    want to rely entirely on my recollection is
20    they use a whole series of methods. Some of
21    these include internet invitations, and I
22    can't remember all of the other means. It's
23    described and I think it's in the documents
24    you may have been given if we had those. I
25    don't remember if we had them. I certainly

Page 460

1  reviewed it online which describes just a
2  variety of methods that Greenfield uses.
3       Now once we have that I felt
4  necessity to do a stratified sampling to
5  bring it back in line with demographic
6  variables, and from my experience I know
7  such stratification has a very high
8  probability of bringing things back in line
9  to be representative.
10 Q. And every person who was included in your
11    627 respondents was paid by Greenfield
12    Online for participating in the survey,
13    isn't that correct?
14 A. As I have indicated in my survey, we gave
15    people incentives. They were offered $5 to
16    complete the survey, and basically these
17    incentives are just incentives to complete
18    the survey, and I found that there's no bias
19    from past experience with using incentives.
20    Some surveys will go quite a bit more
21    than $5.
22 Q. There was also, in addition to $5 payment,
23    to every person there was also a sweepstakes
24    in which participants could obtain something
25    more valuable than $5, is that correct?

Page 461

1  A. Yes, there was a sweepstakes, although the
2     suspected value of that sweepstakes is, to
3     the best of my knowledge, less than $5.
4  Q. Doctor, let me hand you what I'll have
5     marked for identification as Exhibit 23.
6         (Screening Statistics
7          marked Exhibit Number 23.)
8  Q. Doctor, here is Exhibit 23. Marked for
9     identification purposes. It's a copy of
10    your Screening Statistics.
11         MR. GALLAGHER: Exhibit F.
12         MR. GROSSMAN: Exhibit F. I'm
13    sorry. Correct.
14 Q. You indicate on this that Greenfield Online
15    sent out 52,402 invitations and that 44,159
16    people did not respond to the invitation?
17 A. Yes.
18 Q. Now in Exhibit 22 which was the press
19    release by Knowledge Networks on the last
20    page they show a cooperation rate among
21    research vendors.
22 A. Yes.
23 Q. And they suggest that 73 percent of the
24    people who they contact agree to participate
25    in their surveys?

34 (Pages 458 to 461)

Page 466

1   respect to Greenfield.
2   Q. I'd like to direct your attention to two
3      paragraphs. First, on page three do you see
4      where it says incentives?
5   A. Yes.
6   Q. Just below that there's a line that begins
7      optimizing response rates?
8   A. Optimizing response rates.
9   Q. Okay. I'll read it. "Optimizing response
10     rates, retention and panel depth requires a
11     certain level of engagement that goes beyond
12     cash rewards. Thus our help desk staff adds
13     value to our relationship. We make sure our
14     panelists receive enough survey
15     opportunities to stay engaged, but at the
16     same time our guidelines manage exposure to
17     surveys and remove panel members from the
18     pool for a specified time after every
19     completed survey. This discourages
20     so-called professional survey takers from
21     unfairly weighting the sample." Do you see
22     that?
23  A. I see what you've read into the record, yes.
24  Q. Are you familiar with the term, professional
25     survey takers?

Page 467

1   A. I've heard it used before, but this appears
2      to be Greenfield's statement.
3   Q. Greenfield is --
4   A. However, there is no indication and
5      certainly something we can look at as to
6      whether a professional survey taker would be
7      at all different with respect to the
8      variables of interest relative to anybody
9      else.
10  Q. We were provided with a calculation that I
11     gather you did to determine whether people
12     who might be characterized as professional
13     survey takers answered the questions on this
14     survey differently than people who had taken
15     fewer than 30 surveys. Are you familiar
16     with that calculation? Do you recall having
17     made that calculation?
18  A. Well, you've put a predicate in that, and I
19     don't accept a predicate.
20  Q. Did you make a calculation comparing the
21     responses of people who had completed more
22     than 30 surveys with Greenfield and those
23     who had completed fewer than 30 surveys?
24  A. Yes, I have completed a series of
25     calculations to compare people who answered

Page 468

1   more than 30 surveys with those who
2   completed less than 30 surveys.
3   Q. When did you undertake to make those
4      calculations?
5   A. I undertook to make those calculations
6      within the last week or so.
7   Q. Okay. So at the time the survey was
8      conducted in June, 2005, you made no effort
9      to determine whether any of the people
10     taking the survey could be characterized
11     as professional survey takers, is that
12     correct?
13         MR. GALLAGHER: Objection to the
14     form.
15  A. You've now introduced a term, professional
16     survey takers, but --
17  Q. I'll rephrase the question. In June of 2005
18     you made no effort to determine how many
19     people in the panel offered by Greenfield
20     had, in fact, taken more than 30 surveys
21     with Greenfield, is that correct?
22  A. At the time I did the survey that
23     information was not available to me. After
24     that information became available to me I
25     immediately did the calculations.

Page 469

1   Q. When did that information become available
2      to you?
3   A. That information became available to me
4      relatively recently.
5   Q. How did that information become available to
6      you?
7   A. I was looking through the documents that you
8      had been provided and saw compilation,
9      something -- I don't know. I think it might
10     have been this which is Exhibit 20.
11  Q. Yes.
12  A. And I looked at that and I said, Well, we
13     have one variable; let's at least check to
14     see if that variable affects anything.
15  Q. In fact, when you say materials that I had
16     been provided, you're referring to the
17     materials that AMS had provided to
18     defendants in this case, is that correct?
19  A. These are materials that AMS had provided.
20  Q. These are materials -- how long did AMS have
21     these materials? When did AMS receive these
22     materials?
23  A. I do not know how long AMS had these
24     materials.
25  Q. And why did you undertake to -- why did you

36 (Pages 466 to 469)

Page 474

1  Q. Among the survey respondents, the median was
2     31 completed surveys and the mean was 73, is
3     that correct?
4  A. I recall that the median was approximately
5     30. I do not recall the mean. Now the mean
6     is not a robust statistic and it could be
7     led by -- it could be driven by one or two
8     people with very high numbers. The more
9     robust and more appropriate statistic is the
10    median.
11 Q. Well, almost 51 percent of the respondents
12    had completed more than 30 surveys, is that
13    correct?
14 A. By the way, you're saying completed 30
15    surveys. Within what period of time?
16 Q. We don't know. Do you know during what
17    period of time the surveys were completed
18    within?
19 A. My understanding, and I can't remember the
20    answer to this. I probably should have
21    written it down, but it's the number of
22    surveys since joining the panel and, for
23    example, if we look at this respondent
24    103898, joined the panel in the beginning of
25    1999, so that person would have been in the

Page 475

1     panel '99, 2000, one, two, three, four,
2     five -- this is his eighth year on the
3     panel, so that says that that person is
4     taking eight years times 12 months, so less
5     than one survey a month.
6  Q. Isn't one of Greenfield's guides that people
7     will not stay on the panel for more than two
8     years?
9  A. I don't recall that.
10 Q. You haven't studied that?
11 A. That's a misstatement. I said I do not
12    recall it. I did not say I haven't studied
13    that.
14 Q. Doctor, high quality online service
15    companies engaged in market research, survey
16    research, make efforts to avoid the
17    so-called dreaded survey professional survey
18    taker, is that correct?
19    MR. GALLAGHER: Objection.
20 A. That's something that you have just read
21    from this into the record. I, you know,
22    this is a statement that are made in sales
23    materials. I made a judgment that I felt
24    that from Greenfield we could do a
25    subselection of that -- of the panelists. I

Page 476

1     then -- when it came to light that there
2     were panelists who had taken a number of
3     surveys, I did median split analysis to
4     determine whether or not that changes my
5     opinions, and as you know from looking at it
6     there is a slight change in the opinions,
7     and I'm quite happy to provide that.
8  Q. Doctor, let me --
9  A. Do you wish me to?
10 Q. Not at this time. I plan to go back to it
11    when I have an opportunity, but I'm running
12    out of time. Doctor, let me just address
13    one more thing, and then I'm going to hand
14    this over to Murray Garnick and I'll make a
15    statement before I do.
16        In earlier testimony you clarified
17    you made no effort to study the
18    communications between cigarette companies
19    and smokers of light cigarettes. Do you
20    recall that?
21 A. I have paid no -- providing no expert
22    opinion on the advertising of cigarette.
23 Q. And you're providing no expert opinion on
24    the sources of information that consumers
25    relied upon in choosing light cigarettes, is

Page 477

1     that correct?
2        MR. GALLAGHER: Objection. Asked
3     and answered.
4  A. I've answered that before, but I am not
5     providing an expert opinion with respect to
6     the source of information that consumers
7     used when they made their decision to
8     initially begin smoking light cigarettes.
9  Q. Okay. And you're offering no expert
10    testimony, offering no expert opinion on the
11    percentage of light smokers who purchased
12    light cigarettes in reliance on anything
13    ever said by cigarette companies, is that
14    correct?
15 A. That is not correct.
16        MR. GALLAGHER: Objection to form.
17    Asked and answered.
18        MR. GROSSMAN: I have a great deal
19    more questions to ask. I have a great deal
20    more ground to cover. I've covered about
21    roughly half of my outline. As I've noted
22    throughout, I've found the answers to be
23    non-responsive and long and I will be
24    needing more time to complete this, but in
25    deference to my colleagues I'm going to turn

Page 482

1  your expert report from last August. Let me
2  ask you to turn to paragraph ten. In
3  paragraph ten you conclude that "Health
4  risks are a positive contributing factor in
5  the choice of light cigarettes for 90.1
6  percent of light cigarette consumers." Do
7  you see that?
8  A. Just a second. I'm changing my glasses.
9  Okay, page ten. What paragraph again?
10 Q. Paragraph ten?
11 A. Paragraph ten.
12 Q. Paragraph ten.
13 A. I'm sorry. I'm on page ten.
14 Q. Page five, paragraph ten, and in that
15 paragraph you state that you conclude that
16 "Health risks are a positive contributing
17 factor in the choice of light cigarettes for
18 90.1 percent of light cigarette consumers."
19 Do you see that?
20 A. Yes, I see that.
21 Q. What do you mean by "positive contributing
22 factor?"
23 A. What I mean by positive contributing factor
24 is if consumers are given the choice between
25 cigarettes that vary in price and vary in

Page 483

1  health risk and possibly taste and pack
2  size, that the coefficient partworth of
3  health risk will be positive, that is a
4  compensatory attribute and trading off
5  health risk versus those other attributes.
6  Q. Now do you mean by that that -- have you
7  determined that 90 percent of light
8  cigarette smokers -- strike that. New
9  question. Does that 90.1 percent mean --
10 that figure that you have in paragraph ten,
11 does that mean that 90 percent or
12 90.1 percent of light cigarette smokers
13 would not have purchased light cigarettes if
14 they had perceived the risks of lights to be
15 the same as the risks of regular cigarettes?
16     MR. GALLAGHER: Objection.
17 A. That's -- you've basically changed a context
18 here and you've essentially changed from
19 preferences to perceptions, and without
20 further details on your question, I can't
21 answer that, so if you provide me with more
22 details I can answer your question.
23 Q. Like what details?
24 A. Well, restate the question and I'll give you
25 those details.

Page 484

1  Q. Well, would it be correct for me to conclude
2  from your statement here on paragraph ten
3  that you've determined that 90 percent of
4  light cigarette consumers would not have
5  purchased lights if they had perceived
6  lights to have the same health risks as
7  regular cigarettes?
8  A. No. There's other things that can go into
9  that.
10 Q. What are those other things?
11 A. Well, there's other attributes to be
12 measured and whether or not they're
13 sufficiently different.
14 Q. For example, what are those other attributes
15 that have to be measured?
16 A. Taste, pack size.
17 Q. Now why do I have to --
18 A. Price.
19     MR. GALLAGHER: He's not done. Go
20 ahead. Taste, pack size and --
21 A. Taste, pack size and price.
22 Q. Why would I have to measure taste to
23 determine whether 90 percent or 90.1 percent
24 of light cigarette smokers would not have
25 purchased light cigarettes if they had

Page 485

1  perceived lights to have the same risks as
2  regular cigarettes?
3      MR. GALLAGHER: Objection to form.
4  A. Well, as I mentioned before the conjoint
5  analysis to which you're referring to this
6  90 percent comes from is an analysis of
7  these four attributes, and you're taking
8  just one of those attributes.
9      I've indicated that there are other
10 things that can compensate for health risk
11 so if you give me two completely specified
12 profiles, then I can give you an answer to
13 that question, and you're only giving me --
14 you're only specifying one attribute in that
15 profile.
16 Q. How do you determine the percentage of light
17 cigarette smokers who would not have
18 purchased light cigarettes if they had
19 perceived lights to have the same risks as
20 regular cigarettes?
21     MR. GALLAGHER: Objection to the
22 form.
23 A. The data that I have coupled with other data
24 can be used by other experts such as Doctor
25 Harris should he choose to do so to answer

40 (Pages 482 to 485)

Page 486

1  questions such as that.
2  Q. Have you answered that question?
3  A. I am not providing a damages opinion in this
4     case. I can talk about what the data means
5     from the survey, and I can give you
6     interpretations of that data, and that's
7     what I'm here to do today.
8  Q. I'm not sure, just as background, what is a
9     damage question and what is not, so let me
10    ask again the actual question of whether you
11    have done an estimate, done a calculation on
12    the percentage of light cigarette smokers
13    who would not have purchased lights if they
14    had perceived the risks of lights to be the
15    same as the risks of regular cigarettes?
16         MR. GALLAGHER: Objection. Asked
17    and answered.
18 A. I have provided a market simulation in this
19    paper -- I'm sorry -- expert report and
20    that's the market simulation upon which I'm
21    providing an expert opinion. In doing that
22    I seem to recall we may have done a little
23    bit of sensitivity analysis. I don't recall
24    all of those, but beyond that I've not done
25    a lot of market simulations, particularly

Page 487

1  using price and tastes and other data from
2  the marketplace as it exists, and those
3  market simulations would be what would be
4  required to answer the question that you're
5  posing which is an incomplete question with
6  respect to the conjoint analysis.
7  Q. Have you offered an opinion as to a specific
8     percentage of light cigarette smokers who
9     would not have purchased light cigarettes if
10    they had perceived the risks of lights to be
11    the same as regular cigarettes?
12 A. I have -- data that I've provided can be
13    used to run that analysis with other data.
14    I have not particularly run that analysis
15    yet; however, should I be provided that
16    data, I certainly would be able to run those
17    analysis.
18 Q. Have you been asked in this case to estimate
19    what the market price would be if lights had
20    always been perceived by consumers to be
21    just as risky as regular cigarettes?
22         MR. GALLAGHER: Objection to the
23    form.
24 A. In order to determine the market price, I
25    presume that an economic expert would do a

Page 488

1  market -- full market equilibrium analysis.
2  I have not done a full market equilibrium
3  analysis in this case although the data that
4  I provided may be used in such analysis.
5  Q. Can I ask you to turn to page 16 of your
6     expert report, footnote 21. Would it be a
7     correct interpretation of this footnote to
8     conclude from it that you found that --
9  A. Might be simpler if I read it first and then
10    listen to your question.
11 Q. Fine, please.
12         MR. GALLAGHER: Footnote 21?
13         MR. GARNICK: Footnote 21.
14         MR. GALLAGHER: Okay, thanks.
15 A. Okay, now you can ask the question. I just
16    wanted to make sure which ways the numbers
17    are going and things like that. Yes.
18 Q. On average were the partworths greater for
19    soft pack or hard pack?
20 A. Like to look at the exhibit to be sure, but
21    based upon this footnote it appears that it
22    was higher for soft pack versus hard pack.
23 Q. Do you know whether, in the market, the
24    majority of light cigarette smokers prefer
25    soft pack or hard pack?

Page 489

1  A. This is indicative of preference not
2     conditioned upon all the other attributes.
3  Q. I'm sorry. Was that a yes, you know, or no,
4     you don't know?
5  A. Well, this is indicative of the fact that on
6     average the partworth of soft pack is higher
7     than the partworth of hard pack.
8  Q. Do you know whether, in the real market, the
9     majority of light cigarette smokers prefer
10    hard pack or soft pack?
11 A. I don't want to pick on bones, but what do
12    you mean by prefer? Do you mean that all
13    else equal, do they prefer soft versus hard
14    pack?
15 Q. Right.
16 A. This would be indicating that all else
17    equal, it's soft. On average the partworth
18    is bigger. Now this is the average
19    partworth is bigger. Does not say that the
20    majority of people prefer soft versus hard
21    pack, and we've gone through that before,
22    the difference between averages and numbers
23    of people. Median is reflective of numbers
24    of people. Average is just averaging the
25    part where it's overall people. Now from

Page 502

1    the case. Again, there were percentages and
2    we looked at the percentages, but I can't
3    remember all the details. Now I think if
4    you'd like we can go to the actual
5    description of that calculation which is in
6    the report.
7  Q. Well, I'm satisfied with your answer unless
8    you feel you need to go through it. Let me
9    just ask another question.
10 A. Let me just make sure I answered it
11   correctly. I think we had it on page 22 or
12   something? It's getting late in the day and
13   I want to make sure I answer -- positive
14   value on health risk. I can't find it in
15   the report, but as I recall importances were
16   basically the difference between the maximum
17   and the min. We've gone over that earlier
18   in the deposition.
19 Q. Okay. Now if I wanted to know for what
20   percentage of light cigarette smokers, the
21   difference or the net of value of
22   partworths -- strike that. If I wanted to
23   compare not the greatest -- if I wanted to
24   compare not the extremes of partworth, that
25   is, greater than regulars and less than

Page 503

1    ultras -- if I just wanted to compare the
2    partworths attached to the risks of light
3    and the risks of regulars, how would I do
4    that?
5  A. Well, okay, first is the partworths as they
6    perceive it.
7  Q. Right.
8  A. So the partworths of their perceptions of
9    light versus the partworths of, say, their
10   perceptions of ultra lights. If you want to
11   compare lights versus ultra lights.
12 Q. How about lights versus regulars?
13 A. So you'd like to compare lights versus
14   regulars, so we'd like to compare lights
15   versus regulars for each and every
16   respondent recognizing that for some of the
17   people they perceive that the health risks
18   of lights are less than regulars and some of
19   the people, as you've indicated, may have a
20   different perception.
21       We have provided -- I'm pretty sure
22   in the documents, the posterior means, for
23   every respondent on all these partworths.
24 Q. So they can be calculated?
25 A. Yes. They can be calculated.

Page 504

1  Q. Is the 90.1 percent, that doesn't represent
2    the people who have a positive partworth
3    comparing the partworths for health for
4    light cigarettes and the partworth for
5    health for regular cigarettes, correct?
6  A. What the 90.1 percent -- it says
7    90.1 percent of the people care about health
8    and are willing to trade off health risks
9    versus other aspects in the marketplace. So
10   over this range they have a positive
11   valuation of health, and the range, I'm very
12   comfortable with the differences there.
13 Q. So the 90.1 percent is not the percentage of
14   light smokers who perceive that lights are
15   less unhealthy than regulars, correct?
16 A. That's a different number that we've spoken
17   about before.
18 Q. Okay.
19 A. This 90.1 percent is the people that place a
20   positive value on health and are willing to
21   trade off health versus other aspects.
22 Q. Now you talk about ranking the attributes in
23   your expert report, correct?
24 A. Yes.
25 Q. And in ranking the attributes, you look at

Page 505

1    the differences between partworths between
2    two extremes, is that fair to say?
3  A. Yes, and that's so -- I think we've gone
4    over that before, and that was the paragraph
5    I was trying to find. If someone can help
6    me find that paragraph, we can be very exact
7    as to the definitions.
8  Q. Now if we wanted to rank the attributes only
9    with respect to light and regular
10   cigarettes, we could get a different
11   ranking, couldn't we?
12       MR. GALLAGHER: Objection to the
13   form.
14 A. Well, what I've done is I've provided the
15   ranking of partworths with respect to the
16   max versus the min. I have not completed
17   the analysis. It's another analysis that
18   can be done. It might make a health risk
19   more. It might make a health risk the same,
20   etcetera and it's something that certainly
21   is doable.
22 Q. If, over 37 percent of the respondents who
23   took the conjoint study believed that lights
24   were as risky or more risky than regular
25   cigarettes, that would likely affect the

Page 506

```
 1    ranking if one restricted the ranking only
 2    to comparing light cigarettes and regular
 3    cigarettes, is that fair?
 4         MR. GALLAGHER:  Objection to the
 5    form.  Go ahead.
 6  A. Okay.  You know, here we are actually
 7    getting into some of the technical data in
 8    the HB -- hierarchical Bayes in the --
 9    mark-off chain analyses.  Certainly as we
10    change the inputs in the questions we ask,
11    those are questions that can be answered.
12    Now I have not, sitting here today, run
13    those particular numbers, so those are
14    numbers that can be run, and I know you've
15    been provided with the posterior means so
16    you can run those numbers.
17         If I'm asked that question by
18    either you or counsel and I'm asked to look
19    into that, I have the means of answering
20    that question, but I don't know the answer
21    to that question without doing those
22    analyses
23  Q. And again just to be clear, when you said
24    that approximately 18 percent of the
25    respondents ranked health risks at the very
```

Page 507

```
 1    top, that was referring to the result from
 2    looking at the two extremes, greater than --
 3    the health risks greater than regular
 4    cigarettes and health risks less than an
 5    ultra-light.
 6  A. Yes, and I'd like to put that in context, if
 7    I may.
 8  Q. Go ahead.
 9  A. That there are a large number of percentages
10    in the report which are basically consistent
11    and the 18 percent is one of them.  I think
12    it was 57 percent which ranked second, but
13    basically taking all those analysis as a
14    whole it's pretty clear that health is
15    pretty important to these respondents, and
16    it's really the health risks are very
17    important to these respondents as a whole
18    and the vast majority of these, and so we're
19    taking single numbers, and all these numbers
20    are indicative of the overall opinion, and
21    the overall opinion, as summarized, is that
22    health risks is important to the vast
23    majority of these respondents.
24  Q. Health risks are also important to the
25    over 37 percent of the respondents who
```

Page 508

```
 1    believed that lights were as risky or more
 2    risky than regular cigarettes, correct?
 3  A. Okay.  Remember that these respondents
 4    perceived this at the time of the survey, so
 5    I don't know what their perceptions were
 6    prior, you know, maybe a year or two prior
 7    to the survey, so with that caveat, we have
 8    two different measures.
 9         One is their measures of the
10    perceptions of light versus regular
11    cigarettes with respect to health risks and
12    we're finding that yes, approximately 60
13    some odd percentage of people feel that
14    light cigarettes are less unhealthy than
15    regular cigarettes, and then we have another
16    statement which is related to it, but it's
17    not the same statement and that's that
18    roughly 90 percent of the people place some
19    positive value on health risks and are
20    willing to trade things off with respect to
21    health risk.
22  Q. But the two statements are not the same,
23    correct?
24  A. That's what I've just testified.  I've
25    testified that you have to interpret these
```

Page 509

```
 1    as to what they're actually saying and that
 2    these are two of the many data points or
 3    analyses in the report that lead me to the
 4    conclusion that the vast majority of these
 5    consumers care about health risks.
 6  Q. Let me direct your attention to paragraph
 7    nine of your expert report, the second
 8    sentence.  It says, "The results can be
 9    relied upon to draw inferences about
10    whether" --
11  A. Could I catch up?  Thank you.
12  Q. Please.
13         MR. GALLAGHER:  I'm sorry,
14    paragraph nine, page nine?
15         THE WITNESS:  I'm sorry, I keep
16    going to the page.  Paragraph nine, page
17    five, okay.  I'm sorry for --
18  Q. Second sentence.
19  A. Second sentence.
20  Q. "The results can be relied upon to draw
21    inferences about whether health risks are a
22    significant contributing factor in consumer
23    decisions to smoke light cigarettes."  Let
24    me pause there.  Do you see that?
25  A. Yes.
```

Page 534

1  extremes. Certainly the consumer, as we
2  found in the pre-tests, and as you've so far
3  indicated, many people have stated -- and I
4  think we've gone to that number. It's sort
5  of 38 percent or whatever, did say that
6  cigarettes were -- that the health risk of
7  regular cigarettes were, in their own
8  perception at the time of the survey,
9  the same as the health risks of light
10 cigarettes, so this is a two-sided
11 question. It was pre-tested. It appears
12 to be accurate, and people are responding
13 with the answer that you're implying that
14 they would not respond with, so I'm very
15 comfortable with the statement of this
16 question.
17 Q. Did you provide, as an example, that they
18    might believe that smoking light cigarettes
19    provides the same health risks as regular
20    cigarettes?
21        MR. GALLAGHER: Objection to the
22    form.
23 A. You know, the direction you're going you're
24    going to say, you know, I should have been
25    saying 50 percent more, 20 percent more,

Page 535

1  etcetera. I have provided a two-sided
2  question. The two-sided question gives the
3  high level; it gives the low level and by
4  implication gives the middle level, and
5  that's the way the respondents understood it
6  at least to the best of my recollection.
7  Q. Did you list, as an example, that light
8     cigarettes might present the same health
9     risks as regular cigarettes?
10 A. In this particular statement we list more
11    health risk, less health risk. We do not
12    explicitly list equal health risk although
13    that's implicit in the two-sided statement.
14        MR. GALLAGHER: I just want to be
15    clear. You're talking about just in the
16    first paragraph or in the entire screen
17    shot?
18 A. My answer is with respect to just a single
19    paragraph.
20        MR. GARNICK: Just state your
21    objection.
22        MR. GALLAGHER: I did.
23 Q. You knew going in, before you conducted this
24    survey, that very few of the respondents
25    would believe that light cigarettes provide

Page 536

1  more health risks than regular cigarettes,
2  correct?
3        MR. GALLAGHER: Objection to the
4  form.
5  A. Well, as -- I didn't know that. It's
6     reasonable to assume but, in fact, this
7     would -- you might say that I'm bending over
8     backwards to make sure that this question is
9     two-sided in its nature and it's not leading
10    them one way or the other.
11        What you're implying is that there
12    might be a demand artifact to have them --
13    that, in fact, this 37 percent that we're
14    having that we've been talking about is too
15    high a number, and it should be less than
16    that. Now, that's what you're implying. I
17    don't believe that. I believe that the
18    numbers in the survey are accurate to the
19    best of our ability and subject to response
20    errors, etcetera, but I do not believe that
21    this statement, in the first paragraph on
22    page E15, is causing any bias one way or the
23    other.
24 Q. If the great majority of people taking this
25    survey, if it's reasonable to assume that

Page 537

1  the great majority of the people taking this
2  survey would not think that lights are more
3  risky than regular cigarettes, doesn't this
4  first paragraph suggest to them that smoking
5  light cigarettes provides less risk than
6  smoking regular cigarettes?
7        MR. GALLAGHER: Objection to the
8  form.
9  A. First you said more. Then you said less.
10    I'm not sure -- seems to be a confusing
11    question here. I mean --
12        MR. GALLAGHER: Hold on. Let him
13    restate the question.
14 Q. You said that it was reasonable to assume
15    that at least the majority of participants
16    taking the survey would not believe that
17    smoking light cigarettes would be more risky
18    than smoking regular cigarettes.
19 A. I did not say that, but go on.
20 Q. The record will be clear.
21 A. The record was saying that I did not have
22    that preconceived notion. It might be
23    reasonable to assume that.
24 Q. Okay. If that is true, it's reasonable to
25    assume that the majority of people would not

53 (Pages 534 to 537)