1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3            No. CV-0401945 (JBW)(SMG)

4

5    **************************

6   BARBARA SCHWAB, ET AL,

7   INDIVIDUALLY AND ON BEHALF

8   OF A CLASS OF ALL OTHERS

9   SIMILARLY SITUATED,

10                     Plaintiffs

11          vs.

12   PHILIP MORRIS USA, INC.,

13   ET AL,

14                  Defendants

15   **************************

16

17

18                          VOLUME:   III

19                          PAGES:  581-1001

20

21    CONTINUED VIDEOTAPED DEPOSITION of

22          JOHN R. HAUSER, SC.D.

23          FRIDAY, MAY 19, 2006

24

25

Page 614

1    Q.   Now did you ask for this deposition?
2    A.   I asked for materials.  I, of course,
3         didn't know all the materials available.
4    Q.   So you did not ask for this deposition?
5    A.   I asked for materials that might be
6         relevant, and I was provided those
7         materials.  I was not aware of all the
8         depositions that had been taken and all
9         the experts.
10             I don't know if that answers
11        your question.  I will be glad to try
12        again.
13   Q.   It doesn't answer my question.  Did you
14        ask specifically for the deposition of
15        Dr. Gentry?
16   A.   As I have indicated, I did not know all
17        the depositions.  Therefore, I did not ask
18        specifically for the deposition of
19        Dr. Gentry.
20   Q.   Did you know who Dr. Gentry was before you
21        received the deposition transcript?
22   A.   I did not know who Dr. Gentry was prior to
23        receiving the deposition transcript.
24   Q.   So it was plaintiffs' counsel's choice to
25        select that deposition to provide you?

Page 615

1    A.   This -- I had asked for materials.  They
2         had provided materials.  I presumed, since
3         they had choice of all possible things
4         from which to send me, this is one of the
5         things that I was sent.
6    Q.   You say you asked for materials.  You were
7         more explicit than that, weren't you?  You
8         asked for certain kinds of materials?
9    A.   I don't know quite how complete an answer
10        I can give.  I would like to give you a
11        complete answer, if that's okay.
12   Q.   Did you ask for specific kinds of
13        materials?  Did you identify the kinds of
14        materials you wanted to receive?
15   A.   Yes.  I would like to -- I had asked for
16        materials that related to a paragraph in
17        one of the two incomplete drafts that I
18        had written.  The paragraph may actually
19        be in both of the incomplete drafts.
20   Q.   What is that paragraph?
21   A.   I have -- I don't know the number -- I
22        don't recall the number.
23   Q.   What is the substance of the paragraph?
24   A.   Okay.  Thank you.
25             In that paragraph, it begins

Page 616

1         something along the lines of, "I am
2         informed," which were questions that I
3         asked, and as you have no doubt
4         established in the last deposition, I am
5         not a cigarette expert, and, as to all the
6         things that have happened with respect to
7         cigarettes, so I asked for materials that
8         would -- at the time of this that I had
9         been informed about earlier.
10             (Multipage Draft Expert Witness
11             Report by Dr. Hauser marked
12             exhibit number 30 for
13             identification.)
14   BY MR. GROSSMAN:
15   Q.   Dr. Hauser, I am going to hand you what is
16        marked for identification purposes as
17        exhibit number 30.
18             MR. GROSSMAN:  I will take off
19        the cover, because it is not part of the
20        document.  This cover page is not part of
21        the document.
22             (Handing exhibit number 30 to
23        the witness.)
24   Q.   This is a draft report, and I would like
25        to direct your attention, if I may, to

Page 617

1         paragraph 96.
2    A.   Okay.  There were two drafts and then one
3         minor modification of those drafts.  It
4         would help me if you told me which
5         dates --
6    Q.   This is --
7    A.   -- because I notice you have it on your --
8    Q.   Yes.  We were told at Mr. Gaskin's
9         deposition that the dates, although they
10        arise from the properties section of the
11        Word document that accompanied this, that
12        the dates might be off by a day.  This one
13        was dated apparently December 19, 2005,
14        which was the same day when you filed a
15        final report --
16   A.   Okay.
17   Q.   -- with the Court.  It may be in fact that
18        it was drafted on December 18th, the
19        Sunday preceding that.
20             So I cannot attest to the day.
21        I can tell you that this is the last draft
22        that we have that precedes the final draft
23        that was filed with the Court and served
24        on the defendants on December 19th.
25   A.   Okay.  So this is the draft that has the

Page 642

1   THE WITNESS:  Grammatician?
2       MR. GROSSMAN:  Grammarian.
3   A.   -- grammarian, that the word should be
4   "ensure" as opposed to "assure."
5   Q.   Okay.
6   A.   And that was corrected, I believe, in the
7   later draft.
8   Q.   Okay.  Would you turn with me to paragraph
9   23, the next paragraph?
10      (Witness complying.)
11  Q.   You write, "The questionnaires were
12  pretested with 9 respondents on March 25
13  through March 29th, 2005, to ensure that
14  respondents understood the descriptions,
15  instructions, and questions and that their
16  answers adequately represented their
17  beliefs."
18      Do you see that?
19  A.   Yes.  I see that.
20  Q.   And that's an accurate statement, is it
21  not?
22  A.   The questionnaires plus the experience
23  with conjoint analysis.  The pretest
24  combined with the experience of conjoint
25  analysis and my experience as an expert

Page 643

1   allowed me to, well, actually people that
2   helped me in this, they were drafting at
3   my direction, but -- but I felt that my
4   experience plus these pretest interviews
5   would ensure that the descriptions,
6   instructions, and questions were correct
7   so that the answers adequately represented
8   the respondents' beliefs.
9   Q.   With regard to the conjoint study, you did
10  not conduct any of the interviews; is that
11  correct?
12  A.   These interviews were conducted at my
13  direction, and, therefore, I did not
14  conduct these interviews, nor did I
15  believe that they were necessary -- it was
16  necessary for me to do so.
17  Q.   That is because Mr. Gaskin and
18  Ms. Schussheim are expert in conducting
19  such interviews; is that correct?
20      MR. HAUSFELD:  I am going to
21  object to the use of the word "expert."
22      MR. GROSSMAN:  I don't mean
23  expert in the same sense as in a
24  courtroom.
25      MR. HAUSFELD:  That's the point.

Page 644

1       MR. GROSSMAN:  I will rephrase
2   the question.
3   BY MR. GROSSMAN:
4   Q.   You have worked with Mr. Gaskin for years;
5   is that correct?
6   A.   I have worked on and off with Mr. Gaskin
7   since I advised him in his thesis --
8   Q.   He --
9   A.   -- which I believe was 1983 or 1984.
10  Q.   And he has conducted other interviews for
11  you; is that correct?
12  A.   Mr. Gaskin has conducted other interviews
13  for me.
14  Q.   And you have consistently relied upon the
15  interviews that he has conducted for
16  conjoint surveys and for other surveys as
17  well; is that correct?
18  A.   I have consistently -- well, in trying to
19  recall whether or not Mr. Gaskin conducted
20  interviews prior to this for conjoint
21  surveys, I believe he has, but again I'm
22  trying to recall my -- specifically.
23  However, I will say that I have relied
24  upon Mr. Gaskin's ability to do
25  qualitative interviews in prior

Page 645

1   engagements, both in litigation and in
2   nonlitigation contexts.
3   Q.   And you have also relied on Mr. Gaskin to
4   draft survey instruments, questionnaires,
5   not only in this matter but in other
6   matters; is that correct?
7   A.   I don't believe -- I don't know how to
8   answer that, because the first part of
9   that question is not correct.
10  Q.   Mr. Gaskin was principally responsible for
11  drafting the questionnaire in the conjoint
12  analysis that you did; isn't that right?
13  A.   I don't believe that's a correct
14  characterization.
15  Q.   Who drafted it?
16  A.   Mr. Gaskin drafted it at my direction.  I
17  was involved in this.  We certainly talked
18  on the telephone.  I'm the expert in the
19  case.  And I feel that I had total control
20  over the final wording of this
21  questionnaire, subject, of course, to the
22  input from the customers and other inputs
23  that I would normally draw upon as an
24  expert.
25  Q.   Who wrote the first draft of the

Page 646

1    questionnaire?
2  A.   That's a -- I'm not avoiding your
3    question.  I want to say that's an
4    ambiguous question, because -- I can
5    explain.
6  Q.   Who committed to paper or to the memory of
7    a computer the first draft of the
8    questionnaire used for the conjoint
9    analysis in this case?
10 A.   As you have indicated, it was committed
11   to, I guess, the memory of the computer,
12   if that's what you call programming.  The
13   person who would have done that would have
14   been the computer programmer.
15 Q.   At whose -- did the computer programmer
16   have any discretion in deciding what words
17   would be in the first draft or first
18   iteration of the questionnaire used for
19   the conjoint analysis?
20 A.   The computer programmer was working at my
21   direction through Mr. Gaskin.
22 Q.   He was working at Mr. Gaskin's direction;
23   isn't that right?  You never talked to the
24   computer programmer; isn't that right?
25 A.   As I have just stated, the computer

Page 647

1    programmer was working at my direction
2    through Mr. Gaskin.  Mr. Gaskin did the
3    actual physical speaking to the computer
4    programmer.
5  Q.   Mr. Gaskin also constructed the words that
6    were used in the first draft of the
7    questionnaire; isn't that right?
8  A.   That is not a correct characterization.
9  Q.   Did you -- who put together the words, you
10   or Mr. Gaskin?
11 A.   Mr. Gaskin and I discussed the words.  We
12   also listened to customers, customers who
13   certainly described -- want to have the
14   words described in the customer's words --
15   well, want to have the words in the
16   questionnaire described in the customer's
17   words and phrases.
18      So Mr. Gaskin was following
19   methodology I set forth based upon the
20   qualitative interviews and then later the
21   pretests, and Mr. Gaskin certainly
22   discussed this with me.  So he was working
23   at my direction.
24      MR. GROSSMAN:  I move to strike
25   as nonresponsive.

Page 648

1       MR. HAUSFELD:  Objection.
2       MR. GROSSMAN:  How can you
3    object to a motion?
4       MASTER KRANTZ:  I think from my
5    hearing it was a long answer, but I think
6    it was responsive, but why don't you just
7    continue probing the area.
8       MR. HAUSFELD:  That's my
9    objection.
10 BY MR. GROSSMAN:
11 Q.   Mr. Gaskin is a highly capable person in
12   survey resarch of computer -- of consumer
13   purchases, consumer desires, and you have
14   relied upon him to work with you on
15   surveys for many years; is that correct?
16 A.   I have worked with Mr. Gaskin on surveys
17   in many contexts, in some of those
18   instances at my directions, in other
19   instances, particularly in nonlitigation,
20   as a collaborator.
21 Q.   Did --
22 A.   But there was a prefix to your question
23   that I did not agree with.  I did not
24   agree with the first part of your
25   question.

Page 649

1  Q.   That he is highly capable?
2  A.   Mr. Gaskin has -- is capable in some
3    arenas.  Mr. Gaskin is not trained in
4    other arenas.  And I do not want to make a
5    blanket statement as to his expertise in
6    all arenas with respect to either conjoint
7    analysis or survey research.  That will be
8    -- I can provide details if you would
9    like.
10 Q.   Well, you rely upon his experience,
11   judgment, and knowledge to conduct
12   pretests and qualitative interviews for
13   your surveys; is that correct?
14 A.   I believe that Mr. Gaskin was trained and
15   capable in terms of doing the qualitative
16   interviews.
17 Q.   And the pretests?
18 A.   I believe that Mr. Gaskin was trained and
19   capable of working at my direction to do
20   the pretest interviews.
21 Q.   When you say working at your direction,
22   you weren't in the room when he was asking
23   the questions; is that correct?
24 A.   As I have indicated before, I instructed
25   Mr. Gaskin to do these interviews and I

Page 650

1 was not in the room while he was carrying
2 out my directions.
3 Q.  Mr. --
4     MASTER KRANTZ:  I am just going
5 to make a suggestion at this point to try
6 to expedite matters.  If a question can be
7 answered yes or no, that's a fine answer.
8 You don't need to rephrase the question
9 and then affirmatively agree with it.  You
10 can simply say yes.
11 BY MR. GROSSMAN:
12 Q.  Mr. Gaskin also conducted the pretests for
13 the time surveys; right?
14 A.  Mr. Gaskin was involved in the pretests
15 for the time studies.
16 Q.  Did you conduct any pretest for the time
17 study?
18 A.  I did not -- I don't know quite how to
19 answer that.
20     I was not in the room while
21 these pretests were conducted.
22 Q.  Who drafted the questionnaire for the time
23 study?
24 A.  I was involved in the draft of the
25 questionnaire for the time study with

Page 651

1 Mr. Gaskin working at my direction.
2 Q.  Do you recall any editorial change that
3 you made to the questionnaire for the time
4 study?
5 A.  I do not recall any specific words and
6 phrases that I put in there.  I was
7 involved.  We spoke on the telephone.  But
8 I could not at this point point to a
9 particular word and phrase that came from
10 me or came from, alternatively, words and
11 phrases from the consumers.
12 Q.  Can you identify any word or any change
13 that you made in the questionnaire for the
14 conjoint survey, any editorial change that
15 you made for that questionnaire?
16 A.  I was fully involved in that process.
17     MR. GROSSMAN:  Move to strike --
18 A.  I cannot --
19     MR. GROSSMAN:  -- as
20 nonresponsive.
21     MASTER KRANTZ:  I think you are
22 being nonresponsive at the beginning of
23 your answers.
24     THE WITNESS:  Okay.
25     MASTER KRANTZ:  Why don't you

Page 652

1 pose the question again, and if you could
2 try to answer it as directly as possible.
3     THE WITNESS:  Okay.
4 BY MR. GROSSMAN:
5 Q.  Do you recall any editorial change or any
6 addition that you made to the
7 questionnaire that was used for the
8 conjoint analysis?
9 A.  I cannot recall any specific word or
10 phrase in the process of developing that
11 questionnaire.
12 Q.  Do you recall whether Mr. Gaskin wrote any
13 words or phrases in the conjoint analysis
14 questionnaire?
15 A.  Mr. Gaskin was involved in writing the
16 survey.  I not recall which specific words
17 or phrases he wrote.
18 Q.  In fact, didn't Mr. Gaskin to your memory
19 write every word and phrase that was used
20 in the conjoint analysis questionnaire?
21 A.  You misinterpret my statement.  That is
22 not correct.
23     MASTER KRANTZ:  You don't need
24 to comment on whether the questioner --
25     THE WITNESS:  Okay.

Page 653

1     MASTER KRANTZ:  -- misinterprets
2 or not.  Just answer the question.
3     THE WITNESS:  Okay.
4     That is not correct.
5 BY MR. GROSSMAN:
6 Q.  Do you know of anyone other than
7 Mr. Gaskin who wrote words or phrases used
8 in the conjoint analysis questionnaire?
9 A.  I was involved in writing this, so I was
10 involved.
11 Q.  Well, you just said you couldn't recall
12 having written any words or phrases that
13 were used in the conjoint analysis
14 questionnaire, and you also said that you
15 were involved in some general way, but do
16 you know of anyone other than Mr. Gaskin
17 who wrote words or phrases that were used
18 in the conjoint analysis questionnaire?
19 A.  That's not what I said.  I said I did not
20 recall any specific words or phrases.  I
21 do recall someone other than Mr. Gaskin
22 who was involved in the process, and that
23 was me.
24 Q.  Do you recall anyone else other than you
25 who was involved in the process?

Page 666

1    draft time report light cigarettes
2    121905.doc, which also has some
3    handwriting at the top.
4        MR. HAUSFELD:  Why don't you
5    identify the handwriting --
6        THE WITNESS:  Okay.
7        MR. HAUSFELD: -- so we can
8    distinguish it from other materials.
9        THE WITNESS:  Basically same as
10   JH report CGTM short report, short RPT,
11   121605.doc, except draft.
12   BY MR. GROSSMAN:
13   Q.  Okay.  Now, Dr. Hauser, among those
14   documents that you say were not provided
15   to you by counsel are e-mails, various
16   other correspondence, and your own
17   analysis, such as the conjoint study graph
18   and your list of discovery materials as
19   requested from Dr. Hauser.
20       Is there any material that was
21   not provided to you by counsel that
22   consists of internal documents of the
23   cigarette companies or publicly-available
24   public literature on cigarette companies
25   or their products?

Page 667

1    A.  Are you referring to the pile that I
2    brought here today?
3    Q.  I'm referring to anything that you ever
4    received.
5    A.  Okay.  As indicated on the first page of
6    that pile in discovery material, there is
7    material that I provided previously, and
8    to the extent that any of those can be
9    considered research on the cigarette
10   companies, those are research, and I have
11   provided them.
12       MR. GROSSMAN:  I move to strike
13   as nonresponsive.
14   Q.  Do you --
15       MR. HAUSFELD:  Objection.
16   Q.  Do you recall --
17       MR. HAUSFELD:  Objection.
18   Objection to the drama in which the
19   question is asked.
20       MR. GROSSMAN:  Okay.
21       MASTER KRANTZ:  Let's just move
22   on.
23   BY MR. GROSSMAN:
24   Q.  Do you recall any document that
25   constituted an internal document of a

Page 668

1    cigarette company or literature on
2    cigarette distribution, sale, and use
3    obtainable through libraries or online
4    sites that you obtained, having not
5    received them from plaintiffs' counsel?
6    A.  You are asking -- let me understand your
7    question.  You are asking do I recall all
8    of the documents.  I do not recall all of
9    the documents.
10       MR. GROSSMAN:  I move to strike.
11   I move to strike as nonresponsive.
12       MASTER KRANTZ:  That --
13   BY MR. GROSSMAN:
14   Q.  I am asking you if you recall any.
15       MASTER KRANTZ:  I am going to
16   make a suggestion.  Perhaps you could
17   break your question down a little bit.
18       MR. GROSSMAN:  I am happy to.
19   BY MR. GROSSMAN:
20   Q.  Do you recall any document that you ever
21   received from any source other than
22   plaintiffs' counsel that was an internal
23   document of a cigarette company?
24   A.  I have got to answer yes to that.
25   Q.  Could you identify such documents?

Page 669

1    A.  Yes.  You, I believe, to the best of my
2    recollection -- although I am not sure --
3    that you showed me these in my last
4    deposition.
5    Q.  I don't think I showed you any internal
6    document of a cigarette company at the
7    last session of your deposition.
8    A.  Then I misrecall.  You showed me a lot of
9    documents.  I don't recall all of them.  I
10   am being careful here.
11   Q.  Apart from any document that you were ever
12   shown by counsel, do you ever recall
13   having received or reviewed any document
14   that was from the internal files of a
15   cigarette company?
16   A.  Other than the document that we've had
17   before -- that we have seen here this
18   morning, I do not recall any documents
19   from the cigarette companies -- again I
20   don't recall -- that I have seen, unless
21   they have actually been produced.  I just
22   don't recall everything that was in there
23   that we produced.
24   Q.  I am just trying to get a clean answer
25   here.  Have you ever looked anywhere, on

Page 670

1   the Internet or in a library or in any
2   other public source, for internal tobacco
3   company documents?
4   A.   I don't recall doing that.
5   Q.   Thank you.
6   A.   I may have done that.
7        MASTER KRANTZ:  Is your best
8   recollection you have no current
9   recollection of having done that?  You may
10  have done it, but you don't recall it as
11  you sit here today; is that fair?
12       THE WITNESS:  I don't recall any
13  specific searches.  I do recall some
14  general searches.  You know, but I would
15  not say that I relied upon any of those
16  searches.
17       MASTER KRANTZ:  The question is
18  not reliance at the moment.  The question
19  is whether you recall having done those
20  searches, if I understand the question
21  correctly.
22       THE WITNESS:  I am trying to
23  recall.  I am doing my best.
24       MASTER KRANTZ:  I understand.
25  What is your best answer to the question?

Page 671

1   Do you recall having done so?
2        THE WITNESS:  My best
3   recollection is I cannot recall the
4   specific sources.
5   BY MR. GROSSMAN:
6   Q.   And you cannot recall any specific
7   document?
8   A.   I cannot recall any specific document.
9   Q.   And you cannot recall the subject of any
10  document?
11  A.   If I had done it, the subject would have
12  been cigarettes.
13  Q.   "If."  But you cannot recall the subject
14  of any document that you reviewed on the
15  Internet or in the library; is that
16  correct?
17  A.   I am going to try to do my best here.  I
18  cannot recall the specific subjects.
19  Q.   Do you recall having reviewed on the
20  Internet or in a library or from any other
21  source other than counsel in this case
22  documents dealing with the marketing of
23  cigarettes?
24  A.   Yes.
25  Q.   What documents?

Page 672

1   A.   I recall that -- well, yes, I think.
2        Certainly, as I recall various
3   textbooks that I have taught out of, there
4   is certainly some cigarette advertising in
5   them; various materials that, you know, I
6   would have looked at on the Web, many of
7   which I may have looked at that forms sort
8   of a general background information,
9   either before or during the time that I
10  have been involved in the case.  However,
11  I did not rely on those.
12  Q.   And you don't recall any such specific
13  document; is that correct?
14  A.   I do not recall all the specifics of any
15  general searches.  I have done my best to
16  provide anything I could have relied upon.
17  Q.   I am not asking you about all the
18  specifics.  I am asking do you recall any
19  specific of any such document.
20  A.   I do not recall specific words and phrases
21  or titles et cetera of these documents.
22  Q.   Do you recall any document by any
23  description you could give?
24  A.   I have -- I am finding a hard time to
25  describe some general searches.  I can

Page 673

1   recall a particular document written by
2   David Ogilvie.  I can't recall the title.
3   But actually it is a reading in one of my
4   courses, and I believe that it has
5   cigarette advertising in it.
6        THE VIDEOGRAPHER:  We have to go
7   off the record to change tapes.
8        MR. GROSSMAN:  Okay.
9        THE VIDEOGRAPHER:  This is the
10  end of tape number 1.  It is 10:35.  We
11  are off the record.
12       MR. GROSSMAN:  Let's take our
13  first break.
14       (Recess taken at 10:35 a.m.)
15       (Recess ended at 10:49 a.m.)
16       (Mr. Parsigian no longer present
17  in the deposition room.)
18       THE VIDEOGRAPHER:  We are back
19  on the record.  This is tape number 2.
20  The time is 10:49.
21  BY MR. GROSSMAN:
22  Q.   Okay.  Dr. Hauser, a survey can be
23  generalized only to the population
24  studied; correct?
25  A.   That is not always true.

Page 674

1  Q.  Well, you attempt to conduct a survey
2      among the -- that is representative of the
3      group of people who are the subject of the
4      survey, of the study; is that correct?
5  A.  Can you repeat that?
6  Q.  Did you make any attempt in this case for
7      the people surveyed to be representative
8      of light smokers?
9  A.  We made an attempt that the survey that we
10     did could be projected to a representative
11     set of light smokers.
12 Q.  Why did you do that?
13         MR. HAUSFELD:  Can we clarify
14     what surveys?  Because --
15         MR. GROSSMAN:  I am referring to
16     the conjoint survey.
17         MR. HAUSFELD:  Okay.  If we
18     could call it the conjoint survey from now
19     on to distinguish it from other surveys.
20         MR. GROSSMAN:  That is fine.
21         MR. HAUSFELD:  I think it would
22     be helpful.
23         MR. GROSSMAN:  That's fine.
24         THE WITNESS:  So my answer is
25     for the conjoint study, we attempted to

Page 675

1      study a set of respondents that we could
2      project to the population of -- I am sorry
3      -- that we could project to the actions
4      and preferences, et cetera, of the
5      population of light surveys -- light
6      cigarettes -- smokers.
7      BY MR. GROSSMAN:
8  Q.  Smokers?
9  A.  Smokers, thank you.
10 Q.  Why?  Why did you look for a
11     representative population of light
12     smokers?
13 A.  Well, a representative sample is a sample
14     that is probably best to project.  It
15     requires the least adjustment in terms of
16     interpretation.
17 Q.  Now in the time survey, you conducted the
18     survey of current and former smokers of
19     light cigarettes; is that correct?
20 A.  In the time survey, I attempted to conduct
21     a survey of both light and former -- light
22     cigarette smokers and former light
23     cigarette smokers.
24 Q.  In the conjoint study, you conducted the
25     survey only of current light smokers;

Page 676

1      correct?
2  A.  I conducted the survey -- I conducted the
3      conjoint survey of current light cigarette
4      smokers -- from a sample of current light
5      cigarette smokers.
6  Q.  The conjoint survey sample did not include
7      any former smokers; is that correct?
8  A.  To the extent that a current smoker is a
9      former smoker, it did include --
10 Q.  I will rephrase the question.
11         MR. HAUSFELD:  No.  Let the
12     witness finish, please, and I would
13     appreciate if you enjoined from drama
14     trying to indicate to the witness --
15         MR. GROSSMAN:  I am not being --
16         MR. HAUSFELD:  -- in the middle
17     of a question that you are dissatisfied
18     with the answer as he is giving it.
19         MR. GROSSMAN:  I am not -- I am
20     not being dramatic.  I am just trying to
21     get an answer to a question without --
22         MASTER KRANTZ:  We are going to
23     try to avoid colloquy that doesn't get any
24     of us any further.  I suggest you just
25     repose the question.

Page 677

1         MR. GROSSMAN:  Yes.
2         MASTER KRANTZ:  And let's move
3      on.
4      BY MR. GROSSMAN:
5  Q.  Dr. Hauser, the conjoint survey was not
6      administered to anyone who had stopped
7      smoking; is that correct?
8  A.  That's not technically correct.
9  Q.  Okay.  Who among the survey participants,
10     how many among the survey participants was
11     not a current smoker at the time of the
12     survey?
13 A.  All respondents to the survey to the best
14     of our ability were current light
15     cigarette smokers.
16 Q.  So there wasn't a single person in the
17     survey who had formerly smoked and was a
18     nonsmoker at the time of the survey; is
19     that correct?
20 A.  The respondents -- at the time of the
21     survey, the respondents were smokers of
22     light cigarettes; therefore, there was no
23     one in the survey who was not a current
24     smoker of light cigarettes.
25 Q.  For clarification, at the time of the

Page 678

1   survey, there was no one in the survey who
2   previously smoked and had stopped -- and
3   had -- and was no longer smoking; correct?
4   A.   Oh, okay.  That is a slightly different
5   question.  That one I can answer.
6   Q.   And what is the answer?
7   A.   The answer is there is no one in the
8   survey who had stopped smoking and had
9   continued stopping smoking and was no
10  longer smoking in the conjoint sample at
11  the time of the conjoint study --
12  Q.   What --
13  A.   -- to the best of our ability.
14  Q.   Let's define people who used to smoke and
15  were no longer smoking as of the time of
16  the survey as "former smokers."  Okay?
17  A.   Okay.  For the purposes of this
18  deposition, someone who is no -- who used
19  to smoke and is not smoking at the time of
20  the survey, I will accept the definition
21  that these are "former smokers."
22  Q.   Okay.  In addition to not making any test
23  among former smokers, your conjoint survey
24  did not include any current smokers who no
25  longer smoked light cigarettes; is that

Page 679

1   correct?
2   A.   I'm not sure I understand your question.
3   Current smokers of light cigarettes?
4   Q.   No.
5        MR. GROSSMAN:  I will rephrase
6   the question.
7   Q.   Say a person smoked Marlboro Lights from
8   1980 to 1990, and in 1990 switched to
9   Marlboro Ultra Lights.  That is a former
10  smoker of light cigarettes who continued
11  to smoke.
12  A.   Wait.  They?  What was that again?  Okay.
13  They smoked?
14  Q.   Some people currently smoke --
15  A.   Some people currently smoke light
16  cigarettes?
17  Q.   -- brands -- no.  Let me finish.
18  A.   Okay.
19  Q.   Some people currently smoke brands other
20  than light brands, but at sometime since
21  1971 had purchased light cigarettes.  Do
22  you understand the premise?
23  A.   I understand the premise, except for the
24  ambiguous use of the term "brand."
25  Q.   What is ambiguous about the term "brand"?

Page 680

1   A.   Marlboro, for example, would normally be
2   known as a brand.  It has both regular and
3   light cigarettes.
4   Q.   And ultra lights.
5   A.   All right.
6   Q.   And hundreds and special products like
7   special blend 356?
8        MR. HAUSFELD:  He said "brand"
9   is ambiguous because the way the witness
10  understands it and the way you're using it
11  may not be the same.  So if we define
12  "brand" --
13       MR. GROSSMAN:  I will restate
14  the question.
15  BY MR. GROSSMAN:
16  Q.   Do you get the understanding that people
17  switch the kind of cigarette they smoke
18  over their smoking career sometimes?
19  A.   It is my understanding that some consumers
20  will switch either the brand or they might
21  switch the type of cigarette that they
22  smoke over their lifetime.
23  Q.   And when you say "type," you are referring
24  to light, ultra light, or what you call
25  regular; is that correct?

Page 681

1   A.   Well, you are defining "type," and I am
2   using it within your context, not the
3   context in the survey.
4   Q.   I did not use the word "type."  It came
5   from you.  I am asking you what you mean
6   by the word "type."
7   A.   Within the context of the survey, it would
8   be regular versus light versus ultra
9   light.  In other contexts, it might mean
10  other things.
11  Q.   And you understand that in the population
12  of smokers there are people who at one
13  point in their smoking histories smoked
14  light cigarettes and today smoke ultra
15  light cigarettes or what you call regular
16  cigarettes or other types of cigarettes?
17  Do you understand that?
18  A.   I understand that there might be people --
19  consumers who, if I understood -- if I
20  recall your question right who smoked
21  light cigarettes in the past and who now
22  smoke other types of cigarettes, such as
23  regular cigarettes.
24  Q.   Your survey, your conjoint survey, made no
25  attempt, and in fact excluded from

Page 682

1   participation, people who formerly smoked
2   light cigarettes but currently did not
3   smoke light cigarettes; correct?
4   A.   The conjoint analysis survey -- or the
5   survey upon which the conjoint analysis is
6   based was targeted towards consumers who
7   were current smokers of light cigarettes.
8         MR. GROSSMAN:  Move to strike as
9   nonresponsive.
10   BY MR. GROSSMAN:
11   Q.   Could you answer the question, please?
12         MR. HAUSFELD:  He did.
13         MASTER KRANTZ:  I don't think
14   that -- that was sort of a negative, a
15   negative inference.  It might have
16   answered the question.  But why don't you
17   answer the question affirmatively if you
18   can.
19         THE WITNESS:  Okay.  Can you ask
20   the question again?
21         MR. GROSSMAN:  Please ask the
22   question again.
23         (The reporter then read back as
24   follows:
25         "Question:  Your survey, your

Page 683

1   conjoint survey, made no attempt, and in
2   fact excluded from participation, people
3   who formerly smoked light cigarettes but
4   currently did not smoke light cigarettes;
5   correct?")
6         THE WITNESS:  Okay.
7   A.   The survey on which the conjoint analysis
8   is based did not include -- or did not
9   attempt to include consumers who formerly
10   smoked light cigarettes and who do not
11   currently smoke light cigarettes to the
12   best of our ability.
13   Q.   Do you mean to the best of your ability
14   they were excluded from the survey?
15   A.   To the best of the ability and what -- we
16   -- basically we screened people on their
17   answers to our questions, which I believe
18   to a large extent were accurate answers,
19   but in any survey research, there may be
20   one or two or a few customers -- and this
21   is in the error term -- that in fact may
22   answer incorrectly, but it's a small
23   number.
24   Q.   Now who made the decision not to include
25   people who formerly smoked light

Page 684

1   cigarettes but did not currently smoke
2   light cigarettes as of the time of the
3   survey?
4   A.   I don't recall all the details, but it
5   would have been, of course, my decision to
6   pick the target, but the instructions to
7   the best of my recollection was to ask
8   questions of light cigarette smokers.
9   Q.   Current light cigarette smokers?
10   A.   In the definitions that we're using today,
11   of current light cigarette smokers.
12   Q.   Dr. Hauser, in the time survey conducted
13   from late November to early December
14   2005 --
15   A.   Can I ask a question?
16   Q.   Yes.
17   A.   When you make a statement that is clearly
18   a question, is that still a question?
19         MR. GROSSMAN:  Move to strike.
20         MASTER KRANTZ:  I don't even
21   understand that question.
22         THE WITNESS:  He makes a --
23         MASTER KRANTZ:  He can make a
24   statement and ask you is that correct or
25   do you agree with it or is that fair.

Page 685

1         THE WITNESS:  Right.
2         MASTER KRANTZ:  Those are
3   questions.
4         THE WITNESS:  All right.  I was
5   a bit confused on that last one.
6         MASTER KRANTZ:  That is
7   perfectly permissible.  He is allowed to
8   make a statement and ask if you agree with
9   it or adopt it.
10         THE WITNESS:  In that case, he
11   just made a statement and I answered it.
12         MASTER KRANTZ:  The record
13   speaks for itself.  We will just move on.
14   BY MR. GROSSMAN:
15   Q.   Dr. Hauser, your time survey included 442
16   former smokers out of the 1,026
17   respondents who were surveyed; is that
18   correct?
19   A.   That is not correct.
20   Q.   How many people were surveyed in the time
21   survey?
22   A.   In the time survey, we started out with an
23   initial sample of I believe -- or an
24   initial target of I believe 1,026, and in
25   following appropriate procedures, we then

1    look it up.
2  Q.   In the time survey, it was your decision
3    that both former and current light smokers
4    would be included in the survey; is that
5    correct?
6  A.   I, to the best of my recollection, I
7    believe it was my decision, yes.
8  Q.   Now people who have chosen to quit smoking
9    may well have valued the health aspects of
10   smoking, the taste aspects of smoking, and
11   other attributes of smoking differently
12   than people who choose to continue to
13   smoke; is that correct?
14 A.   I don't know the answer to that question.
15 Q.   Because you haven't tested it; is that
16   correct?
17 A.   I can speculate upon the answer.
18       MR. HAUSFELD:  Don't speculate.
19 Q.   We don't want speculation.
20 A.   Okay.
21 Q.   You have not tested that question; is that
22   correct?
23 A.   I have not analyzed data which would --
24   which enable me to at this time form an
25   expert opinion with respect to that.

1  Q.   People who currently smoke ultra light
2    cigarettes but used to smoke light
3    cigarettes may well value taste and health
4    aspects of smoking differently from people
5    who continue to smoke light cigarettes; is
6    that correct?
7  A.   I am not currently providing an expert
8    opinion with respect to that question, and
9    without further analysis, I don't know the
10   answer to that question.
11 Q.   Okay.  Your conjoint analysis, to the
12   extent it is accurate or reliable, applies
13   only to current light smokers; is that
14   correct?
15 A.   That's not quite correct.
16 Q.   Your conjoint analysis studied only
17   current light smokers; correct?
18 A.   The sample of respondents upon which the
19   conjoint analysis is based were to the
20   best of our ability current light smokers.
21 Q.   Your conjoint analysis does not contain
22   any measured values that former light
23   smokers have for the taste of light
24   cigarettes or for the health aspects of
25   light cigarettes; is that correct?

1  A.   Using the definition of "former" that
2    we've agreed to, the conjoint analysis
3    survey did not ask questions, and,
4    therefore, does not -- sorry -- the survey
5    upon which the conjoint analysis is based
6    did not ask questions of former light
7    cigarette smokers as defined in this
8    deposition and to the best of our ability.
9  Q.   If the class in this case is defined as
10   all people who ever purchased a light
11   cigarette from 1971 to the present,
12   including former smokers, your conjoint
13   analysis was intended to measure the
14   perceptions of a subset of that class that
15   currently consists of light smokers;
16   correct?
17 A.   I -- just to be technically accurate -- I
18   don't know specific -- I don't recall the
19   specific class period.  Okay?
20       My survey -- the conjoint
21   analysis survey -- the survey upon which
22   the conjoint analysis is based was
23   targeted only towards or the sample was
24   based upon only those respondents who were
25   current light smokers.  The conjoint

1    analysis itself, not the survey, with
2    assumptions, might be used to inform
3    opinions about other respondents that are
4    similar in some way.  However, I am not
5    providing any expert opinion with respect
6    to how that might be done at this point.
7  Q.   And you have made no attempt to measure
8    the choices made or that would be made in
9    weighing taste, health risks, and other
10   attributes among former smokers of light
11   cigarettes; is that correct?
12 A.   I have up to this point not done any
13   analyses yet that directly project the
14   conjoint analysis from current smokers to
15   former smokers, as we're defining "former
16   smokers" in this deposition.
17 Q.   Now the conjoint survey measured
18   consumers' potential choices among
19   hypothetical products with hypothetical
20   attributes; is that correct?
21 A.   That's not technically a full, correct
22   statement.
23 Q.   The conjoint analysis did not measure
24   consumer choices among products that are
25   currently marketed; is that correct?

Page 694

1   A.   That's not quite correct.
2   Q.   The conjoint analysis asked people to
3        compare such cigarettes as a cigarette
4        that tasted like a regular but had health
5        risks lower than an ultra light?  That's
6        one possible type of cigarette that was on
7        the -- included in the conjoint analysis;
8        correct?
9   A.   I -- we could look at the exact wording.
10  Q.   And did --
11  A.   And by answering the question, I don't
12       want to state that that was the exact
13       wording.  However, the survey upon which
14       the conjoint analysis was based asked
15       questions of that type.
16  Q.   And such product such as a product that
17       tastes like a full-flavor cigarette or
18       regular cigarette but has risks lower than
19       ultra light are not to your knowledge
20       available on the market; is that correct?
21  A.   As we have established, I have not done a
22       complete study of the cigarette market and
23       each and every product that is available,
24       and, therefore, I do not know whether or
25       not these products are currently

Page 695

1        available.
2   Q.   It was not your intention to ask consumers
3        to make trade-offs only among products
4        that are actually available; is that
5        correct?
6   A.   That's a little bit not correct.
7   Q.   In their personal lives making actual
8        purchases, consumers make trade-offs
9        between such factors as taste and
10       perceived risk in products that are
11       actually marketed; is that correct?
12  A.   Consumers make trade-offs or -- I have
13       studied categories in which consumers make
14       trade-offs between perceived risks and
15       other positive attributes.
16            If you -- I am sorry.  I just
17       forgot which attributes you gave.
18  Q.   The conjoint survey, in addition to having
19       the conjoint part that asked consumers to
20       make trade-offs among perceived health
21       risks, taste, package type, and cost,
22       contained sections that asked consumers
23       about their actual perceptions of
24       actually-marketed products; is that
25       correct?

Page 696

1   A.   Well, it is partially correct.
2   Q.   What is incorrect about it?  What part is
3        not correct?
4   A.   You used the word -- you used "products"
5        in the plural.  To the best of my
6        recollection -- we can look at the survey
7        -- we asked consumers their perceptions of
8        their current light cigarette.
9   Q.   Okay.  You asked consumers their
10       perception of their current light
11       cigarette with regard to taste and with
12       regard to health risk; correct?
13  A.   We asked consumers -- to the best of my
14       recollection -- I can look at the survey
15       and answer it more accurately if you have
16       it in front of you.
17            MR. GROSSMAN:  This was
18       previously marked.  Do you know the
19       number?
20            (Discussion off the record.)
21  BY MR. GROSSMAN:
22  Q.   Dr Hauser, this is a copy of -- we would
23       -- don't have the original exhibits with
24       us -- this is a copy of what was
25       previously marked as exhibit 7, which is

Page 697

1        the so-called screen shots from your
2        conjoint analysis.  Okay?
3             (Handing exhibit number 7 to the
4        witness.)
5   Q.   And I am turning your attention, if I may,
6        to page E20.
7             MR. GROSSMAN:  I don't have my
8        copy with me.  Do you have another copy?
9             Thanks.  I'm sorry.
10            THE WITNESS:  Okay.
11  BY MR. GROSSMAN:
12  Q.   Do you see that?
13  A.   Again I would just like to get on the
14       record that the original was in color and
15       larger and easier to read, so any
16       squinting I do should not be inferred that
17       consumers would do that.
18  Q.   Fine.  The question reads:  "Now let's
19       think about taste for a moment.  Consider
20       the taste scale below where 100
21       represents" --
22  A.   Sorry.  Sorry.  Go ahead.
23  Q.   -- "where 100 represents how much you like
24       the taste of your brand of light
25       cigarettes.  The higher the number on the

1   correct?
2   A.   I have done an analysis which has been
3       provided to you, in which I explored
4       median split analysis, which would be the
5       precursor of potential weighting.  I can't
6       recall all the computations I did on that
7       spreadsheet.  So I do not recall whether I
8       actually went the next step and did the
9       weighting.
10              (One-page Chart marked exhibit
11              number 38 for identification.)
12      BY MR. GROSSMAN:
13  Q.   Let me hand you what has been marked for
14      identification purposes as Hauser exhibit
15      number 38.
16              (Handing exhibit number 38 to
17          the witness and counsel.)
18              MR. HAUSFELD:  Thank you.
19              MR. GROSSMAN:  You are welcome.
20  Q.   This is a chart showing -- which I will
21      represent to you is taken from the -- is
22      taken from the CD-ROMs that you provided
23      us in discovery, showing the spread among
24      respondents in answering that question on
25      the conjoint survey.  All right?

1   A.   I -- I accept that for now.  We -- there
2       is a lot of details on here that I think
3       we, before you ask questions, we can go --
4       you can describe to me.
5   Q.   In responding to the question which asked
6       light smokers to compare the, on the taste
7       scale, the taste of their brand of light
8       cigarettes to the taste of regular
9       cigarettes, a total of 12 people out of
10      627 rated the taste of regular cigarettes
11      above 100; is that correct?
12  A.   Yes.  Well, let me -- 12.
13  Q.   Two percent, less than two percent, of all
14      respondents in your survey, in your
15      conjoint survey, indicated that they
16      preferred the taste of regular cigarettes
17      to light cigarettes; is that correct?
18  A.   Well, okay.  You have represented that
19      this is --
20  Q.   I am representing --
21  A.   Okay.
22  Q.   -- that this is an accurate accounting
23      of --
24  A.   Okay.  So conditioned upon this accurate
25      accounting, this being an accurate

1       accounting, and conditioned upon the scale
2       being correct, et cetera, given that 100
3       represents how much you like the taste of
4       your brand of light cigarette, what is the
5       value of the test scale, value on the test
6       scale from zero to 150, would you give to
7       regular cigarettes.
8              A total of -- what was your
9       question?  I'm sorry?
10  Q.   A total of less than 2 percent of the
11      respondents indicated a preference for the
12      taste of regular cigarettes over light
13      cigarettes; correct?
14  A.   According to this document, basically you
15      are reading now the cumulative number
16      98.09, which is less than 2 percent away
17      from 100.  So these 12 people are less
18      than 2 percent of the 627.
19  Q.   And of the 627 respondents, 49
20      respondents, constituting less than 8
21      percent of the whole, had no preference
22      between the taste of light cigarettes and
23      regular cigarettes; correct?
24  A.   To the extent that this is an accurate
25      representation, 49 respondents provided a

1       rating of 100, which is a 7.81 percent of
2       the 627 respondents.
3   Q.   Okay.  And assuming the accuracy of this
4       representation of the CD-ROM that
5       contained the raw responses to your
6       conjoint survey, more than 90 percent of
7       all current light smokers had a preference
8       for the taste of light over the taste of
9       regular cigarettes; is that correct?
10  A.   Say that again?
11  Q.   Of the 627 people who responded to your
12      conjoint survey, more than 90 percent
13      indicated they preferred the taste of
14      light cigarettes to the taste of regular
15      cigarettes; correct?
16  A.   According to this document, which we are
17      currently accepting as correct,
18      90.27 percent gave a rating of 99 or less.
19  Q.   In fact, more than 50 percent of the
20      respondents gave a rating of 50 or less;
21      is that correct?
22  A.   According to this document, which we're
23      accepting as correct, there are 159
24      respondents, which cumulatively is
25      57.10 percent, gave a rating of 50 or

Page 706

1    less.
2    Q.   Okay.  Now in the actual world where
3        actual products are sold, those smokers
4        who prefer the taste of light cigarettes
5        were making no trade-off between better
6        taste and lower risk in their purchase of
7        light cigarettes unless they believed that
8        light cigarettes posed more risk than
9        regular cigarettes; is that correct?
10           MR. HAUSFELD:  Compound.
11   A.   Could you please break that question into
12       parts?
13   Q.   Yes.  Okay.
14           MR. GROSSMAN:  In fact, let's
15       take a two-minute break if we can.
16           THE VIDEOGRAPHER:  The time is
17       11:31.  We are off the record.
18           (Recess taken at 11:31 a.m.)
19           (Recess ended at 11:41 a.m.)
20           THE VIDEOGRAPHER:  We are back
21       on the record.  The time is 11:42.
22   BY MR. GROSSMAN:
23   Q.   Dr. Hauser, we just took a break.  During
24       that break, did you confer with counsel
25       for plaintiffs?

Page 707

1    A.   Yes.
2    Q.   Did you confer about your testimony in
3        this deposition?
4    A.   Just in general.
5    Q.   Did you confer about the question that I
6        had just asked?
7    A.   Not really.  No.
8    Q.   What did you discuss?
9    A.   Oh, pushing short-term memory here.
10           (Pause.)
11   A.   I think they just told me to keep
12       answering -- answering the questions; you
13       know, be careful; listen to what you're
14       saying.  That type of thing.  I'm sorry.
15       I don't recall all the details.
16           MR. HAUSFELD:  We asked him to
17       fix his collar on his suit.
18           THE WITNESS:  See.  I even
19       forgot that.  And Miss, Ms., Mrs.? --
20           MS. ROSENBERG:  Ms.
21           THE WITNESS:  -- Rosenberg asked
22       me to fix my collar.
23   BY MR. GROSSMAN:
24   Q.   Did you discuss any of the substantive
25       testimony you have given thus far?

Page 708

1    A.   Not really.  You know, I can't remember
2        what they -- all the details of what they
3        said.
4    Q.   Did --
5    A.   It wasn't anything substantive.
6    Q.   In the last 15 minutes, including the time
7        of the break, did you discuss with
8        plaintiffs' counsel any answer that you
9        have given in response to any question
10       today?
11   A.   Any specific answer?  No.
12   Q.   Any general answer?
13   A.   Yes.  I asked why you changed from one
14       study to another.
15   Q.   Did plaintiffs' counsel indicate to you
16       why they believed I changed from one study
17       to another?
18           MR. HAUSFELD:  I don't
19       speculate.
20           MASTER KRANTZ:  Let's let the
21       witness answer.
22           MR. GROSSMAN:  Let the witness
23       answer the question.  I move to strike.
24       That is totally inappropriate.
25           MASTER KRANTZ:  Stricken.  Let

Page 709

1    the witness answer the question, not the
2    attorney.
3           THE WITNESS:  They said you jump
4    all over the place.
5    BY MR. GROSSMAN:
6    Q.   Did you discuss any other question that
7        might be presented today?
8    A.   Not that I recall.  I mean I have got to
9        admit we were talking more about health
10       issues and yoga.
11   Q.   Dr. Hauser, looking again at exhibit 38 --
12   A.   Which one?
13   Q.   The one in front of you.
14   A.   This one.  Okay.  Thank you.
15   Q.   When you completed -- when the survey --
16       the conjoint survey -- I will start this
17       question again.
18           When the conjoint survey was
19       completed, did you run a calculation of
20       the answers that respondents gave to the
21       question of how they would rate regular
22       cigarettes and taste compared to their
23       brand of light cigarettes?
24   A.   How they would rate?  State that again?
25   Q.   Did you run any analysis of the answers

1    for a hypothetical person.  And the person
2    has a positive preference for taste.
3  Q.   Yes.
4  A.   Okay.
5  Q.   Do you know anybody who doesn't have a
6    positive preference for taste?  Have you
7    ever met --
8           MR. HAUSFELD:  On anything?
9  Q.   Have you, in your life, have you ever met
10    anyone who says, you know, I think I
11    prefer things that really taste lousy as
12    opposed to things that I think really
13    taste good?
14  A.   Taste is a very complex entity.  I have
15    noticed you have drunk a lot of Diet Coke.
16    I don't know your preference between
17    regular Coke and Diet Coke.  I could ask
18    that.  You are making trade-offs.
19           Yesterday, and I can give lots
20    of examples, where I was asked to try
21    something that, you know, tastes
22    astringent, but yet --
23           MR. GROSSMAN:  Move to strike as
24    nonpreservice.
25  BY MR. GROSSMAN:

1  Q.   Do you know --
2           MASTER KRANTZ:  Could I suggest
3    you pose a different question than whether
4    in his ordinary life he knows people who
5    don't care about taste?
6           MR. GROSSMAN:  Well, the problem
7    is that these -- the -- I will address it
8    to the witness.
9  BY MR. GROSSMAN:
10  Q.   You have asked people to place -- to
11    indicate what they taste -- what they
12    thought tasted better:  a regular
13    cigarette or a light cigarette.  And they
14    have answered on a scale of zero to 150
15    plus.
16           Is it your --
17           MR. HAUSFELD:  I don't believe
18    that was the -- he -- that's what the
19    question is in terms of the use of the
20    word "better," but.
21           MR. GROSSMAN:  Move to strike as
22    -- move to strike the colloquy.
23           MASTER KRANTZ:  Allow the
24    witness to answer the question.  If he
25    disagrees with the characterization, he

1    can say so.
2  BY MR. GROSSMAN:
3  Q.   You have asked -- you asked the
4    respondents on a scale of zero to 150 plus
5    what value they would give to the taste of
6    regular cigarettes if the taste of light
7    cigarettes were valued at 100.
8           Is it not your common
9    understanding that, all things being
10    equal, people prefer taste, things that
11    they say taste better, to things that they
12    say taste worse?
13  A.   In most situations, people will prefer,
14    all else being equal, things that they
15    taste -- that taste better to things that
16    taste worse.
17  Q.   Okay.  And now you say, "All other things
18    being equal"?
19  A.   In most situations.
20  Q.   In most situations, if cigarette consumers
21    believe that the health risks of light
22    cigarettes are the same or lower than the
23    health risks of regular cigarettes, they
24    will opt for the cigarette -- for the
25    light cigarette if they think it tastes

1    better; right?
2  A.   I don't agree with that statement.  There
3    is a lot of other issues going on here.  I
4    -- I am -- I am sorry I am being technical
5    here, but, you know, you are going into
6    technical areas, and I can do my best to
7    explain this.
8  Q.   What is the counterveiling consideration
9    against a cigarette tasting better if the
10    same consumer perceives that the cigarette
11    is either less dangerous or equally
12    dangerous than the cigarette that tastes
13    worse?
14  A.   Okay.  I'll grant that most people will
15    have a positive preference for taste.  I
16    will also grant that most people have a
17    positive preference for health risk.  You
18    may recall that in the survey, not
19    everybody did.  And I have to be careful
20    about that.
21           I will also grant that in most
22    cases there are no interactions.  We
23    tested for them, and there did not appear
24    interactions.
25           You have now also stated that

1    there is a cerebus paribus or all else
2    equal statement here.  So to the extent
3    that you allow me to make those
4    assumptions, okay, and to the extent that
5    we don't have sort of a learning of taste
6    over time, which is something that I
7    didn't measure, then given the
8    hypothetical, consumers would prefer one
9    of these to the others, and that's given
10   -- that is fully conditioned on all those
11   hypotheticals and fully conditioned on all
12   of the assumptions you have now allowed me
13   to make.
14   Q.   And the one that we would prefer would be
15   the light; correct?
16   A.   Well, conditioned upon this hypothetical,
17   as you have stated, the one they would
18   prefer would be the light cigarette.
19   Q.   And that's because assuming that there are
20   no counterveiling considerations and all
21   other things being equal and there are no
22   unmeasured interactions, if the cigarette
23   tastes better in the consumer's perception
24   and it is no more dangerous in the
25   consumer's perception, all of the factors

1    hypothetical, people would prefer the
2    cigarette that you have labeled as light.
3    Q.   Okay.  And, Dr. Hauser, have you studied
4    the actual sales of light cigarettes in
5    the United States?
6    A.   To the extent that the survey that was
7    done upon which the conjoint analysis is
8    based, there are some data on current
9    brands of cigarettes.  Other than that and
10   other than the materials that you have
11   provided to me previously, I have not done
12   any further study of the sales of light
13   cigarettes.
14   Q.   Okay.  And just to clarify this, you were
15   provided with a copy of Monograph 13 by
16   the plaintiffs you have testified earlier?
17   A.   Right.  There is Monograph 13; there is
18   some of the materials in this packet that
19   I brought with me this morning.  There
20   might be -- I just can't remember all the
21   materials that have been previously given.
22   Some of these may contain materials about
23   sales, and, of course, there are data
24   that, you know, it is not meant to be a
25   study of sales.

1    point to smoking the cigarette that tastes
2    better, the light cigarette; correct?
3    A.   Well, your hypothetical has a choice now
4    among two particular cigarettes.  I don't
5    want to project that if there are other
6    cigarettes they are choosing among.  Okay?
7    So given those two particular cigarettes,
8    given the hypotheticals that you have
9    stated, then consumers would prefer this
10   one cigarette that is light on taste and
11   light on health risk, given --
12   Q.   Or the same --
13   A.   -- the preference orders and given the
14   assumptions we have made.
15   Q.   Or the same on health risks?
16   A.   Okay.  Given the assumption of light
17   preferred to regular on taste, given the
18   assumption of lights weakly -- regular
19   weakly preferred to lights, meaning it is
20   greater than or equal to, on health risk,
21   given that there are no interactions,
22   given positive preference for taste, given
23   positive preference for lower health risk,
24   and given a choice among those two and
25   only those two products, then that

1         MR. GROSSMAN:  Move to strike as
2    nonresponsive.
3         MASTER KRANTZ:  I think you have
4    answered the question.
5         THE WITNESS:  Okay.
6    BY MR. GROSSMAN:
7    Q.   Monograph 13 was published in 2001;
8    correct?
9    A.   To the best of my recollection.  If you
10   will let me take a look at it, I will look
11   at the dates.
12   Q.   Let's -- accept my representation that it
13   was published in 2001.
14        Have you studied the effect on
15   sales of light cigarettes by the
16   publication of Monograph 13?
17   A.   I am sorry.  Can you say that again?
18   Q.   Since the publication of Monograph 13, has
19   the sales of light cigarettes gone up or
20   down?  Do you know?
21   A.   Sitting here today, I do not know whether
22   or not the total sales of light cigarettes
23   have gone up or whether or not they have
24   gone down or whether or not they have
25   stayed the same.

1    Q.   Sitting here today, do you know whether
2         the percentage of cigarette sales in
3         America that were sales of cigarettes
4         labeled as light went up, down, or stayed
5         the same following the publication of
6         Monograph 13?
7    A.   Okay.  Just so we're not ambiguous here, I
8         do not know the percentage of sales of
9         light cigarettes as compared to other
10        cigarettes on the marketplace, sitting
11        here today, and I do not know that
12        percentage with respect to either volume
13        or dollar share.
14   Q.   Okay.  Dr. Hauser, let me direct your
15        attention, if I may, to the opinion of
16        Judge Weinstein on the motion for summary
17        judgment on statute of limitations,
18        previously marked as exhibit number 33.
19             MR. GROSSMAN:  Let me get mine
20        out here.
21             (Pause.)
22             MR. HAUSFELD:  I have a copy if
23        you would like me to --
24             MR. GROSSMAN:  I have my copy.
25   Q.   Doctor, if you would look on the last page

1         of this, it is dated October 6, 2005.  Do
2         you have your -- there is a marked copy in
3         there.
4              (Handing exhibit number 33 to
5         the witness.)
6    Q.   Here is exhibit number 33.
7              MR. HAUSFELD:  Thank you.
8    A.   Thank you.  I am sorry.  Which page?
9    Q.   Do you see on the last page this was dated
10        October 6, 2005?
11             MASTER KRANTZ:  I think it is
12        the second to last page of that document.
13             MR. GROSSMAN:  Oh, the last page
14        is the cover sheet on your copy.  I see.
15        BY MR. GROSSMAN:
16   Q.   The second to last page, do you see that
17        it was marked -- dated October 6, 2005?
18   A.   Yes, I do.
19   Q.   Now, Dr. Hauser, you testified at the
20        first session of your deposition that this
21        statute of limitations opinion of
22        Judge Weinstein was one of your reliance
23        materials?
24   A.   Well, I read part of it.
25   Q.   Did you --

1    A.   Not the entire thing.
2    Q.   Do you recall -- and you received a copy
3         of it from plaintiffs' counsel; correct?
4    A.   I -- I received a copy of it.  I, as I
5         recall, I'm not totally sure how it got to
6         me.
7    Q.   You have no reason to believe that it came
8         from any source other than plaintiffs'
9         counsel, do you?
10   A.   I do not recall where it came from.  So I,
11        therefore, have no -- no reason to believe
12        that it is not the plaintiffs' counsel.
13   Q.   Okay.  Now do you recall when you received
14        your copy?
15   A.   No.  I'm sorry.  I do not.
16   Q.   When was the first -- this statute of
17        limitations decision at page 10 contains
18        the following language --
19   A.   Where?  Where are you reading?
20   Q.   "Continuing problems"?
21   A.   Okay.
22   Q.   "A troubling critical problem for
23        plaintiffs is that some members of the
24        class almost certainly were aware long
25        before 2000 that 'light' cigarettes were

1         not appreciably safer for them than
2         regular cigarettes.  The statute would bar
3         their claims."
4              Do you see that?
5    A.   Yes.  I see those words.
6    Q.   Do you recall having read that in the
7         past?
8    A.   Yes.  I probably did read that.
9    Q.   Okay.  Continuing --
10   A.   I don't recall too much of it.
11   Q.   "Yet the plaintiffs may be able to show
12        that a substantial number of smokers were
13        not aware before May 2000.  The individual
14        class members and their times of awareness
15        may well have differed over the years.
16        Suppose, for example, that one million
17        became aware in 1998, one million in 1999,
18        one million in 2000, and one million in
19        2001.  The first two million 1998 to 1999
20        would be barred.  The third (2000) could
21        be deemed damaged for a year or less, and
22        the fourth (2001) for somewhat more of a
23        year.  According to plaintiffs' theory of
24        the case, the particular persons in each
25        group cannot be known.

1    this.  So those two sets of analyses
2    together, we were -- I was able -- that
3    was the role of the pretests, but I would
4    like to include the qualitative --
5    Q.   Okay.
6    A.   -- in there as well.
7    Q.   Leaving the -- adding in the qualitative
8         interviews as well, the qualitative
9         interviews and the pretests of the time
10        study ensured that the respondents
11        understood the descriptions, instructions,
12        and questions and that their answers
13        adequately represented their beliefs;
14        correct?
15   A.   The word, the key word here, is "belief,"
16        but yes, this is, the questions are
17        understood, and respondents state to their
18        best of ability --
19   Q.   Okay.
20   A.   -- their beliefs.
21   Q.   And you would not have approved the
22        conduct of the survey, the actual survey,
23        in late November and early December 2006
24        unless you believed that the pretest had
25        ensured that the respondents could answer

1    the questions by understanding the
2    questions and give -- and able to -- and
3    were able to reflect their true beliefs
4    with regard to the questions; is that
5    correct?
6    A.   Well, it mischaracterizes the process a
7         little bit.
8    Q.   Doctor, you approved going forward with
9         the survey in late November and early
10        December 2005; is that correct?
11   A.   At the time I approved going forward with
12        the survey, I believed that respondents
13        could understand the questions.  I thought
14        there was a very good chance -- or I
15        wouldn't have gone ahead with it -- that
16        the answers would make sense.  I wasn't
17        totally sure of that at the time.  I had
18        my doubts.  But I thought that we would
19        have a good chance of getting answers that
20        would be internally consistent.
21            MASTER KRANTZ:  Just to move
22        things along, the question was whether you
23        approved.
24            THE WITNESS:  Okay.
25            MASTER KRANTZ:  And I think if

1    you would focus on the question in
2    answering just the question, we would make
3    more progress.
4    BY MR. GROSSMAN:
5    Q.   You did approve it, didn't you?
6    A.   Within the context as I have described, I
7         approved it.
8    Q.   It wouldn't have gone ahead if you didn't
9         approve it, would it?
10   A.   The survey would not have gone ahead if I
11        did not approve the next stage.
12   Q.   Okay.
13            MR. GROSSMAN:  Excuse me one
14        moment.  We're getting all sorts of sounds
15        over the telephone.  Could you turn on the
16        mute, please?
17            MR. KOETHE:  Julie?
18            MS. FISCHER:  Ted?
19            MR. GROSSMAN:  Yes.
20            MS. FISCHER:  The mute is on.
21            MR. GROSSMAN:  We are getting
22        all sorts of typing sounds.
23            MS. FISCHER:  That is odd,
24        because the mute is on.
25            MR. GROSSMAN:  Well, you are

1    creating electrical signals that are being
2    picked up by the --
3            MS. FISCHER:  All right.
4            THE WITNESS:  Can I make a
5        request?
6            MR. GROSSMAN:  Now --
7            THE WITNESS:  That at some point
8        we can just lower the heat a little bit.
9        You guys have got your jackets off.
10            MR. GROSSMAN:  When we take a
11        break, we will do what we can.
12            THE WITNESS:  Okay.
13    BY MR. GROSSMAN:
14    Q.   Dr. Hauser, could you return with me to
15         exhibit number 39?
16    A.   Which one is 39?
17    Q.   39 is the series of e-mails.  You had it a
18         moment ago.
19            (Witness complying.)
20    A.   This is it?
21    Q.   Yes.  Could you look with me at the page
22         that is marked at the bottom 008?
23            (Witness complying.)
24    Q.   This is an e-mail from Paul Gallagher to
25         Steve Gaskin, correct, on its face?

Page 778

1   A.   This appears to be an e-mail from Paul
2        Gallagher to Steve Gaskin, November 11th.
3   Q.   2005?
4   A.   2005.
5   Q.   Have you ever seen --
6   A.   Can I read it?
7   Q.   Excuse me.  Sure.
8            (Pause.)
9            (The witness viewing exhibit
10       number 39.)
11  A.   Yes.  I see this.
12  Q.   Have you seen it before?
13  A.   No, I have not seen this before.
14  Q.   All right.  This indicates that
15       Mr. Gallagher used a link that was sent to
16       him, and it worked.  I am reading, "A
17       couple of minor items that I assume are
18       the result that this is just a pretest:
19       it was very slow between screens
20       (sometimes I even thought my computer had
21       locked up) and there are spelling and
22       typing errors in the questions."
23           Do you see that?
24  A.   Yes.  This sounds like a survey in
25       process.

Page 779

1   Q.   Yes.  A pretest of the time survey;
2        correct?
3   A.   Yes.
4   Q.   The next paragraph:  "The bigger issue
5        seems to be that the survey doesn't get to
6        the questions we want to answer, i.e.,
7        when you began smoking did you believe the
8        cigarettes were less harmful; did that
9        change at any time; if you no longer
10       believe they are less harmful, do you know
11       when you first began to suspect this; and
12       when did you first hear/suspect/believe
13       that the cigarette companies may have
14       committed a fraud regarding light
15       cigarettes."
16           Do you see that?
17  A.   I see that sentence.
18  Q.   Okay.  Was it your understanding as the
19       questionnaire for the time survey was in
20       pretest that plaintiffs' counsel was
21       commenting upon the questionnaire as it
22       was evolving?
23  A.   This is the first time I have seen this
24       e-mail.
25  Q.   Would -- I understand it is the first time

Page 780

1        you have seen the e-mail.  Leaving aside
2        whether you saw the e-mail, was it your
3        understanding as the questionnaire was
4        evolving through pretest that plaintiffs'
5        counsel were commenting on the drafts of
6        the questionnaire?
7   A.   You know, I don't know.  Certainly if they
8        would have given comments as to whether or
9        not they felt the questions were accurate,
10       I would have responded.  My goal is to
11       write accurate questions.  But I don't
12       recall all the details of -- I mean I do
13       know that I was writing questions and with
14       Mr. Gaskin attempting to phrase these as
15       accurately as possible.  That much I do
16       remember.  So I do not know to what extent
17       counsel provided suggestions as to the
18       wording of the questions.
19  Q.   You don't know one way or the other?
20  A.   I don't recall.  No.  I just don't recall.
21  Q.   Could you turn with me to number 007 in
22       exhibit number 39?
23           (Witness complying.)
24  Q.   And that's an e-mail from Paul Gallagher
25       to Steve Gaskin, which reads:  "Hi Steve.

Page 781

1        Could you and me and John have a call to
2        finalize the approach to the survey,
3        preferably tomorrow, but if not, maybe on
4        Thursday or Friday."
5            Do you see that?
6   A.   I see that.
7   Q.   Have you seen this e-mail before?
8   A.   I don't appear to be copied on it, so I
9        don't recall.
10  Q.   Now could you turn with me to what has
11       been marked as 006?
12           (Witness complying.)
13  Q.   Or even better yet, let's go to 005,
14       page 005, which is a series of e-mails on
15       Tuesday, November 15th, and Wednesday,
16       November 16th, 2005.
17           (Witness complying.)
18  Q.   Do you see the first is an e-mail from
19       Paul Gallagher to you and Steve Gaskin?
20       The first staying at the top of the page.
21       It is not the first chronologically.
22  A.   Oh, okay.  I am sorry.  I was looking at
23       the bottom of the page.
24           Yes.  There is an e-mail at the
25       top of the page from Paul Gallagher to me

Page 782

1    and to Steve Gaskin.
2  Q.   Okay.  You are right.  It is better to
3    start at the bottom so we are
4    chronological.
5         The earliest of the e-mails on
6    this page is from November 15, 2005, at
7    7:04 p.m.; right?
8  A.   It seems to be about right.  Yes.
9  Q.   And that is an e-mail in which Steve
10   Gaskin writes to Paul Gallagher, "I am not
11   available until Thursday and Friday, but
12   free anytime then."  And then says,
13   "John."
14        And then below that, it says, "I
15   am heavily blocked tomorrow and have to go
16   to an MIT Sloan Retreat on Friday.
17   (However, there is a chance it will end
18   early.)
19        "On Thursday I have some time
20   open between 2 and 4 p.m.  Later in that
21   time frame, e.g., 3 p.m. would be better."
22        Do you see that?
23 A.   I see that.
24 Q.   That is your response; is that correct?
25 A.   That's my response.  I am heavily booked,

Page 783

1    and there appears to be about an hour --
2  Q.   Okay.
3  A.   -- that I can devote to this.
4  Q.   So do you recall having met on the
5    telephone or otherwise with Paul Gallagher
6    and Steve Gaskin in mid November to
7    discuss the wording and general approach
8    to the survey that was being pretested?
9  A.   As I've said, I have recalled conference
10   calls.  I don't recall all the content of
11   this.  It appears from this e-mail that --
12   where was the statement?
13 Q.   The original string is from November 15th,
14   and it's on page 008.
15 A.   Well, 008 is not an e-mail that I have
16   seen before, so.
17 Q.   And on 007, there is a request, could
18   Steve and Paul and you have a call to
19   finalize the approach to the survey?
20 A.   I also haven't seen this e-mail prior to
21   this time.
22 Q.   Whether you saw it or not, do you recall
23   having a discussion, November 17, 18, 19
24   time frame, with Paul Gallagher and Steve
25   Gaskin to finalize the approach to the

Page 784

1    survey?
2  A.   I recall having a conference call -- I --
3    I -- I am sorry -- I recall having
4    conference calls during this period.  I do
5    not recall the specific dates I had these
6    conference calls.  I do know that we
7    discussed the surveys during this period.
8  Q.   Is it your general practice to allow
9    attorneys to have an input into the
10   wording or formulation of surveys that you
11   perform as an expert witness?
12 A.   Well, that's a mischaracterization.  I --
13 Q.   I am asking you whether it is your normal
14   practice.
15 A.   As a survey expert, I am -- you are asking
16   for my normal practice?
17 Q.   Yes.
18 A.   So as a survey expert, counsel will ask me
19   certain questions.  I will then do my best
20   to take those questions, which are usually
21   legal questions, did X do Y, you know,
22   when did consumers do what -- do this,
23   et cetera, and turn that into a scientific
24   study.
25        I -- as I would do as an expert

Page 785

1    or even in nonlitigation context, I would
2    then make sure that I'm checking with the
3    clients to find out whether the questions
4    I'm asking consumers will answer the
5    questions that are appropriate to them as
6    clients, in other words, the questions
7    that are legally appropriate to answer.
8    They're not going -- I'm not going to let
9    them dictate exactly how I ask these
10   questions nor get into the science of the
11   study.
12        However, as consumers -- as
13   people, if they say, "Gee, this question
14   is ambiguous," or "I have a hard time
15   reading it," or "I don't understand it," I
16   will certainly take that as input, because
17   as a survey expert, I want to listen to as
18   much input as I possibly can from
19   consumers and other people.
20        So my normal practice is to
21   listen to everybody I can, integrate that
22   input, and try and write a survey that
23   will answer the question as posed to me by
24   the client.
25 Q.   Now in your expert report, you

Page 802

1   better methodology than the time study, as
2   I have indicated in this issue of
3   incentives, but I do not recall all the
4   details of the racial breakdown, nor do I
5   think they're relevant.
6   Q.  You don't think they are relevant because
7   you have never read any literature on the
8   effect of race on smoking patterns in the
9   United States; isn't that correct?
10  A.  Are you asking me why I think --
11  Q.  No.  I am saying you have never read any
12  literature --
13          MR. HAUSFELD:  No.  That is not
14  the question.
15          MR. GROSSMAN:  I am asking a new
16  question.
17          MR. HAUSFELD:  Well, then --
18          MASTER KRANTZ:  The last
19  question --
20          MR. GROSSMAN:  Keep quiet.
21          MASTER KRANTZ:  Excuse me.  No
22  colloquy.  The last question is withdrawn?
23          MR. GROSSMAN:  Yes.
24          MASTER KRANTZ:  Pose a new
25  question.

Page 803

1           MR. HAUSFELD:  That is all I was
2   going to ask, your Honor.
3           MR. GROSSMAN:  The record is
4   clear.
5           MR. HAUSFELD:  There is no
6   reason for unprofessional conduct in
7   telling anyone, counsel or otherwise, to
8   keep quiet.
9           MR. GROSSMAN:  That wasn't
10  unprofessional.  It was appropriate.  Now
11  I will continue.
12          MASTER KRANTZ:  Again we started
13  the deposition with a suggestion of
14  limited colloquy, and I stick with that
15  suggestion.
16          MR. GROSSMAN:  All right.
17  BY MR. GROSSMAN:
18  Q.  Dr. Hauser, have you ever read any
19  publication, by the surgeon general or
20  otherwise, on the effect of race on
21  smoking patterns in the United States?
22  A.  Not that I can recall.
23  Q.  Okay.  So if there are enormous
24  differences between the cigarettes chosen
25  by black Americans and the cigarettes

Page 804

1   chosen by white Americans, you don't know
2   about those differences; correct?  And you
3   didn't study them; correct?
4   A.  Okay.  If I understand the question, you
5   are asking me did I study the differences,
6   other than what I have seen already
7   presented to me in this case or presented
8   to Mr. Gaskin, did I study the differences
9   in respondents' or consumers' choice of
10  brand based upon race?  I -- is that the
11  right question?
12  Q.  Yes.
13  A.  Okay.  I have not studied the choice of
14  brand and how the brand choice is affected
15  by race.
16  Q.  And you have, similarly, you have not
17  studied the choice between light and what
18  you call regular cigarettes in the white
19  community versus the African-American
20  community; is that correct?
21  A.  Well, I'm not -- why did you use "you
22  call"?
23  Q.  "You call"?
24  A.  You said, "What I call."  You used the
25  words, "You call."

Page 805

1   Q.  What you referred to in your survey as
2   regular cigarettes.
3   A.  Okay.  In my survey refers appropriately
4   within context to regular cigarettes.
5           MR. GROSSMAN:  Move to strike as
6   nonresponsive.
7           MASTER KRANTZ:  That is not
8   worth getting into a debate about the term
9   that you are debating.
10          THE WITNESS:  Right.
11          MASTER KRANTZ:  I think the
12  question is clear.  Do you want to reread
13  the question?  Do you want to repose the
14  question?
15          MR. GROSSMAN:  Why don't you
16  reread the question.
17          (The reporter then read back as
18  follows:
19          "Question:  And you have,
20  similarly, you have not studied the choice
21  between light and what you call regular
22  cigarettes in the white community versus
23  the African-American community; is that
24  correct?")
25          THE WITNESS:  Could you reask

Page 822

1    Q.   30.
2    A.   Okay.
3    Q.   And in particular, I would like to direct
4         your attention to paragraph number 96.
5             (Witness complying.)
6    Q.   This document contains further rewriting
7         and writing over of the draft that we
8         previously identified as exhibit 37 dated
9         December 16, 2005; is that correct?
10   A.   This document is the continuing to evolve
11        this document.  It is one of three files
12        that you have been provided.
13   Q.   One of three files?  Excuse me?  That?
14   A.   That you have been provided.
15   Q.   Okay.  I didn't hear it.
16            Looking at paragraph 96, "I am
17        informed by that the public health
18        community did not reach a consensus that
19        'light' cigarettes had the same health
20        risk as regular cigarettes until
21        approximately 2001"?
22   A.   Yes.  I see that sentence.
23   Q.   "If this is the case and if respondents
24        did not have a means to form these beliefs
25        prior to 2001, then it appears that

Page 823

1         respondents are either telescoping their
2         responses to earlier dates, remembering
3         other events, or some other reporting
4         error.  Furthermore, these effects appear
5         to be greater for less confident
6         respondents"?
7    A.   Yes.  I see those two sentences.
8    Q.   Okay.  First of all, who informed you that
9         the public health community did not reach
10        a consensus that light cigarettes have the
11        same health risk as regular cigarettes
12        until approximately 2001?
13   A.   Okay.  This was in response to some
14        questions I asked.  Mr. Gallagher told
15        me that other experts would testify to
16        this information.
17   Q.   So this information comes exclusively from
18        Mr. Gallagher; is that correct?  That is
19        the only basis of information for that
20        first sentence, "I am informed that the
21        public health community..."?
22   A.   Well, I am informed, yes.  Mr. Gallagher
23        said there is information, and that is why
24        I put this caveat in there.
25   Q.   And you made no independent research of

Page 824

1         your own by reading the New York Times
2         historically or other newspapers
3         historically or going online or through
4         any other means to determine whether the
5         public health community reached a
6         consensus prior to October -- prior to
7         2001 that light cigarettes had the same
8         health risk as regular cigarettes;
9         correct?
10   A.   Because I was running out of time and
11        because I did not feel a need to at the
12        point, I did no further analysis at the
13        time I wrote this paragraph.
14   Q.   Okay.  The next sentence: "If this is the
15        case and if respondents did not have a
16        means to form these beliefs prior to 2001,
17        then it appears that respondents are
18        either telescoping their responses to
19        earlier dates, remembering other events,
20        or some other reporting error."
21            If this is the case, you are
22        accepting that first sentence to be true
23        conditionally; correct?
24   A.   That's what the words say.  Yes.
25   Q.   Okay.

Page 825

1    A.   I am.
2    Q.   Next: "...if respondents did not have a
3         means to form these beliefs prior to
4         2001," who if anyone told you that
5         respondents did not have a means to form
6         these beliefs prior to 2001?
7    A.   The second sentence refers to the first
8         sentence.  The second -- the first
9         sentence, as I have testified, and I put
10        into words, "I am informed," I said that
11        this is information that I don't have time
12        to check out.  This is going to be the
13        responsibility of other experts.  And,
14        therefore, I put the conditional in.
15   Q.   Okay.  Now I am referring to the phrase,
16        "if respondents did not have a means to
17        form these beliefs prior to 2001."  Do you
18        see that phrase?
19   A.   Yes.  I see that phrase.
20   Q.   Did anyone suggest or tell you -- to you
21        or tell you that respondents did not have
22        a means to form their beliefs that light
23        cigarettes had the same health risks as
24        regular cigarettes prior to 2001?
25   A.   This sentence refers to the first

Page 850

1    basis to challenge the results of that
2    survey --
3    A.   Is that what you asked?
4    Q.   -- that is cited in Monograph 13.  Yes.
5    A.   Oh, as I said, I have not studied that
6        survey, so I cannot comment upon its
7        methodology.
8    Q.   Okay.  And you have no basis to challenge
9        the finding that 32.2 percent of light
10       smokers in 1987 -- let me go back.
11               You neither endorse nor
12       challenge the finding reported here that
13       32.2 percent of light smokers in a 1987
14       survey believe that light smokers reduced
15       the risk of cancer -- low-tar cigarettes
16       reduced the risk of cancer versus regular
17       cigarettes; correct?
18   A.   Although the author of this report implies
19       that there is a different interpretation,
20       I personally have no basis to which to
21       evaluate whether or not this survey used
22       appropriate methodology.
23   Q.   Now you are familiar with Mr. Gaskin's
24       testimony.  Do you recall he testified
25       that on or about Friday, December 16,

Page 851

1    2005, Mr. Gallagher came to Boston to
2        discuss the time survey?
3               MR. HAUSFELD:  Wait.  Page and
4        line, please?
5               MR. GROSSMAN:  It goes from
6        page 218 to 265.  It is throughout that.
7               MR. HAUSFELD:  Page?
8    BY MR. GROSSMAN:
9    Q.   But I would like -- are you generally
10       familiar with that testimony?  You read
11       that testimony?
12   A.   I am generally familiar with Mr. Gaskin's
13       testimony.  I have certainly not memorized
14       each and every line, and if you are now
15       asking me to remember --
16   Q.   I am not asking you -- I am not asking you
17       to.
18   A.   Okay.
19   Q.   Do you recall Mr. Gallagher coming to
20       Boston on or about December 16, 2005?
21   A.   Okay.  December 16th is a Friday; right?
22   Q.   Yes.  That's right.
23   A.   Okay.  December -- Mr. Gallagher came to
24       Boston.  I can't remember whether I asked
25       him to come or not.  I might have.  But he

Page 852

1    did come to -- actually he must have come
2        through Boston, but I met him in Waltham.
3    Q.   In Waltham.  Did you have any conversation
4        on the telephone with Mr. Gallagher about
5        the draft report prior to his arrival?
6    A.   We have already -- we have gone over this.
7        You know, I have spoken to him.
8    Q.   Let me refine the question.  Did you
9        provide Mr. Gallagher with access to your
10       draft report prior to his arrival in
11       Waltham on December 16th?
12   A.   I don't recall.  If --
13   Q.   Did --
14   A.   If we provided it, we provided it to you.
15   Q.   Did you personally speak with
16       Mr. Gallagher about the findings that you
17       had tentatively arrived at in your draft
18       report prior to his arrival on
19       December 16, 2005?
20   A.   I don't recall when I spoke to
21       Mr. Gallagher about some of the
22       uncertainty that I was having with respect
23       to this report.  The word "findings" at
24       this point in a developing -- well, I
25       don't think the word "findings" is

Page 853

1    accurate.
2               MASTER KRANTZ:  I think the
3        language was tentative findings.
4               THE WITNESS:  Or tentative
5        findings.
6               I, you know -- even tentative.
7        I really was conflicted about this, and --
8               MR. GROSSMAN:  I will rephrase
9        the question.
10              MR. HAUSFELD:  Objection.
11       Please let the witness finish.
12              MASTER KRANTZ:  I think at this
13       point the witness is not being responsive,
14       so pose a new question.
15   BY MR. GROSSMAN:
16   Q.   Did you personally communicate to
17       Mr. Gallagher any of the results of the
18       survey that you conducted in late November
19       and early December of 2005 prior to
20       Mr. Gallagher's arrival in Waltham on
21       December 16th?
22   A.   I do not recall any -- the details of what
23       I communicated to Mr. Gallagher about
24       preliminary analyses, which would be
25       numeric, coming out of this, nor do I

Page 858

```
 1   details.  So I guess I have to answer I
 2   don't recall --
 3   BY MR. GROSSMAN:
 4   Q.  Okay.
 5   A.  -- but, you know, if I -- at some point,
 6       you know, sometimes things come to you,
 7       and you kind of remember them, in which
 8       case I will be glad to tell you.  I am
 9       really trying hard here.
10           MASTER KRANTZ:  You are being
11       asked for your recollection as you sit
12       here today.
13           THE WITNESS:  Okay.
14   BY MR. GROSSMAN:
15   Q.  Doctor, Dr. Hauser, we previously have
16       marked as --
17           MR. GROSSMAN:  What was the
18       submitted -- 35?
19   Q.  Could you take out exhibit 35, please?
20           (Witness complying.)
21           MR. HAUSFELD:  It's your report.
22           THE WITNESS:  Can we move this?
23           MR. GROSSMAN:  Sure.
24           (Handing the laptop computer
25       back to Mr. Koethe.)
```

Page 859

```
 1   A.  35.  It is a different version.
 2   Q.  Dr. Hauser, you are looking at exhibit
 3       number 35, which is the report that you
 4       signed and was served upon defendants on
 5       December 19, 2005?
 6   A.  Yes.
 7   Q.  The only reference in that report to the
 8       time survey is at footnote 2; is that
 9       correct?
10           (Pause.)
11           (The witness viewing exhibit
12       number 35.)
13   Q.  I am sorry.  Is at footnote -- footnote 2?
14   A.  Footnote 2.
15   Q.  Now, Dr. Hauser, --
16   A.  I am a little worried about some of the
17       wording there, but that's okay.
18   Q.  In footnote 2, you made no reference to
19       any of the findings of the time survey; is
20       that correct?
21   A.  Well, after --
22           MR. HAUSFELD:  He is just asking
23       you --
24   A.  Did I in the footnote 2, --
25   Q.  Yes.
```

Page 860

```
 1   A.  -- did I make any reference to the
 2       findings?
 3   Q.  Any of the findings in the time survey or
 4       any of the calculations -- any of the
 5       numbers that came out of the time survey?
 6   A.  Well, I do conclude that I was basically
 7       losing confidence in the -- have lost at
 8       this point confidence that there is
 9       sufficiently accurate to make a full
10       opinion, which also reflects the fact that
11       I basically had no time to complete any
12       analyses further than that.
13           MR. GROSSMAN:  Move to strike.
14   A.  So I did not make --
15           MASTER KRANTZ:  That is a
16       nonresponsive answer.
17           THE WITNESS:  Okay.
18           MASTER KRANTZ:  I think the
19       question was simply -- really implicit in
20       your prior answer, I think, is footnote 2
21       the reference to the time survey in this
22       report, if I understood your answer.
23           MR. HAUSFELD:  Your Honor,
24       having little confidence is a finding.
25           MASTER KRANTZ:  I am sorry?
```

Page 861

```
 1           MR. HAUSFELD:  Having, as he
 2       says, little confidence that the responses
 3       would be sufficiently accurate is
 4       essentially a finding.
 5           MASTER KRANTZ:  The footnote
 6       says what it says.
 7           MR. HAUSFELD:  He asked for a
 8       finding.
 9           MASTER KRANTZ:  I believe the
10       testimony was, if I heard you correctly,
11       that footnote 2 was the only reference to
12       the time survey in this report.
13           THE WITNESS:  I think he asked a
14       different question.
15           MASTER KRANTZ:  Is that correct,
16       that is the only reference in this report?
17           THE WITNESS:  To the best of my
18       recollection, this is the only reference,
19       but he was asking a different question.
20   BY MR. GROSSMAN:
21   Q.  In all prior drafts of this report, you
22       had a description of the survey, a
23       description of the methodology, a
24       description of the responses, and a
25       description of the confidence or lack of
```

Page 862

1    confidence that you had in the outcome of
2    the survey; correct?
3  A.   As I was developing my opinion, I had
4       phrases in there that were very complete.
5       As I lost confidence, I couldn't --
6       neither -- none of these were complete, so
7       I really didn't feel I should submit them.
8  Q.   Did anyone other than yourself have any
9       input into the decision to put in
10      footnote 2 in the place of all of the
11      material that had previously been in every
12      draft of this report that has now been
13      submitted to us?
14 A.   Yes.
15 Q.   Who?
16 A.   Well, I can describe how, but that is not
17      your question.
18 Q.   First who.  Yes.
19 A.   The attorneys had some suggestion on how I
20      might phrase it.
21 Q.   Which attorneys?
22 A.   I don't recall.
23 Q.   Was Mr. Gallagher one of them?
24 A.   I don't recall.
25 Q.   But they were plaintiffs' attorneys, those

Page 863

1       with whom you work; correct?
2  A.   On the phrasing of this -- so I want to
3       make clear that it is my decision --
4            MASTER KRANTZ:  The question is
5       just --
6            THE WITNESS:  Yes.
7            MASTER KRANTZ:  -- your
8       reference to attorneys in your prior
9       answer, the question is --
10           THE WITNESS:  Plaintiffs'
11      attorneys.
12           MASTER KRANTZ:  Is what he is
13      referring to.
14      BY MR. GROSSMAN:
15 Q.   Plaintiffs' attorneys?
16 A.   Yes.
17 Q.   What was their suggestion?
18 A.   Well, what I -- what was their suggestion?
19      Can I give a context?
20 Q.   I am asking you what was their suggestion.
21 A.   Right.  Their suggestion -- well, I wanted
22      to -- their suggestion is -- I want more
23      time -- I want more time to fully digest
24      these opinions, and they asked me, "Do you
25      have confidence in your report?"

Page 864

1            And I said, "No."
2            MR. GROSSMAN:  I move to strike
3       as nonresponsive.
4       BY MR. GROSSMAN:
5  Q.   What was their suggestion as to drafting
6       this paragraph 2 to replace all of the
7       discussion of the time survey that was in
8       all previous drafts?
9  A.   Their suggestion is, if I did not have
10      confidence in the report, then I should so
11      state in this report and not worry about
12      all the other details of the report in
13      which I have lost confidence.
14 Q.   But for their suggestion, would you have
15      submitted a report such as the draft of
16      December 19th that was previously marked
17      that contained a full description of the
18      survey plus your opinion about lack of
19      confidence in certain of the results?
20           MR. HAUSFELD:  Objection.  It is
21      a non sequitur.
22 Q.   Could you please answer the question?
23           MASTER KRANTZ:  Answer it if you
24      can.
25           THE WITNESS:  Okay.

Page 865

1  A.   Well, I was running out of time.  I didn't
2       feel confident in any of these.  And I
3       certainly would not have submitted --
4       wanted to submit a report to the Court
5       that I had not had a chance to complete
6       the wording in or to complete my opinions
7       or to complete the analysis.
8  Q.   I will ask the question again.  If the
9       attorneys for plaintiffs had not suggested
10      that you put in footnote 2 in place of the
11      extensive analysis that had been in prior
12      drafts, would you have used the language
13      that was contained in prior drafts or
14      something like it to explain the survey,
15      its methodology, its results, and your
16      degree of confidence or lack of confidence
17      in those results?
18           MR. HAUSFELD:  Don't answer the
19      question.  I am going to object, because
20      it is a deliberate distortion of the
21      record.
22           MR. GROSSMAN:  Oh, come on.
23           MASTER KRANTZ:  Can we just -- I
24      suggest going about it a different way.
25      You say there was a suggestion made that

Page 906

1    you a different question.
2    BY MR. GARNICK:
3    Q.   Do you have one number that you would
4         stand behind as the number -- as the
5         percentage of light smokers for which
6         health risks is a significant contributing
7         factor in their decision to purchase
8         lights?
9    A.   I really --
10   Q.   Do you have one number?
11   A.   You are boiling down a complicated
12        situation to a single number which I
13        object to.
14   Q.   No?
15   A.   I will do my best.
16   Q.   You can say no or you can say yes.  And
17        where is it in the report?  Where is that
18        number in the report?
19            MR. HAUSFELD:  Now that is
20        compound.  Do you want him to go through
21        the numbers?
22            MR. GARNICK:  No speaking
23        objections, please.
24        BY MR. GARNICK:
25   Q.   I don't want you to go through the

Page 907

1         numbers.  I want you to tell -- show me
2         where you have a number in this report.
3    A.   Well, let me -- give me a chance to --
4    Q.   Go ahead.
5             MASTER KRANTZ:  Let's get some
6         clarity, because the questions have
7         shifted a little bit.  What is the precise
8         question you want answered?
9             MR. GARNICK:  Let me start
10        again.
11        BY MR. GARNICK:
12   Q.   Please show me, if you can, if it is in
13        the report, the percentage of light
14        smokers for which health risks is a
15        significant contributing factor in their
16        decision to purchase lights.
17            (Pause.)
18            (The witness viewing exhibit
19        number 35.)
20   A.   Okay.  The best I can answer to you -- you
21        keep asking -- you know, it is sort of
22        like asking, you know, can you show me a
23        single number that -- the report cannot be
24        boiled down to a single number.
25   Q.   Okay.

Page 908

1    A.   So let me do my best.
2    Q.   No.  That was my question is whether you
3         had a single number that reflected the
4         percentage of light smokers for whom
5         health risks are a significant
6         contributing factor in their decision to
7         smoke light cigarettes.  If there isn't a
8         single number, that answers my question.
9    A.   Okay.  It is a trick question.  But go
10        ahead.  Yes.
11   Q.   So is there a single number?
12   A.   Well, you know, the -- given the trick
13        question, the answer is that there is no
14        single number.
15   Q.   Thank you.  Let me ask you.  Do you
16        utilize your conjoint analysis to
17        establish the percentage of class
18        members --
19            MR. GARNICK:  No.  Strike that.
20   Q.   Do you utilize a conjoint analysis to
21        establish the percentage of light smokers
22        who relied on cigarette manufacturers'
23        allegedly false representations in
24        deciding to purchase light cigarettes?
25   A.   State that again?

Page 909

1    Q.   Yes.  Do you utilize a conjoint analysis
2         to establish the percentage of light
3         smokers who relied on cigarette companies'
4         allegedly false representations in
5         deciding to purchase light cigarettes?
6    A.   Coupled with other information, the
7         conjoint analyses can be used to answer
8         that particular question, but I am relying
9         on other experts to establish the whether
10        or not cigarette companies have in fact
11        misled consumers, although I understand
12        that -- I have been told that that has
13        been established and, of course, all the
14        other things that are part of that
15        question.
16   Q.   So is the answer no?
17   A.   Answer the question -- ask the question
18        again, and I'll do my best.
19   Q.   Do you utilize your conjoint analysis to
20        establish -- do you utilize your conjoint
21        analysis to establish the percentage of
22        light smokers who relied on cigarette
23        companies' allegedly false representations
24        in deciding to purchase light cigarettes?
25   A.   I have not personally established all of

1      the items in the predicate to your
2      question.
3  Q.  Thank you.  Let me ask you to turn to
4      exhibit 37, which is your December draft
5      16th report.
6              (Handing exhibit number 37 to
7      the witness.)
8  A.  Which one is this?  It is one of the
9      December 16th ones.  Is this the one we
10     are calling Long or calling Short?
11 Q.  I thought we were calling this Big.
12 A.  Or Big, or whatever.
13 Q.  Let me ask you to turn to paragraph 93,
14     and then we can compare -- make sure it is
15     the right one.
16 A.  Okay.
17             (Witness complying.)
18 A.  No.  I just want to make sure that I,
19     because there are three reports --
20 Q.  I think this is the earlier of the three.
21 A.  This is one of the two that was developed
22     on December 16th.
23 Q.  Right.
24 A.  And I now recognize it.  Thank you.
25 Q.  Okay.  Now the purpose of the time study

1      was to attempt to determine essentially
2      when light smokers came to believe that
3      lights were not safer than regular
4      cigarettes?  Is that fair?  Is that one of
5      the purposes of the time study?
6  A.  That is one of the purposes --
7  Q.  Okay.
8  A.  -- subject to the actual phrasing in the
9      questionnaire.
10 Q.  Okay.  And as a predicate to that, one of
11     the questions you asked the people who
12     were participating in the study was about
13     their current beliefs about the risks of
14     lights compared to the risks of regular
15     cigarettes; is that correct?
16 A.  Well, we're asking an aggregated scale,
17     which I have described in this report.
18 Q.  Right.  And that aggregated scale included
19     questions that talked about present
20     beliefs as opposed to past beliefs;
21     correct?
22 A.  It is a complicated question -- well, it
23     is a questionnaire that is long, and it
24     included to the best of my recollection --
25     and I would be happy to look through it --

1      I am getting a little tired here -- it
2      included statements about current beliefs
3      and whether or not they could recall
4      changing their beliefs --
5  Q.  Okay.
6  A.  -- with respect to the aggregated scale.
7  Q.  And in paragraph 93A, it states, "151" --
8      and then in parentheses "15 percent" --
9      "of the 1,026 respondents currently
10     believe that smoking 'light' cigarettes
11     has LESS health risks than smoking regular
12     cigarettes."
13             Did I read that correctly?
14 A.  You read that correctly.
15 Q.  Okay.  Now at one point in writing this
16     report, did you believe that -- I am
17     trying to phrase this without running into
18     -- at any time --
19             MR. GARNICK:  Well, strike that.
20             MR. HAUSFELD:  So I can withdraw
21     the objection?
22             MR. GARNICK:  Yes.
23             MR. HAUSFELD:  Okay.
24 BY MR. GARNICK:
25 Q.  First of all, who wrote 93A?  Did you

1      write 93A?
2  A.  Well, I think at my direction, I described
3      this to Mr. Gaskin and said, "You know,
4      put all these numbers in here."
5  Q.  Okay.
6  A.  It is still -- as I have testified this
7      morning earlier, some of this is
8      boilerplate.  Some of it is material I'm
9      still developing.
10 Q.  And you also testified earlier today that
11     over time you came not to -- to start
12     losing confidence in some of the results
13     of the time survey; correct?
14 A.  Yes.
15 Q.  And did you lose confidence in the result
16     of the time survey reflected in 93A?
17 A.  Well, if we -- yes.  In fact, there is
18     another footnote in one of these that
19     describes in detail how to interpret that
20     particular number, and I thought that this
21     number is not reflective of the more
22     accurate conjoint analysis study and also
23     some projections that could be made from
24     that.
25 Q.  Well, I thought that what you had done was