UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

C.A. No. CV-0401945(JBW)(SMG)

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

BARBARA SCHWAB, et al., Individually    *

and on behalf of a class of all         *

others similarly situated,              *

       Plaintiffs              *

v.                                      *

PHILIP MORRIS USA, INC., et al.,        *

       Defendants               *

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

PAGES 1-294

VIDEOTAPED DEPOSITION OF STEVEN P. GASKIN, a witness called on behalf of the Defendant R.J. Reynolds Tobacco Company, pursuant to the Federal Rules of Civil Procedure, before Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Goodwin Procter, LLC, 53 State Street, Boston, Massachusetts, on Tuesday, May 9, 2006, commencing at 9:38 a.m.

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 22

1  was not difficult.
2  Q.  What was the nature of your clientele there?
3  A.  Well, we were a start-up, so I'm not sure we
4  had any paying clients.
5  Q.  At least in the beginning?
6  A.  Perhaps ever.
7  Q.  Okay.  How long were you at AdPilot?
8  A.  For four years.  Or at least -- I'm not
9  sure, I'm sorry.  It might have been three
10  years.
11  Q.  Okay.  Through sometime in 2003 or 2004?
12  A.  Something like that.
13  Q.  So in that period of time you don't recall
14  if you had any paying clients at all?
15  A.  We had one paying client, but it turned out
16  that we did not have the data we needed to
17  deliver the project, so they ended up not
18  paying.
19  Q.  Did you then join AMS?
20  A.  I consulted on my own again for a while.
21  Q.  And then what did you do after that?
22  A.  In September of 2004 I was invited to join
23  AMS.
24  Q.  And what's your role at AMS?
25  A.  My title is senior consultant.

Page 23

1  Q.  And what do you do in that capacity?
2  A.  I work on projects such as this, and I
3  develop -- I'm in charge of developing new
4  products and services for the company and --
5  which is sort of a research and development
6  role, and I help deliver other market
7  research they conduct.
8  Q.  Okay.  Now, do you do market research that's
9  not involved in litigation unsupervised?
10  MR. LANDAU:  Objection to form.
11  A.  I'm trying to think here.  I do run my own
12  projects, so I guess the short answer is
13  yes.  I hesitated because occasionally I'll
14  work with my boss, say, on the project.
15  Q.  Who is your boss?
16  A.  So it varies.  Bob Klein, he's the president
17  of AMS.  Or I might be doing work for a
18  project where I'm not in charge, I'm just
19  doing some interviewing or something.
20  Q.  So you help out others on projects that
21  they're responsible for, and you supervise
22  your own project?
23  A.  Right.
24  Q.  Okay.  How many are on the staff at AMS?
25  A.  I don't know exactly.  Approximately 25.

Page 24

1  Q.  And is there anyone to whom you report?
2  A.  As I said, I report to Bob Klein.
3  Q.  You report directly to him?
4  A.  Yes.
5  Q.  Okay.  Are there people who report to you?
6  A.  Yes.
7  Q.  Who were they?
8  A.  Dan Bailiff is a programmer.  He reports to
9  me.
10  Q.  Now, you've been there, you say, since 2004?
11  A.  Yes.
12  Q.  What kinds of clients have you worked for,
13  in what industries or businesses?
14  A.  Worked for high-tech companies, Internet
15  search engine companies, window-making
16  companies, medical device manufacturers.
17  That's all I can recall at the moment, but,
18  you know, a variety of industries.
19  Q.  Okay.  You were engaged to help Dr. Hauser
20  in this case a little over a year ago; is
21  that correct?
22  A.  Yes.
23  Q.  Prior to that had you ever done any work in
24  the cigarette industry?
25  A.  No.

Page 25

1  Q.  Had you ever done any work in any other
2  industry where products are sold for
3  personal consumption and enjoyment?
4  A.  Yes.
5  Q.  What industries are those?
6  A.  Consumer packaged goods industry.
7  Q.  Any -- what kind of packaged goods were
8  they?
9  A.  Soft drinks, for example.  Ocean Spray, a
10  company here, makes a good number of drinks,
11  as well as cranberry-based foods, did a lot
12  of work for them.  I can't remember offhand
13  the others, but...
14  Q.  Have you ever purchased cigarettes?
15  A.  No.
16  Q.  So you've never gone up to a cash register
17  and asked someone for a pack of something
18  lights or a pack of something regulars or
19  anything of that kind?
20  MR. LANDAU:  Objection to form.
21  A.  I've never bought cigarettes.  I've looked
22  at cigarette displays.
23  Q.  Yes, you've seen displays?
24  A.  Yeah.
25  Q.  Have you carefully reviewed displays or ads

7 (Pages 22 to 25)

9e52be18-e224-4560-b50b-0d2ee91c9014

1    for any cigarette company at any time?
2         MR. LANDAU:  Objection to form.
3  A.  Do you mean paid by a cigarette company to
4    do that?
5  Q.  No, whether you were paid or otherwise.
6  A.  I took a look at some cigarette displays for
7    this case.
8  Q.  Prior to your engagement in this case you
9    made no study of cigarette displays; is that
10   correct?
11 A.  That's correct.
12 Q.  And prior to your engagement in this case
13   you made no study of cigarette advertising;
14   is that correct?
15 A.  That's correct.
16 Q.  And you've never made a study of cigarette
17   regulation, have you?
18 A.  No.
19        MR. LANDAU:  Objection to form.
20 A.  You mean professionally?
21 Q.  Yes.
22 A.  No.
23 Q.  Have you ever made a study of the regulation
24   of cigarettes -- cigarette use by states as
25   it varies across the United States?

1  A.  No.
2  Q.  Have you ever done a study of cigarette
3    marketing?
4         MR. LANDAU:  Objection to form.
5  A.  What does that mean?
6  Q.  Have you ever done a study of the ways in
7    which cigarette companies communicate with
8    the public in addition to printed
9    advertisements?
10 A.  No.
11 Q.  Have you ever done a study of polls or
12   surveys regarding cigarettes other than the
13   polls and surveys conducted by AMS?
14 A.  I don't understand the question.
15 Q.  You conducted -- you participated in two
16   surveys at AMS --
17 A.  Oh, those surveys, I'm sorry.
18 Q.  Yes, yeah.
19 A.  If you want to reask the question.
20 Q.  Yeah, yeah, we'll clarify it --
21 A.  Okay.
22 Q.  -- just for a clean record.
23        You participated in two surveys that
24   were conducted by AMS regarding cigarettes,
25   correct?

1  A.  No.
2  Q.  Did you participate in the survey for the
3    conjoint analysis that was reported on by
4    Dr. Hauser?
5  A.  Yes.
6  Q.  Did you participate in the survey that was
7    conducted in late November and early
8    December of 2005 that is sometimes called
9    the time survey?
10 A.  Yes.
11 Q.  Did you participate in any other surveys on
12   the cigarette industry or on cigarettes
13   working with Dr. Hauser?
14 A.  Yes.
15 Q.  What other surveys?
16 A.  There was a pilot conjoint analysis study
17   conducted in March to April of last year for
18   the Massachusetts case.  It was very similar
19   to the health risk conjoint, and that -- I
20   participated in that.  So that's why I
21   answered no earlier.
22 Q.  I appreciate it.
23 A.  Yeah.
24 Q.  Apart from those three that you've just
25   identified, have you ever reviewed or

1    studied surveys or polls that were conducted
2    of cigarette usage?
3  A.  No.
4  Q.  Okay.  Have you ever studied or reviewed
5    polls regarding people's beliefs of the
6    health risks of smoking?
7  A.  No.
8  Q.  Have you ever studied polls regarding
9    people's interest in stopping smoking?
10 A.  No.
11 Q.  Have you ever reviewed any polls regarding
12   people's beliefs in the addictive nature of
13   smoking?
14 A.  No.
15 Q.  Okay.  Is it all right with you if for our
16   purposes we refer to the first study that
17   you worked on with Dr. Hauser resulting in
18   the August 2005 opinion as the conjoint
19   analysis survey?
20 A.  That's fine.
21 Q.  And if we refer to the second survey
22   conducted at the end of 2005 as the time
23   survey?
24 A.  That's all right.
25 Q.  Okay.  Now, neither one involved a randomly

8 (Pages 26 to 29)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 50

1    work for an additional law firm that was
2    dealing with a Massachusetts case on
3    cigarettes.  You'll recall the pilot study I
4    mentioned.
5  Q.  Uh-huh.
6  A.  It could be their firm or perhaps both firms
7    were paying, so it represented both.
8  Q.  But, in fact, you did talk to counsel for
9    the plaintiffs from time to time in this
10   case?
11 A.  Yeah.  Yes.
12 Q.  Okay.  Looking at the next page, Hauser 026,
13   you forwarded to John Hauser Paul
14   Gallagher's contact information; is that
15   correct?
16 A.  That's correct.
17 Q.  Have you spoken with Mr. Gallagher in the
18   past?
19 A.  Oh, yes, yes.
20 Q.  How many times?
21 A.  A good number of times.
22 Q.  More than five?
23 A.  Yes.
24 Q.  More than 10?
25 A.  Yes.

Page 51

1  Q.  More than 15?
2  A.  Yes.
3  Q.  More than 20?
4  A.  I don't know.
5  Q.  Okay.
6  A.  We're pushing it there.
7  Q.  Okay.  And how long has been the longest of
8    your conversations with him?
9  A.  I don't know.
10 Q.  More than a half an hour?
11 A.  Possibly.
12 Q.  What subjects have you discussed with him?
13 A.  Generally the research we're doing.
14 Q.  You've given him updates on the research?
15 A.  Yes.
16 Q.  Has he made suggestions for things to
17   consider in the research?
18 A.  Yes.
19 Q.  What kind of suggestions?
20      MR. LANDAU:  Objection to form.
21 A.  For example, when John was happy with the
22   latest draft of a questionnaire, for
23   example, we would let counsel look at it and
24   see if they had any typos or even any other
25   suggestions.  We would consider them if we

Page 52

1    thought they had merit.
2  Q.  So in the conjoint study you provided
3    plaintiffs' counsel with copies of the
4    questionnaire before it was used with the
5    final sample?
6  A.  It's not entirely correct.
7  Q.  Tell me what about that question is not
8    correct.
9  A.  We did not provide them with a copy.
10 Q.  What did you provide them with?
11 A.  We provided them with a URL where they could
12   take the survey.
13 Q.  And they had the opportunity to review the
14   survey before it was administered to the
15   sample?
16 A.  Yes.
17 Q.  And they had the opportunity to comment on
18   the survey before it was administered to the
19   sample?
20 A.  Yes.
21 Q.  And they, in fact, made comments on the
22   survey before it was administered to the
23   sample?
24 A.  I can't recall any specific one, but they
25   may well have.

Page 53

1  Q.  Were there comments recorded anyplace?
2  A.  I don't recall.  I've provided all the notes
3    that I've got with -- so...
4  Q.  Apart from Mr. Gallagher, who among
5    plaintiffs' counsel have you met or spoken
6    with?
7  A.  Well, I've met these gentlemen (indicating),
8    and I don't -- I don't know if I've met
9    anyone else.  I may have spoken to people on
10   the phone.
11 Q.  Have you met these gentlemen before today?
12 A.  I've met with Brent before.
13 Q.  How many times have you met with Mr. Landau?
14 A.  Once that I recall.
15 Q.  When was that?
16 A.  A few months ago to deal with discovery.
17 Q.  Discovery of -- paper discovery?
18 A.  Discovery of materials for this case.
19 Q.  Now, were plaintiffs' counsel provided with
20   an opportunity to review the survey
21   instrument for the time survey as well
22   before it was administered to the sample?
23 A.  Yes.
24 Q.  And do you recall whether they had comments
25   on the time survey before it was

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 54

1    administered to the sample?
2  A.  Yes.
3  Q.  And what were their comments?
4  A.  The one that I remember was that they added
5    a line of questioning that was not
6    originally in the survey.
7  Q.  What was the line of questioning?
8  A.  It dealt with whether or not or when people
9    had learned that the cigarette companies had
10    misled them -- I don't remember the exact
11    wording -- about the health risks of light
12    cigarettes.
13  Q.  Was that question or line of questions added
14    to the survey as it was administered to the
15    sample?
16  A.  No.
17  Q.  So the suggestion --
18         MR. ALLINDER:  Sorry, I didn't
19    understand the answer.
20         MR. GROSSMAN:  No.
21         THE WITNESS:  It was no.
22         MR. ALLINDER:  Thank you.
23  BY MR. GROSSMAN:
24  Q.  So the survey was administered -- the time
25    survey was administered without the line of

Page 55

1    questions that had been proposed by
2    plaintiffs' counsel?
3  A.  No.
4  Q.  The survey was administered with the line of
5    questions that were proposed by plaintiffs'
6    counsel?
7  A.  Not precisely.
8  Q.  What happened?
9  A.  Well, we took them and made sure they were
10    worded reasonably and such and applied
11    scales to them, made them into proper market
12    research questions.
13  Q.  You edited them?
14  A.  John and I edited them.
15  Q.  Together you and John edited them?
16  A.  Yes.
17  Q.  And as edited were those questions
18    pretested?
19  A.  Yes.
20  Q.  So the proposed changes from plaintiffs'
21    counsel were made -- were offered before the
22    pretests of the time survey?
23  A.  They were made after our initial pretests
24    but before -- then we pretested again when
25    we had these questions.

Page 56

1  Q.  Okay.  So in the time survey you had
2    qualitative interviews, then a pretest, then
3    after comments from plaintiffs' counsel and
4    amendments to the survey instrument another
5    set of pretests?
6  A.  No.
7  Q.  What am I missing?
8  A.  We did not do an initial qualitative stage
9    for the survey, but we did have two rounds
10    of pretests.
11  Q.  Why didn't you do an initial qualitative
12    stage?
13  A.  We felt it wasn't necessary.
14  Q.  And why is that?
15         MR. LANDAU:  Objection to form.
16  A.  The qualitative stage is mainly an attempt
17    to get terminology, initial terminology, and
18    we were able to get -- confirm that in your
19    first pretest, at least for the questions we
20    were asking at that time.
21  Q.  Now, did you communicate with counsel on the
22    conjoint survey upon receipt of the results,
23    learning the results?
24  A.  How immediately do you mean?
25  Q.  How long did it take after you got the

Page 57

1    results before you communicated --
2  A.  I don't know.  You know, in a timely manner.
3  Q.  Now, in the time survey did you have more
4    than one conversation with plaintiffs'
5    counsel about the time survey?
6  A.  Yes.
7  Q.  Did you have more than five?
8  A.  I don't know.
9  Q.  But it could be?
10  A.  It could be.
11  Q.  Did you have conversations with plaintiffs'
12    counsel on the time survey before it was
13    administered to the panel, apart from the
14    conversation that you discussed?
15         MR. LANDAU:  Objection to form.
16  A.  You mean, other early conversations?
17  Q.  Yes, other conversations prior to the
18    administration of the questionnaire to the
19    panel.
20  A.  Yes.
21  Q.  In those conversations did you discuss the
22    cost of the survey.
23  A.  Yes.
24  Q.  And, in fact, for the time survey you
25    increased the cost to -- by increasing the

15 (Pages 54 to 57)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 58

1    size of the panel that the test would be
2    administered to; is that correct?
3         MR. LANDAU:  Objection to form.
4  A.  Well, again, "panel" is not the term.
5  Q.  Sample?
6  A.  Yes.
7  Q.  Where at first you considered a sample of
8    about 600 people, later the sample was
9    expanded to include over a thousand; is that
10   correct?
11        MR. LANDAU:  Objection to form.
12 A.  No.  To the best of my knowledge, it was
13   always that sample size.
14 Q.  Okay.  Now, after the time survey was
15   conducted and completed by the sample, did
16   you communicate with plaintiffs' counsel as
17   to the results?
18 A.  Yes.
19 Q.  When did you first communicate with them as
20   to the results?
21 A.  I can't remember exactly.
22 Q.  Was it before the first draft of Dr.
23   Hauser's opinion on the time survey?
24        MR. LANDAU:  Objection to form.
25 A.  There were many drafts.  Probably not before

Page 59

1    the first.
2  Q.  Did you communicate with them before the
3    last draft of Dr. Hauser's opinion relating
4    to the time survey?
5  A.  Yes.
6  Q.  How many times from the first draft until
7    the last draft of Dr. Hauser's opinion with
8    regard to the time survey did you
9    communicate with plaintiffs' counsel?
10 A.  I don't remember precisely.  I would say two
11   or three times.
12 Q.  Did you provide plaintiffs' counsel with
13   drafts of Dr. Hauser's opinion regarding the
14   time survey?
15 A.  Prior to when?
16 Q.  Prior to the final opinion being filed?
17 A.  We did provide one for one of the counsel's
18   review, yes.
19 Q.  Which counsel was that?
20 A.  Well, actually, it might have been for more
21   than one counsel, but we provided it to Paul
22   Gallagher.
23 Q.  You provided Paul Gallagher with the final
24   draft?
25 A.  No, an earlier draft.

Page 60

1  Q.  With an earlier draft.
2       Do you know which earlier draft you
3    provided him?
4  A.  It's probably similar to the one, that long
5    report, December 16th, that I'm sure you're
6    familiar with.
7  Q.  Yes, I am.  And we'll take it out later.
8  A.  Yes, I'm sure we will.
9  Q.  But you did provide that or one like it to
10   Paul Gallagher?
11        MR. LANDAU:  Objection to form.
12 A.  Well, we provided him a draft at roughly
13   that time.
14 Q.  Do you know if Ms. Schussheim also
15   communicated with plaintiffs' counsel in
16   this case?
17 A.  Yes.
18 Q.  Was she with you when you had your
19   communications with plaintiffs' counsel?
20        MR. LANDAU:  Objection to form.
21 A.  Generally not.
22 Q.  Did she have, to your knowledge, independent
23   conversations with plaintiffs' counsel in
24   this case, independent of you?
25 A.  Yes.

Page 61

1  Q.  And was Dr. Hauser with you when you
2    communicated with plaintiffs' counsel in
3    this case?
4       MR. LANDAU:  Objection to form.
5  A.  Not always.
6  Q.  Sometimes but sometimes not?
7  A.  Right.
8  Q.  And you communicated with plaintiffs'
9    counsel in this case from sometime in the
10   spring of 2005 through the present; is that
11   correct?
12 A.  Correct.
13 Q.  Let's turn to the conjoint survey for a
14   moment.  There were qualitative interviews
15   for the conjoint survey?
16 A.  Yes.
17 Q.  Dr. Hauser did not conduct any of them; is
18   that correct?
19 A.  That's correct.
20 Q.  They were conducted only by you and Ms.
21   Schussheim; is that correct?
22 A.  Yes.
23        MR. GROSSMAN:  Why don't we take a
24   five-minute break, and we'll go on from
25   there.

16  (Pages 58 to 61)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 66

1  Q.  You've seen these materials before?
2  A.  Well, I'm looking at the first page, so it's
3      hard to generalize.
4  Q.  You are familiar with the first page?
5  A.  Yes, I am.
6  Q.  I would like to direct your attention, if I
7      may, to the first and second page which have
8      numbers 039 and 040 at the bottom.
9  A.  Right.
10  Q.  These are both outlines that were used for
11      qualitative interviews in the conjoint
12      analysis; is that correct?
13  A.  Not entirely.
14  Q.  How is it not correct?
15  A.  Just to remind you of the chronology, we did
16      our exploratory interviews and first pretest
17      prior to fielding the -- what we call the
18      pilot conjoint test for the Massachusetts
19      lawyers, which is very similar to what
20      you're referring to as the conjoint
21      analysis.  So this was exploratory research
22      for that pilot conjoint.
23  Q.  This would --
24  A.  It was also used for the other study, but it
25      was developed for the first study.

Page 67

1  Q.  And then it was used for the qualitative
2      interviews in this conjoint study?
3  A.  Yes.
4  Q.  Who drafted the document that -- on the
5      first page, which is 039?
6  A.  I drafted it.
7  Q.  And who drafted the second page, which is
8      040?
9  A.  Well, they're both the same page in terms of
10      word processing.  Are you referring to that
11      or to the writing on it?
12  Q.  Well, they are not identical.
13  A.  Oh, really?
14  Q.  Yeah.
15  A.  Okay.  Oh.  Well --
16  Q.  Is one a later draft?
17  A.  Probably.  Oh, wait, I'm speculating.  I
18      would say yes, one is later.
19  Q.  And do you know which one is later?
20  A.  No, I don't.
21  Q.  Okay.  Looking on 039, there it -- in the
22      upper left-hand corner it says "Introduce
23      me" and "AMS."  Do you see that?
24  A.  Yes, I do.
25  Q.  Who wrote that?

Page 68

1  A.  I wrote that.
2  Q.  Okay.  It also says, "Your smoking history."
3      Who wrote that?
4  A.  I wrote that.
5  Q.  Looking at the next page in the upper
6      left-hand corner it says, "Tell me about the
7      cig. you smoke."
8      Do you see that?
9  A.  Yes, I do.
10  Q.  Who wrote that?
11  A.  Ms. Schussheim wrote that.
12  Q.  Is the other writing on that page Ms.
13      Schussheim's also -- Schussheim's also?
14  A.  To the best of my knowledge.
15  Q.  And at the bottom where it says, "Image
16      (Lite vs. Regular)" above the line, and then
17      "Pack," "Test," "Safety," "Price" and then a
18      line and "Brand" under that, is that Ms.
19      Schussheim's writing?
20  A.  That's my understanding, yes.
21  Q.  Okay.  Now, looking at 039 which contains
22      your writing --
23  A.  Yes.  All right.
24  Q.  -- it's your recollection that you wrote
25      this originally for the pilot study for the

Page 69

1      Massachusetts project?
2  A.  Yes.
3  Q.  How many respondents were there in the
4      Massachusetts pilot study?
5  A.  The actual conjoint analysis?
6  Q.  Yes.
7  A.  199, I believe.
8  Q.  Now, what review of literature did you do,
9      if any, in constructing this outline of
10      light cigarette questions?
11  A.  I believe we've gone over that.
12  Q.  Yeah.  The answer is none; is that correct?
13      MR. LANDAU:  Objection to form.
14  A.  Again, which literature do you mean?
15  Q.  Any public literature.
16  A.  Essentially, yes.
17  Q.  Essentially none, correct?
18  A.  Correct.
19  Q.  Did you ever review the websites of R.J.
20      Reynolds, Brown & Williamson, Philip Morris
21      or Lorillard?
22  A.  Yes.
23  Q.  When did you do that?
24  A.  Prior -- I think prior to this research.
25  Q.  What were you looking for?

18 (Pages 66 to 69)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 70

1  A.  Looking for what they had to say about light
2      cigarettes.
3  Q.  As to the health effects of light
4      cigarettes?
5  A.  Yes.  More generally, but yes.
6  Q.  Did you look for anything else on the
7      websites of these companies?
8  A.  I can't recall specifically what I looked
9      for.
10 Q.  Now, at what point in the process for the
11     conjoint analysis did you develop a
12     tentative list of attributes to be studied
13     in the conjoint analysis?
14         MR. LANDAU:  Objection to form.
15 A.  I'm not sure.
16 Q.  Just for clarification, four attributes were
17     studied in the conjoint analysis; is that
18     correct?
19 A.  Yes.
20 Q.  And those were pack versus -- hard pack box
21     versus soft pack, price, taste and risk; is
22     that correct?
23 A.  Basically.
24 Q.  Do you recall whether you tentatively set
25     those attributes as the attributes that

Page 71

1      would be measured before conducting the
2      qualitative interviews for the conjoint
3      analysis?
4  A.  What do you mean by "set"?
5  Q.  Did you go into the qualitative interviews
6      with a hypothesis that those four attributes
7      would be the attributes measured?
8  A.  I don't recall.
9  Q.  You may have, but you don't recall?
10 A.  We had a hypothesis.  I don't recall exactly
11     what it was.  It was something similar.
12 Q.  What was -- as a matter of scientific
13     method, you entered the qualitative
14     interviews with a hypothesis; is that
15     correct?
16 A.  Again, it was a long time ago, so I don't
17     really recall.
18 Q.  Do you recall any aspects of the
19     hypothetical that you had as you entered
20     into the qualitative interviews?
21 A.  I think that we had a list of possible
22     attributes.
23 Q.  Do you recall whether there were any items
24     on the list other than price, taste, health
25     risk or pack type?

Page 72

1  A.  I think there were some, but I can't recall
2      exactly.
3  Q.  Can you recall any of them?
4  A.  I think that would be speculation.
5  Q.  Did you do any study or review any
6      literature on cross-elasticity of demand
7      among different cigarette brands and
8      types --
9          MR. LANDAU:  Objection to form.
10 Q.  -- in constructing your hypothetical or the
11     final questionnaire?
12         MR. LANDAU:  Objection to form.
13 A.  No.
14 Q.  Now, as a person who has conducted and
15     designed conjoint analyses -- let me go
16     back.
17     You have, in fact, designed conjoint
18     analyses; is that correct?
19 A.  Yes.
20 Q.  And you've also conducted them; is that
21     correct?
22 A.  Yes.
23 Q.  As one who has both conducted and designed
24     conjoint analyses, you would agree, wouldn't
25     you, that it's important to test for the

Page 73

1      right attributes?
2          MR. LANDAU:  Objection to form.
3  A.  I would agree.
4  Q.  If you don't test for the right attributes,
5      there is a possibility that the results will
6      be skewed by unmeasured attributes; is that
7      correct?
8          MR. LANDAU:  Objection to form.
9  A.  Possible.
10 Q.  And that's called confounding; is that
11     correct?
12 A.  That's one word for it.
13 Q.  And if the results are skewed by unmeasured
14     attributes, no adjustment can be made after
15     the study to account for them; is that
16     correct?
17         MR. LANDAU:  Objection to form.
18 A.  I don't know that that's true.  It's
19     difficult.
20 Q.  If they're not measured, there is no way to
21     know the extent to which those unmeasured
22     attributes affect respondents' answers with
23     regard to the measured attributes; is that
24     correct?
25         MR. LANDAU:  Objection to form.

19 (Pages 70 to 73)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 78

1      of light smokers as a whole; is that
2      correct?
3   A. That's correct.
4   Q. Now, the questioning that you did of the
5      people in the qualitative interviews was not
6      the primary basis upon which he generated
7      hypotheses; is that correct?
8         MR. LANDAU: Objection to form.
9   A. What do you mean by that question? I don't
10     understand.
11  Q. Based upon the qualitative interviews that
12     you conducted, did you expand or contract a
13     list of attributes to be measured in the
14     conjoint analysis?
15  A. I don't recall the exact process, but I do
16     recall that we decided not to have brand as
17     one of the attributes. We decided to deal
18     within a person's brand because of all the
19     cross-elasticity problems and such you
20     mentioned, among other things.
21  Q. Now, you decided to deal within a person's
22     brand after the qualitative interviews?
23  A. I don't remember exactly when.
24  Q. You mentioned cross-elasticity problems. Is
25     it your understanding -- you have not

Page 79

1      studied cross-elasticity in the cigarette
2      industry, correct?
3   A. Correct.
4   Q. And you didn't know before the conjoint
5      analysis and you don't know after the
6      conjoint analysis what the cross-elasticity
7      demand is among brands in the cigarette
8      industry; is that correct?
9   A. That's correct.
10  Q. And the conjoint analysis could not tell you
11     whether in the absence of the word "light"
12     Marlboro Light smokers would choose the same
13     cigarette or a different Marlboro or a
14     different cigarette entirely marked "light";
15     is that correct?
16        MR. LANDAU: Objection to form.
17  A. I think you double-negatived yourself there.
18  Q. Okay. I'll rephrase the question.
19  A. Okay.
20  Q. Now that you have completed the conjoint
21     analysis --
22  A. Yes.
23  Q. -- you do not know whether smokers of
24     Marlboro Light would have purchased the same
25     cigarettes had they not contained the word

Page 80

1      "light"; is that correct?
2         MR. LANDAU: Objection to form.
3   A. I'm afraid I paused on "you do not know" and
4      was waiting for the structure. If you'll
5      just repeat it once more, I'll give it a
6      try.
7   Q. Okay. You finished the conjoint analysis?
8   A. Yes.
9   Q. And having completed that conjoint analysis,
10     you don't know what the second choice of any
11     particular smoker would be; is that correct?
12        MR. LANDAU: Objection to form.
13  A. Well, you haven't said second choice in the
14     event of what.
15  Q. If his cigarette were not available.
16  A. That's true. That's correct.
17  Q. So, for example, you don't know if a
18     Marlboro Light smoker in the absence of this
19     cigarette would choose a different Marlboro
20     product or a different lights product?
21  A. That's correct.
22  Q. And that's because your conjoint analysis
23     was not designed to answer that question; is
24     that correct?
25        MR. LANDAU: Objection to form.

Page 81

1   A. Perhaps. Ask it once more.
2   Q. Your conjoint analysis was not designed to
3      answer the question what a smoker's
4      cigarette choice would be; is that correct?
5         MR. LANDAU: Same objection.
6   Q. Isn't that correct?
7   A. It wasn't a double negative problem. I'm
8      sorry. Try again.
9   Q. Conjoint analysis was not designed to
10     determine what brand a smoker would choose
11     if his brand were not available?
12  A. That's correct.
13  Q. This conjoint analysis was not designed to
14     determine the historic reason why the smoker
15     chose the brand that he uses; is that
16     correct?
17        MR. LANDAU: Objection to form.
18  A. That's correct.
19  Q. The conjoint analysis was not designed to
20     determine the information that was available
21     to the smoker when he chose his light brand
22     of cigarettes; is that correct?
23        MR. LANDAU: Objection to form.
24  A. Correct. I just want to point out here that
25     I'm not the expert on this case, so these

21 (Pages 78 to 81)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 82

1   may be questions that are really not my area
2   of expertise.
3   Q.  I understand, but --
4   A.  Okay.
5   Q.  -- to your understanding.
6   A.  All right.  If we go on that basis --
7   Q.  Yes.
8   A.  -- for these.
9   Q.  To your understanding.
10  A.  To my understanding.  Here, ask the question
11      again.  I'm afraid I've forgotten.
12  Q.  To your understanding, the conjoint analysis
13      was not designed to determine the reason why
14      smokers chose the light cigarettes that they
15      chose?
16          MR. LANDAU:  Objection to form.
17  A.  I'm not trying to be obstinate, but that's
18      not a complete question.
19  Q.  Let me just continue on to the next area.
20  A.  Okay.  Sure.
21  Q.  Now, you know from your earlier work -- you
22      know vaguely from your earlier work at
23      Management Decisions that --
24  A.  Management Decision Systems.
25  Q.  -- Management Decision Systems that the

Page 83

1   cigarette market is highly fractionalized
2   and that there are many, many brands
3   available to consumers?
4          MR. LANDAU:  Objection to form.
5   A.  Yes.
6   Q.  And the sample in the conjoint analysis was
7       630-odd people; is that correct?
8   A.  It's close, yes.
9   Q.  And you understand that many of the brands
10      involved in this case have market shares
11      well below 1 percent?
12         MR. LANDAU:  Objection to form.
13  A.  That's my understanding.
14  Q.  The sample surveyed was not large enough to
15      draw meaningful results as to any of those
16      brands by themselves; is that correct?
17         MR. LANDAU:  Objection to form.
18  A.  No.
19  Q.  Well, in constructing the questionnaire and
20      designing the survey --
21  A.  Uh-huh.
22  Q.  -- did you make any allowance or attempt to
23      determine on a brand-by-brand basis how
24      respondents would answer the conjoint
25      analysis questions?

Page 84

1          MR. LANDAU:  Objection to form.
2   A.  If you will, please give that another try.
3       I'll try to listen to it harder.  I think I
4       can answer that.  You don't even have to
5       change it, just repeat it.
6          MR. GROSSMAN:  Why don't you repeat
7       the question.
8          (Record read.)
9          MR. LANDAU:  Same objection.
10  A.  I don't understand that question, or I don't
11      believe it's asked correctly.
12  Q.  Okay.  Have you -- in the qualitative
13      interviews and pretests did you make any
14      attempt to determine whether the lights
15      market was homogeneous as to the reasons
16      smokers chose their particular brands?
17  A.  Did you say in the qualitative or pretests?
18  Q.  Both.  In either of them.
19         MR. LANDAU:  Objection to form.
20  A.  No, because it would be impossible to make
21      an authoritative determination on such a
22      small sample size.
23  Q.  Did you make any effort to determine whether
24      the market for light cigarettes was
25      homogeneous on the basis of the conjoint

Page 85

1   survey as it was administered to the sample
2   of just over 600 people?
3          MR. LANDAU:  Objection to form.
4   A.  You're getting better.  Yes.
5   Q.  You made such an effort?
6   A.  We made a small effort in that we looked at
7       the partworths of -- average partworths for
8       groups where we broke out the groups by the
9       brand that they -- of light cigarette that
10      they used most often.
11  Q.  When you said you made a partial effort --
12  A.  Well, I mean --
13  Q.  -- did you make an effort for each brand?
14  A.  What you do is you know each brand each
15      person primarily smokes, and so that enables
16      you to divide them into groups based on that
17      brand, and then you can look at the average
18      partworths for the levels of the attributes
19      for each group.  And that lets you determine
20      if they are statistically different.
21  Q.  Was there a statistical difference between
22      smokers of Kool cigarettes, Kool Light
23      cigarettes and other brands?
24         MR. LANDAU:  Objection to form.
25  A.  A, I don't recall, and, B, as you've noted

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 114

1     smokers, which includes smokers of all
2     types.
3  Q.  Okay.  Let me rephrase --
4  A.  We don't have that.
5  Q.  Let me rephrase the question.
6       If the market for light cigarettes
7     were homogeneous --
8  A.  Uh-huh.
9  Q.  -- then the responses of Newport Light
10    smokers and Marlboro Light smokers in your
11    conjoint survey would be substantially
12    identical; is that correct?
13        MR. LANDAU:  Objection to form.
14  A.  If groups are homogeneous with the variables
15    of interest, they tend to answer about the
16    same, that's true, but --
17  Q.  But if Marlboro Light smokers have a
18    different view of the taste of Marlboro
19    Lights in relation to Marlboro regulars than
20    Newport Light smokers do with regard to the
21    taste of Newport Light versus Newport
22    regulars, there are differences not
23    accounted for in the homogenized answers to
24    the conjoint analysis?
25        MR. LANDAU:  Objection --

Page 115

1  A.  You speak of my --
2       MR. LANDAU:  Objection to form.
3  A.  -- example as if it were milk, and that's
4     not correct.
5  Q.  The sample was intended to be of light
6     smokers, correct?
7  A.  Yes.  What happened -- you haven't really
8     plumbed how we do that or did that, but the
9     completed surveys were of light cigarette
10    smokers.
11  Q.  And the completed survey was intended to be
12    representative of the public by sex, by
13    region of the country and by income as
14    divided into three groups, correct?
15        MR. LANDAU:  Objection to form.
16  A.  That's not correct.
17  Q.  You set up quotas?
18  A.  That's correct.
19  Q.  You set up no quota by brand; is that
20    correct?
21  A.  That's correct.
22  Q.  You set up no quota by race; is that
23    correct?
24  A.  That's correct.
25  Q.  You set up no quota by ethnicity; is that

Page 116

1     correct?
2  A.  Is that different from race?
3  Q.  Yes, like Hispanic.
4  A.  Okay.  We didn't do that.
5  Q.  And you set up no quota by education; is
6     that right?
7  A.  I believe that's correct.
8  Q.  Have you done any study at any time to
9     determine whether education is a substantial
10    driver in whether individuals smoke light
11    cigarettes or cigarettes at all?
12        MR. LANDAU:  Objection to form.
13  A.  No, I still must say you don't understand
14    how the sample was drawn in this study.
15    You're not telling me -- you don't seem to
16    have a clear picture of it.
17  Q.  Did you ever make any attempt in analyzing
18    the numbers that came back from the conjoint
19    survey whether menthol smokers differed in
20    the way they responded to questions from
21    smokers of non-mentholated cigarettes?
22  A.  Again, your question assumes there are
23    regular and light menthol smokers in the
24    sample, it seems, since you just --
25  Q.  No.  No, no, no.

Page 117

1  A.  -- say smokers.
2  Q.  I'm sorry.  The sample was only of light
3     smokers, correct?
4  A.  That's correct.
5  Q.  Okay.  Did you ever make any effort to
6     determine whether the smokers of mentholated
7     light cigarettes responded to the questions
8     the same as the smokers of non-mentholated
9     light cigarettes?
10        MR. LANDAU:  Objection to form.
11  A.  I object to the form also, but I'll tell you
12    why.  We didn't look at mentholated versus
13    non-mentholated --
14  Q.  Okay.
15  A.  -- just to move things along.
16  Q.  Now, when you conducted the qualitative
17    interviews, most smokers who you interviewed
18    told you they preferred the taste of light
19    cigarettes; isn't that right?
20        MR. LANDAU:  Objection to form.
21  A.  I would say that's true.
22  Q.  In fact, if they told you that all things
23    were equal, if they viewed both cigarettes
24    as equally risky, they would have smoked
25    lights anyway?

30 (Pages 114 to 117)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 118

1        MR. LANDAU:  Objection to form.
2   A.  I think that's stating it too strongly, for
3       two reasons:  One is you're making a very
4       general statement compared to the exact
5       conclusions one could draw from an
6       experiment; B, I'm not the expert; but C --
7       now I can't remember C, but there was
8       something else.
9   Q.  Well, why don't we take out --
10  A.  Oh, C -- I'm sorry.  C was I don't quite
11      remember what the partworth values were,
12      which you're probably about to show me.
13  Q.  No, I'm talking about the qualitative
14      interviews.
15  A.  Oh, the qualitative interviews?
16  Q.  Yes.
17  A.  Oh, I'm sorry, I misunderstood.
18  Q.  Yeah.  And you conducted the qualitative
19      interviews, so you were the one who spoke
20      with the people?
21  A.  Well, actually, that's not entirely correct
22      since Ms. Schussheim conducted some of the
23      qualitative interviews.
24  Q.  Yeah, you conducted seven?
25  A.  Right.

Page 119

1   Q.  And in those qualitative interviews the
2       people interviewed told you to a large
3       extent that all things being equal regarding
4       health, they still would have smoked lights
5       because they preferred the taste?
6        MR. LANDAU:  Objection to form.
7   A.  I think there was a general -- these were
8       light smokers --
9   Q.  Yes.
10  A.  -- and they -- I think they generally
11      preferred the taste of light cigarettes.
12  Q.  In fact, one told you in Latin "ceteris
13      paribus"?
14  A.  That was probably me at work.
15  Q.  Okay.  But you said, "Ceteris paribus, he
16      would smoke lite cigarettes"?
17       MR. LANDAU:  Objection to form.
18  A.  Can we look at the exact --
19  Q.  Yes.
20  A.  -- quote?
21  Q.  Yes.
22  A.  I'm not disputing it.
23  Q.  Yes, could you look at Exhibit No. 2,
24      please.
25  A.  Exhibit No. 2, okay, yeah.

Page 120

1   Q.  On Page 050 you'll see in the lower
2       left-hand corner --
3   A.  Yeah.
4   Q.  -- which is the interview of someone named
5       Heinz.  At the top of 050 --
6   A.  Uh-huh.
7   Q.  -- you wrote, "So ceteris paribus, he'd
8       smoke lites instead of regulars due to
9       taste.  Nicotine is the same."
10  A.  Yes, I wrote that.
11  Q.  Do you recall whether those words are your
12      impression of what he said or a quote of
13      what he said?
14  A.  Well, given the pretentious Latin usage,
15      it's likely my paraphrase of what he said.
16  Q.  But, in fact, it was your understanding that
17      if lights and regulars were equally risky,
18      he would smoke lights anyway because he
19      preferred the taste?
20  A.  Yes.  I would like to point out once more
21      that this is not a counting exercise on the
22      qualitatives.
23  Q.  Yes, I understand that.
24  A.  Okay.
25  Q.  Could you look at -- two pages later at

Page 121

1       Hauser 052.
2   A.  Uh-huh.
3   Q.  Jennifer who you interviewed similarly said
4       at the very bottom of the page, "if lites
5       are as unhealthy as regulars, she wants the
6       lite - taste, feel are better 'lighter.'"
7   A.  Yes, I wrote that.
8   Q.  Okay.  If you look at Page 045, "Bottom
9       line" -- literally and figuratively the
10      bottom line in discussing Chris you wrote,
11      "Bottom line:  regular cigarettes are
12      harsh"?
13  A.  Yes, I did.
14  Q.  He didn't like the taste of regular
15      cigarettes, correct?
16  A.  Well, he said they're harsh.
17  Q.  Yes, okay.
18       MR. GROSSMAN:  Let's see.  It's a
19  quarter after 12:00.  Why don't we turn off
20  the tape.
21       THE VIDEOGRAPHER:  The time is
22  12:13.  This is the end of Cassette No. 2.
23  We're off the record.
24      (Lunch recess taken.)
25

31 (Pages 118 to 121)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 126

1    traditional conjoint/choice models."
2        When did you write that?
3    A.  Sometime last year, I think.
4    Q.  Before or after the conjoint study in this
5        case?
6    A.  I don't remember.
7    Q.  In the next paragraph it says, "Consumers
8        generally develop their consideration set by
9        reviewing a list of features and finding all
10       the products with their 'must have' features
11       and without features that are grounds for
12       elimination, such as, an unacceptable brand
13       or an unaffordable price.  This is a
14       non-compensatory process, because no amount
15       of good performance on other features can
16       make up for the lack of a 'must have'
17       feature."
18           Do you know if any appreciable number
19       of consumers of light cigarettes view some
20       brands as unacceptable?
21           MR. LANDAU:  Objection to form.
22   A.  Our study did not deal with brands, so I do
23       not.
24   Q.  Okay.  The next sentence here is
25       "Traditional choice and conjoint models, on

Page 127

1        the other hand, assume a compensatory
2        process, in which a product can be chosen
3        even if it does poorly on some features, as
4        long as it does well on others.  This
5        generally works for trade-offs within the
6        consideration set, but not for the formation
7        of the consideration set itself."
8            Do you agree with that?
9    A.  Depends on the category, but it's often the
10       case.
11   Q.  Now, it continues.  "With our process,
12       respondents are presented with an array of
13       product alternatives generated from the full
14       set of attributes for the product category.
15       Respondents select the alternatives they
16       would seriously consider buying.  A quick
17       mathematical test is done to check whether
18       each respondent used a non-compensatory or
19       compensatory method for deriving his or her
20       consideration set.  In initial testing, it
21       appears that only a small minority will use
22       a compensatory method, and for those
23       respondents, we perform a choice-based
24       conjoint analysis using the full set of
25       attributes and levels."

Page 128

1        Do you see that?
2    A.  Yes, I do.
3    Q.  Was the full set of attributes and levels
4        used in the conjoint analysis on cigarettes
5        that you conducted?
6            MR. LANDAU:  Objection to form.
7    A.  Are you asking me this as an expert in the
8        case or --
9    Q.  No.  Is it your understanding that you chose
10       to work with a full set of attributes and
11       levels in this case?
12           MR. LANDAU:  Objection to form.
13   A.  Well, we did not follow this particular
14       process.  We did work with -- we did not
15       whittle down the set of attributes for each
16       respondent as this describes.
17   Q.  Okay.  So in this case you used the
18       traditional conjoint analysis rather than
19       the new model that you referred to in this;
20       is that correct?
21   A.  Essentially, yes.
22           MR. GROSSMAN:  Let me mark what we
23       will as Exhibit No. 7, and that's an
24       opinion.
25

Page 129

1            (Exhibit No. 7, Expert Witness
2        Report of Dr. John R. Hauser, marked for
3        identification.)
4    Q.  Mr. Gaskin, I'm handing you what's been
5        marked for identification purposes as Gaskin
6        Exhibit No. 7, which is a copy of Dr.
7        Hauser's opinion of August 22, 2005 on the
8        conjoint analysis.  Did you participate in
9        any way in drafting this report?
10   A.  Yes, under Dr. Hauser's direction.
11   Q.  Who wrote the first draft?
12           MR. LANDAU:  Objection to form.
13   A.  Well, again, it's not an all or nothing
14       thing, but I would attempt to write a draft
15       under John's direction.
16   Q.  And then he edits it?
17   A.  He'll add content, edit it, delete.  It's up
18       to him.
19   Q.  And in this particular case of the conjoint
20       analysis report, you made the first effort
21       to commit this to paper?
22   A.  Actually, it's a little more complicated
23       than that.
24   Q.  Okay.  What was the process?
25   A.  We had done a similar analysis for another

33 (Pages 126 to 129)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 150

1     affecting their taste or change the taste of
2     cigarettes without affecting their risk?
3          MR. LANDAU:  Objection to form.
4   A.  I don't recall.  I do recall they said they
5     could do our study reasonably.
6   Q.  You recall that they said they could suspend
7     their disbelief if they, in fact,
8     disbelieved that hypothetical?
9   A.  We asked --
10         MR. LANDAU:  Objection to form.
11  A.  We asked -- well, I don't remember the exact
12    quote, but we did ask them to, for the
13    purposes of the study, to assume that it
14    could happen.
15  Q.  And in your qualitative interviews in which
16    you asked wide-ranging questions about risk,
17    as well as in the pretesting interviews, no
18    one, to your recollection, said that he had
19    believed prior to the survey that
20    manufacturers could change the risks of
21    cigarettes without affecting taste; is that
22    correct?
23         MR. LANDAU:  Objection to form.
24  A.  I don't recall anyone saying that.
25  Q.  Okay.  What was Dr. Hauser's role, if any,

Page 151

1     in drafting the language that was used in
2     the questionnaire for the conjoint survey?
3   A.  Well, as I said, I wrote it at his
4     direction, so he had a substantial amount of
5     involvement in terms of feedback, quality
6     control, final say.
7   Q.  Did he personally write any part of it?
8   A.  I don't recall.
9          MR. LANDAU:  Objection to form.
10  Q.  Did he personally write any part of the time
11    survey?
12         MR. LANDAU:  Objection to form.
13  A.  I don't recall.
14  Q.  Did you write under his guidance or
15    otherwise the first draft of the time
16    survey?
17  A.  I worked on it with him.  I don't recall
18    that I wrote it like Athena or Venus rising
19    out of the sea for him.
20  Q.  Athena rising out of Zeus's head?
21  A.  Correct.  Thank you.
22  Q.  Did Ms. Schussheim work with you on the time
23    survey as well?
24  A.  No, she did not.
25

Page 152

1          (Mr. Allinder entered deposition
2     room.)
3   Q.  Did anyone else work with you on the time
4     survey?
5   A.  Some of -- a number of pretests were
6     conducted -- a few of the pretests were
7     conducted by a woman at AMS.
8   Q.  What's her name?
9   A.  Derby Swanson.
10  Q.  Did you work on the pretest as well?
11  A.  Yes.
12  Q.  Did Dr. Hauser participate in any of the
13    interviews, pretests on the time survey?
14         (Mr. Falcone entered deposition room.)
15  A.  No, he did not.
16  Q.  Now, in the conjoint survey did Dr. Hauser
17    give you the go-ahead to begin pretesting of
18    the questionnaire?
19  A.  Yes.
20  Q.  In order to give you the go-ahead on the
21    pretesting of the questionnaire, what is
22    your understanding of what Dr. Hauser had to
23    be satisfied of?
24         MR. LANDAU:  Objection to form.
25  Q.  Let me rephrase the question.

Page 153

1   A.  Okay.
2   Q.  How far along in the process do you have to
3     be before you can begin pretesting?
4          MR. LANDAU:  Objection to form.
5   A.  Generally reasonably far.
6   Q.  In order to begin pretesting, you have to
7     have developed the basic format and wording
8     of the questionnaire; is that correct?
9   A.  Yes.
10  Q.  Because pretesting is a means of fine-tuning
11    the language of the questionnaire; is that
12    correct?
13         MR. LANDAU:  Objection to form.
14  A.  Basically.  Sometimes you might find you're
15    missing a question, but generally you're
16    tuning the language.
17  Q.  And so in approving pretests for the
18    conjoint questionnaire, Dr. Hauser was, to
19    your understanding, agreeing that the study
20    design was appropriate to the circumstance?
21         MR. LANDAU:  Objection to form.
22  A.  What do you mean by "the study design"?
23  Q.  Well, at the time that pretesting began on
24    the conjoint study --
25  A.  Right.

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 162

1  Q.  In your qualitative research were 14
2      interviews, correct?
3  A.  Yes.
4  Q.  And there are 41 brands in this case,
5      correct?
6          MR. LANDAU:  Objection.
7  A.  That's correct.
8  Q.  And so --
9  A.  Well, at least -- we had 41 brand
10     differentiations of some sort, yes.
11 Q.  Yeah, 41 -- you did not interview even one
12     person for most of the brands that are
13     involved in this case; is that correct?
14 A.  That's correct.
15 Q.  And, in fact, you had multiple respondents
16     who smoked Marlboro Lights and Parliament
17     Lights in your interviews; is that correct?
18 A.  I believe so.
19 Q.  Did you ever question why there were so many
20     Parliament Light smokers among the people
21     who you interviewed, considering the
22     minuscule share of the national market that
23     Parliament Light has?
24         MR. LANDAU:  Objection to form.
25 A.  I don't recall.

Page 163

1  Q.  So the decision to lump smokers of all 41
2      brands together for purposes of the conjoint
3      survey was an a priori decision; is that
4      correct?
5          MR. LANDAU:  Objection.
6  A.  Could you define the term "lump"?
7  Q.  The decision to conduct the single survey
8      that would be attributed to all 41 brands
9      regardless of the number of smokers per
10     brand included in the survey was an a priori
11     decision; is that correct?
12         MR. LANDAU:  Objection to form.
13 A.  That's correct, for good reason, so...
14 Q.  But it was an a priori decision?
15 A.  Yes.
16 Q.  Did you maintain any drafts of the
17     questionnaire that was used in the pre --
18     the questionnaire or questionnaires that
19     were used in the pretests before the
20     conjoint analysis survey?
21 A.  Yes.
22 Q.  Where are they?
23 A.  I produced them.
24 Q.  To my knowledge, we have only the final
25     draft.

Page 164

1  A.  Okay.  In the notes I had copied -- you
2      know, maybe I'm wrong.  In the notes I had
3      copied I believe I saw the other day a copy
4      of either a printout of it, of the screens
5      or a Word version of it that I thought was
6      an earlier draft.
7  Q.  Okay.
8  A.  There were also notes on the pretest that
9      had comments on the questions and such.
10 Q.  Yes.  We have the notes on the pretest --
11 A.  Yeah.
12 Q.  -- but I don't know of anything else.
13 A.  Okay.
14 Q.  Again, in the pretest Dr. Hauser did not
15     participate in any interviews on the
16     pretest; is that correct?
17 A.  That's correct.
18 Q.  Now, perhaps you could clarify it for me
19     quickly.  If you look at Exhibit No. 2 --
20     oh, I think this might be separate.  They
21     might be included in that.
22         Following the pretests there were
23     additional qualitative interviews conducted;
24     is that correct?
25 A.  Huh?

Page 165

1  Q.  Well, the pretests were conducted on March
2      23rd, 2005, approximately?
3  A.  That's correct.
4  Q.  Did they continue into later days?
5  A.  I seem to remember March 29th, but which
6      later ones are you referring to?
7  Q.  I've got March 23, March 29, March 25.
8  A.  Okay.
9  Q.  I believe that there were interviews
10     conducted in May, on May 18th.
11 A.  That's correct.
12 Q.  What were those interviews?
13 A.  These were interviews for a survey that was
14     not conducted.
15 Q.  What was the survey that was not conducted?
16 A.  The Massachusetts lawyers, if I may term
17     them as such --
18 Q.  Yes.
19 A.  -- without fear of reprisal asked if we
20     could do a version of the pilot conjoint we
21     had done that talked about health risk that
22     instead referred to tar and nicotine levels
23     instead of health risk.
24 Q.  I see.
25 A.  So we did some pretest with that wording

42 (Pages 162 to 165)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 166

1   changed, and then for whatever reason they
2   did not do a survey.
3   Q.  Okay.  I would like to direct your
4   attention, if I may, to the pretest
5   interviews.  Let's see, 065...
6   A.  That's Exhibit 2?
7   Q.  Well, I think --
8   A.  Oh, that's another one.
9       (Discussion off the record.)
10  Q.  Well, could I see your Exhibit 2, please?
11  A.  Sure.  (Hands document to Mr. Grossman.)
12  Q.  062, it will be in here, okay.  Mine has
13  been separated.
14      Looking at Exhibit 2, Page 062 --
15  A.  Right.
16  Q.  -- I'm sorry, 065 --
17  A.  Ah.
18  Q.  -- there's an interview from the pretest of
19  March 25, 2005 of Stacey.  Do you see at the
20  bottom it says, "She got a bit scared by
21  health risk is greater than regular
22  cigarettes.  20 percent and 50 percent -
23  that sounds fine.  A buck is serious money.
24  50 percent is crazy - as long as the health
25  risk is greater, even though she knows it's

Page 167

1   the same."
2       What is she saying there?
3   A.  I'm not --
4       MR. LANDAU:  Objection to form.
5   A.  -- sure.
6   Q.  There was no option on the survey for the
7   conjoint analysis in the conjoint analysis
8   section for respondents to write no
9   preference; is that correct?
10  A.  You mean, with any set of choice --
11  Q.  Yes.
12  A.  -- alternatives?
13  Q.  Yes.
14  A.  That's correct.
15  Q.  Whose decision was it not to include a no
16  preference option?
17      MR. LANDAU:  Objection to form.
18  A.  I think that "no preference" isn't quite the
19  right term.
20  Q.  What's the right term?
21  A.  I think it's -- you choose none of those,
22  and I -- again, I'm not speaking as an
23  expert, but the decision would have been
24  John's.
25  Q.  Not yours?

Page 168

1   A.  (No verbal response.)
2   Q.  Okay.  Um, could you --
3       THE WITNESS:  While you're saying
4   um, I'm an old person, so I need another
5   break.
6       MR. GROSSMAN:  Okay.
7       THE WITNESS:  I'll be right back.
8       MR. GROSSMAN:  Let's stop the tape.
9       THE VIDEOGRAPHER:  The time is
10  2:17.  We're off the record.
11      (Recess taken.)
12      THE VIDEOGRAPHER:  The time is
13  2:20.  We are back on the record.
14  BY MR. GROSSMAN:
15  Q.  Okay.  Mr. Gaskin --
16  A.  Thank you.
17  Q.  -- all set?  Could you direct your
18  attention, please, to -- in Exhibit No. 2 to
19  the Page 073 in the lower right-hand corner.
20  A.  Right.
21  Q.  And those are your notes of Melissa No. 6?
22  A.  Right.
23      (Mr. Garnick entered deposition room.)
24  Q.  You wrote, "Likes ultra lights best!  But is
25  a Parliament smoker, and they don't appear

Page 169

1   to have ultra lights.  It wasn't bad."
2       Do you see that?
3   A.  Yes, I do.
4   Q.  For some smokers the importance of brand or
5   brand image trumps all other factors; is
6   that correct?
7       MR. LANDAU:  Objection to form.
8   A.  I'm not an expert, so --
9   Q.  In the case of Melissa who preferred the
10  taste of ultra lights, purchasing Parliament
11  was more important than purchasing the class
12  of cigarettes that she preferred the taste
13  of; is that correct?
14      MR. LANDAU:  Objection to form.
15  A.  I'm not sure why I said "they don't appear
16  to have" -- well, I think that -- yeah, I'm
17  not quite sure what she was saying, but it
18  appears that she was saying that she's a
19  Parliament smoker.  I don't know if they
20  have an ultra light or not, in fact.
21  Q.  But she reported to you that she smoked
22  Parliament Lights; otherwise, she wouldn't
23  be included in the pretest, correct?
24  A.  That's true.
25  Q.  And having reported that she smoked

43 (Pages 166 to 169)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 170

1    Parliament Lights, she also reported that
2    she preferred the taste of ultra lights, but
3    at least that she found it difficult to find
4    Parliament Ultra Lights --
5        MR. LANDAU:  Objection to form.
6  Q.  -- if they were available at all?
7        MR. LANDAU:  Objection.
8  A.  That's a bit of speculation on my part to
9    agree.  It's conceivable, but, again, you
10   know...
11 Q.  You found evidence in the interviews you
12   conducted that for some smokers brand was a
13   very important factor in cigarette choice?
14       MR. LANDAU:  Objection to form.
15 A.  We found there with Melissa that she liked
16   Parliament, for example.  I would say it's
17   fair to say that brand is an important
18   factor in people's cigarette choice.
19 Q.  For some people --
20 A.  Well, saying this based on my qualitative --
21 Q.  Yes.
22 A.  -- interviews as opposed to being an expert.
23 Q.  Yes.  And saying this based on what was
24   reported to you --
25 A.  Okay.

Page 171

1  Q.  -- in the interviews you conducted?
2  A.  Yeah.
3  Q.  And there was -- there are also people who
4    reported to you in the interviews that you
5    conducted that the length of the cigarette
6    was important in their choice?
7        MR. LANDAU:  Objection to form.
8  A.  I don't recall them saying that.  If you can
9    show me.
10 Q.  There was one person who reported that he
11   would only smoke 100 millimeter cigarettes,
12   smoked Parliament 100 lights.  Let me just
13   see if I can find it quickly.  I'll give it
14   one more run, and then we'll move on.
15 A.  Okay.
16 Q.  Oh, it's the first person --
17 A.  Oh.
18 Q.  -- Bert, on Page 041.
19 A.  Okay.
20 Q.  Do you see the second paragraph, "Smoked
21   Parliaments - and the brand changed to be
22   all lights.  He smoked the 100s.  No taste
23   difference.  No difference in smoking.  He
24   didn't even notice at first.  He was okay
25   with that.

Page 172

1    "If he had to switch, he'd smoke
2    another 100 - would look around."
3        Do you see that?
4  A.  Yes, I see that.
5  Q.  For some smokers, as reported to you, the
6    length of the cigarette was important in
7    their choice?
8        MR. LANDAU:  Objection to form.
9  A.  For Bert here it appears he wants to smoke a
10   100, and that's the length of the cigarette.
11 Q.  Did you consider whether to include length
12   of cigarette in the factors to be included
13   in the conjoint analysis?
14 A.  I don't recall exactly, but I do know that
15   since we had them work within their brand,
16   they could hypothetically stay with a
17   certain size.
18 Q.  Do you know if all brands are available in
19   100s in all styles, that is, ultra light,
20   light and full flavor?
21 A.  No, I don't.
22 Q.  By the way, did you test the word "regular"
23   to determine whether respondents understood
24   that to mean a filtered cigarette?
25       MR. LANDAU:  Objection to form.

Page 173

1  A.  We tested the word "regular" extensively in
2    our pretests.  I can't recall if there was
3    confusion or agreement about whether it was
4    a filtered cigarette.
5  Q.  Did you ask them whether they believed
6    regular to be a filtered or unfiltered
7    cigarette?
8  A.  No.  I asked them if they found the term
9    clear to them and usable.
10 Q.  But you don't know whether when they said
11   they understood the term "regular," you
12   don't know what they meant by the term?
13 A.  I don't know if they meant filtered or
14   unfiltered.
15 Q.  Okay.  How did you find out about the
16   request for the time survey?
17 A.  From counsel by phone.
18 Q.  Which counsel was it?
19 A.  Paul Gallagher, I believe.  I don't want to
20   speculate, but...
21 Q.  That's what you recall?
22 A.  Yes.
23 Q.  Had he spoken with Dr. Hauser about that, to
24   your knowledge, when he spoke to you about
25   it?

44 (Pages 170 to 173)

Page 186

1    correspondence and notes relating to the
2    time survey.
3  A.  Right.
4  Q.  Let's quickly go through some of these.  On
5    the page in the lower right-hand corner,
6    2287, 2287 --
7  A.  Yes.  22 --
8  Q.  It's two pages in.
9  A.  Oh, on the right?
10 Q.  Three pages in, yeah.
11 A.  Oh, okay.
12       MR. GROSSMAN:  Let's turn off the
13    tape, please.
14       THE VIDEOGRAPHER:  The time is
15    2:54.  We're off the record.
16    (Discussion off the record.)
17       THE VIDEOGRAPHER:  The time is
18    2:55.  We're back on the record.
19  BY MR. GROSSMAN:
20 Q.  Do you see Page 2287?
21 A.  Yes.
22 Q.  In the upper left-hand corner -- this is an
23    e-mail from you to Sonia Arora and Varun
24    Vig; is that correct?
25 A.  Yes.  Or -- yes.

Page 187

1  Q.  And you're passing along an e-mail that came
2    to you?
3  A.  Yes.  Or -- well, it's sent to me, so I
4    didn't write it.
5  Q.  Yes.
6  A.  So someone's sending it to me.
7  Q.  And the person who sent it to you was Puneet
8    Khurana from Greenfield Online?
9  A.  Yes.
10 Q.  Okay.  And he wrote he understood you would
11    be running the project smokers with them,
12    and he wanted to verify some information; is
13    that correct?
14 A.  That's correct.
15 Q.  And, in fact, you were -- you did serve as
16    the point person on this?
17 A.  To Puneet, yes.
18 Q.  Could you -- and during the pretest each of
19    the participants was given a $50 bill; is
20    that correct?
21 A.  Generally correct.  I think at some point in
22    the pretest we gave movie tickets, but
23    perhaps at that stage that's correct.
24 Q.  On Page 2304, which is about a quarter of
25    the way in on yours, or a fifth of the way

Page 188

1    in --
2  A.  Yes.
3  Q.  -- you were provided with costs for the
4    survey from Greenfield depending on whether
5    you had 600, 700, 800 or 900 participants?
6  A.  Yes.
7  Q.  And those costs were provided to you on
8    November 29, 2005?
9  A.  Yes.
10 Q.  In fact, you chose to have over a thousand
11    participants; is that correct?
12 A.  Not really so much a choice, but that's how
13    many came out of the screening process.
14 Q.  And the total cost for that was $39,202?
15 A.  Where do you see that?
16 Q.  It's on 2320, which is also HAUSER 626.
17 A.  So 39,202?
18 Q.  Yes, that's correct.
19 A.  The best of my recollection.
20 Q.  And it also notes that there was $20,302 due
21    to the additional completes, that is, that
22    there were more than a thousand completed
23    surveys as opposed to 600 that was in the
24    original estimate?
25 A.  That's my understanding.

Page 189

1  Q.  Now, you included former smokers in the time
2    survey which you had not included in the
3    conjoint survey.  How come?
4  A.  We understood that the question for timing
5    was to be asked among both such populations,
6    so we had them in the survey.
7  Q.  Your conjoint analysis dealt with choices
8    among hypothetical products?
9  A.  Yes.
10 Q.  And people who had stopped smoking no longer
11    had an interest in choosing among
12    hypothetical products; is that correct --
13       MR. LANDAU:  Objection to form.
14 Q.  -- presumably?
15 A.  Well, I don't know that I could conclude
16    that.
17 Q.  The conjoint analysis -- let me start this
18    again.
19    Assume that the class involved here
20    includes both former and current smokers.
21 A.  Okay.
22 Q.  The time study was intended to address that
23    class of former and current smokers; is that
24    correct?
25       MR. LANDAU:  Objection to form.

48  (Pages 186 to 189)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 210

1  Q.  What is the other possibility, that Dr.
2      Hauser --
3  A.  That Dr. Hauser wrote it, and I left the
4      conclusions blank for him to put in.
5  Q.  Okay.  One of the two of you wrote that?
6  A.  Right.
7  Q.  And regardless of who wrote it, up through
8      the date of this draft that language
9      survived; is that correct?
10 A.  Yes.
11 Q.  The next sentence says, "Appropriate
12     qualification questions, stimuli, and
13     methods were used to address the potential
14     difficulties respondents may have in
15     estimating the years in which events
16     occurred."
17         Did you draft that?
18 A.  It would be the same answer as before.
19 Q.  Okay.  And when that was drafted and
20     preserved in this draft, that was your
21     belief at the time; is that correct?
22 A.  Yes.
23 Q.  And that was Dr. Hauser's belief at the
24     time; is that correct?
25         MR. LANDAU:  Objection to form.

Page 211

1  A.  As far as I know.
2  Q.  So far as he told you; is that correct?
3  A.  Yeah.
4  Q.  Next paragraph, "The results of the Time
5      Study can be relied upon as evidence with
6      which to draw inferences about the
7      distribution of when, if ever, current and
8      former 'light' smokers first changed their
9      beliefs regarding the health effects of
10     'light' versus regular cigarettes."
11         That was drafted either by you or Dr.
12     Hauser?
13 A.  Yes.
14 Q.  And it survived various drafts of this
15     report?
16 A.  Yes.
17 Q.  And that was your belief at the time it was
18     written?
19         MR. LANDAU:  Objection to form.
20 A.  I think at the time it was written, if I
21     were writing it, I would be writing it in
22     that format because that is customary, and
23     then Dr. Hauser would approve it, but at
24     that time I believed the survey was valid,
25     yes.

Page 212

1  Q.  As did Dr. Hauser --
2          MR. LANDAU:  Objection to form.
3  Q.  -- from what he told you?
4          MR. LANDAU:  Objection to form.
5  A.  Well, let me clarify that.  Around this time
6      we had shared this draft with counsel, and
7      they informed us of certain facts which
8      caused us to cast doubt upon the time
9      estimates, and I'm not sure if that's by
10     this day, and we just let it alone till we
11     could think of what to do or if we still
12     felt that way by this day, but around this
13     time when it was first created we believed
14     this.
15 Q.  Okay.  What facts did -- well, first of all,
16     which counsel informed you of such facts?
17 A.  I don't recall.  It was a conference call.
18 Q.  Which counsel participated in the conference
19     call?
20 A.  I know that Paul Gallagher participated.  I
21     don't remember the other names --
22 Q.  Okay.
23 A.  -- because I'm not very good with that.
24 Q.  That's fine.  What did Paul say to you --
25     first of all, Paul had -- Paul Gallagher had

Page 213

1      received the earlier drafts of the report
2      prior to the conference call; is that
3      correct?
4          MR. LANDAU:  Objection to form.
5  A.  That's not correct.
6  Q.  Okay.  When did he receive that?
7  A.  He received -- he did not receive the draft
8      of this report until he came to visit us the
9      Friday of that week, which is whatever day,
10     the 17th, 16th, I don't know what day that
11     was, of December.
12     (Discussion off the record.)
13         THE WITNESS:  If I may, while you
14     dig that up, I'll take another quick break.
15         MR. GROSSMAN:  Okay.  We'll turn
16     off the tape.
17         THE VIDEOGRAPHER:  The time is
18     3:31.  We're off the record.
19     (Recess taken.)
20         THE VIDEOGRAPHER:  The time is
21     3:44.  We are continuing.
22 BY MR. GROSSMAN:
23 Q.  Okay.  Could you turn with me to Paragraph
24     18 --
25 A.  Paragraph 18.

54 (Pages 210 to 213)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 214

1  Q.  -- which is on Page 7 to 8.
2          MR. LANDAU:  On Exhibit 12?
3          MR. GROSSMAN:  Of Exhibit 12.
4  Q.  Do you see where it says, "The results of
5      the Time Study can be relied upon as
6      evidence with which to draw inferences about
7      the distribution of when, if ever, current
8      and former 'light' cigarette smokers first
9      came to know or suspect that cigarette
10     companies had not been telling the truth
11     about the health effects of 'light' versus
12     regular cigarettes"?
13 A.  Uh-huh.
14 Q.  That also reflected your belief and Dr.
15     Hauser's belief as of the time when this
16     draft was written; is that correct?
17         MR. LANDAU:  Objection to form.
18 A.  That's not quite correct.
19 Q.  Well, during the -- we just had a break of
20     some --
21 A.  Yes.
22 Q.  -- few minutes?
23 A.  Yes.
24 Q.  You had an opportunity to talk with counsel;
25     is that correct?

Page 215

1  A.  Yes.
2  Q.  Did counsel discuss your testimony in this
3      deposition during that break?
4  A.  Yes.
5  Q.  What did counsel tell you?
6  A.  They asked me if I remembered who drafted
7      the document.
8  Q.  Who drafted the document?
9  A.  I said, again, I wasn't quite sure.  It's
10     likely I did, but I wasn't entirely sure.
11 Q.  You may have drafted it, or Dr. Hauser may
12     have drafted it?  Those are the only two
13     possibilities; is that correct?
14 A.  Yes.
15 Q.  And if you drafted it, Dr. Hauser approved
16     it to that point; isn't that correct?
17         MR. LANDAU:  Objection to form.
18 A.  Again, there's certain timing difficulties
19     with what you're saying, but -- so I can't
20     answer yes for that.
21 Q.  You said earlier that this was not the first
22     draft?
23 A.  That, I did.
24 Q.  And this language survived from an earlier
25     draft?

Page 216

1  A.  It did survive.
2  Q.  And it did survive Dr. Hauser's scrutiny
3      from the earlier draft?
4          MR. LANDAU:  Objection to form.
5  A.  Yes, but I'm also saying something else, and
6      it wasn't a mystery question.  I'm saying
7      that before the date of this draft we spoke
8      with counsel, and they revealed certain
9      facts to us about the way people -- what
10     people should have been remembering and such
11     that caused us to have doubts about this,
12     and so this draft is surviving another day
13     or so until we could figure out what to do
14     about it.  So that's why I'm quibbling.
15 Q.  Well --
16 A.  When it was first drafted, I was using the
17     usual language for this, and I believed it
18     at the time, and John believed it, till we
19     heard otherwise.
20 Q.  Okay.  The only source of your hearing
21     otherwise was through counsel; is that
22     correct?
23         MR. LANDAU:  Objection to form.
24 A.  They informed us based on documents they
25     had, so --

Page 217

1  Q.  What documents --
2  A.  And facts.
3  Q.  What documents did they have?
4  A.  I'm not sure personally of the exact name of
5      those documents.
6  Q.  Did you do any independent research on
7      contemporaneous polls on smokers over
8      preceding years as to their beliefs of the
9      health effects of smoking?
10 A.  Could you repeat the question?
11 Q.  Have you done any research either before you
12     were talking with counsel or after of polls,
13     public polls, that were conducted on
14     smokers' beliefs of the health risks of
15     smoking over time?
16         MR. LANDAU:  Objection to form.
17 A.  None other than this study.
18 Q.  So your only information is the study that
19     you conducted pursuant to scientific
20     standards and what counsel told you about
21     documents that you haven't seen; is that
22     correct?
23         MR. LANDAU:  Objection to form.
24 A.  I haven't seen them.  That doesn't mean that
25     Dr. Hauser hasn't seen them.

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 218

1  Q.  Do you know whether he has or not?
2  A.  My belief is he has, yes.
3  Q.  Do you know what the documents are?
4  A.  I haven't seen them.
5  Q.  We looked on a calendar.  November 16th, the
6     date of this draft, was a Friday.
7  A.  Yes.
8  Q.  So this was the same date when you met with
9     Mr. Gallagher and others; is that correct?
10 A.  We, John Hauser and I, met with Paul
11    Gallagher.
12 Q.  And did you meet in person?
13 A.  Yes.
14 Q.  Where did you meet?
15 A.  At AMS's offices in Waltham.
16 Q.  Had he been provided with any of the drafts
17    prior to the meeting?
18 A.  No.
19 Q.  Did he read a draft at the meeting?
20 A.  Yes.
21       MR. LANDAU:  Objection to form.
22 Q.  You said that you were test -- that you were
23    speaking with counsel during the break?
24 A.  Yes.
25 Q.  Did counsel remind you of any -- attempt to

Page 219

1     remind you of any facts related to your
2     testimony during the break?
3  A.  Not that I know of.
4        MR. LANDAU:  Objection to form.
5  Q.  Did counsel suggest that any answer that you
6     had given so far was incorrect or
7     misleading?
8  A.  No.
9        MR. LANDAU:  Objection to form.
10 Q.  What did counsel say?
11 A.  They said when I discussed it with them
12    before, that I had said that I had drafted
13    the conclusions we were discussing, and here
14    I said I wasn't quite sure.
15 Q.  And, in fact, you're not quite sure.  Is
16    that correct?
17 A.  Yes, I said it's probable, but I'm not quite
18    sure, so they commented about it.
19 Q.  In fact the properties, which is document
20    13 --
21 A.  Yeah.
22 Q.  -- indicates that the first draft was on Dr.
23    Hauser's computer; is that correct?
24       MR. LANDAU:  Objection to form.
25 A.  It does say "John Hauser" there.  I'm not

Page 220

1     really familiar with the properties and
2     their exact meaning.
3  Q.  Do you use Dr. Hauser's computer to do
4     drafts of litigation report such as this?
5  A.  I don't type on it.  I use my own computer.
6  Q.  So if this was originally created on Dr.
7     Hauser's computer, it would be he rather
8     than you who was the author of the --
9     original author of the document; is that
10    correct?
11       MR. LANDAU:  Objection to form.
12 A.  Well, you know, it could have had two lines
13    at that point and then come to me.
14 Q.  Whatever, whatever it was?
15 A.  So it says "John Hauser" and last saved by
16    me.
17 Q.  You said, "On December 16th Mr. Gallagher
18    revealed facts about what people should be
19    remembering."
20       Do you know the nature of those facts?
21       MR. LANDAU:  Objection to form.
22 A.  I can tell you my understanding.
23 Q.  Okay.
24 A.  My understanding is that despite all of our
25    efforts, we were measuring when people

Page 221

1     received the wrong sort of information, that
2     they were supposed to be -- we were supposed
3     to detect when their opinions were changed
4     by either government announcements about the
5     health risks of light cigarettes or -- and
6     regarding when cigarette companies were
7     misleading people.  There were other
8     documents that came out about this, so that
9     they were referring to specific events, as
10    far as I can see, not the personal events
11    that I was detecting in pretest and probably
12    in the survey.
13 Q.  Well, in fact, you made no effort to review
14    newspaper -- historic newspapers, other
15    historic documents, historic surveys by
16    Gallup, the Gallup organization or others to
17    determine contemporaneous public opinion on
18    the health effects of smoking in the 1950s,
19    '60s, '70s, '80s, or '90s; is that correct?
20       MR. LANDAU:  Objection to form.
21 A.  I did not review those reports.
22 Q.  You didn't review them before Mr. Gallagher
23    said that there must be something wrong with
24    the study, and you didn't review them after
25    Mr. Gallagher said there must be something

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 234

1  A.  No.  I just told you that it seemed to me to
2     be more of a legal question.  He did not say
3     to me per se this is a legal question.  It
4     was a question of what was the study trying
5     to measure and showing us that what we had
6     asked was incompatible with what the study
7     was actually trying to measure, which to us
8     was, you know, a compelling sort of
9     argument.  It's not that --
10 Q.  Nothing --
11         MR. LANDAU:  Excuse me.
12 A.  It's not that we got too low a number or
13     something.  It's just an impossible number,
14     which is different from bad results where he
15     would want a better result.
16         MR. GROSSMAN:  Move to --
17 A.  It was impossible results.
18         MR. GROSSMAN:  Move to strike as
19     non-responsive.  There was no pending
20     question as well.
21 A.  Well, I was finishing my previous answer.
22 Q.  Mr. Gaskin, you're saying that Mr. Gallagher
23     said that you were asking the wrong
24     questions?
25         MR. LANDAU:  Objection to form.

Page 235

1  A.  He didn't say it in exactly those words,
2     but --
3  Q.  That's what you inferred?
4  A.  Yes.  What we were measuring was not what we
5     were supposed to measure.
6  Q.  What you did measure was accurately
7     measured, so far as you understood and still
8     believe; is that correct?
9         MR. LANDAU:  Objection to form.
10 A.  Well, let's put it this way:  It was our
11     best shot at that.  Measuring time events is
12     always difficult in market research when
13     people did something, because as you know,
14     people don't really remember things that
15     well.  But it was our best effort to measure
16     those questions.
17 Q.  Well, what did you believe you were
18     measuring?
19 A.  Well, if we could look at the text of the
20     questions, I believed that -- well, I'll try
21     to answer that as far as I recall.  There
22     were two questions:  One was if you changed
23     your belief in the health risks of light
24     cigarettes and that belief changed from less
25     health risk to some -- to more health risk,

Page 236

1     when did that change in beliefs occur?  That
2     was one question.  And the other question
3     was -- and, again, I haven't seen it in a
4     while since it's been months, but we were
5     trying to measure if you believed that the
6     cigarette companies had misled you, I'm not
7     sure the exact verb, but something about
8     lied, misled, if they had misled you about
9     the health risks of light versus regular
10     cigarettes, when did you realize that that
11     was occurring?
12 Q.  There was a third thing you were measuring
13     as well, wasn't there?  Didn't you ask the
14     respondents whether they currently believed
15     that light cigarettes were more dangerous,
16     less dangerous or as dangerous as regular
17     cigarettes?
18 A.  Well, what we were trying to do --
19 Q.  I need a --
20 A.  Okay.  You want as short an answer as
21     possible?  That was not measured in the same
22     sense that you referred to the two other
23     questions.
24         MR. GROSSMAN:  (To Mr. Gleason.)
25     Let's get out the survey.  Let's have the

Page 237

1     time -- the screen shots.
2         (Exhibit No. 14, Document headed
3     "Draft Exhibit J," Nos. E31 - E60, marked
4     for identification.)
5  Q.  Mr. Gaskin, I'm handing you what's been
6     marked for identification purposes as Gaskin
7     Exhibit No. 14.
8  A.  All right.  And I just want to comment that
9     these were a lot clearer and in color when
10     we handed them in.
11 Q.  Okay.
12 A.  Because they're a little hard to read.
13 Q.  I don't -- I don't mean to make this a
14     reading exam, but I would like to address
15     your attention to Page 39.
16 A.  Yes.
17 Q.  And you see on that question it asks
18     consumers, "Through your own experience,
19     including what you may have heard from
20     television, newspapers, the government,
21     friends, or other sources, you may have
22     formed beliefs about the health risks of
23     certain types of cigarettes.  For example,
24     you might believe that smoking light
25     cigarettes has more health risks or less

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 238

```
1     health risks than smoking regular
2     cigarettes"?
3  A.  Yes, it says that.
4  Q.  "We want you to use your," all capitals,
5     "personal belief," highlighted, "as you
6     answer the following question:  Do you
7     personally believe that smoking light
8     cigarettes has more health risks than
9     smoking regular cigarettes, the same health
10    risks as smoking regular cigarettes, less
11    health risks than smoking regular
12    cigarettes," or "I don't know and not sure"?
13 A.  That's what it says.
14 Q.  Yes.  Now, that question was administered,
15    and it was answered, correct?
16 A.  Correct.
17 Q.  And nothing that Mr. Gallagher said about
18    historic events affects the validity of the
19    answers to that question; is that correct?
20        MR. LANDAU:  Objection to form.
21 A.  That's correct, but, again, I would like to
22    explain that this is a foundational question
23    where we're trying to find people with a
24    large change between their previous and
25    posterior belief, so it's not intended to be
```

Page 239

```
1     a measure -- as an exact a measure as the
2     conjoint analysis of whether people deeply
3     believe that the cigarettes are more or less
4     risky.
5         MR. GROSSMAN:  All right.  Move to
6     strike the latter part as non-responsive.
7  Q.  Was this question available to Mr. Gallagher
8     and plaintiffs' counsel before it was
9     administered in the survey?
10        MR. LANDAU:  Objection to form.
11 A.  Yes.
12 Q.  And do you see that the question which has
13    been available to counsel before December
14    14th, 15th or 16th, in fact, before November
15    30th said, "Through your own experience,
16    including what you have heard from
17    television, newspapers, the government,
18    friends, or other sources," counsel had
19    approved a question that related to sources
20    of information on the health risks of light
21    cigarettes that extended well beyond
22    government reports; is that correct?
23        MR. LANDAU:  Objection to form.
24 A.  This question does base people's opinions on
25    more than just government reports.
```

Page 240

```
1  Q.  And, in fact, it was your understanding,
2     based upon all your meetings with counsel
3     before December 14th, 15th or 16th, whenever
4     you spoke with Mr. Gallagher and he said
5     that there was a problem, it was always your
6     understanding that you were probing the
7     beliefs of light smokers based upon what
8     they had heard from a wide variety of
9     sources, not just what they had heard from
10    government reports; is that correct?
11        MR. LANDAU:  Objection to form.
12 A.  Well, to be honest, Mr. Gallagher was not
13    really very available during this time.  It
14    is possible he looked at it.  I don't know
15    for sure because he was often traveling out
16    of the country and unreachable, and we were
17    on a very tight schedule.
18 Q.  Well, whether he looked at it or not, it was
19    available to him and all of plaintiffs'
20    counsel in the period before it was
21    administered; is that correct?
22        MR. LANDAU:  Objection to form.
23 A.  Yes, it was available.
24 Q.  And it was your understanding -- regardless
25    of where Mr. Gallagher was anyplace in the
```

Page 241

```
1     world, it was your personal understanding,
2     based upon all of your conversations with
3     counsel and your reading of Judge
4     Weinstein's opinion and any other
5     information that you had at your disposal,
6     that you were testing light smokers' beliefs
7     and awareness on the basis of what they had
8     heard from all sources, not just from the
9     government; is that correct?
10        MR. LANDAU:  Objection to form.
11 A.  It was my belief that the information could
12    come from any source.
13 Q.  Okay.  Now, Mr. Gallagher told you that he
14    did not want a survey -- let me go back.
15        On December 14, 15th or 16th when you
16    spoke with Mr. Gallagher after the first
17    draft or so of the report on the time
18    survey --
19 A.  Right.
20 Q.  -- Mr. Gallagher said he was not interested
21    in when people changed their minds generally
22    but only when they changed their mind as a
23    result of government reports; is that
24    correct?
25        MR. LANDAU:  Objection to form.
```

61 (Pages 238 to 241)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 242

1  A.  This is my understanding of it, and I can't
2     recall exactly what he said, but that's the
3     sense that I got from him.
4  Q.  That's -- and accurately reports on the
5     sense that you got?
6         MR. LANDAU:  Objection to form.
7  A.  Yes, that their knowledge was based --
8     should be based on certain events which
9     occurred at a certain time.
10 Q.  Now, did Mr. Gallagher ever tell you that in
11    1983 one of the experts in this case named
12    Dr. Benowitz published a report that was
13    widely reported in newspapers throughout the
14    country in which he said that he found that
15    smokers of light cigarettes had the same
16    risks as smokers of full-flavored
17    cigarettes?
18        MR. LANDAU:  Objection to form.
19 A.  Full-flavored cigarettes?
20 Q.  What you referred to as regular cigarettes?
21 A.  I've not heard of that report.
22 Q.  Okay.  Mr. Gallagher didn't tell you about
23    it; is that correct?
24 A.  Not that I recall.
25 Q.  Mr. Gallagher didn't tell you about polls of

Page 243

1     light smokers conducted in the 1980s or
2     1990s that showed that a majority of light
3     smokers at that time believed that light
4     cigarettes were as dangerous as regular
5     cigarettes, did he?
6         MR. LANDAU:  Objection to form.
7  A.  Well, I don't know of -- I haven't heard of
8     such polls.
9  Q.  Okay.  And it follows from that that Mr.
10    Gallagher didn't tell you about that; is
11    that correct?
12        MR. LANDAU:  Objection to form.
13 A.  I think it follows that I don't recall him
14    telling me about that.
15 Q.  Okay.  Now, when the draft in front of you
16    was written and the earlier drafts were
17    written, it was your understanding that this
18    report would be submitted to the Court as a
19    final report with no further studies to be
20    undertaken; is that correct?
21        MR. LANDAU:  Objection to form.
22 A.  I wasn't aware of any further studies that
23    would take place.
24 Q.  Okay.  Now, let me hand you what I'll have
25    marked for identification purposes as Gaskin

Page 244

1     Exhibit No. 14 -- 15, which is a draft
2     report that we believe is dated December
3     19th.
4         (Discussion off the record.)
5         (Exhibit No. 15, Draft Expert
6     Witness Report by Dr. John R. Hauser, marked
7     for identification.)
8         MR. GROSSMAN:  Let's turn off the
9     tape.
10        THE VIDEOGRAPHER:  The time is
11    4:23.  We are off the record.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  The time is
14    4:23.  We are back on the record.
15    BY MR. GROSSMAN:
16 Q.  Mr. Gaskin, I've handed you what's been
17    marked for identification purposes as
18    Exhibit No. 15, which is a copy of a draft
19    report which we believe is dated December
20    19th.  I would like to turn your attention,
21    if I may, to Page 31.
22 A.  Just a moment.  Can you tell me why this is
23    December 19th?
24 Q.  From the properties that were --
25 A.  Can I see them?

Page 245

1  Q.  Yeah, sure.  Let me get them out.
2  A.  And what was the name of this file?
3  Q.  Now you've got me there.
4  A.  Because that's how I'll recognize it.
5  Q.  I hand you what I'll mark as Exhibit No. 16,
6     which is a printout of the properties that
7     we found related to that document.
8         (Exhibit No. 16, Document headed
9     "Hauser's December 19 Draft Time Exhibits -
10    Properties," marked for identification.)
11 A.  Yeah, let's take a look.
12        (Witness reviews document.)
13        MR. LANDAU:  Do you have a copy of
14    that?
15        MR. GROSSMAN:  I don't have one
16    more copy.  You can look on with him.
17 A.  This is for exhibits.  This isn't for the
18    report.
19 Q.  Okay.  Then it's the wrong one.
20        MR. BUTTERFIELD:  Just put it down
21    there.
22        THE WITNESS:  Okay.
23        MR. GROSSMAN:  Okay.  We have to go
24    off again because he has to change the tape.
25    Let's go off the record.

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 250

1   A.  Okay.  So not the 19th?
2   Q.  No, the 18th apparently; is that correct?
3   A.  That looks like one of my files.
4   Q.  Based upon your review of the files, a draft
5       was made on December 18th?
6   A.  It was saved on December 18th.
7   Q.  December 18th, okay.
8           Let's look at Exhibit 15, which we now
9       believe is the draft that was saved on
10      December 18th; is that correct?
11          MR. LANDAU:  Objection to form.
12  A.  Well, that's what it says.  I just want you
13      to know that I was no longer in Boston on
14      the 18th.
15  Q.  Where were you?
16  A.  I was in Belize in Central America, so I was
17      not reachable at that point.
18  Q.  So you were not involved -- let me rephrase
19      the question.
20          We previously reviewed a draft of
21      December 16th which you said was not the
22      first draft of the report but which was
23      later revised again; is that correct?
24  A.  That's correct.
25  Q.  Were you involved in any revisions of that

Page 251

1       draft after that draft was written?
2   A.  Yes.
3   Q.  Okay.  Could you look at Exhibit No. 15 --
4   A.  Uh-huh.
5   Q.  -- Page 31.
6   A.  Page 31.  All right.
7   Q.  Do you see it says at the top "Overview of
8       Methodology - Experimental Time Study
9       (Draft)"?
10  A.  Yes.
11  Q.  Were you involved in drafting a revised
12      draft that referred to the time study as an
13      experimental time study draft?
14  A.  Not to my knowledge.
15  Q.  Okay.  So someone else revised this draft to
16      include that language?
17  A.  To include the word "experimental."
18  Q.  And "draft"; is that correct?
19          MR. LANDAU:  Objection.
20  A.  Yes.
21  Q.  And this draft was in all likelihood
22      prepared after you had left for Belize --
23          MR. LANDAU:  Objection.
24  Q.  -- or were otherwise unreachable?
25          MR. LANDAU:  Objection to form.

Page 252

1   A.  It was saved.
2   Q.  When did you leave for Belize?
3   A.  Early in the morning on the Saturday of the
4       17th.
5   Q.  Okay.  And if this document was created in
6       its -- revised on December 17th and saved on
7       December 18th, it makes sense that you would
8       not have seen it; is that correct?
9   A.  That would make sense.
10  Q.  You never -- in all the time that you worked
11      on the time survey, you never referred to it
12      as the experimental time study draft; is
13      that correct?
14  A.  That's correct.
15  Q.  Nor did Dr. Hauser refer to it that way to
16      you in all the time that you referred -- you
17      worked on it; is that correct?
18  A.  That's correct.
19  Q.  Were you involved in preparation of the
20      draft that was signed and served on
21      defendants December 19th that contained
22      Footnote 2 that you referred to earlier?
23  A.  No.
24          MR. LANDAU:  Objection to form.
25  Q.  Did you know that such a revision was taking

Page 253

1       place when it did?
2   A.  No.  I was unreachable, or at least not
3       easily reachable.
4           (Pause.)
5   Q.  Could you turn with me to Paragraph 96,
6       which reads as follows:  "I am informed that
7       the public health community did not reach a
8       consensus that 'light' cigarettes had the
9       same health risk as regular cigarettes until
10      approximately 2001.  If this is the case and
11      if respondents did not have a means to form
12      these beliefs prior to 2001, then it appears
13      that respondents are either telescoping
14      their responses to earlier dates,
15      remembering other events, or some other
16      reporting error.  Furthermore, these effects
17      appear to be greater for less confident
18      respondents."
19  A.  All right.
20  Q.  Does that refer to the material and
21      statements that Mr. Gallagher was making?
22          MR. LANDAU:  Objection to form.
23  A.  I believe so.
24  Q.  Now, with regard to the phrase "if
25      respondents did not have a means to form

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 254

1    these beliefs prior to 2001," do you recall
2    whether Mr. Gallagher said that light
3    smokers did not have a means to form their
4    beliefs before 2001 as to the health risks
5    of lights versus regular cigarettes?
6        MR. LANDAU:  Objection.
7  A.  Again, I don't recall exactly what he said.
8    So you can try again, I'm sorry.
9  Q.  Based upon your best recollection, did Mr.
10   Gallagher suggest or state that prior to
11   2001 light smokers did not have a means to
12   form a belief that light cigarettes were as
13   dangerous as regular cigarettes?
14       MR. LANDAU:  Objection to form.
15 A.  I don't believe so.
16 Q.  Did Mr. Gallagher ever tell you that he and
17   his law firm filed cases with essentially
18   similar -- essentially identical allegations
19   as early as 1998?
20       MR. LANDAU:  Objection to form.
21 A.  I haven't heard that.  I don't know when
22   these things are filed or when this one was
23   filed.
24 Q.  Okay.  But for Mr. Gallagher's intervention
25   the report that was done in draft form on

Page 255

1    December 16th would have been filed with
2    Judge Weinstein reporting on the time
3    survey; is that correct?
4        MR. LANDAU:  Objection to form.
5  A.  Not so much as intervention as the
6    information he presented.
7  Q.  Okay.  Just for clarity of the question and
8    answer --
9  A.  Yes.
10 Q.  -- but for Mr. Gallagher's providing
11   information in mid-December 2005 the report
12   that is in draft form on December 16th, 2005
13   reporting on the time survey and the degree
14   of confidence that the Court could place on
15   it would have been filed with the Court on
16   or before December 19th; is that correct?
17       MR. LANDAU:  Objection to form.
18 A.  I would have a slight caveat to that.
19 Q.  Your answer is yes with a caveat?
20       MR. LANDAU:  Objection to form.
21 A.  No, my answer is I have a caveat.
22 Q.  What is the caveat?
23 A.  Mr. Gallagher is the one counsel I can
24   remember, but we were presented this by a
25   group of counsel.

Page 256

1  Q.  Okay.  Now that we have that caveat in
2    place, but for the information that was
3    presented to you by plaintiffs' counsel --
4  A.  Yes.
5  Q.  -- the December 16th draft report on the
6    time study and on the degree of confidence
7    that the Court could place on the time study
8    would have been filed with the Court on or
9    before December 19th --
10       MR. LANDAU:  Objection --
11 Q.  -- in substantially the same form?
12       MR. LANDAU:  Objection to form.
13 A.  That's my belief.
14 Q.  Okay.  Now, when you were conducting the
15   conjoint survey and you asked respondents to
16   compare the risks of light cigarettes and
17   regular cigarettes, were you asking them to
18   compare the risks on a per cigarette basis
19   or on a total basis depending upon the
20   number of cigarettes smoked?
21       MR. LANDAU:  Objection to form.
22 A.  That's an either/or question, and the answer
23   would be neither.
24 Q.  What were you asking them to compare?
25 A.  We were asking them a more general question,

Page 257

1    the health risk you perceive light
2    cigarettes, the health risk you perceive
3    regular cigarettes to have.  It was not --
4    we could look at the screens, but I don't
5    believe it was in quite that detail.
6  Q.  Okay.  I don't believe it was in that
7    detail, either --
8  A.  Okay.
9  Q.  -- and so I'm trying to see if there's a
10   latent ambiguity.
11 A.  All right.
12       MR. LANDAU:  Objection to form.
13 Q.  Both in the time study and in the conjoint
14   study, in pretests and in previous
15   interviews did you ever seek to clarify
16   whether consumers were evaluating light
17   cigarettes versus regular cigarettes on a
18   per cigarette basis or on a total basis?
19       MR. LANDAU:  Objection to form.
20 A.  No, I did not.
21 Q.  Okay.  So you don't know if in responding to
22   the surveys consumers were responding on
23   a -- to the comparative risks on a per
24   cigarette basis or on a total basis?
25       MR. LANDAU:  Objection to form.

65 (Pages 254 to 257)

9e52be18-e224-4560-b50b-0d2ee91c9014

Page 262

1    One was don't know, one was less than the
2    health risks of a regular, the other one was
3    the same, the other one was more, correct?
4  A.  Those were the scales, yes.
5  Q.  And --
6  A.  Well, more or less, yes.
7  Q.  Yes.  And 76.9 percent of the respondents
8    said that they believed that light
9    cigarettes had the same health risk as
10   regular cigarettes; is that correct?
11 A.  That's how they answered that, yes.
12 Q.  In fact, among those who had an answer,
13   81.9, almost 82 percent, believed that the
14   risks of lights were the same as the risks
15   of regulars?
16 A.  I would not --
17        MR. LANDAU:  Objection to form.
18 A.  -- characterize this, correct.
19 Q.  I'll rephrase the question because I think I
20   know what your --
21 A.  Okay.
22 Q.  -- problem is.  In response to the question
23   that you asked, 81.9, almost 82 percent, of
24   respondents said that they believed that the
25   health risks of light cigarettes were the

Page 263

1    same as the health risks of regular
2    cigarettes; is that correct?
3        MR. LANDAU:  Objection to form.
4  A.  I don't recall if the verb was "believe" or
5    "perceive."
6  Q.  Let's go back to the --
7  A.  Yeah.
8  Q.  -- screen shot.
9  A.  They did answer at that scale value of the
10   question.
11 Q.  Look at Exhibit 14 with me again.  You have
12   a copy there in front of you.
13 A.  Oh, yeah.  It's here somewhere.
14 Q.  Looking at the time survey --
15 A.  Yes, okay.  I see it.
16 Q.  -- 80 -- almost 82 percent of all
17   respondents who had an opinion said that
18   they believed that smoking light cigarettes
19   had the same health risks as smoking regular
20   cigarettes; is that correct?
21 A.  That's how they answered that question.
22 Q.  And 2 percent said they believed that the
23   health risks of light cigarettes were
24   greater than the health risks of regular
25   cigarettes; is that correct?

Page 264

1  A.  That's how they answered that question.
2  Q.  And only 16 percent of respondents --
3  A.  Wait.  I'm sorry, I've lost the other page.
4    Can you tell me where that is?
5  Q.  Yes.  That's Page 6 -- Hauser 696 which is
6    all the way toward the back.  It's 2390.
7  A.  Of Exhibit?
8  Q.  Of Exhibit 11.
9  A.  Okay.  Which page? I'm -- oh, wait.  I'm
10   there.  Okay.  I was lucky.
11 Q.  Okay.  And 16.0 percent of those who had an
12   answer, who have an opinion, believed that
13   light cigarettes had less health risks than
14   smoking regular cigarettes?
15 A.  That's their stated belief.
16 Q.  That's their stated belief; is that correct?
17 A.  That's what they said, yes.
18 Q.  Yes.  Now, there were a number of
19   differences between the question that was
20   asked in the time survey on this issue and
21   the question that was asked in the conjoint
22   survey on this issue; is that correct?
23 A.  That's correct.
24 Q.  Let's get out the question -- let's get out
25   the conjoint analysis screen shots.

Page 265

1        MR. GROSSMAN:  In fact, this is,
2    for me, a good time for a bathroom break.
3    Why don't we turn off the -- let's take a
4    break.
5        THE VIDEOGRAPHER:  I'm sorry?
6        MR. GROSSMAN:  Break time.
7        THE VIDEOGRAPHER:  A break, I'm
8    sorry.  The time is 4:56.  We're off the
9    record.
10   (Recess taken.)
11       THE VIDEOGRAPHER:  The time is
12   5:16.  We are back on the record.
13       (Exhibit No. 20, Document headed
14   "Exhibit D, Questionnaire, Web Survey Screen
15   Shots," Nos. E4 - E24, marked for
16   identification.)
17 BY MR. GROSSMAN:
18 Q.  Mr. Gaskin, I've handed you what's been
19   marked for identification purposes as
20   Exhibit No. 20.  That's a copy of the screen
21   shots from the conjoint --
22       THE VIDEOGRAPHER:  Counselor, I
23   don't think you're wearing your...
24       MR. GROSSMAN:  Let's --
25 Q.  Okay.  It's a copy of the screen shots from

67 (Pages 262 to 265)

9e52be18-e224-4560-b50b-0d2ee91c9014