**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**

WASHINGTON • NEW YORK • PHILADELPHIA • CHICAGO

Brent W. Landau
(215) 825-4012
blandau@cmht.com

ADMITTED ONLY IN NY AND DC

February 9, 2006

BY HAND DELIVERY AND CM/ECF

The Honorable Steven M. Gold
United States Magistrate Judge
United States District Court
 for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:     *Schwab v. Philip Morris USA, Inc.*, No. 04 Civ 1945 (JBW) (SMG)

Dear Judge Gold:

This letter responds to Mr. Grossman's letter of February 1, 2006 regarding the production of materials for Dr. John Hauser. Although we believe that some of these issues could have been resolved by discussions among the parties, because Defendants insist on prematurely involving the Court, we discuss the substance of that letter below.

Attempted Survey. As the Court knows, Dr. Hauser offers expert opinions as to "the value and importance of health risks to 'light' cigarette consumers in their decision to purchase a 'light' cigarette." Expert Witness Report by Dr. John R. Hauser, Aug. 22, 2005, ¶ 4. To reach his conclusions, Dr. Hauser used a methodology known as "web-based conjoint analysis," in which respondents took an internet survey designed by Dr. Hauser. *Id.* ¶ 15. Potential survey participants were selected at random from the database of Greenfield Online ("Greenfield"), and were then screened to ensure a representative sample. *Id.* ¶¶ 24, 26.

On December 19, 2005, Dr. Hauser submitted a new report, which was nearly identical to his earlier report. The new report included the following footnote:

> In response to a ruling by the court on the issue of statute of limitations, counsel for Plaintiffs also asked me to conduct a test survey to determine whether accurate dates could be obtained from respondents regarding when they first learned that light cigarettes

One South Broad Street • Suite 1850 • Philadelphia, PA 19107
Phone (215) 825-4016 • Fax (215) 825-4001 • www.cmht.com

AFFILIATED OFFICES: UNITED KINGDOM • ITALY • SOUTH AFRICA • PANAMA • AUSTRALIA

W0DFD0779

The Honorable Steven M. Gold
February 9, 2006
Page 2

> are no less harmful than regular cigarettes, and when they first learned that the cigarette companies had defrauded them. After attempting to conduct such a survey, I have concluded that I would have little confidence that the responses would be sufficiently accurate. *I do not rely on any such survey as part of my expert opinions in this case.*

Expert Witness Report by Dr. John R. Hauser, Dec. 19, 2005, ¶ 4 n.2 (emphasis added).

Defendants do not – and cannot – dispute that the survey Dr. Hauser attempted with respect to "how many smokers knew what and when" is totally unconnected to the opinions he is offering in this case as to "the value and importance of health risks to 'light' cigarette consumers in their decision to purchase a 'light' cigarette." With respect to the attempted survey, Dr. Hauser acted merely as a *consulting expert* to Plaintiffs, and consequently, his work product in this regard is not discoverable, as Plaintiffs do not intend to have Dr. Hauser testify on this subject. Indeed, had this attempted survey been undertaken by some other consulting expert, Defendants clearly would not be entitled to it. The result should be no different simply because Dr. Hauser is serving as a testifying expert on a different issue in this case.

Consulting experts are "generally immune from discovery." *Chiquita Int'l v. M/V Bolero Reefer*, No. 93 Civ. 0167 (LAP), 1994 U.S. Dist. LEXIS 5820 (S.D.N.Y. May 6, 1994) (citing Fed. R. Civ. P. 26(b)(4)(B)). Although Dr. Hauser is serving as a testifying expert with respect to his opinions about "the value and importance of health risks to 'light' cigarette consumers in their decision to purchase a 'light' cigarette," one court recently explained that an expert can be a "testifying expert" at some times and a "consulting expert" at others:

> Dr. Rhodes was, and still is, a technical consultant for Astra in its worldwide litigations relating to omeprazole. Andrx has argued that all communications involving Dr. Rhodes must be disclosed because Dr. Rhodes testified as an expert during Astra's Korean proceedings. However, only some of Dr. Rhodes' work related to actual testimony. . . . Accordingly, some communications with Dr. Rhodes relate to his work as a non-testifying expert. *Andrx is only entitled to documents that formed the basis for his testimony.* Some of the documents Andrx seeks, however, were created after Dr. Rhodes testified in the Korean proceedings. Those documents could not form the basis for his opinions. Thus, documents dated after Dr. Rhodes testified in Korea on June 10, 1994, *are not discoverable because Dr. Rhodes was a consulting expert at that time.*

*Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 105 n.12 (S.D.N.Y. 2002) (citations omitted and emphases added); *see also Beverage Mktg. Corp. v. Ogilvy & Mather Direct Response, Inc.*, 563 F. Supp. 1013, 1014 (S.D.N.Y. 1983) ("It is conceivable that an expert could

W0DFD0780

The Honorable Steven M. Gold
February 9, 2006
Page 3

be retained to testify and in addition to advise counsel outside of the subject of his testimony. Under such a circumstance it might be possible to claim a work product privilege if this delineation were clearly made."). Here, the delineation between Dr. Hauser's expert report and his attempted survey is clear, as they concern two totally discrete issues.[1]

The advisory committee notes to Rule 26, on which Defendants rely, are inapplicable because they relate only to the production of "materials *furnished to* . . . experts [i.e., by counsel] to be used in *forming their opinions*," not to the expert's own work product not related to any opinion being offered. Fed. R. Civ. P. 26 advisory committee note (emphases added). Such materials are irrelevant and not discoverable.

Moreover, although Defendants strenuously argue that their own Total Exposure Study ("TES") should be governed by a different set of rules, this cannot be true. Like the TES, Dr. Hauser is not relying on his attempted survey, specifically because he concluded he had no confidence in the results that it would have produced. The attempted survey is in this sense incomplete. (This is not to suggest, as Defendants claim, that Plaintiffs do not intend to comply with the Court's schedule. Dr. Hauser has no plans to complete the attempted survey, and his December 19, 2005 report is his final report.) Therefore, the reasoning from this Court's April 20, 2005 order regarding the TES applies equally here: Dr. Hauser should not be required to produce the uncompleted attempted survey.

That Dr. Hauser's attempted survey was undertaken for litigation purposes, while the TES ostensibly was not, carries no weight. First, the April 20, 2005 order did not turn on the purpose for preparing the TES. Second, Defendants' assertion that "the TES was not conducted for litigation reasons" is dubious: are they representing that they will never seek to use it in any litigation, no matter what findings are drawn from it?

Significantly, at the hearing regarding the TES, Defendants' primary argument was that the TES was protected from discovery because Defendants did not plan to rely on it. *See* Tr., Apr. 19, 2005, at 3:3-5 (excerpts attached hereto as Exhibit 1) ("The first point is that Philip Morris is not relying on the study and no defense expert is relying on the study."). As Defendants' counsel explained at that hearing, this was true despite the fact that some of Defendants' experts were themselves involved in the study:

---

[1]     The fact that Plaintiffs previously contemplated that Dr. Hauser would testify regarding his new survey if it produced reliable results is irrelevant. *See Ross v. Burlington N. R. Co.*, 136 F.R.D. 638, 638-39 (N.D. Ill. 1991) ("Although plaintiff may have originally designated the witness as a testifying expert, plaintiff has the prerogative of changing his mind. . . . The court cannot find, then, that the shift in designation affects the witness's current status as a non-testifying expert witness and denies him the protection afforded such a witness."); *Bailey v. Meister Brau, Inc.*, 57 F.R.D. 11, 13-14 (N.D. Ill. 1972) (holding that when an expert originally was designated to testify as to two issues but later was limited to one issue, he could not be deposed as to the issue on which he was no longer testifying).

W0DFD0781

The Honorable Steven M. Gold
February 9, 2006
Page 4

> Obviously, to the extent that Philip Morris' internal scientists are called to testify [as expert witnesses], some of them have been involved in the study. *However, they're not going to be relying on the study.* And the reason they're not going to be relying on the study goes to my second point and that is it is an ongoing study and the statistical analysis of the study has barely begun. There is nothing to rely on. They're not going to rely on the results. They don't have statistical analysis.

*Id.* at 4:12-23 (emphasis added). Indeed, Defendants' counsel went on to argue that Plaintiffs' request for a study on which no expert would rely was *unprecedented*:

> There is *little utility* in the study for a number of reasons. First, as I say, we're not relying on the study. *No one will be relying on the study.* Plaintiffs have not cited a single case like this where no one is relying on the study that's not incorporated in anyone's analysis.

*Id.* at 6:1-7 (emphases added).

Similarly, Plaintiffs do not intend to rely on Dr. Hauser's attempted survey. As Defendants argued regarding the TES, there is "little utility" to the data because Dr. Hauser concluded that he would "have little confidence that the responses would be sufficiently accurate." Expert Witness Report by Dr. John R. Hauser, Dec. 19, 2005, ¶ 4 n.2. If this Court were to rule that the raw, unanalyzed data from Dr. Hauser's attempted survey are relevant and discoverable despite the fact that Plaintiffs and their experts are not relying on it, the same would have to be true for the raw, unanalyzed data from the TES. Put another way, allowing discovery of Dr. Hauser's attempted survey would necessitate revisiting this Court's TES ruling.

<u>Profile Data.</u> Defendants seek "the 'profile data' collected for Dr. Hauser by Greenfield Online."[2] As an initial matter, Greenfield did not collect *any* data "for" Dr. Hauser or "for" this litigation. Rather, it collects varied profile data from its members for its own commercial purposes on an ongoing basis. To the extent that Dr. Hauser or Applied Marketing Science ("AMS"), which assisted Dr. Hauser, *used* any of Greenfield's data, such data *already have been produced*. Defendants' request for more information, therefore, is a baseless claim for a third party's commercial property.

In addition, although Defendants protest that they have made "multiple requests over many months," the relevant profile data was produced as long ago as November 2005. Not until January 9, 2006 – a mere ten days before their asserted need to bring this matter to the Court's attention – did Defendants express to Plaintiffs any dissatisfaction with the profile data that had

---

[2] "Profile data" is information collected by Greenfield about its members, such as a member's age, occupation, and income level. Greenfield collects over 2500 data points, including a variety of demographic and behavioral information.

W0DFD0782

The Honorable Steven M. Gold
February 9, 2006
Page 5

been produced. Even then, one of Defendants' complaints, that two data fields were inadvertently omitted from one of the produced files, promptly was corrected.

The additional profile data that Defendants are seeking are: "(i) survey respondents' smoking practices (and health related information), and (ii) the number of prior surveys taken by individual respondents." As to the first issue, we have learned that Greenfield does ask its members whether they smoke, how many cigarettes per day they smoke, and whether they are interested in smoking cessation programs,[3] and we intend to produce this profile data to Defendants as soon as it can be collected – a process that does take some time, especially given that Greenfield is an independent third party not normally involved in litigation. Other "health related information" identified in Exhibit B to Mr. Grossman's letter, such as "[p]ersonal perception of state of health" and "wears glasses or contact lenses," is irrelevant to smoking and to this litigation.

We also have learned that Greenfield does maintain data on the number of prior surveys taken by its members, although it considers such information to be extremely sensitive and prefers not to produce it. Nevertheless, it is willing to produce this data (designated as "Confidential" pursuant to the Protective Order in this case), but wishes to avoid its being used as a wedge to obtain even more intrusive discovery from Greenfield in the future.

<u>Affidavits.</u> Defendants call "unacceptable" Plaintiffs' reasonable proposal that affidavits from AMS and Greenfield be in lieu of their depositions. Yet, this so-called "unacceptable" approach is exactly what the Court suggested at the November 18, 2005 hearing:

> Well, with respect to the Greenfield-related documents, I suppose that Hauser and Harris can answer at their deposition questions about their record keeping practices, but I'm trying to keep a non-party, Greenfield, from subjected to a defendant's deposition unless that's place of preference for answering remaining questions that plaintiff has now interfering with the relationships between some of your experts and some of the services that they use and if we can avoid the defendant serving with this deposition subpoena. I am happy to work out a mechanism that will be the rough equivalent from the defendants' perspective.

Tr., Nov. 18, 2005, at 28:1-12 (excerpts attached hereto as Exhibit 2). Simply put, it would be unfair for AMS and Greenfield to undertake to provide the requested affidavits only to be subpoenaed for depositions anyway.

Defendants insist that the Court suggested affidavits "months ago." This is true, but the Court also wanted the parties to "work out whatever documentation by affidavit or letter"

---

[3] It should be noted, however, that this smoking-related profile data was not used in connection with Dr. Hauser's survey.

The Honorable Steven M. Gold
February 9, 2006
Page 6

Defendants required.  Tr., Nov. 18, 2005, at 29:17-18.  Yet, in what appears to be a consistent pattern, Defendants did not make any effort to "work out" the subjects of the affidavits prior to their January 9, 2006 letter, and did not even allow Plaintiffs a meaningful opportunity to respond before bringing the issue before the Court.

Finally, with respect to communications between the survey participants and Greenfield, Defendants state that "[i]n this regard, Greenfield's website indicates that it contacts panel members on a 'regular basis' and that it maintains a 'live help desk.'"  Plaintiffs always have understood that Defendants were requesting only those communications that relate to Dr. Hauser's survey, and not wholly unrelated communications such as those that might occur when Greenfield contacts members for other purposes.  Such other communications would be irrelevant and unduly burdensome to produce, and we assume that Defendants are not asking for them.

Respectfully submitted,

/s/

Brent W. Landau

cc:     All Counsel of Record (by CM/ECF and e-mail)

W0DFD0784