**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **BARBARA SCHWAB et al., individually and** ) | **No. CV 04-1945 (JBW)** |
| **on behalf of all others similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | MEMORANDUM AND ORDER |
| ) | DEFENDANTS' MOTION FOR |
| **v.** ) | SUMMARY JUDGMENT ON |
| ) | STATUTE OF LIMITATIONS |
| **PHILIP MORRIS USA, INC. et al.,** ) | |
| ) | |
| **Defendants.** ) | |

JACK B. WEINSTEIN, Senior District Judge:

**I.    Introduction**

In this civil RICO class action, defendants move for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure. They contend that, as a matter of law, plaintiffs'

claims are barred by RICO's four-year statute of limitations; plaintiffs oppose. *See* Defs.' Br. in

Supp. of Mot. for Summ. J. on Stat. of Lims. ("Defs.' Br.") (Docket No. 431); Decl. of Todd

Geremia ("Geremia Decl.") (Docket No. 442); Defs.' Reply Br. in Supp. of Mot. for Summ. J. on

Stat. of Lims. ("Defs.' Reply") (Docket No. 721); Pls.' Br. in Opp. to Defs.' Mot. for Summ. J.

on Stat. of Lims. ("Pls.' Br.") (Docket No. 607). Because the statute of limitations is an

affirmative defense, discovery is not yet concluded and it cannot be said with any assurance at

this time that defendants would necessarily succeed in proving the defense at trial, the motion is

denied with leave to renew upon completion of discovery.

1

## II.     Law

### A.     Burdens on Summary Judgment

Summary judgment is granted "if the pleadings, depositions, answers to the

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Rule 56(c), Fed. R. Civ. P. The movant bears the burden of showing "that there

is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477

U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). Evaluation of the record is conducted in a "light

most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82

S.Ct. 993, 994 (1962) (per curiam); *see also O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d

29, 37 (2d Cir. 2003).

Critical is recognition of the jury's fact-finding primacy:

> It is well established that credibility assessments, choices between
> conflicting versions of the events, and the weighing of evidence are
> matters for the jury, not for the court on a motion for summary
> judgment. If, as to the issue on which summary judgment is sought,
> there is any evidence in the record from which a reasonable
> inference could be drawn in favor of the opposing party, summary
> judgment is improper.

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) (quotation marks omitted).

### B.     RICO Statute of Limitations

The statute of limitations for a civil RICO claim is four years. *Agency Holding Corp. v.*

*Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 153, 107 S. Ct. 2759, 2765-6 (1987). RICO itself does

not contain a statute of limitations. *See Malley-Duff*, 483 U.S. at 146. By reference to the private

2

enforcement provisions of the Clayton Antitrust Act, 15 U.S.C. § 15(a), after which civil RICO was modeled, the Court has supplied one. *Id.* at 153. Limitation runs from the date when a plaintiff discovers or reasonably should have discovered his or her injury. *Rotella v. Wood,* 528 U.S. 549, 555-560. The determination of that date is a question of fact.

The statute of limitations is an affirmative defense; defendants must plead and prove it. Fed. R. Civ. P. 8(c). They must demonstrate, as a matter of law, when the class members either 1) knew or 2) should have known of their injuries. *In re Merrill Lynch Ltd. Partnerships Litigation,* 154 F.3d 56, 59 (2d Cir. 1998). As to the first, they point to several surveys and statements by experts that less than a majority of smokers believe "light" cigarettes are healthier than regular cigarettes. Defs.' Br. in Opp. to Class Cert. 38-40 (Docket No. 346). These surveys are controverted by plaintiffs, who rely upon surveys referred to in Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine (Nat'l Cancer Institute, Nov. 1, 2001) ("Monograph 13"). As to the second, defendants have marshaled a number of media reports, public service announcements and case filings. *See infra* at 4, 7. These, too, are met with evidence supplied by plaintiffs. *Id.* at 7-8.

Defendants also argue that smokers' knowledge for statute of limitations purposes must be decided for each individual smoker, making the statute of limitations defense presumptively valid and the class action unmanageable. Defs.' Br. in Opp. to Class Cert. 58 ff.

Plaintiffs filed this case on May 11, 2004, claiming economic injuries arising from their fraud-induced purchases of light cigarettes marketed by defendants since 1971. Second Amended Complaint ("Compl.") ¶ 30, No. CV 04-1945 (E.D.N.Y.) (Docket No. 95). The bar of limitations is measured from a date four years earlier—May 11, 2000. Should plaintiffs have

3

known of the fraud prior to that date?

Many attorneys knew of the dangers of "light" cigarettes long before 2000. A substantial
number of actions based on grounds of fraud much like those now alleged were brought earlier
than May 11 of that year. Putative class counsel in the present case—Cohen, Milstein, Hausfeld
& Toll, P.L.L.C. and Finkelstein, Thompson & Loughran ("plaintiffs' counsel")—filed four
similar "light" cigarettes class actions in various state courts in 1998 and 1999: *Aspinall v. Philip
Morris Cos.*, No. 98-6002 (Mass. Sup. Ct.) (filed Nov. 25, 1998); *Cummis v. Philip Morris Cos.*,
No. L-2114-98 (N.J. Super. Ct.) (filed July 9, 1998); *Marrone v. Philip Morris Cos.*, No. 99 CIV
0954 (Ohio Ct. Com. Pl.) (filed Nov. 8, 1999); *McClure v. Altria Group, Inc.*, No. 99C148
(Tenn. Cir. Ct.) (filed Jan. 19, 1999). Other "of counsel" attorneys to the class filed two "light"
cigarettes class actions in state courts during the same period: *Oliver v. R.J. Reynolds Tobacco
Co.*, No. 268 (Pa. Ct. Com. Pl.) (filed Mar. 6, 1998); *Trombino v. R.J. Reynolds Tobacco Co.*,
No. L-11263-98 (N.J. Super. Ct.) (filed Jan.19, 1999). In those state class actions, plaintiffs
sought economic damages on state fraud and consumer protection law grounds alleging facts
similar to those now relied upon. *See* Defs.' Br. 4-7. In 1999, the United States government
filed a widely remarked upon complaint in federal district court for damages and injunctive relief
under RICO and other statutes alleging that the tobacco companies misled consumers about the
dangers of "light" cigarettes. Defs.' Br. 2; Compl. for Damages and Injunctive and Declaratory
Relief ("Gov't Compl.") at 37-40, *United States v. Philip Morris*, No. 1:99CV02496 (D.D.C.
1999). Other private and state government plaintiffs filed RICO and consumer fraud suits in the
1990s alleging deceptive marketing of "light" cigarettes. Defs.' Br. 21-22. *See, e.g., Allman v.
Philip Morris, Inc.*, No. 94-0504-IEG (S.D. Cal.); *Commonwealth of Mass. v. Philip Morris Inc.*,

4

No. 95-7378 (Mass. Dist. Ct.); *Maryland v. Philip Morris Inc.*, No. 96122017/CL211487

(Baltimore Cir. Ct.); *Oregon v. Philip Morris, Inc.*, No. 9706-04457 (Or. Cir. Ct.); *Blue Cross &*

*Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, CV 98 3287 (E.D.N.Y.).

It is not denied that plaintiffs' counsel has had knowledge of the RICO injury alleged in

this matter since at least July 1998, when they filed a class action alleging a similar fraud in New

Jersey state court. *See* Defs.' Br. 4 n.1; Geremia Decl. Ex. 2. Defendants contend that this

knowledge should be imputed to the entire class under principles of agency. *See* Defs.' Br. 4 ff.;

Defs.' Reply 9 ff. To do so would bar the suit entirely.

"The relationship between an attorney and the client he or she represents in a lawsuit is

one of agent and principal." *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994); *see* Restatement

(Third) of the Law Governing Lawyers Ch. 2 Introductory Note (2000) (the attorney-client

relationship is, "from one point of view, derived from the law of agency."). In a conventional

attorney-client relationship, the attorney's knowledge is imputed to the client. *Geraci*, 23 F.3d at

725; Restatement (Third) of the Law Governing Lawyers ("Information imparted to a lawyer

during and relating to the representation of a client is attributed to the client for the purpose of

determining the client's rights and liabilities in matters in which the lawyer represents the client.

. ."); *see generally* Restatement (Second) of Agency § 272 (agent's knowledge imputed to

principal). An attorney's knowledge of an injury may work to bar his client's claim under a

statute of limitations. *See Geracia* at 725 (plaintiff's § 1983 claim time-barred because his

attorney knew of injury outside three-year statute of limitations period).

In some cases it is appropriate for an attorney's knowledge to be imputed to the client,

particularly where there is a single attorney and a single known client in an ongoing relationship.

That is not the situation now presented. In the instant case defendants seek to impute the knowledge of counsel to a class of unidentified plaintiffs numbering in the tens of millions who claim they were defrauded for decades. Principles of agency applicable in the single-attorney-single-client relationship cannot be transposed into the class action context under present circumstances. *Cf.* Restatement (Third) of the Law Governing Lawyers § 14 cmt. f ("Class actions may pose difficult questions of client identification."). How can a smoker who was not even aware when he purchased a pack of cigarettes years ago that any of the class attorneys existed be assumed to have known what the attorneys knew?

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). Without consent by both parties, there can be no principal-agent relationship. *See* Restatement (Second) of Agency § 15. Unnamed class members have not yet "consented" to be represented by putative class counsel; these attorneys cannot be their agent for purposes of imputing knowledge of danger. The role of class counsel is akin to that of a judicially appointed fiduciary, not that of a privately retained attorney. *See* Restatement (Second) of Agency § 14F ("A person appointed by a court to manage the affairs of others is not an agent of the others."); *cf.* Rule 23(g), Fed. R. Civ. P. (setting forth standards governing mandatory court appointment of class counsel).

The mass nature of the class action requires that both the court and counsel carefully protect unnamed plaintiffs' rights. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S. Ct. 2295 (1999); *see generally* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev.

6

1343 (1995); Monograph, *Individual Justice in Mass Tort Litigation* 53 ff. (1995) (noting the

ethical challenges facing class counsel). It does not permit the imposition of the principles of

agency in a way that would bar the suit and deprive class members of experienced counsel. The

knowledge of class counsel cannot be imputed to the members of the class for the purposes of

determining whether this suit is barred by the statute of limitations.

The attorneys' knowledge is not decisive. What is critical is what and when the plaintiffs

knew or should have known.

## III.    Application of Law to Facts

The defendants make a strong case that plaintiffs knew or should have known of their

claimed economic injuries years before 2000. A number of reports appeared in newspapers,

popular magazines, textbooks, government pamphlets, television news programs and public

service announcements from the late 1950s to the present indicating that "light" cigarettes were

not as safe as portrayed by defendants. Defs.' Br. 10 ff. Tens of millions of pages of internal

documents could easily be obtained for research as a result of the Master Settlement Agreement

of November 23, 1998 between the tobacco industry and various states' attorneys general. The

Master Settlement Agreement provided that the tobacco companies would make available

through their web sites and at a central depository in Minnesota many of the documents produced

during discovery of the states' attorneys general actions. *See* Master Settlement Agreement

("MSA") 29-32. Not all of these documents were available at once; the earliest posting on the

Philip Morris USA Document Site, for example, appears to be February 1998. Many of the

documents relied upon by plaintiffs' counsel were available long before 2000 through the

7

defendants' web sites and other channels. Defs.' Br. 23.

In response, plaintiffs chronicle the past and ongoing efforts of the tobacco industry to
induce public misperception of the health risks posed by smoking by indicating their doubt about
the truth of warnings by the health services community, and by limiting the release of their own
scientific studies, Pls.' Br. Ex. 12; lobbying the Federal Trade Commission, Pls.' Br. Ex.7-8;
cloaking documents with the attorney-client privilege, Pls.' Br. Ex. 15-17; conducting studies
outside the United States so that the results would remain secret, Pls.' Br. Ex. 10, 11, 19; and
working with scientists sympathetic to the industry to produce reports favorable to the industry's
health claims, Pls.' Br. Ex. 21-22. Plaintiffs also point to the testimony of tobacco industry
executives who testified that, into the late 1990s, they were ignorant of the phenomenon of
compensation—a technique used by many smokers to increase their intake of nicotine and tar
from "low-tar" cigarettes. Pls.' Br. Ex. 36-38.

The enormous amount of conflicting evidence filed by the parties on the subject of
consumer knowledge demonstrates that genuine issues of fact exist as to the defense of the
statute of limitations. If this case goes to trial, it will be for a jury to determine when plaintiffs
had actual knowledge or should have had knowledge of the alleged fraud. *Cf. Bingham v. Zolt,*
66 F.3d 553, 558 (2d Cir. 1995) (jury asked to determine "when the estate actually knew of
defendants' alleged wrongful acts").

The instant matter is unlike other "knowledge" cases before the Court of Appeals for the
Second Circuit. Other litigations have dealt with *either* individuals in close contact with the
persons who defrauded them, *see, e.g., Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23 (2d
Cir. 2002) (hotel employee suing hotel); *Bingham v. Zolt* (administrator of estate suing

8

decedent's legal advisors); *Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) (trust beneficiaries

suing administrators), *or* sophisticated plaintiffs who invested significant amounts of money in a

venture controlled by defendants. *See, e.g.*, *In re Merrill Lynch* (investors in real estate limited

partnerships); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) (federal

stock association lending money to mortgage broker). Such plaintiffs in ongoing business

relationships with defendants can be expected to be alert to the possibility of fraud in a way that

the average smoker, spending a few dollars for a pack of cigarettes as a matter of habit, may not

be. The plaintiffs in the instant matter are members of a nationwide mass market; their

interaction with defendants was largely limited to advertisements and other general knowledge.

A jury question is presented.

Plaintiffs do not discuss the knowledge timing beyond asserting that no class member

could have known of his injuries until the publication of Monograph 13. The studies referred to

in Chapter 6 of this monograph do provide some support for plaintiffs' position that many

smokers lacked knowledge of the dangers of "light" cigarettes. Plaintiffs, however, do not refer

to any expert reports on the time when knowledge of dangers about "light" cigarettes were, or

should have been, acquired by smokers. They concede only that sometime after 2000 smokers

were warned. *See* Tr. of Sept. 12-13, 2005 Hr'g 180:16-22 (warning by defendants on internet

and in advertisements). Their argument is essentially one of estoppel: the tobacco companies

made tremendous efforts to keep the truth about "light" cigarettes from smokers and so should be

estopped from arguing that the smokers learned the truth anyhow. *See Price v. Philip Morris*,

No. 00-L-112, 2003 WL 22597608 (Ill.Cir.) (in statewide "light" cigarettes class action trial

under Illinois consumer protection acts, defendant held liable for $7 billion in compensatory and

$3 billion in punitive damages).

    *Price* apparently adopted the estoppel theory. The Illinois court ruled that since evidence
at that trial established that Philip Morris had concealed the truth about "light" cigarettes until
November 2002 (when it added inserts to packages of "light" cigarettes that warned of their
dangers), it could not assert that the plaintiffs should have been aware of the information any
earlier. *Price* at ¶ 81. As to actual knowledge, the court apparently believed that the company's
decision to publish the inserts so widely (and duplicate their contents in newspaper
advertisements and on its website) provided strong evidence that its customers were unaware
earlier of the risks the inserts described. *Id.*

    The *Price* court also found that Monograph 13 represented the first scientific consensus
on the true nature of "light" cigarettes; it appears to have concluded that the class could not be
deemed to have known of the fraud prior to the publication of the monograph. *Id.* at ¶ 80.
Defendants in the present litigation contest this point, arguing that Monograph 13 was only a
reinterpretation of existing studies. Tr. of Sept. 12-13, 2005 Hr'g 229.

## IV.    Continuing Problems

    A troubling critical problem for plaintiffs is that some members of the class almost
certainly were aware long before 2000 that "light" cigarettes were not appreciably safer for them
than regular cigarettes. The statute would bar their claims. Yet the plaintiffs may be able to
show that a substantial number of smokers were not aware before May 2000. The individual
class members and their times of awareness may well have differed over the years. Suppose, for
example, that one million became aware in 1998, one million in 1999, one million in 2000 and

one million in 2001. The first two million (1998-1999) would be barred, the third (2000) could.
be deemed damaged for a year or less, and the fourth (2001) for somewhat more than a year.
According to plaintiffs' theory of the case, the particular persons in each group cannot be known.

Assuming a jury could find defendants liable, recovery would have to depend upon a
statistical analysis to estimate how many smokers knew what and when. *See* Order & Mem. of
Sep, 29, 2005 (Docket No. 763) (discussing *Daubert* issues). One way that plaintiffs might
proceed would be:

1)     Based on surveys, other evidence and extrapolation, plaintiffs' experts might develop a
       model showing how many smokers of "light" cigarettes were ignorant of the alleged fraud
       in each relevant year.

2)     Based on evidence, plaintiffs' experts might estimate the "pack premium" paid by
       smokers because of the fraud, and the total class damages for each year.

3)     To provide a total loss for the period of liability fixed by the jury, the damages for each
       year might be summed up.

4)     Members of the class might prove by affidavits the number of packs of "light" cigarettes
       they bought during the period to receive a pro rata share of damages.

Calculations would have to exclude geographic areas such as Illinois where, in the *Price* case,
sales overcharges were recovered in a separate state substantive law fraud recovery.

The population of smokers is not static. There was during the applicable time of alleged
fraud a continuing introduction into the class of naive new smokers, including children who may
have had no inkling of the extensive literature in the field concerning health risks of "light" and
regular cigarettes, newly addicted sophisticated adults and other new smokers. Over the years

11

there was also a continuing seepage out of the class of those who quit smoking, either voluntarily because of what they had learned about health risks; concern about their children's health; or disapproval of their spouses, peers and employers; or involuntarily because of death. Between the completely naive and the completely sophisticated lies a broad changing spectrum of smokers with partial knowledge that may or may not have been fully assimilated. There are, as defendants rightly suggest, probably as many variations in knowledge as there are individual smokers.

In short, to avoid the statute of limitations and determine total damages, plaintiffs' theory may depend upon an estimate predicated largely on expert testimony that may require disaggregation of smokers by knowledge, year by year, with reintegration to obtain total damages. Such estimates, if properly modeled and supported by evidence, may be appropriately used to resolve factual issues not susceptible of direct proof. *See, e.g.,* Federal Judicial Center, Reference Manual on Scientific Evidence 2 (2d ed. 2000) (Breyer, J., describing the "great weight" the Supreme Court had placed on statistical analysis in recent cases); *id.* at 83-178 (offering guidelines for the judicial supervision of statistical evidence); *id.* at 229-276 (guidelines for survey data); *id.* at 277-334 (damages); American Bar Association, Econometrics 179-224 (2005) (use of statistical techniques in class certification to demonstrate existence of common issues); *id.* at 1 n.2 (noting widespread use of statistical analyses outside antitrust context). Since discovery is not completed this problem of proof need not be decided now.

## V.  Unresolved Matters

### A.  Separate Accruals on Separate Purchases

The Court of Appeals for the Second Circuit has adopted a "separate accrual" rule in civil

RICO cases under which "a new claim accrues and the four-year limitation period begins anew

each time a plaintiff discovers or should have discovered a new and independent injury." *In re*

*Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) (separate accrual rule not

applicable on the facts). If this rule were to apply here, it might permit recovery for economic

damages suffered by plaintiffs on all packs of cigarettes purchased after May 11, 2000, four years

before class counsel filed the complaint in this matter. Defendants argue that the rule is

inapplicable because plaintiffs have alleged a single injury—the loss of value in packages of

"light" cigarettes purchased in reliance on defendants' alleged fraud. Defs.' Reply 15. Plaintiffs

have not relied on the separate accrual rule in their motions in opposition to summary judgment,

Pls.' Br. 34, possibly for the sensible reason that if knowledge barred all claims for purchases

before 2001, *a fortiori* it applied to purchases after that date.


### B.  Equitable Tolling

In view of the present decision, the issue of equitable tolling because of defendants'

alleged fraudulent concealment of the actual deliveries of tar and nicotine by "light" cigarettes

need not be considered. *See* Defs.' Br. 18 ff; *Price v. Philip Morris, supra.* Whether to present

that issue to the jury by evidence and charge is postponed.

13

## VI.    Conclusion

The motion for summary judgment on the ground that the statute of limitations expired

before the suit was filed is denied. Leave to renew is granted upon completion of discovery, with

additional expert and other evidence on how dated knowledge is to be imputed to the class.

SO ORDERED.

Jack B. Weinstein

Dated: October 6, 2005
       Brooklyn, New York

14

*Jack B. Weinstein*
*Senior United States District Judge*
*Eastern District of New York*
*225 Cadman Plaza East*
*Brooklyn, N.Y. 11201*

*Tel: (718) 260-2520*
*Fax: (718) 260-2527*



**TO:**  Magistrate Judge Steven M. Gold  ~ (718) 260-2566
David M. Bernick                      ~ (312) 660-0203
Murray Garnick                        ~ (202) 942-5999
Theodore M. Grossman                  ~ (216) 579-0212
Michael Hausfeld                      ~ (202) 408-4699
Alan Mansfield                        ~ (212) 801-6400
Richard M. Volin                      ~ (202) 337-8090

**DATE:** October 6, 2005                    **# PAGES WITH COVER: 15**
**RE:**  Memorandum and Order – *Schwab v. Philip Morris USA Inc.*, 04-CV-1945
Please distribute. This order will also appear on the ECF system shortly.
Please contact law clerk Christopher Wimmer at the judge's chambers if you
believe this distribution list should be altered. (718) 260-2524.