```
                                                              Page 164
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
     McLAUGHLIN,
 3                  Plaintiff,

 4           versus                   CV 04-1945

 5   PHILLIP MORRIS, ET AL.,
                    Defendant.        United States Courthouse
 6                                    Brooklyn, New York
     --------------------------------x
 7
                                      September 13, 2005
 8                                    9:00 a.m.

 9               TRANSCRIPT OF HEARING

10   Before:    HON. JACK B. WEINSTEIN, District Judge

11                   APPEARANCES

12   Attorneys for Plaintiff:

13   COHEN MILLSTEIN HAUSFELD & TOLL, PLLC
     150 East 52nd Street
14   New York, N.Y.  10022
     BY:   MICHAEL D. HAUSFELD, ESQ.
15         PAUL GALLAGHER, ESQ.

16

17   SHELLER, LUDWIG & BADEY
     1528 Walnut Street
18   Philadelphia, Pa  19102
     BY:   JUDY SHOPP, ESQ.

19

20

21   SMOGER & ASSOCIATES, P.C.
     3175 Monterey Blvd
22   Orlando, Va  94602
     BY:   GERSON H. SMOGER, ESQ.

23

24

25
```

Page 265

1      MR. GROSSMAN: And those who actually were
2  appropriate plaintiffs would have their claims diluted. So
3  there is an overbreadth and underbredth problem.
4      THE COURT: No question, but those that would get
5  less than they should get would get nothing. Unless there was
6  a class action, they couldn't possibly sue individually. And
7  this is a result in almost all of the settled cases, as I
8  suggested earlier.
9      So it's a matter of obtaining an adequate
10 compensatory scheme. But so far as the defendants are
11 concerned, you won't be paying any more than you should pay
12 assuming that you should pay anything.
13     MR. GROSSMAN: There is no question that we have
14 standing to challenge the scheme.
15     THE COURT: The distribution scheme.
16     MR. GROSSMAN: Yes.
17     THE COURT: No doubt about that. And you should.
18 Every defendant should. I've taken the position in my book, I
19 think, if I hadn't, I certainly should have, on ethics, that
20 the defendants should not just settle or walk away and not try
21 to make sure that all the plaintiffs are adequately dealt
22 with.
23     MR. GROSSMAN: And there is no question that we have
24 standing in order to challenge the class for its overbreadth.
25     THE COURT: No question.

Page 266

1      MR. GROSSMAN: Now, your Honor, Rule 23 requires,
2  and specifically Rule 23(b)(3), requires this Court to find
3  that the questions of law or fact comment to members of the
4  class predominance.
5      THE COURT: Certainly, the law questions
6  predominate, don't they?
7      MR. GROSSMAN: There are legal issues that are
8  common but they certainly don't predominate in our view,
9  your Honor. Every purported class has legal issues that are
10 common but here the questions of individual reliance, of
11 statute of limitations, of compensation --
12     THE COURT: Those are factual issues but the basic
13 question in RICO actions of this kind seem to me to be almost
14 unique and predominant.
15     MR. GROSSMAN: As your Honor has ruled, there has to
16 be but for causation in a RICO action.
17     THE COURT: Right.
18     MR. GROSSMAN: And but for causation in an
19 individual RICO case would necessarily involve questions of
20 reliance, statute of limitations, of whether the person
21 compensated and others.
22     THE COURT: Right.
23     MR. GROSSMAN: The same is true here.
24     Now, we have a dispute as to how the trial might
25 proceed on that basis but there has to be a finding and the

Page 267

1  finding I submit has to be on the record. And this raises a
2  point that came up yesterday when your Honor said that you
3  might take judicial notice of some facts.
4      We understand the Court's power to take judicial
5  notice but we believe that we have a right to receive notice
6  of those facts of which the Court would take judicial notice.
7      THE COURT: I think that is so. And I said
8  yesterday if I rely on anything not in the record before me,
9  I'll try to let you know.
10     MR. GROSSMAN: Yes.
11     THE COURT: Assuming I can read my own mind, which
12 is always a problem with all of us. We make decisions trying
13 to make them rationally and then sometimes there are
14 subconscious facts that bubble up that we are not aware of,
15 but certainly I think that you are entitled to that. I think
16 I said that in my treatise.
17     MR. GROSSMAN: And we would be entitled to challenge
18 those facts to put in the record our opposition to them.
19     THE COURT: Correct. And you could always, if they
20 were substantial, also move to reargue should I possibly
21 decide against you. Yes, I think that is absolutely
22 acceptable.
23     MR. GROSSMAN: In regard to the need for findings,
24 Abkin made clear that a class certification cannot be based on
25 a Gestalt judgment. It has to be based on the factual record

Page 268

1  submitted.
2      In that regard, let's look for Rule 23 purposes at
3  what the record is that plaintiffs have made.
4      I'm very well aware of your Honor's statements many
5  times that the concept of universality of reliance is
6  essentially preposterous, but that indeed is the plaintiffs'
7  position on the record in this case.
8      Let me see if I can find my folder here.
9      THE COURT: I don't know whether I used the word
10 preposterous, but it's not an inadequate representation of how
11 I feel.
12     MR. GROSSMAN: Fair enough, your Honor.
13     Here is the expert report of Dr. Joel Cohen.
14     Paragraph 8.
15     This is the record that the plaintiffs have made.
16     It is my opinion to a reasonable degree of
17 scientific certainty that the implicit health reassurance --
18     THE COURT: That is an absurd position to begin
19 with. I told you there can't be any certainty in these things
20 and we all know that. I don't know who advised him to say
21 that but it's not a reasonable degree of medical certainty --
22 probability rather, or scientific probability. You are
23 dealing with probabilities in these cases, never with
24 certainty.
25     MR. GROSSMAN: I agree, your Honor, but this is the

27 (Pages 265 to 268)

Page 269

1  record that they made.
2      THE COURT: Okay.
3      MR. GROSSMAN: And let's see if I can focus this a
4  little better.
5      It is my opinion to a reasonable degree of
6  scientific certainty that the implicit health reassurance of
7  the term lights as that term is used as a cigarette brand
8  descriptor was universally understood by all smokers of
9  so-called lights cigarettes. In addition, the implicit health
10 representation of the term lights contributed to the purchase
11 decision for all cigarette purchasers of light cigarettes.
12     THE COURT: I can't simply accept it. I'm not going
13 to rely on that statement. It's not a reliable statement.
14 There may be other things in his opinion that are useful but
15 that is not.
16     The problem has to be solved, if it's at all soluble
17 in a case like this, on the basis of averages of some kind
18 statistically based on large numbers.
19     MR. GROSSMAN: Indeed, the record of plaintiffs, the
20 record before the Court from Dr. Cohen, their expert, this is
21 page 54 of his deposition says that surveys don't work.
22     "There are probably surveys that do this in the
23 following way. They basically are looking at correlational
24 data --
25     By the way, there is nothing special about this but

Page 270

1  I believe that what he is referring to here is what the
2  plaintiffs have referred to as conjoint analysis.
3      THE COURT: Yes.
4      MR. GROSSMAN: "They basically are looking at
5  correlational data, that is, they ask people questions and
6  they attempt statistically to assign weights to various
7  factors to determine how important they are. That is a
8  standard survey research procedure but it suffers from all the
9  very serious flaws of relying on people's answers to the
10 questions as valid indicators of the factors that were
11 important. And so it doesn't matter how sophisticated the
12 empirical analysis is. If people can validly answer the
13 questions they are asked, it doesn't matter with the numbers
14 once you get them in. You have those limitations in any
15 conclusions you reach. So people have attempted it but have
16 not overcome the more basic problems when doing it."
17     It is plaintiffs' position on the record, on the
18 record that is before the Court on this Rule 23 motion, not
19 only that there is universality but that surveys are flawed,
20 the very surveys that Mr. Hausfeld was referring to in his
21 argument.
22     Even beyond that, it's plaintiffs' position, Dr.
23 Cohen's position at page 79 of his deposition:
24     "As to how you could test, how you could
25 appropriately test what people really had in mind, why they

Page 271

1  smoked lights. He said the word test usually means that at
2  the end you say it either one way or the other. So a test,
3  you either pass the test or you fail the test. I don't know
4  that you can come to that type of conclusion. I think you can
5  be more or less confident as a result of in-depth probing. So
6  I'm having trouble with the notion of testing as a hypothesis.
7  I think that you can have more or less confidence as a result
8  of having more evidence about a given person but I don't think
9  that amounts to a test."
10     He goes further:
11     "Trying to understand their belief a little more,
12 what is the strength of their belief, the conviction they
13 have, what is the possibility that they would admit that they
14 might be wrong, you know, much more in depth."
15     He is talking about the kind of probing that occurs
16 at a deposition where specific questions are asked of each
17 individual.
18     It is the position of plaintiffs' expert, Dr. Cohen,
19 at least at his deposition and in his expert report, that in
20 order to find out why people smoked light cigarettes, you have
21 to ask them individually. And it can't be one question, it
22 has to be an in-depth interview.
23     Now, I agree with you entirely, your Honor, that
24 universality doesn't make sense but it is plaintiffs'
25 position. It's their only position of record.

Page 272

1  No surveys have been offered by plaintiff on
2  reliance. The only surveys that have been really offered
3  before the Court are those that we have shown your Honor, such
4  as that Koslowski survey from 2000 which showed essentially
5  that 66 percent of smokers of lights said they had no effect
6  on health. 16 percent said they are more dangerous and
7  20 percent said less dangerous.
8      And with a look at those surveys, many of which were
9  performed by Dr. Cummings, one of plaintiffs' experts, I asked
10 Dr. Cummings what their significance was specifically on the
11 question of predominance. And here is his testimony from
12 page 192 of his deposition, Dr. Cummings.
13     "Question: Essentially, there was no predominant
14 view on whether all cigarettes are equally hazardous or some
15 cigarettes are more hazardous, is that correct?
16     And he said: Yes.
17     And that's from his so-called banned survey, I
18 believe.
19     I then asked him, and this is at page 197 through
20 198:
21     With regard to the published data, it was typical,
22 he found, plaintiffs' expert, for American smokers to believe
23 that light cigarettes do not make quitting easier.
24     Further, he found that a majority of smokers did not
25 believe that light cigarettes are less harmful. Indeed, he

28 (Pages 269 to 272)

Page 341

1  would have been revealed that the hybrid car got no better gas
2  mileage than the non-hybrid car, consumption of hybrid cars
3  would go down. If consumption goes down, so does price.
4  Basic competitive economics. The difficulty here. In this
5  market, it is not competitive with respect to health issues.
6  The defendants all knew they had to maintain a uniform
7  position with respect to the health controversy.
8       If anyone deviated and charged a higher price for
9  their light cigarettes, it would have impacted adversely on
10 the remainder of the industry because it could have
11 cannibalized or spoke ill of the safety of the regular
12 cigarettes which they were falsely trying to promote.
13      So we would have affected consumption on a market
14 level not just an individual level. It also would have
15 affected the market on willingness to pay.
16      Taking again what I alluded to earlier in the day.
17 When a company introduces a new product, they have to get some
18 sense of what consumer willingness to pay is. You just don't
19 put out a product and pick a number out of the ether and say
20 I'll attach a number to this product and see what happens.
21 Companies have some foresight, some design. They will test
22 market a product, do surveys about pricing a product. They
23 will try to find out what is the consumer willingness to pay
24 for a new product with different attributes; one, gas mileage;
25 the other, less risky, than they would for products that were

Page 342

1  more traditional that did not have those attributes.
2       And there are two ways that that can be done. That
3  can be done by traditional surveys or that can be done by
4  conjoint analysis, conjoint analyses which were done by the
5  defendants for the last several decades as to all their
6  cigarette sales generally and lights in particular.
7       Dr. Stewart who is defendants' marketing expert
8  said, and this is in response to the questions that your Honor
9  asked, found on page 32 of our answers: There are also
10 well-known widely accepted tools for quantifying the relative
11 value of product attributes and benefits, such tools
12 frequently referred to as choice modeling and choice
13 experiments can be used to identify and quantify the value of
14 health. That is what Dr. Harris did. That is precisely what
15 Dr. Houser did.
16      MR. GROSSMAN: Objection, your Honor, move to strike
17 as to Dr. Houser.
18      MR. HAUSFELD: Your Honor, I assiduously avoided any
19 reference to the answers to the Court's questions.
20      This morning Mr. Grossman introduced those answers
21 in his presentation to the Court. At that point the entirety
22 of those answers have to be admitted into the record.
23      MR. GROSSMAN: Your Honor, the answer to that is
24 easy. We moved to strike the reports of Dr. Houser and the
25 others. The Court granted the motion that they would not be

Page 343

1  part of this record, that they would not be considered.
2       THE COURT: New reports, the new reports filed a
3  week and a half ago.
4       MR. GROSSMAN: Yes, and that includes the report of
5  Dr. Houser. He had no reports before that date. I referenced
6  this morning page 4 and 6 of the plaintiffs answers to the
7  Court's questions. The Court's questions had nothing to about
8  with Dr. Houser.
9       THE COURT: Those answers are entirely in. I plan
10 to consider them.
11      MR. GROSSMAN: And I did not in the motion refer to
12 any part having anything to do with Dr. Houser.
13      THE COURT: Then we won't hear Dr. Houser. We won't
14 hear anything about Dr. Houser at this argument.
15      MR. HAUSFELD: Your Honor, at one point -- excuse
16 me.
17      What Mr. Grossman did reminded me of an incident
18 that occurred years ago in a particular case that we had --
19      THE COURT: Excuse me. I don't really care about
20 anything except the merits of this. I don't care to hear any
21 dispute among attorneys.
22      MR. HAUSFELD: I believe, your Honor, in introducing
23 the answers to your Honor's questions which contain reference
24 to Dr. Houser, the entirety of those answers are before the
25 Court but I can answer your Honor's questions without

Page 344

1  reference specifically to Dr. Houser but in reference to the
2  recognition by defendants of conjoint analyses.
3       And at footnote 25 of our answers to your Honor's
4  questions on page 36, the defendants own documents, internal
5  papers state: Conjoint analysis is the best way to find out
6  what is important. Should I concentrate more on color or
7  shape? Decisions of this type abound. Indeed, most marketing
8  decisions look like these. Conjoint analysis is in essence a
9  method that finds out what is important to consumers'
10 decisions. Respondents often hide their motives from
11 themselves and even more often from market researchers.
12 Conjoint analysis avoids these problems and is the most
13 sensitive, reliable and valid technique available to deciding
14 what is important. For purposes of class certification, all
15 that needs to be established is whether or not there are
16 methodologies available from which judgments can be made to
17 the class as a whole concerning issues of impact or damage.
18      Conjoint analyses can identify precisely what
19 your Honor asked, what percentage if it's less than the whole
20 of light smokers relied on the meaning, the common meaning,
21 the predominating common meaning of the light descriptor?
22      It will also as a matter of predominance make
23 available the price at which an aggregate of consumers that
24 would have made up the market were willing to pay for that
25 product so that a manufacturer who was introducing a new

46 (Pages 341 to 344)

Page 345

1  product called light would know before they introduced that
2  product what consumers as a whole expressed as their
3  willingness to pay a price for that product based on the
4  attributes of that product.
5       The next issue we have relates to a defense not yet
6  officially raised by the tobacco companies because they have
7  not yet answered but one which they have clearly indicated
8  they will raise and have raised in these hearings; the statute
9  of limitations.
10      And that involves three elements, your Honor.
11 Injury, as the defendants claim, and knowledge. I was
12 intrigued by Mr. Garnick's presentation that under RICO, the
13 statute begins at the time of injury. That would mean that at
14 the time the first person purchased a light cigarette, they
15 were injured.
16      How?
17      They had no idea that there was a fraud. All of the
18 RICO cases that talk about injury combine it at least with the
19 concept that you had to know that you were in fact injured
20 just like a latent injury in the tort field.
21      When was the deceit made known and to whom was it
22 made known?
23      Is that a common question? Is it a predominating
24 common question? And we'll get to that in a moment.
25      Then Mr. Garnick said it's the plaintiffs' burden to

Page 346

1  prove fraudulent concealment or due diligence.
2       I'd like to read what was omitted in the
3  presentation this afternoon from Monograph 13 at the preface
4  on page I.
5       "This monograph is unique in another important
6  aspect. For the first time the authors who prepared the
7  various chapters have had extensive access to the information
8  gleaned from the internal documents of the tobacco companies.
9  The tobacco industry files now open to the public and
10 available on the internet constitute some 33,000,000 pages of
11 formal and informal memos, meeting notes, research papers and
12 similar corporate documents. Included are marketing
13 strategies that express the growing concern among the various
14 tobacco companies of the potential loss of new recruits. This
15 concern over the potential loss of market was due to the
16 evolving public opinion that smoking is harmful to health and
17 that it is related to many of the illnesses that smokers
18 experience over the course of their lives."
19      This is now my parenthetical in that "Evolving
20 public opinion that smoking is harmful despite the public
21 denials by the companies at the same time of no causal
22 relationship between smoking and human disease."
23      But the monograph authors go on to state on page II:
24 "Access to internal industry papers allowed monograph authors
25 to cite a number of tobacco company documents that show a

Page 347

1  long-term trend altering the tar and nicotine content of
2  cigarettes by various chemicals and mechanical procedures.
3  The documents further reveal the industry's efforts to produce
4  cigarettes that could be marketed as acceptable to
5  health-conscious consumers. Ultimately these low tar low
6  nicotine cigarettes were part of the industry's plan to
7  maintain and expand its consumer base.
8       The preface goes on to state:
9       "The use of these 'decreased risk' cigarettes have
10 not significantly decreased the disease risk. In fact, the
11 use of these cigarettes may be partly responsible for the
12 increase in lung cancer for long-term smokers who have
13 switched to the low tar low nicotine brands."
14      Finally: "Switching to these cigarette may provide
15 smokers with a false sense of reduced risk when the actual
16 amount of tar and nicotine consumed may be the same as or more
17 than the previously used higher yield brand."
18      Aside from the merits, the issue of fraudulent
19 concealment, the absence of those documentations, the
20 withholding of those documents by assertion of unlawful and
21 wrongful privileges is a predominating common question across
22 the class. No one member is going to prove fraudulent
23 concealment differently than any other member.
24      Due diligence.
25      What could a smoker have found out by himself or

Page 348

1  herself?
2       Even if a smoker got on to the internet of their
3  webcite with the various codes and countercodes and
4  contracodes so that each particular webcite had a new code to
5  get to the next level, what could they make of it
6  realistically?
7       What could a single consumer in due diligence do to
8  uncover probably the single greatest fraud in U.S. history,
9  perpetrated by what some courts have already found to be the
10 biggest liars in the U.S. history?
11      A bit of an imbalance until the publication of
12 Monograph 13 when the public health community was able to sit
13 and sift through all of these materials which were made
14 available as they said for the first time.
15      Was there any ability of the public to become even
16 aware of the nature of the deception and its magnitude?
17      An issue again predominating across class members.
18      The last thing that needs to be decided in this
19 litigation based on the defenses that have been argued as
20 opposed to raised is compensation.
21      The defendants say that each individual member of
22 the class will have to show how they compensated and the fact
23 that the class knew about compensation because this was a
24 matter that was generally available. They didn't hide it.
25 Well, again, I'm not getting to the merits, just going to

47 (Pages 345 to 348)