John C. Byer, Ph.D.

Washington, DC

June 2, 2005

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - - - x

4     BARBARA SCHWAB, et al.,         :

5            Plaintiffs,             :   Civil Action No.

6        v.                          :   04-1945

7     PHILIP MORRIS USA, INC., et al.,:

8            Defendants.             :

9     - - - - - - - - - - - - - - - x

10                              Friday, June 2, 2005

11                              Washington, D.C.

12

13         Deposition of JOHN C. BEYER, Ph.D., commencing

14    at 9:05 a.m., held at the offices of Arnold & Porter,

15    555 Twelfth Street, N.W., Washington, D.C., before

16    Keith Wilkerson, a notary public in and for the

17    District of Columbia.

18

19

20

21

22

W0D6E1508

John C. Byer, Ph.D.                                                                June 2, 2005

Washington, DC

1   February and the other at the end of March. I read
2   again in part or in full the complaint and other
3   legal documents that have been provided in this case,
4   some of the reports by other experts that the
5   plaintiffs have offered, the underlying methodology
6   and data that were used for the estimation of
7   damages, and I met briefly with plaintiff's counsel
8   and off and on with the senior staff members of
9   Nathan Associates, who assisted me in which analysis
10  and research leading up to the two reports.
11      Q.  Besides the complaint, what other legal
12  documents did you read?
13      A.  I reviewed, and this is again -- answers
14  to interrogatories by the defendants. I think, along
15  with the complaint, those are the only legal
16  documents in this case, yes.
17      Q.  The interrogatory answers to which you
18  refer, are those the answers in which defendants
19  provide estimates of operating profits?
20      A.  Well, it's a variety of answers to
21  interrogatories. Some concern revenues and profits
22  of selected defendants for their production and sale

1   of light cigarettes, but also there were some other
2   answers to interrogatories that concerned pricing or
3   general statements, not numbers, but general
4   statements about the cost of manufacturing light
5   cigarettes compared to full flavored cigarettes.
6       Q.  You have reviewed the defendants -- the
7   estimates the defendants have provided of their
8   revenues and profits. Correct?
9       A.  Those that did provide it. I've only --
10  I think there are estimates of operating profits for
11  light cigarettes by two, maybe three defendants thus
12  far that have come in the form of interrogatories.
13      Q.  And in reviewing those that you've seen,
14  did you see any problems or errors or anything
15  questionable in those calculations?
16      A.  I wasn't reviewing them for that goal. I
17  was trying to simply see what information had come to
18  our attention through the interrogatories and was
19  assessing it for its coverage or completeness. The
20  fact that that set of information is not yet complete
21  means that I'm not going to spend time doing the
22  detailed analysis of that data until it is all

1   available.
2       Q.  So at this point in time, you haven't
3   identified any errors or problems with the
4   calculations that defendants have provided.
5       A.  I haven't looked for any. Therefore, I
6   haven't identified them.
7       Q.  Now, you mentioned that the estimates
8   that you've been provided are not yet complete. What
9   do you mean by that? What's missing?
10      A.  The answers to -- the interrogatories?
11  Some of the defendants have not yet provided them,
12  and right offhand I can't recall which ones. The
13  absence of that data, which I understand is in the
14  process of being developed, will be completed by the
15  defendants at some time in the future.
16      Q.  Are there any other respects in which
17  defendants' estimates of profits or revenues are
18  incomplete, in your opinion?
19      A.  Again, I have not reviewed the underlying
20  information for basic integrity where a defendant has
21  provided information or data on revenues and costs
22  and hence operating profits by categories of their

1   products.
2       Rather, I have been interested to see to
3   what extent we have coverage by the defendants in
4   response to the requests that have been asked of
5   them. My approach will be, once we have all of it,
6   to undertake a more careful analysis of that
7   information to see whether it comports with publicly
8   available information, whether there is consistency
9   across defendants, issues that would go to the
10  integrity of the data.
11      Q.  You also mentioned that the
12  interrogatories contained some responses relating to
13  the pricing of lights and regular cigarettes.
14  Correct?
15      A.  At least in part. I don't know if I have
16  a complete universe, but I have some answers to
17  interrogatories concerning pricing.
18      Q.  Have you reviewed, to use the word you
19  used, the integrity of those responses?
20      A.  On pricing?
21      Q.  Yes.
22      A.  All that I've done is take it at its face

4 (Pages 10 to 13)

W0DE1511

John C. Byer, Ph.D.                                          June 2, 2005

Washington, DC

Page 14

1  value, and it's consistent -- let me just say this.
2  The statements on pricing that I have seen are
3  consistent with what is generally available in the
4  public domain.
5      Q.   One of the statements on pricing in the
6  interrogatory answers is that the defendants have
7  always priced light cigarettes and full flavor
8  cigarettes in a particular brand family at the same
9  price.  Correct?
10     MR. GALLAGHER:  Objection.  Lack of
11 foundation.
12     THE WITNESS:  I'm not sure that's the
13 exact wording, but that's in essence what I recall,
14 and that's what's available in the public domain as
15 well.
16     BY MR. MCCARTER:
17     Q.   And that statement is consistent with
18 what you've seen in the public domain.  Correct?
19     A.   Yes.
20     Q.   Now, the other category of information
21 you mentioned that you had seen in these discovery
22 responses related to the cost of manufacturing light

Page 15

1  and full flavor cigarettes.  Correct?
2      A.   Yes.
3      Q.   And have you performed any check on the
4  integrity of that information?
5      A.   No.
6      Q.   To the best of your knowledge, are those
7  statements by the defendants on that issue consistent
8  with the information you've reviewed in other
9  contexts?
10     MR. GALLAGHER:  Objection.  Lack of
11 foundation.
12     THE WITNESS:  I can't answer that
13 question because I haven't done the analysis, as I
14 said, using defendant data on operating profits
15 between lights and other cigarettes.  And that in
16 part obviously depends on the cost of manufacturing
17 different categories of cigarettes.  I can only do
18 that analysis once I have the full set of
19 information.
20     BY MR. MCCARTER:
21     Q.   Is there information in the public domain
22 relating to the relative cost of manufacturing lights

Page 16

1  and non-light cigarettes?
2      A.   I have not seen it.  The information on
3  cost which the defendants produce is available
4  through their SEC required reporting which comes in
5  the form of 10-Ks, and they do not break down either
6  profitability or cost by different segments within
7  the same line of business.
8          So therefore in a public sense, and
9  that's what I said in my report, publicly available
10 information from the defendants, at least as far as
11 I've been able to determine, does not distinguish
12 between the cost of manufacturing light cigarettes
13 and other cigarettes for a given supplier.
14     Q.   Whose expert reports have you read?
15     A.   I have read the expert reports of Jack
16 Henningfield, Dr. Peter Shields, Dr. Burns, Dr. Joel
17 Cohen, Dr. George Stiglitz, and the -- I've read his
18 first report, I haven't read Dr. Stiglitz's second
19 report, and I have read the first report of
20 Dr. Jeffrey Harris.
21     Q.   Have you spoken with any of those
22 individuals in connection with this case?

Page 17

1      A.   I was at a meeting in which Dr. Harris
2  was present, yes.
3      Q.   When was that meeting?
4      A.   Probably in mid January of 2005.
5      Q.   And what was discussed at the meeting?
6      A.   The basic purpose of the meeting was to
7  enable -- really two-fold, to enable the plaintiffs'
8  attorneys to describe several experts or their
9  representatives, their staff, some of the issues in
10 this case, schedules and the like, so that everybody
11 understood it.  That's something that had to be done
12 on several different occasions.
13         And then secondly, at least from my
14 perspective, was to lay out to the plaintiffs'
15 attorneys, I really wasn't too concerned about others
16 that were present, the two methodologies in broad
17 terms that are described in my February 28th -- I
18 think it's the end of February report, and then
19 implemented in my end of March report.
20     Q.   Who else besides you and Dr. Harris was
21 at this meeting?
22     A.   There were several plaintiff attorneys.

5 (Pages 14 to 17)